UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DISABILITY ADVOCATES, INC.,

Plaintiff,

v.

ELIOT SPITZER, in his official capacity as
Governor of the State of New York,
RICHARD DAINES, in his capacity as
Commissioner of the New York State
Department of Health, THE NEW YORK
STATE DEPARTMENT OF HEALTH,
MICHAEL HOGAN, in his capacity as
Commissioner of the New York State Office of
Mental Health, and THE NEW YORK
STATE OFFICE OF MENTAL HEALTH

Defendants.

03 Civ. 3209 (NGG) (MDG)

**AFFIDAVIT OF
ELIZABETH JONES**

STATE OF MARYLAND )
) ss.:
COUNTY OF MONTGOMERY )

ELIZABETH JONES, being sworn, deposes and says:

1.      I have been retained as an expert witness by the Plaintiff in above-captioned case.

2.      I hereby annex copies of my expert report, dated April 5, 2006, and expert reply report, dated October 17, 2006, with exhibits, as Exhibits E. Jones-A and E. Jones-B, respectively.  These reports were true and accurate when I wrote and submitted them in this case, and I hereby re-affirm and incorporate them by reference.

3.      I hereby annex an updated copy of resume as Exhibit E. Jones-C. This resume is true and accurate and I hereby affirm and incorporate it by reference.

Elizabeth Jones

Sworn to before me this
26th day of November, 2007

Notary Public

**JENISE S. ROSS**
**NOTARY PUBLIC**
**STATE OF MARYLAND**

**E. Jones – A**

**REPORT IN THE MATTER OF**
**DISABILITY ADVOCATES, INC. v. PATAKI**
**03 CV 3209 (NGG)**

## I.     Introduction

As my resume indicates, I have over thirty years of experience in the field of mental disability. A substantial part of my work has focused on the management of institutions and the planning, development and management of community services for people with mental illness and/or mental retardation. I have been the Superintendent/Director of three institutions (Belchertown State School, Northampton State Hospital, and St. Elizabeths Hospital) and the court-appointed Receiver of a psychiatric institution (the Augusta Mental Health Institute). I have managed the day-to-day operations of two community systems (Western Massachusetts and the District of Columbia). With respect to these latter responsibilities, in particular, I have had a leadership role in planning, developing and implementing services in integrated settings as an alternative to institutional care. I have served as an expert consultant regarding institutional conditions and the development of alternative community-based programs in Massachusetts, Texas, North Dakota, Iowa, Michigan, Romania, Bulgaria and Paraguay. My resume is attached as Exhibit 1.

The information for this report was obtained from five primary sources.

1.     Between June 5, 2004 and January 11, 2006, I visited twenty-three impacted adult homes. I visited fifteen of these homes once (Surf Manor, Park Inn, New Central Manor, Parkview Manor, Sanford Home, Elm-York Home, Ocean House Center, Long Island Hebrew Living Center, Belle Harbor Manor, Lakeside Manor, Queens Adult Care Center, Anna Erika, Thomas Jefferson, New Haven Manor and New Gloria's Manor). I visited seven of these homes twice (Brooklyn Manor, Bayview Manor, Garden of Eden, Ocean View Manor Home, Surfside Manor, Seaview Manor and Riverdale Manor). I visited one adult home, Mermaid Manor, three times. I spent approximately one to six hours per visit. Overall, I have spent approximately seventy-five hours in the adult homes referenced above. During these visits, I was able to visit common living areas and/or individual bedrooms; observe activities, including mealtimes and medication times; observe staff to resident and resident to resident interactions; and, in some instances, speak with staff about their work in the adult home. A list of adult homes that I visited, including the dates of my visits, is attached as Exhibit 2.

2.     My site visits to the adult homes enabled me to speak with residents, often at length. Overall, I was able to speak with 179 residents about their daily lives at the adult homes and the

circumstances that brought them there. My conversations with residents ranged in length from several minutes to over two hours.

3.      Three adult homes, Seaview Manor, Riverdale Manor and Garden of Eden, were selected, on the basis of location, size and participation in the Columbia Presbyterian survey, for additional focus. Three social workers with community mental health experience in New York were retained to visit the homes, interview residents and observe activities and conditions. Between April 2005 and October 2005, the social workers interviewed sixty-two residents and prepared summaries of their observations for my review. Three former residents of adult homes, now living in supported housing, were also interviewed. I provided direction to the social workers in meetings and by telephone. I also interviewed eleven of the same residents.

4.      I reviewed numerous documents about the adult homes including inspection reports, incident reports, medical records regarding individual residents, depositions and literature from the Office of Mental Health. The materials that I considered in reaching my opinion are listed in Exhibit 3. I am being compensated at a rate of $125/hour for my work in this case.

5.      Along with Mr. Dennis Jones, I participated in a meeting with providers of residential services in New York City. The discussion centered on the availability and array of housing for adults with serious mental illness in New York.

## II.    Summary of Major Findings

It is my principal finding that the adult homes are institutions. This finding applies to each of the adult homes visited in preparation for this report. There is no meaningful difference between the homes in this regard.

Each of these homes is a large congregate facility for residents with mental illness or another disability. Each home has many of the characteristics of a psychiatric hospital.

By observation and by reports from the residents themselves, it is clearly evident that:

- Privacy is severely curtailed;
- Lifestyles are highly regimented;
- Choice is limited by rigid rules and practices;
- The living environment is loud and impersonal;
- Staff to resident interactions are perfunctory;
- Residents do not always feel safe;

- Residents fear retaliation and some have been arbitrarily penalized;
- There is little meaningful activity;
- Days are characterized by waiting for meals, medication and cigarettes.

As a result of these living conditions, residents have very limited opportunities for meaningful interaction with members of the community outside of the adult home. Some adult homes are located in areas with few available resources for shopping or recreation. While some residents attend day programs, they do so in groups of people with mental illness. Organized trips to shopping centers and other community recreational sites are limited; when they do occur, it is usually a group activity. Residents lack the funds to pay for transportation and access to community events. The adult home may restrict visitors to certain times or areas of the facility. Visitors must sign in and state the purpose of their visit. In most homes, access to telephones with an outside line is limited to pay phones in the hallways or in the common areas.

Residents had virtually no meaningful choice about their admission to an adult home. Many were confined to a state or community psychiatric hospital and were eager to leave that setting. Some residents were homeless and were desperate for an alternative to a shelter. Others had lost their family home when a relative died and were referred from social service agencies. I met very few residents who were offered options other than an adult home. Many residents reported that they accepted placement in an adult home with the understanding or belief that it would be a short term placement.

In fact, the adult homes are permanent placements. Comprehensive discharge planning is non-existent. Residents lack information about alternative housing. When residents request another option, they lack reliable assistance in completing and processing applications in a timely manner. Residents do not often see other adult home residents obtain alternative housing. As a result, residents become discouraged and develop a sense of hopelessness about their future. Finally, some residents may express a desire to leave the adult home but their desire may be mixed with fear. As one resident stated: "…definitely I have pause about moving out on my own, could I handle the budget, could I handle cleaning, could I handle the shopping, could I handle the cooking again…I am terrified of winding up back in the system."

Adult home residents are capable of living in supported housing and other more integrated settings. Some residents are quite independent. Other residents would require more supports in the transition from the adult home to a more integrated setting. Existing supported housing programs could meet the needs of these adult home residents. After the resident is more confident of his/her skills in managing personal and household tasks, it is probable that supports can be reduced. In the 109 conversations where living preferences were discussed, 91% (ninety-nine) of the residents I interviewed would choose to leave the adult home, if other options were available. The remaining 9% (ten) of the residents I spoke with about this issue were reluctant to leave; with very few exceptions, they lacked sufficient information to make an informed decision.

### III.   Discussion of Findings

####   A.   The Adult Homes Are Institutions

Psychiatric institutions are congregate facilities characterized by restrictive rules and practices that prohibit or severely limit opportunity for interaction with non-disabled individuals. As a result, institutionalized individuals exercise little or no control over their personal lives, possessions or space. There are few opportunities to participate in community events or activities. There is scant opportunity for developing relationships with non-disabled people at work or in the neighborhood.

Institutions are designed to manage or control large numbers of people. They exercise such control by eliminating choice and personal autonomy, establishing inflexible routines for the convenience of staff, restricting access, implementing measures that maximize efficiency, and penalizing residents who break the rules.

The adult homes are institutions for people with mental illness. They have the following characteristics:

1.   The physical environment is institutional.

The adult homes I visited house from 123 to over 420 people. The median capacity of these homes is 200 people. The residents live in semi-private rooms with minimal furnishings and personal space. The three residents I met at Elm-York share a single bedroom. Each room has a bed, dresser and nightstand for each person. Generally, there is a closet for each resident, although the closets were shared in certain facilities. Bathrooms are shared by roommates and, frequently, with the residents next door. One facility, Park Inn, had common bathrooms for men and women residents. Bathroom doors do not always lock.

There are areas in the adult home that only staff can use. Staff bathrooms are usually locked and only staff has the keys. Staff space is more personalized, cleaner and more comfortable. Staff has access to telephones and privacy.

Common areas are generally limited to a dining area, smoking areas, and a lobby or waiting area that serves as a day room. Chairs are lined up in rows around the day room walls; chairs are lined up in front of the ever present television sets; benches are lined up in front of the buildings and in smoking areas. There is virtually no space to have a private conversation or to avoid being observed by other residents or staff. Residents are required to either remain in their rooms or go outside for privacy. Otherwise, they have no choice but to remain with a large group of people throughout the day and evening.

2.   Adult homes are dehumanizing.

Staff frequently enters resident rooms without permission. Residents repeatedly cited examples of staff entering the room without respecting their need for

privacy. Residents reported that their personal belongings were stolen by staff and that management removed possessions without their permission.

Medication and meal times are announced by loudspeakers. There are long lines for medication, long lines for meals, and long lines for receiving personal allowances. Significant amounts of time are spent waiting. In fact, the adult home lines are longer than those in most psychiatric hospitals. Adult homes have lines for up to 400 people. Psychiatric hospitals are divided into wards with approximately twenty residents. There is no evidence of flexibility or individualization in these or other routines of the adult home. Rather, routines are established for the staff and home's convenience. They help staff and the home manage a large group of people.

With few exceptions, staff interactions with residents are cursory and usually limited to business transactions. Staff is verbally disrespectful in many instances and physically abusive in at least one resident report. Residents were treated as if they were invisible or were objects. Repeatedly, I observed staff failing to recognize or acknowledge the resident's presence. I seldom observed greetings or kindly inquiries about a resident's well-being, even when the resident was passing through the lines for medication or allowances or when food was being served. In the common areas, I observed residents who were crying or withdrawn. I never saw a staff person approach these residents to offer assistance or comfort. As I sat with residents at the dining room tables, plates of food often were distributed and collected without comment or recognition of the resident.  As I sat with residents in their rooms, I frequently observed staff entering without knocking, without permission and without acknowledging the resident's presence. Unless requested, staff did not leave the room while the resident was speaking with me. Residents reported that staff yelled at them or ridiculed them.

3.    Adult home residents are deprived of meaningful choice in almost every aspect of their daily lives.

Residents lack choice in almost every aspect of their lives, and must adhere to rigid schedules.  Adult homes severely limit opportunities to learn and practice skills, enjoy spontaneity, and plan and experience activities outside the home. For example, at one adult home, I sat in the residents' group discussion about diabetes and the selection of healthy foods. The residents described how they would shop for certain meal items and then prepare them. This lesson would have been much more effectively taught, and remembered, if the instructor had helped the resident go to the grocery store and then prepare the meal in his/her own kitchen.

Residents are assigned roommates and must request changes from the administrator. Residents have described the stress of being housed with another adult in a small space, the relief of being assigned a roommate who is respectful and friendly, the discomfort of having a roommate who is not, such as one who invites other residents into the room for sexual activity.

In the dining rooms, residents are assigned tables marked by numbered signs. They do not choose their table mates. They cannot sit with their friends. As a result, mealtime is often unusually quiet—a roomful of strangers eating together but not interacting. Residents with diabetes are routinely clustered at certain tables, often marked by signs with green or red dots. There is very limited choice about meals. Residents complain bitterly about the poor quality of the food and the inadequate portions. The food is served by staff, often observed to be rude and inconsiderate. Mealtimes are perfunctory events. They are not opportunities for socializing, satisfaction or participation in meal planning and preparation.  In these ways, mealtimes are more restrictive than those in psychiatric hospitals.

Mealtimes are also times for the distribution of medication. Residents are administered their medication from carts wheeled through the dining area or while standing in lines in front of a nurses station. Medication and mealtimes are linked in the routine of the day.

Despite the inadequacies of mealtime at the adult home, residents are waiting in line at the dining room door as the loudspeaker announces the time to eat. Mealtimes are diversions in the monotony of the day. Mealtimes are part of the expected routine.

Residents have limited access to their personal needs allowances. At many adult homes, residents are distributed their funds after waiting in lines at designated times on certain days of the week.

Residents reported being required to attend a day program and being forced to take their medication. Residents have no choice as to when they eat, when they take their medication, when they have their rooms cleaned.

Residents must adhere to the rules of the home or risk being arbitrarily penalized. Residents described being refused dinner because they were a few minutes late and being denied their personal allowance because they declined to attend the day program. Residents reported being chastised for complaining about a rule.

The institutional nature of the adult homes is clearly demonstrated by its unrelenting daily routines.  In one's own home or in supported housing, such arbitrary routines do not occur. There is flexibility in the rhythm of the day; there is an opportunity to make decisions about schedules and ordinary activities; there is an opportunity to learn and practice skills; there is the possibility of spontaneous social events or interactions with non-disabled neighbors or friends; there is the choice of priorities; there are no lines; there is no one telling you what to do over a loudspeaker.

4.      There is evidence of physical and psychological neglect.

In my visits, I observed numerous residents who lacked adequate clothing, who said they did not get enough to eat, and/or who required serious attention to their

dental needs. I noted some residents who were upset. I did not see staff offer assistance or comfort. Residents were comforted by other residents or were ignored.

For example, on the eve of Passover 2005, I spent three hours in the day room of Belle Harbor, sitting with elderly residents who were upset by the lack of cleanliness on this important holiday. In the entire time I was there, not one staff person came into the room to inquire about the residents or to talk with them about the approaching holiday. The nurse dispensed medication from her cart without greeting the residents or even acknowledging their presence. Dinner was served in silence.

Residents lack information that is important to their emotional well-being. Deaths are not acknowledged or discussed. Residents are not mourned. One resident told me of the recent death of a resident who was a friend. He considered it a major accomplishment that the adult home operator agreed to display a notice recognizing his friend's death. Residents are not given any reassurances to alleviate their concerns about hospitalized roommates or to inform them as to when their roommate will return to the adult home.

5.      Residents are fearful of the adult home management and staff.

Residents fear retaliation, especially psychiatric hospitalization, if they complain or do not follow the rules in the adult home. This fear is grounded in their experiences of being sent to the hospital themselves or of witnessing the police remove other residents from the home.

Frequently, residents were uncomfortable with talking to me within the view of staff.  Residents expressed concern that they would be overheard.  Residents wanted reassurance that the information they gave me would not be repeated to the adult home operator. During one visit, a resident began to answer a very simple question about her daily routine. When the adult home manager came up to us, she began to cry and anxiously asked him if she had said the right thing.  On other occasions, residents would end their conversation with me when staff approached us or were within close proximity.

Fear has caused residents to endure unpleasant and undesirable conditions without complaint. Residents dislike and resent the inflexible and dehumanizing practices of the adult homes, but many have decided that there is too much risk in raising an objection. Instead, they have learned to adapt. They say nothing because they know nothing will change.

Residents have been arbitrarily penalized by the adult home staff. Residents informed me that refusing medication would result in psychiatric hospitalization. Residents' personal allowances have been withheld because they refused to attend a day program. One resident informed me that staff was instructed by the adult home operator to withhold his meals if the resident arrived late.

B.      The Adult Homes Are Segregated Settings

The adult homes I visited are located within or on the periphery of residential neighborhoods in Brooklyn, Queens, the Bronx and Staten Island. With one exception (Mermaid Manor), they are unlocked during the day. Access to local transportation, shopping and other resources is highly variable. Residents may be unable to access these resources because of the walking distance and limited funds for transportation.

Despite their location and unlocked doors, adult homes are not integrated settings. They are not similar to apartment buildings in a New York neighborhood. Rather, in several important respects, they are comparable to unlocked wards on the grounds of a state psychiatric hospital.

The adult homes are identifiable by the concentration of residents who congregate on the sidewalks surrounding the building. Residents are clustered on the benches and in the outdoor smoking areas. The adult home's building design and its appearance contrast with the other housing in the neighborhood. In some instances, a fence limits access to the building. There are day program vans and staff in uniform. Programs located on the grounds of a state psychiatric hospital often can be described with these same characteristics.

Furthermore, the adult homes segregate residents from their communities by their restrictions on autonomy, choice, privacy, and access to sustained and meaningful contact with people who are not disabled. As described above, the inflexible and controlling practices of the adult homes prevent residents from exercising independence in their everyday routines. There are numerous examples as to the segregating effect of these adult home practices. For example, medical care is often provided on site rather than in a doctor's office in the neighborhood or in the broader community. In at least one example, religious services are offered routinely inside the adult home. Residents cited examples of purchasing clothing from clothing suppliers who came into the home. There is a paucity of occasions to celebrate with family or friends. There is no room at the dining tables for visitors. There are limitations on access to computers and telephones. There is a failure to teach socialization skills so that more shy or more solitary residents feel more comfortable with their peers. In virtually every aspect of adult home life, the residents are deprived of the necessity—the stimulation—of leaving the building in order to address their basic living experiences. Furthermore, deviation from the adult home routines is at the resident's expense. For example, if they are absent for meals at the adult home, residents must buy their own food. Two of the facilities I visited did not permit visitors in the residents' rooms without prior permission from management. One adult home required that my driver's license be duplicated for their record of visitors. One adult home asked me to leave because my visit was not approved by management.

In their conversations with me, residents expressed their sense of being apart from the larger world. Residents told me:

"You can't make a life with two hundred people."

"Most people will die here."

"This is its own society. This is a very cruel place.
This is such a hard life."

C.      Adult Home Residents Were Placed Without Meaningful Choice

Residents were admitted to the adult homes from state psychiatric hospitals, community hospitals, nursing homes, shelters, family homes, including those with their spouses and children, and from other adult homes that were closed.

Residents have lived in the adult homes for varying lengths of time. I met residents who were admitted to an adult home from state hospitals over thirty years ago. Other residents were admitted more recently—several months before I spoke with them.

Residents were admitted to the adult homes with little or no choice. The options included staying in the state hospital, staying in a shelter, or remaining in another adult home where the conditions were even worse. Only a very small number of individuals were offered alternative housing at the time they were admitted. These residents were uncertain they would get the support they needed. Residents were admitted to the adult homes after being promised that it was a temporary placement.

D.      Adult Home Residents Would Choose To Leave

During my site visits, I spoke with 179 residents. The issue of housing preference was discussed in 109 conversations. The great majority--91%-- of the adult home residents I spoke with during my visits wants to live somewhere else. They expressed a preference for their own apartment, with or without a roommate, in a familiar neighborhood or borough. They were able to articulate their needs for support. They were expressive about their wishes for jobs, companionship, privacy and independence. The desire for one's own home was not limited by age, education, or psychiatric history.

Regardless of the level of support required, residents want to leave the adult homes.

For example:

Without any hesitation, P.C., an elderly woman, told me that her own apartment would be "a dream come true." She very quickly outlined the supports she would need, such as help carrying packages up the stairs, and clearly described her ability to cook, clean and manage her own household. This adult home resident was eighty-two years old the very day we spoke.

J.T. and S.R. are roommates who are working together to locate an affordable apartment. They read the newspaper ads every day and are saving their money for the expenses they must pay.

Over six years ago, R. applied for supported housing. She has yet to learn the status of her application and is afraid there is "something wrong" with her.

R.S. and R.S. are a married couple who live together and would like their own apartment. They did not know how they could support themselves on their monthly personal allowances. They had received no information about or help in locating alternative housing.

I know of no reason why these and the other residents could not live in their own apartments, with family/friends, or in supported housing. Residents need to have their individual requirements and interests determined so that in-home and other supports are provided, as appropriate. Each resident should be given sufficient information about available options. Each resident should be offered assistance in exploring alternative housing that reflects their personal preferences and needs for support.

Many adult home residents are uninformed about the resources available for supported housing. Quite erroneously, they believe that they would be required to pay for all of their living expenses within the limits of their current monthly personal allowance — approximately one hundred and fifty dollars per month. (They are correct in thinking that such funds are insufficient for food, clothing and other household costs). They have not been provided with accurate and complete information about supported housing or the other resources and benefits that might be available to them. As a result, they are afraid to leave the adult home. Residents who were once evicted from housing for inability to pay rent and residents who were homeless are especially articulate about their fear of a lack of adequate resources. They do not want to be homeless again.

Although the great majority of residents desire to live elsewhere, I did speak with some residents who prefer at this time to remain in the adult homes. For example, some individuals who had been homeless were reluctant to lose the stability they had achieved in having a place to live. Although they acknowledged the inadequacies of the adult home, they found it preferable to life in a shelter or on the streets. Other residents have had financial difficulties and were afraid to take on the responsibility for managing their household expenses and rent. Some residents were reluctant about establishing new relationships. Two residents had assumed roles with some influence with management in the adult home and did not want to relinquish that position.

These conversations were helpful to my understanding of the traumatic experiences, disrupted relationships and isolation of adult home residents. Many people with mental illness who have been institutionalized are reluctant to make changes in their lives. They will be prepared to make major changes if they receive support and detailed information. Based on my own experience and knowledge, I am convinced that most residents who are reluctant to leave the adult home would change their minds if offered options that reflected their interests and preferences. I am convinced that they would decide to live in their own apartment or in supported housing if they had information and reassurances about financial assistance, counseling, in home support, and opportunities for work and social activities. I am confident that they would choose to leave the home if they had someone they trusted to speak with and who would go with them to see the various housing options.

These residents have not made an informed choice about their housing. They have not been informed about the array of housing options provided by the state of New York, the benefits available to them, or the complement of providers experienced in supporting adults with mental illness.

E.     Adult Home Residents Are Capable of Living in Alternative Housing

With individualized planning and support, adult home residents are capable of living in alternative housing. I did not meet any adult home resident who could not live in his/her own apartment, with family or friends, or in supported housing.

Each adult home resident requires an individualized assessment of his/her need for support. In order to provide necessary supports, there must be an understanding of the individual's interests and wishes as well as knowledge about his/her strengths and vulnerabilities.

The residents of adult homes reflect a range of needs for support. Some individuals will require little case management or other support to live alone or with family and friends. Other residents will require some support, for some period of time, with the use of community resources and with the activities of daily living—grooming, meal preparation, shopping, household maintenance, and budgeting. Some residents may need such supports for an extended period. Some will need help from case managers and other professionals in managing their medications and meeting health-related needs.

Residents need support due to their mental illness and because they lack recent experience in taking care of their personal needs. Residents who need to relearn certain living skills will do so more easily in "real life" settings. All residents would benefit from small, individualized residential settings such as supported apartments. Over time, as residents gain confidence and relearn skills, supports can be withdrawn or reduced.

Some residents expressed concern about loneliness and a lack of companionship. These residents will require assistance in finding ways to meet other

people and to participate in leisure and recreational activities. These men and women might prefer a roommate or might want to become a member of a Clubhouse, a program that provides social and vocational opportunities.

None of the adult home residents' needs is unusual or difficult to address. They reflect standard issues of practice in the field of mental health. These are issues routinely managed by community providers in New York.

Some clients I spoke with said that they did not wish to leave the adult home. I believe this decision should be respected. However, I am confident that some of these residents would want to live in a more integrated setting if they had more information about alternative housing and if they were given a meaningful choice of options. Adult home residents simply have not been informed about the array of housing options provided by the State of New York; the benefits available to them; or the complement of providers experienced in supporting adults with mental illness.

## IV.    Conclusions

Based on my experience and multiple sources of information, I conclude the following:

- The adult homes are institutions.
- The adult homes are segregated settings. Residents have limited access to interaction with non-disabled people.
- Residents have had minimal or no choice about their placement into the adult home.
- Virtually all adult home residents would choose independent or supported housing.
- Some adult home residents are reluctant to leave the adult home because of their unstable life histories and/or their lack of information about funding and available alternatives.  Most of these residents would choose to leave if given an informed choice and appropriate support.
- With individualized planning and support, adult home residents are capable of living in independent or supported housing.

Today, generally accepted principles of mental health care include: self-determination, individualized treatment, social interaction with non-disabled peers, employment with appropriate supports, and use of mainstream community resources including housing. The strategic plan of the Office of Mental Health reflects these very principles.  Regretfully, these principles, espoused by the State of New York, have not been extended to the residents of the adult homes.

Elizabeth Jones                     April 5, 2006

_____         _____
Elizabeth Jones                     Date

1

RESUME

ELIZABETH JONES

Address: 608 Symphony Woods Drive
         Silver Spring, MD 20901
         240-423-4648
         elzjns@aol.com

**EDUCATION**

Web-based Certificate Course in Supported Employment, Virginia Commonwealth University, Rehabilitation Research and Training Center on Workplace Supports, Richmond, VA, 2002.

Program for Senior Executives in the Commonwealth of Massachusetts, Kennedy School of Government, Cambridge, MA, 1983.

Master of Science, Labor Studies, University of Massachusetts, Amherst, Labor Relations and Research Center, 1982. Thesis focused on the Rhode Island Labor/Management agreement regarding the transfer of public employees from institutional to community-based programs.

Graduate work (20 credit hours) in Educational Psychology, Georgia State University, Atlanta, GA, 1976-77.

Bachelor of Arts, English, University of California at Santa Barbara, 1972.

**WORK EXPERIENCE**

**February 10, 2004 to present:**          **Court Monitor**
                                            **Washington, DC**

Appointed as Court Monitor in federal court class action litigation, Evans v. Williams, brought to compel the development of community-based, individualized services/supports for former residents of the District-operated Forest Haven institution (now closed) for children and adults with mental retardation/developmental disabilities. Responsibilities include oversight of all monitoring activities, management of the Court Monitoring Office, reporting to the federal court, and working with the parties to identify issues/concerns affecting compliance with longstanding court orders and agreements.

**November 5, 2003 to December 31, 2004:**   **Receiver**
                                              **Riverview Psychiatric Center/Augusta**
                                              **Mental Health Institute**
                                              **Augusta, ME**

Appointed by the Maine Superior Court in the Bates v. Walsh and Burdick case, class action litigation brought in 1989 to ensure the provision of mental health treatment to current and former clients of the Augusta Mental Health Institute. Responsibilities included oversight of all Hospital management and operations; preparation and implementation of a work plan that will lead to compliance with the Consent Decree and monthly reporting to the Court. The Receivership was vacated by the Law Court of Maine in December 2004.

**August 1, 2001 to February 10, 2003:**   **Senior Planner**
                                              **District of Columbia**
                                              **Department of Mental Health**
                                            **Washington, DC**

Within the newly formed Department of Mental Health, responsible for planning systemic initiatives that improve the quality of care/treatment for individuals with serious mental illness. Major responsibility for the Department's evidence-based supported employment initiative including the Ticket to Work; development of core curriculum for employment specialists; implementation of the Johnson & Johnson-Dartmouth Community Mental Health Program grant award; data analysis of existing employment services; restructuring employment models no longer considered consistent with best practices; and interagency collaboration to expand employment options for adults and youth with serious mental illness/emotional disturbance. Additionally, exercised major responsibility for interagency efforts to improve services/supports for those clients with a dual diagnosis of mental illness/mental retardation.

**June 1, 2000 to August 1, 2001:**         **Chief Operating Officer**
                                              **District of Columbia**
                                              **Commission on Mental Health Services**
                                            **Washington, DC**

**April 1, 2000 to June 1, 2000:**           **Acting Chief Operating Officer**

Under the direction of the Transitional Receiver, responsible for the day to day operations of the Commission including supervision of all administrative and programmatic functions; working with other government agencies and providers of services/supports to the Commission and its clients; collaborating with consumer groups, advocates, family groups and other interested parties to strengthen the mental health system's responsiveness and effectiveness in meeting its mandates; participating in the design and implementation of systemic reform initiatives; overseeing the investigation and resolution of concerns impeding the delivery of services/supports of the highest possible quality.

February 1998 to February 2001:      **Hospital Director**
                                     **St. Elizabeths Hospital**
                                     **Washington, DC**

Overall management responsibility for the Acute Care and Continuing Care programs of
a public psychiatric hospital then under federal court receivership pursuant to orders in
the <u>Dixon v. Williams</u> case, a longstanding class action lawsuit mandating the
development of a comprehensive community based mental health system.

Responsibilities included direction and oversight of the provision of active treatment to
approximately 375 clients; identification of appropriate community services for
individuals no longer requiring stabilization in an inpatient setting; management of
personnel and budget; work with advocates, families, legal representatives, community
providers, community advocacy groups and public officials. As member of the senior
executive staff, responsible for working with the Receiver and colleagues to design,
implement and evaluate strategies for systemic reform. Also responsible for the overall
management of the CarePoint Project, an initiative designed to substantially reform and
improve the provision of individualized services and supports.

June 1990 to February 1998:          **Executive Director**
                                     **Maryland Disability Law Center**
                                     **Baltimore, MD.**

The Maryland Disability Law Center is a public interest law firm funded mainly through
federal and state grants and contracts. Pursuant to federal law, it has been designated
since 1977 as the Protection and Advocacy System for the State of Maryland. Reporting
to an independent Board of Directors, responsibilities as Executive Director included
supervision of thirty-six staff including thirteen attorneys and nine paralegals and
management of a two million dollar budget. Responsibilities also included planning,
program implementation, liaison with advocacy groups and state agencies, public
relations and playing a key role in the disability and public interest community.

July 1986 to June 1990:              **Coordinator**
                                     **Dixon Implementation Monitoring Committee**
                                     **Washington, D.C.**

Coordinator for the Dixon Committee, a monitoring group established in 1980 by Federal
District Judge Aubrey Robinson in the <u>Dixon v. Williams</u> lawsuit.  The Committee was
mandated to receive and analyze defendant's reports and factual investigations; screen
and investigate complaints; oversee and report on the progress of the implementation of
the Court's decrees.  Responsibilities as Coordinator included advising plaintiffs'
attorneys at the Mental Health Law Project (now the Bazelon Center for Mental Health
Law) and at Covington and Burling on programmatic issues; serving as a liaison between
the Committee and its attorneys as necessary; community organizing; conducting site

3

visits; designing public education strategies; extensive public speaking; working with the media; fundraising; and developing and managing student internships with local colleges and universities.

**December 1983 to July 1986:**                 **District Manager**
                                                **Department of Mental Health**
                                                **Northampton, Massachusetts**

Chief Executive Officer for five mental health and mental retardation service areas (total population 800,000). Exercised responsibility for an approximately sixty million-dollar budget.  Overall responsibility for the implementation of the Brewster decree, a landmark federal court order governing the use of Northampton State Hospital and the development of community programs for people with mental illness.  Extensive experience in working with organized labor, private provider agencies, local and state government officials consumer and family advocates, the media and a wide spectrum of community groups interested in the mental health system and the implementation of necessary systemic reforms.

Management responsibilities also included planning; program development; program implementation; supervision of senior staff; community relations; dispute settlement; interagency coordination; budget preparation; oversight and monitoring; designation as appointing authority for all area-based state employees.

**September 1983 to December 1983:**           **Director of Planning, Development and**
                                                        **Compliance**
                                                **Belchertown State School**
                                                **Belchertown, Massachusetts**

Oversaw Belchertown State School's compliance with federal, state and court mandates; coordinated all responses and compliance plans for the court under the Ricci v. Greenblatt decree and for federal Medicaid.  Worked with local and state officials and agencies on issues related to the present and future uses of state school property; developed long-range initiatives for the use of state school resources; designed and implemented tools, methods and techniques for monitoring service delivery at the State School; designed and implemented training in quality assurance for staff at all levels of the organization.

**August 1982 to September 1983:**             **Acting Superintendent**
                                                **Belchertown State School**
                                                **Belchertown, Massachusetts**

Overall management responsibility for the direction of a large residential facility for individuals with mental retardation.  Responsibilities included the implementation of a consent decree resulting from a federal class action lawsuit,  Ricci v. Greenblatt. Management functions also included personnel authority over 1,400 staff; supervision of senior staff; oversight of budget preparation and spending for direct resources of over

4

twenty-eight million dollars in state and federal funds; labor relations; community relations; participation in the planning and implementation of community programs for clients with mental retardation in District I; and planning on statewide issues. Initiated the development of self-advocacy programs for the residents of Belchertown State School.

Worked as a primary member of the regional senior management team to plan and ensure the implementation of all necessary reforms in the provision of mental health and mental retardation services to residents of Western Massachusetts and their families. Worked with senior management colleagues to design, coordinate and evaluate policies and program standards for all components of the systems in Western Massachusetts as mandated by two federal court ordered consent decrees.

**October 1977 to August 1982:**          **Community Residential Services Consultant**
**State of Georgia**
**Division on Mental Health and Mental**
**    Retardation**
**Atlanta, Georgia**

Responsible for the statewide planning and monitoring of community residential services for people with mental retardation, including those with a dual diagnosis of mental illness, particularly those in transition from institutional settings. Designed specific plans and processes for the placement of five hundred clients from state institutions throughout Georgia.

**July 1976 to April 1977:**          **Advocacy Specialist**
**Advocacy Planning Project**
**Atlanta Association for Retarded Citizens**
**Atlanta, Georgia**

Responsible for the statewide design and implementation of a protection and advocacy system for people with developmental disabilities as specified in Public Law 94-103. Activities included the planning and implementation of public hearings throughout Georgia.

**July 1975 to July 1976:**          **Community Services Consultant**
**State of Georgia**
**Division of Mental Health and Mental**
**    Retardation**
**Atlanta, Georgia**

Supervision of community services workers monitoring the placement of people with mental retardation who had returned to the Atlanta area from state institutions.

5

**April 1974 to July 1975:**
           **Cottage Life Supervisor**
           **Georgia Mental Health Institute**
           **Atlanta, Georgia**

Supervisor of staff working in a transitional living unit for adults with mental retardation, including those with a dual diagnosis of mental illness, previously institutionalized in state facilities.

**November 1973 to April 1974:**
           **Assistant Teacher**
           **Georgia Center for the**
             **Multihandicapped**
           **Dekalb County Schools**
           **Atlanta, Georgia**

Assisted in the evaluation of school-aged children with multiple disabilities, including deafness and/or blindness. Assisted in the coordination of community-based services for these children in order to support their individual and family needs.

**January 1971 to October 1971:**
           **Editorial Assistant**
           **Department of Anthropology**
           **University of Turin**
           **Turin, Italy**

Editing of manuscripts on primate classification. Editing and preparation of journal articles on genetics for the Academic Press, London. Teaching of English to graduate students at the University of Turin.

**January 1969 to June 1970:**
           **Substitute Teacher**
           **Board of Education**
           **Dayton, Ohio**

Teacher of remedial class for seventh and eighth grade inner city children bused to suburban school to meet desegregation mandates.

## CONSULTATION

**Maine:** Consultant to the State Department of Health and Human Services regarding mental health services related to achieving compliance in the Bates v. Nicholas case (February 2006-present).

**New York:** Expert consultant in <u>Disability Advocates, Inc. v. Pataki</u>, litigation brought on behalf of the residents of adult board and care homes in New York City (June 2004-

6

present).
        Expert consultant in **Rothenberg v. State**, a case brought on behalf of an individual confined to a state psychiatric hospital (July 2004-present)

**Paraguay:** Expert consultant to Mental Disability Rights International on the reform of the mental health system in Paraguay. Action is being taken pursuant to the Inter-American Commission on Human Rights' decision to grant precautionary measures regarding the Neuro-Psychiatric Hospital in Asuncion. (2005-present)

**Bulgaria:** In collaboration with Amnesty International and Mental Disability Rights International, expert for the Bulgaria Helsinki Committee. Visited eight institutions for children and adults with mental retardation and/or mental illness in order to provide recommendations for systemic reform. Guest presenter at the Bulgarian Psychiatric Association's annual conference (October 2001-2002).

**Massachusetts:** Expert for the plaintiffs in <u>Rolland v. Celluci</u> (1999-2004). Case involves the right to habilitation for individuals with mental retardation/developmental disabilities confined to nursing homes.

**Ireland:** Guest lecturer to students/faculty at the Center for the Study of Developmental Disabilities, University College of Dublin, in contemporary issues in the field of mental retardation (1999-present).

**Pennsylvania:** Consultant for the Special Master in <u>Halderman v. Pennhurst</u> (May 1996-January 1997).

**Romania:** Consultant for Mental Disability Rights International on the development of services/supports for people with mental retardation (November 1995-1997).

**District of Columbia:** Expert for the Department of Justice, Plaintiff-intervenor in <u>Evans v. Barry</u>, a class action lawsuit filed in federal court on behalf of individuals with a developmental disability institutionalized at Forest Haven (February 1995-May 1995).

**Massachusetts:** Expert for the Defendants regarding the implementation of the consent decrees regarding the state schools (1992).

**Texas:** Expert for the Plaintiffs in <u>Leslz v. Kavanagh</u>, a class action lawsuit regarding the rights of individuals with mental retardation residing in institutions funded by the State of Texas (1991-1992).

**North Dakota:** Consultant for the Protection and Advocacy System regarding systemic issues affecting individuals with mental illness institutionalized in state psychiatric facilities (1992).

**Iowa:** Expert for the Plaintiffs in <u>O'Connor v. Branstad</u>, a class action lawsuit on behalf of individuals with mental retardation residing in two state schools (May 1989 to 1994).

**New Mexico:**  Expert witness in <u>Robbins et al. v. Budke,</u> a class action case concerning access of the Protection and Advocacy System to a state hospital (December 1989).

**Michigan:**  Expert witness in <u>Kope v. Watkins</u>, a class action lawsuit on behalf of individuals with mental retardation living in nursing homes (January 1989-1993).

**Louisiana:**  Consultant to the Special Master in the <u>Gary W</u>. case in the New Orleans region (Spring 1986).

**England and Wales:**  Consultant on the development of mental retardation services for the Sheffield Health Authority, Manchester Health Authority and NINROD of Cardiff, Wales (October 1984).


**Prior Work in Other Litigation**

In <u>Rolland v. Celluci,</u> I provided deposition and trial testimony.

In <u>Robbins et al. v. Budke,</u> I provided trial testimony.

8

2

<u>Site Visits to Adult Homes</u>

I conducted site visits to the following adult homes on the dates specified:

Anna Erika (5/8/05)
Bayview Manor (9/18/04, 11/18/04)
Belle Harbor Manor (4/22/05)
Brooklyn Manor (6/5/04, 6/10/05)
Elm-York Home (9/14/04)
Garden of Eden (9/18/04, 12/16/05)
Lakeside Manor (3/21/05)
Long Island Hebrew Living Center (7/18/05)
Mermaid Manor (11/18/04, 4/23/05, 1/11/06)
New Central Manor (11/5/04)
New Gloria's Manor (5/26/05)
New Haven Manor (5/5/05)
Ocean House Center (9/20/04)
Ocean View Manor Home (11/18/04, 1/11/06)
Park Inn (11/5/04)
Parkview Manor (9/19/04)
Queens Adult Care Center (4/4/05)
Riverdale Manor (9/19/04, 11/16/05)
Sanford Home (9/14/04)
Seaview Manor (9/17/05, 1/12/06)
Surf Manor (6/5/04)
Surfside Manor (4/21/05, 1/12/06)
Thomas Jefferson (8/23/05)

**3**

**Exhibit 3**

**Documents Considered**

1. Documents produced by Queens Adult Care Center (QAC 1-580)

2. Documents produced by Lakeside Manor (LAKE 1-298)

3. Documents produced by Anna Erika (AE 1-718)

4. Documents produced by Department of Health -- DOH 77300-77360; DOH
   76667-76676; DOH 77421-77448; DOH 77128-77141; DOH 76785 -- 76798;
   DOH 76933 -- 76936; DOH 77142-77152; DOH 196524 - 197087

5. Marc Santora, "*At a Home for the Mentally Ill, the Problems Are Legion but the
   Solutions Are Not*" The New York Times, May 15, 2005

6. Transcript of and exhibits from the deposition of Martha Bruce, dated July 22,
   2005

7. Documents produced by Garden of Eden (GOE 1 -- 58)

8. Documents relating to Garden of Eden

9. Documents relating to Seaview Manor

10. Transcript of and exhibits from the deposition of an adult home resident dated
    November 9, 2005

11. Transcript of and exhibits from the deposition of and adult home resident dated
    October 28, 2005

12. Transcript of and exhibits from the deposition of an adult home resident dated
    October 19, 2005

13. Transcript of and exhibits from the deposition of an adult home resident dated
    November 3, 2005

14. Transcript of and exhibits from the deposition of an adult home resident dated September 29, 2005

15. Transcript of and exhibits from the deposition of Sam Tsemberis, dated October 12, 2005 and November 9, 2005

16. "*Transforming MH Care in America: The Federal Action Agenda, First Steps,*" U.S. Department Health and Human Services, Substance Abuse and Mental Health Services Administration, dated July 2005

17. Adult Home Resident Records Produced – PC 1-276, PC 1 – 314; DW 1-6, Q 64 – 181; SMK 1 – 99; Q 63; GL-MHP 1 – 251, GL 1 – 8; AMR 1 – 8, SH 290 – 312; BJ-SC 1 – 94, BJ 1 – 13; P 91 – 129; P 1 – 90; B 1 – 114; RH 1 – 35, SH 234 – 282; OM 437 – 563, OM 581 – 808; SMK 100 - 194; L 1 – 101; JMQ 1 – 39, DOH 33146-33197; AE 1 – 93; SM 184 – 220; B 115 – 184; SM 221 – 347; NH 1 – 82; Q 182 – 238; IK 456 – 495

18. Notes relating to reports of adult home resident (GOE 1 – 58)

19. Notes relating to reports of adult home resident (R 1-104)

20. Notes relating to reports of adult home residents of Garden of Eden (GOE 59 – 1527)

21. Notes relating to reports of adult home residents of Riverdale Manor (R 105 – 3548)

22. Notes relating to reports of adult home residents of Seaview Manor (SE 1 – 1667)

23. Documents produced by Elm-York Home (EY 1 – 1700)

24. Transcript of and exhibits from the deposition of an adult home resident dated November 28, 2005

25. Transcript of and exhibits from the deposition of an adult home resident dated November 5, 2005 and November 15, 2005

26. Transcript of and exhibits from the deposition of an adult home resident dated November 30, 2005

27. Transcript of and exhibits from the deposition of an adult home resident dated December 2, 2005

28. Transcript of and exhibits from the deposition of an adult home resident dated December 14, 2005

29. Transcript of and exhibits from the deposition of an adult home resident dated December 16, 2005

30. Transcript of and exhibits from the deposition of an adult home resident dated December 2, 2005

31. Transcript of and exhibits from the deposition of an adult home resident dated December 27, 2005

32. Transcript of and exhibits from the deposition of an adult home resident dated December 29, 2005

33. Transcript of and exhibits from the deposition of an adult home resident dated December 29, 2005

34. OMH Statewide Comprehensive Plan for Mental Health Services (OMH 37082 – 37247)

35. OMH Official Policy Manual: Patient Care Discharge and Conditional Release (OMH 553 – 559)

36. Documents produced by Bayview Manor (B 185 – 1178)

37. Documents produced by Sanford Home (SH 313 – 794)

38. Documents produced by Surf Manor (SM 348 – 1023)

39. Documents produced by Queens Adult Care Center (Q 239 – 2160)

40. Documents produced by Ocean View Manor Home (OM 310 – 3523)

41. Transcript of an exhibits from the deposition of an adult home resident dated
    December 30, 2005

42. Transcript of an exhibits from the deposition of an adult home resident dated
    December 30, 2005

43. Resident records produced by HRA (HRA 117 – 11443)

44. Transcript of an exhibits from the deposition of an adult home resident dated
    December 28, 2005

45. Documents produced by Ocean House Center (OH 1 – 695)

46. Documents produced by OMH (OMH 40812 – 40994; OMH 40995 – 41179)

47. Mental Health Provider Documents: JBFCS 498 – 9400; PAHCM 1 – 374; SCS 1
    – 348; NHCC 1 – 6368; GCC 1 – 778; FEGS 119A – 472; BFY 2173 – 2334;
    FHMC 1 – 611; JGB 1 – 548; LICH 1 – 308; ICLI 1 – 707; JPBVA 1 – 980; CPC
    1 – 329

48. Draft report of Ivor Groves

49. Draft report of Dennis Jones

50. Clifford Levy, "*For Mentally Ill, Death and Misery,*" The New York Times, April
    28, 2002; Clifford Levy, "*Ingredients of a Failing System: A Lack of State Money,*
    *a Group Without a Voice,*" The New York Times, April 28, 2002; Clifford Levy,
    "*Here, Life is Squalor and Chaos,* The New York Times, April 29, 2002; Clifford

Levy, "*State is Failing Mentally Ill, Study Says,*" The New York Times,

September 15, 2002; Clifford Levy, "*Panel Urges Change in New York Homes*

*for the Mentally Ill,*" The New York Times, September 24, 2002

51. Title 2 of the Americans with Disabilities Act

52. *Olmstead* v. *L.C.*, 527 U.S. 581 (1999)

53. "The Adult Home Industry: A Preliminary Report" by the New York City Council

Subcommittee on Adult Homes, 1979 (DAI 3569 – 3614)

54. "Private Proprietary Homes for Adults: their administration, management,

control, operation, supervision, funding & quality of" – A Second Investigative

Report by Charles Hynes, March 31, 1979 (DAI 2857 – 2996)

55. "Adult Homes: Serving Residents with Mental Illness" report by the New York

State Commission on Quality Care for the Mentally Disabled, October 1990,

(DAI 2717 – 2795)

56. "Exploiting Not-For-Profit Care in an Adult Home: The Story Behind Ocean

House Center, Inc." report by the New York State Commission on Quality Care

for the Mentally Disabled, December 2001, (DAI 3007 – 3058)

57. "Interagency Adult Home Initiative" by the New York State Department of

Health, the New York Office of Mental Health, the New York State Commission

on Quality of Care for the Mentally Disabled, the New York State Office for the

Aging, (DAI 750)

58. NYS Commission on Quality Care for the Mentally Disabled, August 2002

59. Adult Home Regulations, 18 NYCRR Part 485, 486, 487

60. Erving Goffman, "*Asylums: Essays on the Social Situation of Mental Patients and Other Inmates*," November 10, 1961

61. Ridgeway and Zipple, "The Paradigm Shift in Residential Services: From the Linear Continuum to Supported Housing Approaches" *Psychosocial Rehabilitation Journal*, April 1990, vol. 13, issue 4

62. Statewide Comprehensive Plan for Mental Health Services for 2001 – 2005 (OMH 31558 – 31613)

63. Statewide Comprehensive Plan for Mental Health Services for 2005 – 2010

64. Statewide Comprehensive Plan for Mental Health Services for 2006 – 2010

65. Interview notes of social workers Susan Saler, Ken Dubin, Ilana Marmon, and related newspaper articles

66. Tsemberis, Gulcur and Nakae, "Housing First, Consumer Choice and Harm Reduction for Homeless Individuals with a Dual Diagnosis" *American Journal of Public Health*, April 2004, vol. 94, no. 4 (PTH 197 – 201)

67. Selection of articles by Dr. J. Geller

68. *Disability Advocates* v. *Pataki*, Civ. No. 03-3209 (E.D.N.Y.) - Complaint dated June 30, 2003

69. *Disability Advocates* v. *Pataki*, Civ. No. 03-3209 (E.D.N.Y.) – Protective Order dated May 19, 2004

70. Documents relating to Queens Adult Care Center

| Bates No. |
| --- |
| DOH 630-630 |
| DOH 632-652 |
| DOH 653-653 |

| Bates No. |
| --- |
| DOH 654-657 |
| DOH 2276-2276 |
| DOH 2277-2295 |

| Bates No. |
| --- |
| DOH 2296-2296 |
| DOH 13389-13454 |
| DOH 16204-16209 |

| Bates No. |
|---|
| DOH 17599-17600 |
| DOH 17601-17621 |
| DOH 17622-17625 |
| DOH 17626-17626 |
| DOH 17627-17630 |
| DOH 17631-17641 |
| DOH 56320-56324 |
| DOH 83467-83467 |
| DOH 83468-83868 |
| DOH 89330-89332 |
| DOH 96002-96004 |
| DOH 96022-96024 |
| DOH 129437-129438 |
| MFY 559-563 |
| OMH 1340-1342 |
| OMH 4460-4464 |

| Bates No. |
|---|
| OMH 6302-6304 |
| OMH 6792-6792 |
| OMH 6803-6805 |
| OMH 6906-6908 |
| OMH 7311-7314 |
| OMH 7315-7317 |
| OMH 7338-7343 |
| OMH 8296-8300 |
| OMH 9063-9065 |
| OMH 9211-9218 |
| OMH 9654-9654 |
| OMH 9755-9755 |
| OMH 9791-9791 |
| OMH 9792-9792 |
| OMH 9807-9807 |
| OMH 9813-9813 |

| Bates No. |
|---|
| OMH 9828-9829 |
| OMH 10166-10166 |
| OMH 10320-10328 |
| OMH 11331-11335 |
| OMH 11337-11339 |
| OMH 10685-10685 |
| OMH 10966-10969 |
| OMH 11340-11345 |
| OMH 28452-28458 |
| OMH 28459-28459 |
| OMH 28460-28461 |
| OMH 28492-28495 |
| OMH 28501-28501 |
| OMH 28683-28693 |

71. Documents relating to Lakeside Manor

| Bates No. |
|---|
| DOH 71459-71459 |
| DOH 71436-71439 |
| DOH 70859-70859 |
| DOH 71433-71435 |
| DOH 71528-71537 |
| DOH 71462-71465 |
| DOH 70926-79928 |
| DOH 71482-71483 |
| DOH 71321-71322 |

| Bates No. |
|---|
| DOH 71323-71324 |
| DOH 71268-71274 |
| DOH 71425-71432 |
| DOH 71487-71487 |
| DOH 71488-71489 |
| DOH 71490-71499 |
| DOH 71486-71486 |
| DOH 71366-71373 |
| DOH 71446-71450 |
| DOH 71501-71508 |
| DOH 71474-71477 |

| Bates No. |
|---|
| DOH 71453-71453 |
| DOH 71473-71473 |
| DOH 71421-71421 |
| DOH 71414-71415 |
| DOH 71452-71452 |
| DOH 71454-71455 |
| DOH 71589-71597 |
| DOH 71456-71456 |
| DOH 71568-71574 |
| DOH 71722-71722 |
| DOH 71441-71445 |

| Bates No. |
| --- |
| DOH 71654-71655 |
| DOH 71257-71260 |
| DOH 71326-71331 |
| DOH 71550-71554 |
| DOH 71576-71588 |
| DOH 71656-71721 |
| DOH 71510-71527 |
| DOH 71478-71479 |
| DOH 71412-71413 |
| DOH 71411-71411 |
| DOH 71546-71549 |
| DOH 71249-71256 |
| DOH 71240-71248 |
| DOH 71480-71481 |
| DOH 71228-71232 |
| DOH 71261-71265 |
| DOH 71267-71267 |
| DOH 71227-71227 |
| DOH 71646-71653 |
| DOH 70621-70628 |
| DOH 70619-70620 |
| DOH 70618-70618 |
| DOH 71723-71743 |
| DOH 71410-71410 |
| DOH 71374-71374 |
| DOH 71377-71403 |
| DOH 71375-71376 |
| DOH 71325-71325 |
| DOH 56056-56057 |
| DOH 70949-70950 |

| Bates No. |
| --- |
| DOH 70952-70957 |
| DOH 70930-70931 |
| DOH 70986-70991 |
| DOH 70992-70992 |
| DOH 71338-71343 |
| DOH 70852-70852 |
| DOH 70932-70938 |
| DOH 71051-71068 |
| DOH 71356-71357 |
| DOH 71044-71046 |
| DOH 70584-70584 |
| DOH 70929-70929 |
| DOH 70994-71043 |
| DOH 70958-70961 |
| DOH 71104-71154 |
| DOH 70985-70985 |
| DOH 70854-70854 |
| DOH 71071-71103 |
| DOH 71193-71226 |
| DOH 70632-70633 |
| DOH 70850-70851 |
| DOH 70853-70853 |
| DOH 71157-71190 |
| DOH 71069-71070 |
| DOH 71155-71156 |
| DOH 12937-12978 |
| DOH 85130-85165 |
| DOH 71191-71192 |
| DOH 70586-70587 |
| DOH 85228-85280 |

| Bates No. |
| --- |
| DOH 70530-70540 |
| DOH 85281-85327 |
| DOH 70558-70560 |
| DOH 70556-70557 |
| DOH 70585-70585 |
| DOH 85215-85227 |
| DOH 70629-70631 |
| DOH 12156-12175 |
| DOH 70711-70849 |
| DOH 71334-71334 |
| DAI 3170-3181 |
| DOH 70637-70653 |
| DOH 110758-110759 |
| DAI 3182-3184 |
| DOH 8553-8588 |
| DOH 70494-70507 |
| DAI 3185-3194 |
| DOH 8667-8752 |
| DOH 8506-8510 |
| DOH 70510-70528 |
| DOH 70583-70583 |
| DAI 3195-3195 |
| DOH 8529-8552 |
| DOH 71420-71420 |
| DAI 3196-3196 |
| DOH 90159-90161 |
| DOH 70492-70493 |
| DOH 85113-85128 |
| DOH 56102-56104 |
| DOH 85129-85129 |

| Bates No. |
| --- |
| DOH 85197-85200 |
| DOH 56115-56117 |
| DOH 56123-56125 |
| DAI 3197-3197 |
| DOH 71419-71419 |
| DOH 70635-70635 |
| OMH 372-384 |
| DOH 71409-71409 |
| DOH 56095-56097 |
| DOH 57429-57449 |
| DOH 56133-56135 |
| DOH 70656-70656 |
| DOH 70669-70669 |
| DOH 11973-11977 |
| DOH 56084-56087 |
| DOH 70508-70509 |
| DOH 85175-85196 |
| DOH 56088-56091 |
| DOH 56112-56114 |
| DOH 85166-85174 |
| DOH 11301-11376 |
| DOH 56109-56111 |
| DOH 56130-56132 |
| DOH 70664-70666 |
| DOH 56054-56055 |
| DOH 56079-56080 |
| DOH 56083-56083 |
| DOH 56107-56108 |
| DOH 56120-56122 |
| DOH 56128-56129 |

| Bates No. |
| --- |
| DOH 56069-56070 |
| DOH 56034-56050 |
| DOH 56058-56058 |
| DOH 56066-56067 |
| DOH 56071-56071 |
| DOH 70481-70490 |
| DOH 56020-56031 |
| DOH 12906-12908 |
| DOH 3792-3805 |
| DOH 70479-70480 |
| DOH 56018-56019 |
| DOH 110727-110750 |
| DOH 13342-13388 |
| DOH 5312-5343 |
| DOH 5021-5051 |
| DOH 5052-5271 |
| DOH 5272-5311 |
| DOH 5386-5406 |
| DOH 5407-5419 |
| DOH 5344-5352 |
| DOH 5420-5478 |
| DOH 5353-5385 |
| DOH 5479-5500 |
| DOH 5501-5503 |
| DOH 5504-5505 |
| DOH 5506-5511 |
| DOH 13389-13454 |
| DOH 110771-110827 |
| DOH 12909-12915 |
| DOH 71418-71418 |

| Bates No. |
| --- |
| DOH 11199-11300 |
| DOH 8763-9047 |
| DOH 10726-10943 |
| DOH 10313-10409 |
| DOH 10944-11198 |
| DOH 11386-11724 |
| DOH 8511-8529 |
| DOH 70477-70477 |
| DOH 70541-70555 |
| DOH 70561-70565 |
| DOH 70566-70582 |
| DOH 70588-70610 |
| DOH 70611-70616 |
| DOH 70700-70710 |
| DOH 70670-70699 |
| DOH 70858-70858 |
| DOH 70884-70905 |
| DOH 70907-70924 |
| DOH 70906-70906 |
| DOH 70875-70883 |
| DOH 70984-70984 |
| DOH 70973-70980 |
| DOH 70981-70983 |
| DOH 70963-70971 |
| DOH 70972-70972 |
| DOH 70939-70948 |
| DOH 70951-70951 |
| DOH 71047-71050 |
| DOH 71275-71320 |
| DOH 71358-71363 |

| Bates No. |
|---|
| DOH 71344-71345 |
| DOH 71416-71417 |
| DOH 71408-71408 |
| DOH 71423-71423 |
| DOH 71457-71458 |
| DOH 71466-71470 |
| OMH 9164-9166 |
| OMH 9193-9198 |
| OMH 9211-9218 |
| DOH 71538-71545 |
| DOH 71598-71644 |
| DOH 71566-71567 |
| DOH 71558-71565 |
| OMH 7687-7687 |
| DOH 85109-85110 |
| DOH 85111-85112 |
| DOH 85201-85201 |
| DOH 85202-85203 |
| DOH 85204-85214 |
| DOH 71346-71355 |
| DOH 56016-56016 |
| DOH 56032-56033 |
| DOH 110755-110757 |

| Bates No. |
|---|
| OMH 7315-7317 |
| OMH 7311-7314 |
| OMH 7338-7343 |
| DOH 16204-16209 |
| DOH 16190-16203 |
| OMH 9654-9654 |
| OMH 9063-9065 |
| OMH 1340-1342 |
| OMH 6906-6908 |
| OMH 6302-6304 |
| OMH 11331-11335 |
| OMH 11337-11339 |
| DOH 17631-17641 |
| DOH 17627-17630 |
| DOH 17626-17626 |
| DOH 17622-17625 |
| DOH 17601-17621 |
| OMH 9828-9829 |
| OMH 9792-9792 |
| OMH 9813-9813 |
| OMH 9807-9807 |
| DOH 13342-13388 |
| OMH 9791-9791 |

| Bates No. |
|---|
| OMH 9755-9755 |
| DOH 13389-13454 |
| OMH 28492-28495 |
| OMH 28452-28452 |
| OMH 28683-28693 |
| OMH 28459-28459 |
| OMH 28460-28461 |
| OMH 28501-28501 |
| DOH 83468-83868 |
| OMH 9044-9045 |
| OMH 9211-9218 |
| OMH 10320-10328 |
| OMH 10360-10361 |
| OMH 6792-6792 |
| OMH 11340-11345 |
| DOH 654-657 |
| DOH 653-653 |
| DOH 632-652 |
| DOH 2277-2295 |

72. Documents relating to Queens Adult Care Center

| Bates No. |
|---|
| CIAD 1816-1819 |
| CIAD 1848-1851 |
| DOH 27311-27311 |
| DOH 27313-27316 |

| Bates No. |
|---|
| DOH 27317-27321 |
| DOH 27322-27326 |
| DOH 27329-27330 |
| DOH 27333-27351 |

| Bates No. |
|---|
| DOH 27555-27668 |
| DOH 27669-27670 |
| DOH 27671-27706 |
| DOH 27708-27708 |

| Bates No. |
|---|
| DOH 27709-27709 |
| DOH 27710-27783 |
| DOH 27785-27785 |
| DOH 27787-27798 |
| DOH 27799-27800 |
| DOH 27801-27804 |
| DOH 27805-27862 |
| DOH 27864-27864 |
| DOH 27865-27865 |
| DOH 27866-27914 |
| DOH 27916-27918 |
| DOH 27919-27920 |
| DOH 27921-27921 |
| DOH 27924-28017 |
| DOH 28018-28018 |
| DOH 28019-28020 |
| DOH 28021-28024 |
| DOH 28025-28036 |
| DOH 28037-28047 |
| DOH 28048-28051 |
| DOH 28052-28072 |
| DOH 28074-28076 |
| DOH 28077-28088 |
| DOH 28134-28151 |
| DOH 28158-28167 |
| DOH 28168-28178 |
| DOH 81641-81689 |
| DOH 95210-95210 |
| DOH 95807-95812 |
| DOH 97233-97235 |

| Bates No. |
|---|
| DOH 100685-100686 |
| DOH 100725-100729 |
| DOH 100834-100835 |
| DOH 101942-101942 |
| DOH 101943-101943 |
| DOH 101944-101944 |
| DOH 101945-101945 |
| DOH 101946-101946 |
| DOH 101950-101950 |
| DOH 101952-101952 |
| DOH 101953-101953 |
| DOH 101957-101957 |
| DOH 102003-102003 |
| DOH 102004-102004 |
| DOH 102005-102006 |
| DOH 102007-102007 |
| DOH 102008-102008 |
| DOH 102009-102009 |
| DOH 102011-102011 |
| DOH 102051-102051 |
| DOH 102053-102053 |
| DOH 102168-102169 |
| DOH 102311-102311 |
| DOH 102312-102312 |
| DOH 102313-102313 |
| DOH 103745-103745 |
| DOH 103943-103968 |
| DOH 103969-103994 |
| DOH 103995-104020 |
| DOH 105554-105651 |

| Bates No. |
|---|
| DOH 105999-106015 |
| DOH 106016-106018 |
| DOH 106021-106031 |
| DOH 106032-106041 |
| DOH 106042-106050 |
| DOH 106051-106065 |
| DOH 106066-106080 |
| DOH 106081-106088 |
| DOH 106089-106090 |
| DOH 106092-106094 |
| DOH 106645-106663 |
| DOH 106664-106679 |
| DOH 106680-106698 |
| DOH 107426-107439 |
| DOH 109388-109414 |
| DOH 109472-109483 |
| DOH 109484-109504 |
| DOH 109565-109578 |
| DOH 109614-109623 |
| DOH 109739-109742 |
| DOH 109747-109766 |
| DOH 109777-109785 |
| DOH 110119-110123 |
| DOH 110124-110127 |
| DOH 110128-110130 |
| DOH 110623-110632 |
| DOH 110633-110661 |
| DOH 115607-115609 |
| DOH 115662-115664 |
| DOH 115717-115717 |

| Bates No. | Bates No. | Bates No. |
|-----------|-----------|-----------|
| DOH 116876-116877 | DOH 125939-125939 | OMH 13722-13724 |
| DOH 117094-117095 | DOH 125940-125943 | OMH 13836-13837 |
| DOH 117194-117194 | DOH 125982-125983 | OMH 13838-13839 |
| DOH 117271-117271 | DOH 126031-126031 | OMH 13841-13842 |
| DOH 117282-117282 | DOH 126077-126082 | OMH 13844-13852 |
| DOH 117334-117337 | DOH 126083-126083 | OMH 13853-13854 |
| DOH 117390-117393 | DOH 126084-126089 | OMH 13855-13858 |
| DOH 117502-117504 | DOH 126097-126100 | OMH 13859-13862 |
| DOH 117671-117671 | DOH 126101-126104 | OMH 13863-13866 |
| DOH 117909-117910 | DOH 126105-126106 | OMH 13881-13883 |
| DOH 118017-118020 | DOH 126121-126124 | OMH 16617-16620 |
| DOH 118231-118231 | DOH 126449-126450 | OMH 17245-17246 |
| DOH 118281-118282 | DOH 126846-126847 | OMH 17329-17334 |
| DOH 118709-118709 | DOH 127121-127147 | OMH 17977-17978 |
| DOH 118766-118766 | DOH 127230-127230 | OMH 18278-18278 |
| DOH 119005-119013 | DOH 127584-127588 | OMH 18289-18289 |
| DOH 119883-119883 | DOH 127597-127599 | OMH 18315-18315 |
| DOH 119938-119938 | DOH 127613-127616 | OMH 18317-18317 |
| DOH 120143-120143 | DOH 127617-127619 | OMH 18330-18330 |
| DOH 120298-120304 | DOH 127620-127622 | OMH 18342-18342 |
| DOH 120913-120913 | DOH 128391-128392 | OMH 20381-20403 |
| DOH 121668-121669 | DOH 128679-128682 | OMH 20434-20434 |
| DOH 122312-122313 | DOH 128699-128699 | OMH 20469-20470 |
| DOH 122324-122325 | DOH 128704-128704 | OMH 20635-20638 |
| DOH 122988-122989 | DOH 128934-128935 | OMH 20639-20649 |
| DOH 123898-123899 | OMH 12223-12286 | OMH 20650-20673 |
| DOH 123901-123902 | OMH 13135-13153 | OMH 20674-20676 |
| DOH 124841-124842 | OMH 13208-13222 | OMH 20765-20788 |
| DOH 125719-125719 | OMH 13455-13456 | OMH 20812-20812 |
| DOH 125736-125736 | OMH 13626-13627 | OMH 20813-20817 |

| Bates No. |
| --- |
| OMH 20818-20821 |
| OMH 20822-20822 |
| OMH 20829-20835 |
| OMH 20836-20849 |
| OMH 20850-20854 |
| OMH 20863-20865 |
| OMH 20866-20868 |
| OMH 20870-20873 |
| OMH 20878-20889 |
| OMH 20891-20896 |
| OMH 20907-20907 |
| OMH 20908-20909 |
| OMH 20910-20911 |
| OMH 20917-20920 |
| OMH 20921-20922 |
| OMH 20925-20927 |
| OMH 21011-21011 |
| OMH 21021-21021 |
| OMH 21107-21107 |
| OMH 21134-21137 |
|  |
| OMH 21148-21149 |
| OMH 21176-21183 |
| OMH 21360-21372 |
| OMH 21410-21411 |
| OMH 21414-21415 |
| OMH 21557-21557 |
| OMH 21725-21725 |
| OMH 21728-21729 |
| OMH 21730-21732 |

| Bates No. |
| --- |
| OMH 21731-21736 |
| OMH 21737-21737 |
| OMH 21739-21740 |
| OMH 21741-21741 |
| OMH 21742-21743 |
| OMH 21744-21744 |
| OMH 21937-21939 |
| OMH 21940-21940 |
| OMH 21961-21961 |
| OMH 22591-22591 |
| OMH 22592-22592 |
| OMH 22732-22732 |
| OMH 22752-22753 |
| OMH 22835-22837 |
| OMH 22854-22855 |
| OMH 22974-22976 |
| OMH 22984-22992 |
| OMH 23029-23031 |
| OMH 23048-23048 |
| OMH 23049-23049 |
| OMH 23052-23052 |
| OMH 23053-23053 |
| OMH 23315-23319 |
| OMH 24375-24375 |
| OMH 24547-24560 |
| OMH 24613-24617 |
| OMH 24826-24826 |
| OMH 24963-24963 |
| OMH 25065-25065 |
| OMH 25382-25383 |

| Bates No. |
| --- |
| OMH 25520-25520 |
| OMH 25554-25554 |
| OMH 25560-25561 |
| OMH 25564-25564 |
| OMH 25571-25572 |
| OMH 25623-25624 |
| OMH 25628-25628 |
| OMH 25642-25642 |
| OMH 25673-25673 |
| OMH 27347-27347 |
| OMH 27349-27351 |
| OMH 27357-27357 |
| OMH 27414-27414 |
| OMH 27443-27445 |
| OMH 27758-27758 |
| OMH 27761-27762 |
| OMH 27796-27798 |
| OMH 27821-27821 |
| OMH 27881-27881 |
| OMH 27906-27908 |
| OMH 27994-28002 |
| OMH 28007-28007 |
| OMH 28011-28011 |
| OMH 28013-28014 |
| OMH 28290-28290 |
| OMH 28321-28322 |
| OMH 28343-28343 |
| OMH 28683-28693 |
| OMH 29207-29211 |
| OMH 29217-29218 |

| Bates No. |
|---|
| OMH 29219-29238 |
| OMH 29565-29566 |
| OMH 29571-29578 |
| OMH 29739-29741 |
| OMH 29762-29762 |
| OMH 30119-30120 |
| OMH 30178-30178 |
| OMH 30365-30365 |
| OMH 31057-31057 |
| OMH 31073-31074 |
| OMH 31110-31110 |
| OMH 31186-31186 |
| OMH 31231-31231 |
| OMH 31295-31295 |

| Bates No. |
|---|
| OMH 31313-31313 |
| OMH 31342-31342 |
| OMH 31343-31343 |
| OMH 31347-31347 |
| OMH 31365-31365 |
| OMH 31374-31374 |
| OMH 31382-31382 |
| OMH 31384-31385 |
| OMH 31392-31392 |
| OMH 31449-31449 |
| OMH 31452-31452 |
| OMH 31458-31459 |
| OMH 31491-31491 |
| OMH 31736-31738 |

| Bates No. |
|---|
| OMH 31947-31947 |
| OMH 31954-31956 |
| OMH 31993-31993 |
| OMH 32011-32011 |
| OMH 32012-32012 |
| OMH 32017-32017 |
| OMH 32073-32073 |
| OMH 32074-32074 |
| OMH 32082-32082 |
| OMH 32474-32477 |
| OMH 33710-33710 |

73. Lakeside Issue Pocket 3/9/2005

| Bates No. |
|---|
| DOH 81336-81348 |
| DOH 94057-94058 |
| DOH 95635-95636 |
| DOH 95807-95812 |
| DOH 100725-100729 |
| DOH 102109-102111 |
| DOH 102112-102114 |
| DOH 102115-102116 |
| DOH 102168-102169 |
| DOH 103943-103968 |
| DOH 103969-103994 |
| DOH 103995-104020 |

| Bates No. |
|---|
| DOH 104692-104710 |
| DOH 104901-104921 |
| DOH 104922-104932 |
| DOH 105480-105495 |
| DOH 107892-107893 |
| DOH 108684-108686 |
| DOH 108876-108876 |
| DOH 108877-108899 |
| DOH 108900-108917 |
| DOH 108918-108933 |
| DOH 108934-108947 |
| DOH 108948-108977 |
| DOH 108978-108984 |

| Bates No. |
|---|
| DOH 108991-109008 |
| DOH 109009-109022 |
| DOH 111443-111446 |
| DOH 111484-111487 |
| DOH 111495-111498 |
| DOH 111509-111514 |
| DOH 116375-116378 |
| DOH 116614-116619 |
| DOH 116697-116698 |
| DOH 116970-116974 |
| DOH 117198-117198 |
| DOH 117395-117400 |
| DOH 117672-117677 |

| Bates No. |
|---|
| DOH 118283-118284 |
| DOH 118404-118404 |
| DOH 118513-118513 |
| DOH 118534-118572 |
| DOH 119005-119013 |
| DOH 119095-119097 |
| DOH 120030-120030 |
| DOH 121166-121166 |
| DOH 121540-121540 |
| DOH 121547-121547 |
| DOH 121556-121558 |
| DOH 121562-121563 |
| DOH 121567-121568 |
| DOH 122046-122046 |
| DOH 123817-123817 |
| DOH 123847-123847 |
| DOH 123855-123856 |
| DOH 123964-123964 |
| DOH 125813-125814 |
| DOH 125816-125817 |
| DOH 125821-125825 |

| Bates No. |
|---|
| DOH 126449-126450 |
| DOH 126557-126557 |
| DOH 126567-126568 |
| DOH 126580-126583 |
| DOH 126588-126589 |
| DOH 126656-126656 |
| DOH 126846-126847 |
| DOH 126946-126955 |
| DOH 127283-127285 |
| DOH 127286-127287 |
| DOH 127288-127288 |
| DOH 127289-127289 |
| DOH 127290-127290 |
| DOH 127291-127291 |
| DOH 127292-127292 |
| DOH 127323-127324 |
| DOH 128723-128724 |
| DOH 128730-128730 |
| DOH 129496-129498 |
| OMH 12541-12556 |
| OMH 17415-17423 |

| Bates No. |
|---|
| OMH 18009-18009 |
| OMH 18219-18219 |
| OMH 21196-21198 |
| OMH 21244-24255 |
| OMH 21344-21350 |
| OMH 21374-21401 |
| OMH 21403-21408 |
| OMH 21762-21764 |
| OMH 21961-21961 |
| OMH 22040-22074 |
| OMH 27414-27414 |
| OMH 30997-30997 |
| OMH 31003-31003 |
| OMH 31004-31004 |
| OMH 31032-31032 |
| OMH 31033-31033 |
| OMH 31191-31191 |
| OMH 33327-33352 |
| OMH 33433-33433 |
| OMH 33710-33710 |

74. Documents relating to Brooklyn Manor

| Bates No. |
|---|
| DOH 127518-127523 |
| DOH 127544-127544 |
| DOH 127499-127500 |
| DOH 127348-127362 |
| DOH 127328-127338 |

| Bates No. |
|---|
| DOH 112852-112868 |
| DOH 112786-112844 |
| OMH 24679-24679 |
| OMH 24677-24677 |
| DOH 112975-112989 |
| DOH 112877-112896 |

| Bates No. |
|---|
| OMH 11001-11007 |
| OMH 10982-10987 |
| OMH 11010-11012 |
| OMH 11008-11009 |
| OMH 10970-10970 |
| OMH 2660-2660 |

| Bates No. | Bates No. | Bates No. |
|---|---|---|
| OMH 2658-2658 | DOH 112343-112343 | DOH 129759-129759 |
| OMH 2657-2657 | DOH 63608-63612 | DOH 129698-129700 |
| DOH 125575-125575 | OMH 10994-11000 | DOH 129697-129697 |
| DOH 123788-123788 | OMH 10971-10981 | DOH 124987-124988 |
| DOH 13874-13881 | PWBM 181-182 | DOH 124986-124986 |
| DOH 18997-18998 | OMH 2690-2700 | DOH 124975-124978 |
| DOH 1412-1415 | OMH 10988-10993 | DOH 124969-124974 |
| DOH 1428-1431 | OMH 11020-11025 | DOH 124961-124961 |
| OMH 7185-7186 | OMH 11013-11019 | DOH 124957-124957 |
| DOH 127632-127632 | OMH 2648-2651 | DOH 124948-124948 |
| DOH 127600-127606 | OMH 2642-2642 | DOH 124758-124760 |
| DOH 127501-127501 | OMH 2605-2630 | DOH 124752-124753 |
| DOH 127498-127498 | DOH 84681-84682 | DOH 124736-124736 |
| DOH 123558-123566 | DOH 84662-84664 | DOH 124562-124562 |
| DOH 128773-128773 | OMH 6759-6762 | DOH 124606-124612 |
| DOH 63727-63747 | DOH 84514-84523 | DOH 124709-124709 |
| OMH 2643-2647 | DOH 84336-84341 | DOH 124671-124673 |
| DOH 128674-128676 | DOH 84306-84311 | DOH 124668-124670 |
| DOH 129499-129501 | OMH 7325-7327 | DOH 122714-122714 |
| DOH 129469-129475 | OMH 2702-2707 | DOH 122458-122459 |
| DOH 125704-125704 | OMH 2661-2661 | DOH 124408-124410 |
| OMH 28245-28245 | OMH 2654-2656 | DOH 124377-124378 |
| OMH 28061-28062 | OMH 2653-2653 | DOH 124374-124376 |
| DOH 107610-107613 | OMH 2636-2641 | DOH 122739-122739 |
| DOH 107605-107609 | OMH 2593-2601 | OMH 28800-28801 |
| OMH 24175-24175 | OMH 2589-2592 | OMH 28507-28512 |
| OMH 24860-24860 | OMH 36136-36164 | OMH 28479-28484 |
| DOH 119939-119943 | OMH 36134-36135 | DOH 123556-123557 |
| DOH 112969-112974 | OMH 36133-36133 | OMH 28785-28786 |
| DOH 112869-112876 | OMH 36112-36112 | DOH 125206-125207 |

| Bates No. |
|-----------|
| DOH 125190-125191 |
| DOH 125186-125186 |
| DOH 125167-125170 |
| DOH 125166-125166 |
| DOH 125149-125151 |
| DOH 125129-125129 |
| DOH 125051-125051 |
| DOH 125030-125034 |
| DOH 125029-125029 |
| DOH 124103-124103 |
| DOH 124014-124016 |
| DOH 123986-123987 |
| DOH 123974-123979 |
| DOH 123973-123973 |
| DOH 123967-123968 |
| DOH 123946-123947 |
| DOH 123909-123909 |
| DOH 123704-123705 |
| DOH 123683-123683 |
| DOH 123674-123682 |
| DOH 123665-123673 |
| DOH 123631-123636 |
| DOH 123462-123485 |
| DOH 122899-122899 |
| DOH 122749-122750 |
| DOH 122740-122743 |
| DOH 122738-122738 |
| DOH 123571-123571 |
| OMH 24371-24372 |
| OMH 24370-24370 |

| Bates No. |
|-----------|
| OMH 24264-24264 |
| DOH 110760-110770 |
| DOH 110751-110754 |
| DOH 82344-82388 |
| DOH 82389-82490 |
| DOH 19395-19460 |
| DOH 19541-19601 |
| DOH 19133-19148 |
| DOH 19149-19156 |
| DOH 19355-19366 |
| DOH 19367-19377 |
| DOH 18255-18265 |
| DOH 18991-18991 |
| DOH 19031-19038 |
| DOH 19226-19253 |
| DOH 19027-19030 |
| DOH 18992-1 8994 |
| DOH 18806-18816 |
| DOH 18306-18774 |
| DOH 18984-18986 |
| DOH 19025-19026 |
| DOH 18266-18305 |
| DOH 18914-18916 |
| DOH 18983-18983 |
| DOH 18959-18982 |
| DOH 18999-19002 |
| DOH 19061-19062 |
| DOH 18854-18874 |
| DOH 19015-19022 |
| DOH 19256-19354 |

| Bates No. |
|-----------|
| DOH 18917-18918 |
| DOH 19009-19011 |
| DOH 19095-19130 |
| DOH 18957-18957 |
| DOH 19039-19041 |
| DOH 19221-19225 |
| DOH 19157-19219 |
| DOH 19013-19014 |
| DOH 18958-18958 |
| DOH 18953-18956 |
| DOH 18952-18952 |
| DOH 18799-18805 |
| DOH 18946-18946 |
| DOH 19059-19060 |
| DOH 18947-18951 |
| DOH 19463-19536 |
| DOH 3355-3365 |
| DOH 3275-3311 |
| DOH 1528-1567 |
| DOH 1407-1409 |
| DOH 1416-1424 |
| DOH 1440-1442 |
| DOH 1432-1439 |
| DOH 1374-1375 |
| DOH 1460-1467 |
| DOH 121838-121838 |
| DOH 121779-121780 |
| DOH 18837-18853 |
| DOH 18936-18936 |
| DOH 18817-18836 |

| Bates No. |
| --- |
| DOH 18931-18935 |
| DOH 18214-18214 |
| DOH 18219-18219 |
| DOH 18929-18929 |
| DOH 18987-18988 |
| DOH 18924-18928 |
| DOH 18200-18212 |
| DOH 18938-18945 |
| DOH 18921-18922 |
| DOH 18937-18937 |
| DOH 19023-19024 |
| DOH 18777-18798 |
| DOH 19005-19005 |
| OMH 22606-22606 |
| OMH 24321-24321 |
| OMH 28795-28799 |
| OMH 28833-28833 |
| OMH 28813-28816 |
| OMH 28769-28770 |
| OMH 28777-28777 |
| OMH 28789-28793 |
| OMH 28839-28840 |
| OMH 28417-28418 |
| DOH 12989-13026 |
| DOH 18989-18990 |
| DOH 102359-102360 |
| DOH 63760-63761 |
| OMH 28744-28745 |
| DOH 128100-128100 |
| DOH 127970-127971 |

| Bates No. |
| --- |
| OMH 13656-13659 |
| OMH 13458-1 3465 |
| DOH 127323-127324 |
| OMH 18298-18302 |
| OMH 18004-18006 |
| OMH 17329-17334 |
| OMH 17323-17326 |
| OMH 17318-17321 |
| OMH 17310-17314 |
| OMH 17304-17308 |
| OMH 17293-17296 |
| OMH 17288-17291 |
| OMH 17272-17274 |
| DOH 117995-117996 |
| DOH 103678-103678 |
| OMH 23036-23036 |
| OMH 28324-28325 |
| OMH 28127-28128 |
| OMH 28084-28106 |
| DOH 100107-100129 |
| DOH 120824-120841 |
| OMH 24262-24262 |
| OMH 24239-24241 |
| DOH 126546-126549 |
| DOH 112740-112750 |
| DOH 115339-115350 |
| DOH 115332-115338 |
| DOH 64153-64159 |
| DOH 12984-12984 |
| DOH 116209-116209 |

| Bates No. |
| --- |
| DOH 115758-115764 |
| OMH 22609-22609 |
| OMH 21817-21818 |
| OMH 28083-28083 |
| OMH 26849-26849 |
| DOH 119862-119863 |
| DOH 112261-112263 |
| DOH 64680-64681 |
| DOH 64427-64434 |
| DOH 64317-64347 |
| DOH 64187-64226 |
| DOH 63398-63423 |
| DOH 63396-63397 |
| DOH 63333-63340 |
| DOH 63194-63197 |
| OMH 22740-22740 |
| DOH 19085-19092 |
| DOH 1425-1427 |
| DOH 18930-18930 |
| DOH 18923-18923 |
| OMH 30475-30475 |
| OMH 30224-30224 |
| OMH 30179-30179 |
| OMH 30160-30160 |
| OMH 30155-30156 |
| OMH 30141-30146 |
| OMH 29944-29944 |
| OMH 29728-29729 |
| OMH 29467-29467 |
| DOH 128321-128321 |