UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DISABILITY ADVOCATES, INC.,

**MEMORANDUM & ORDER**

03-CV-3209 (NGG) (MDG)

Plaintiff,

-against-

DAVID A. PATERSON, et al.,

Defendants.
-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Disability Advocates, Inc. ("DAI" or "Plaintiff") brings this action on behalf of

adults with mental illness who reside in adult homes, residential adult care facilities licensed by

the State of New York that provide long-term care and supervision to people with disabilities

and/or mental illness. DAI alleges that adult homes are segregated settings akin to psychiatric

institutions and that New York State has violated the Americans with Disabilities Act and the

Rehabilitation Act, as well as the Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581

(1999), by failing to enable persons with mental illness to receive services "in the most

integrated setting appropriate to their needs." (See Compl. (Docket Entry #1).) Defendants are

the State Department of Health ("DOH") and the New York State Office of Mental Health

("OMH"), as well as Governor David A. Paterson, DOH Commissioner Richard F. Daines, and OMH Commissioner Michael F. Hogan, all sued in their official capacities.[1]

The parties have submitted Motions for Summary Judgment, which remain pending. (Docket Entries #145, 176.)  Defendants have also submitted two evidentiary motions, seeking 1) to exclude testimony and opinions of Plaintiff's experts on whether adult home residents are qualified to move to alternative settings; and 2) to strike witness testimony and certain documentary exhibits.  (Def. Mot. *in Limine* to Exclude Expert Testimony, Reports, and Opinions of DAI's Experts (Docket Entry #173); Def. Mot. to Strike Evidence (Docket Entry #219).)  The Motions for Summary Judgment will be addressed in a subsequent memorandum and order.  For the reasons that follow, Defendants' Motion to Exclude Expert Testimony is DENIED, and Defendants' Motion to Strike is GRANTED in part and DENIED in part.

## I.  Defendants' Motion *in Limine* to Exclude Expert Testimony, Reports, and Opinions of DAI's Experts

One of the issues in this action is whether the individuals residing in the adult homes are qualified to move to alternative housing, including supported housing, in which individuals with mental illness live in their own apartments and receive supportive services.  In support of its claims, DAI provides four experts, all of whom have expressed the opinion that virtually all individuals with mental illness who reside in the adult homes at issue are qualified to move to more integrated supported housing with appropriate supports.  Defendants have moved to exclude the opinion of each expert under Rule 702 of the Federal Rules of Evidence.  (Docket Entry #173.)  For the reasons discussed below, Defendants' Motion is denied.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted the names of the Defendants sued in their official capacities, as the original named parties are no longer in office.

## A. Standard

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court made clear that the district court is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). To gauge the reliability of proffered testimony, "the district court should consider the indicia of reliability identified in Rule 702," Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004), which are not exhaustive, id., and may consider additional factors identified in Daubert, including (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) in the case of a particular scientific technique, the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) "general acceptance." Daubert, 509 U.S. at 593-94.

The inquiry is "flexible," and Daubert factors are neither exclusive nor dispositive, id. at 594-95; they "neither necessarily nor exclusively appl[y] to all experts or in every case," Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 139 (1999). Because the Supreme Court's standard for admissibility is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline," expert witnesses, unlike lay opinion

witnesses, possess "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 592. The court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152. The district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142.

The burden is on the party presenting the expert to demonstrate that the expert testimony is admissible. Daubert, 509 U.S. at 592; Fed. R. Evid. 702 Advisory Comm. Note (2000). The Second Circuit's standard for admissibility of expert testimony is "especially broad." Clarke v. LR Systems, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002) (collecting cases). The rejection of expert testimony is "the exception rather than the rule." Id. (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)). Because Rule 702 "embodies a liberal standard of admissibility for expert opinions, Nimely v. City of New York, 414 F.3d 381, 395-96 (2d Cir. 2005), the assumption the court starts with is that a well qualified expert's testimony is admissible." In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).

Disputes as to the strength of an expert's credentials, faults in the use of a methodology, or lack of textual authority for an opinion go to the weight, and not the admissibility, of an expert's testimony. McCollock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995); see also Blue Cross & Blue Shield, Inc. v. Philip Morris, Inc., 141 F. Supp. 2d 320, 324 (E.D.N.Y. 2001) (opposing counsel has wide latitude on cross-examination to "probe the [expert] witness's qualifications, experience and sincerity; weaknesses in the opinion's basis, the sufficiency of

assumptions, as well as the strength of the opinion") (internal quotation marks and citation omitted).

### B.  Discussion

Defendants do not dispute that the opinions of DAI's experts will assist the court in understanding the facts in this case, which involve numerous issues relating to mental illness and mental health systems and services.  Rather, Defendants contend that the experts' opinions that virtually all of the adult home residents are qualified to move should be excluded, because the experts did not clinically assess any adult home resident or have those residents assessed by a treatment team, which Defendants contend is the "industry standard" and a "well-established methodology used by mental health professionals."  (See Def. Mem. Supp. Mot. Exclude 2-4, 13 (Docket Entry #174).)  Defendants assert that DAI's experts acknowledge this standard, indicating that such a review is necessary to determine the supports a person would need in an alternative setting.  (Id. at 3.)  But DAI's experts did not opine that individual clinical assessments are necessary to determine who is qualified or eligible to live in supported housing; rather, they stated that individual assessments are necessary to determine what, if any specific supports each individual would need upon moving from an adult home to supported housing. (See Affidavit of Kenneth Duckworth Ex. B at 3 (Docket Entry #209); Duckworth Dep. 173-75 (Decl. Scott J. Spiegelman Vol. 1, Ex. Duckworth-Dep. (Docket Entry #165)); Ivor Groves Dep. 127-128 (Decl. Francine N. Murray Ex. 25 (Dec. 4, 2007) (Docket Entry #214)); Affidavit of Elizabeth Jones Ex. A at 11 (Docket Entry #208); E. Jones Dep. 55-56, 89 (Murray Decl. Ex. 28); Decl. of Dennis R. Jones Ex. A at 10-13 (Docket Entry #207); D. Jones Dep. 206-207 (Murray Decl. Ex. 27).)  For the reasons discussed below, the court concludes that DAI has met its burden to demonstrate that its experts' opinions are based on substantial experience, sufficient

facts and data, and reliable methodologies.  The opinions, testimony, and reports relating to adult

home residents' qualifications to move to supported housing are therefore admissible pursuant to

Rule 702.

### 1. Dr. Kenneth Duckworth

Dr. Kenneth Duckworth is a psychiatrist with twenty years of experience in both clinical

and leadership positions serving people with serious mental illness.  (Duckworth Aff. Ex. A at

Ex. 1.)  Dr. Duckworth's work has involved selecting services and supports for individuals with

mental illness residing in both community and institutional settings.  (Duckworth Aff. Ex. A at 1-

3.)  As a staff psychiatrist, and later as the Medical Director and Clinical Director at the

Massachusetts Mental Health Center, the principal community psychiatry agency of Harvard

Medical School, Dr. Duckworth cared for and supervised the care of thousands of people with

serious psychiatric disorders in a variety of settings, including inpatient psychiatric facilities and

supported housing.  (Id. at 2; Duckworth Dep. 13-20, 31 (Murray Decl. Ex. 23).)  From June

2000 to July 2003, Dr. Duckworth served in various clinical and leadership capacities at the

Massachusetts Department of Mental Health ("DMH").  (Duckworth Aff. Ex. A at 2-3.)  As the

Medical Director at DMH, Dr. Duckworth oversaw DMH's efforts to comply with the Olmstead

decision, including supervising the closure of a state hospital and transitioning 120 patients to

integrated community settings.  (Id.; Duckworth Dep. 41-42.)  As Acting Commissioner of the

DMH, Dr. Duckworth helped to develop clinical standards for thirteen mental health treatment

teams as part of Massachusetts's Program of Assertive Community Treatment initiative, or

"PACT."[2]  (Duckworth Aff. Ex. A.)  Dr. Duckworth is currently the medical director of the

---

[2] PACT teams consist of service providers who provide people with mental illness living in community housing the
services necessary to meet their individual needs, such as instruction in cooking, managing medication, budgeting,
working, and furthering their education.  (Duckworth Aff. Ex. A at 1-2.) The PACT model is known as ACT in New
York State and is also used in New York's supported housing programs.  (Id. at 1 n.2.)

National Alliance on Mental Illness, a nonprofit organization comprised of more than 200,000 individuals with mental illness and their families.  (Id. at 3.)  In this role, he conducts policy research, analyzes large national clinical trials, and acts as the psychiatric resource for the organizations' membership.  (Id.; Duckworth Dep. 58-59.)  Dr. Duckworth is also an Assistant Professor of Psychiatry at Harvard Medical School, where he has been teaching for twelve years. (Duckworth Aff. Ex. A at 4.)

To form his opinions, Dr. Duckworth analyzed how persons with mental illness residing in adult homes compare to people with mental illness served in supported housing.  (Duckworth Dep. 72-74, 95.)  Accordingly, he observed and spoke with residents at five of the adult homes at issue in this case in various settings at various times – in the common areas of the homes, in their rooms, at mealtimes, and while medication was being dispensed – as well as with adult home operators and staff and mental health service providers.  (Id. at 78-80; 102-103; 154-155; Duckworth Aff. Ex. A at 4.)  He also visited the Pathways to Housing supported housing program, where he observed an Assertive Community Treatment ("ACT") team meeting and interviewed several clients in their homes.  (Duckworth Aff. Ex. A at 5; Duckworth Dep. 86-89.)

Dr. Duckworth also reviewed the mental health and medical records of 203 adult home residents.[3]  (Id. at 73, 76.)  In his review, Dr. Duckworth looked for indicators of adult home residents' functional levels, past experiences with independent living, and histories of dementia, substance abuse, or other factors that may be "possible contraindications to living in supported housing," such as an active risk to third parties or an assessment by an occupational therapist that the resident was incapable of practically functioning and learning real world skills.  (Id. at 93-

---

[3] Dr. Duckworth reviewed the mental health records for his reply to Defendants' expert report.  (See Spiegelman Decl. Ex. Duckworth-3.)  He reviewed 130 of the 188 records reviewed by Defendants' expert and found that nothing in those records would preclude any individual from supported housing, and that each individual could move to supported housing with appropriate supports.  (Spiegelman Decl. Ex. Duckworth-7 at 3.)

96.) He testified that the resident medical evaluations he reviewed provided no compelling reason why those residents could not live in supported housing. (See id. at 106-108; Duckworth Aff. Ex. A at 6.) In addition, Dr. Duckworth reviewed the depositions of adult home residents, depositions of other fact witnesses, relevant scholarly articles, and publications from OMH and the U.S. Department of Health and Human Services. (Duckworth Aff. Ex. A at Ex. 2.) Dr. Duckworth did not perform clinical evaluations of any adult home residents. (Duckworth Dep. 102-03, 253-54.)

Based on his experience and analysis, Dr. Duckworth concluded that "[t]here are no material clinical differences between adult home residents and supported housing clients," and that "[v]irtually all of these [adult home residents] could make it in supporting housing or supported housing plus ACT." (Duckworth Aff. Ex. A at 5; Duckworth Dep. 78.) For the few individuals he thought might be difficult to serve in supported housing, he testified that further evaluation would be necessary to make a definitive conclusion. (Duckworth Dep. 108.)

Defendants assert that this methodology is unreliable because Dr. Duckworth conducted no clinical interviews of adult home residents, and his report states that "a good clinical interview would be essential to help understand the precise mix of supports necessary to serve the individual." (Def. Mem. Supp. Mot. Exclude 3; Spiegelman Decl. Ex. Duckworth-7, at 3.) The next sentence of the report states that "[h]owever, I am confident that each of these individuals could be in supported housing if provided the appropriate supports." (Id.) These statements refer to what particular supports an adult home resident would need in supported housing, not whether he or she is qualified for supported housing. Defendants also contend that Dr. Duckworth's methodology is unreliable because Dr. Duckworth wrote in a draft report that "reading a chart and discerning a placement is incomplete at best." (Def. Mem. 4; Spiegelman

Decl. Ex. Duckworth-8 at DAI 26641; Duckworth Dep. 181-83.)  But Dr. Duckworth's opinion is based on more than a review of adult home residents' charts; as discussed above, his opinion is based on his experience, visits with adult home residents and staff, and review of relevant materials, including depositions of adult home residents and other fact witnesses, scholarly articles, and state and federal government publications.

Defendants also argue that Dr. Duckworth's opinion should be excluded because it is based on only one of several supported housing models in New York, and that Dr. Duckworth is insufficiently informed about supported housing in New York.  (Def. Mem. Supp. Mot. Exclude 14, 8.)  While DAI has provided evidence of how Dr. Duckworth formulated his understanding of supported housing in New York, including the materials he consulted (see Duckworth Aff. Ex. A at Ex. 2; Duckworth Aff. Ex. B at 3-4; Duckworth Dep. 91-92), Defendants' criticism of Duckworth's approach to becoming informed about supported housing goes to the weight, not the admissibility, of the testimony.  See McCullock, 61 F.3d at 1044.

Given the "liberal standard" of admissibility for expert opinions, Nimely, 414 F.3d at 395-96, the court concludes that Plaintiff has met its burden to show that Dr. Duckworth's opinion meets the criteria in Rule 702, namely, that it is based on sufficient facts and is the product of reliable principles and methods, which have been applied reliably to the facts of the case.  Fed. R. Evid. 702.  Dr. Duckworth has significant experience in the field and his opinion has a "traceable, analytical basis in objective fact."  In re Blech Securities Litig., No. 94-CV-7696 (RWS), 2003 WL 1610775, at *22 (S.D.N.Y. Mar. 26, 2003).  That he did not conduct a clinical examination of each patient does not render his methodology unreliable or his opinion inadmissible.  See Daubert, 509 U.S. at 592 (experts have "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

## 2. Dennis Jones

Dennis Jones has served in leadership roles in public mental health systems for more than twenty years. (D. Jones Aff. Ex. A at Ex. 1.) From 1981 to 1988, he was the Mental Health Commissioner of the State of Indiana. (Id.) He then served as the Commissioner of the Texas Department of Mental Health and Mental Retardation, where he had leadership responsibility for twenty-six state institutions. (Id. at 1-2.) During that time, he negotiated the resolution of two class action lawsuits that involved the successful transition of nearly 700 persons with mental retardation to community settings. (Id.) Subsequently, he served as the Chief Executive Officer of the Midtown Community Health Center, the largest mental health center in Indiana, providing clinical, rehabilitative, and residential supports, including ACT teams, to more than 13,000 persons with mental illness. (Id. at 2.) In 1999, he served as an expert witness in Rolland v. Cellucci, 198 F. Supp. 2d 25 (D. Mass. 2002), a federal action concerning appropriate placement and services for individuals with mental retardation and developmental disabilities residing in nursing homes. (Id.) From 2000 to 2002, he was the Transitional Receiver for the District of Columbia's mental health system, an appointment arising out of Dixon v. Weinberger, 405 F. Supp. 974 (D.D.C. 1975) (subsequent opinions issued under different captions), an action brought on behalf of individuals committed to a state hospital who sought community-based treatment alternatives. (Id. at 1.) As Receiver, Mr. Jones drafted the court-approved plan for a new Department of Mental Health. (Id.) In 2002, the court appointed Mr. Jones as Court Monitor, a position he still holds, with responsibility for ensuring continued implementation of the court-ordered plan. (Id.) Mr. Jones is currently employed by the Psychiatry Department at the Indiana University School of Medicine, where he leads a behavior health consulting unit and administers a psychiatric practice plan and managed care entity. (Id.)

To form his opinions, Mr. Jones observed and spoke with residents in four adult homes between June 2004 and May 2005.  (D. Jones. Decl. Ex. A at 3.)  He also visited persons with mental illness residing in supported housing apartments that are operated by non-profit providers in New York City.  (Id. at 4.)  He met with community agencies in New York City that provide supported housing.  (Id.)  He also met with staff at the Center for Urban Community Services, an organization that provides housing referral services for persons with mental illness, and also met with local city officials involved in the planning and oversight of mental health services, and local and statewide association leaders who deal regularly with mental health policy, funding, clinical services, and residential solutions.  (Id.; D. Jones Dep. 146-148, 223-227.)

Mr. Jones also worked with Dr. Ivor Groves, another of DAI's experts, to analyze data collected by Defendants as part of the state-commissioned New York Adult Home Assessment Project ("Assessment Project"), a $1.3 million study conducted in 2003 and 2004 by New York Presbyterian Hospital under a contract with DOH.  (D. Jones Decl. Ex. A at 10-13.)  Dr. Jones concluded that the Assessment Project methodology was "consistent with what is done in the mental health field" across the country, and that the data was "instructive, both for individual care planning and for aggregate care planning for mental health services."  (D. Jones Decl. Ex. A at 13; D. Jones Dep. 204-206.)  He also reviewed the depositions of state officials and adult home residents, the records of several adult home residents, requests for proposals for supported housing, documents produced by mental health service and housing providers in New York City, the reports of DAI's other experts, the report of Defendants' expert Dr. Jeffrey Geller, and substantial literature on the mental health care system.  (D. Jones Decl. Ex. A at Ex. 2.)  Based on his experience and review of these materials, Mr. Jones concluded that virtually all persons

with mental illness residing in adult homes could live in supported housing. (D. Jones Decl. Ex. A at 10.)

For the same reasons discussed above with respect to Dr. Duckworth, Mr. Jones's failure to conduct or order a clinical assessment of each adult home resident does not render his testimony inadmissible. Defendants cite Mr. Jones's testimony that the individual assessments in the Assessment Project would be used by mental health professionals to plan individualized services and as a basis for case management (Def. Mem. Supp. Mot. Exclude 3; D. Jones Dep. 206-07), but that testimony does not support the assertion that individual assessments are *required* to determine whether an adult home resident is qualified to be placed in supported housing. (See also D. Jones Dep. 129-31 (noting that he considered doing an independent analysis that was "very much similar" to the Assessment Project but did not do so).)

Given Mr. Jones's expertise, review of the Assessment Project data, and many hours of interviews with adult home residents, mental health providers, and New York City advocates and officials in the field of mental health policy and services, the court concludes that Plaintiff has met its burden to show that Mr. Jones's testimony, report, and opinions are supported by sufficient data and reliable methodology and are thus admissible under Rule 702.

### 3. Elizabeth Jones

For more than thirty years, Elizabeth Jones has overseen the discharge of thousands of patients from state institutions for people with mental disabilities. (E. Jones Aff. Ex. A at Ex. 1.) Her work focuses on the planning, development, and management of community services for people with mental illness and/or mental retardation (see id. at Ex. A.), and she creates and supervises the establishment of the mechanisms – including housing, case management,

employment assistance, and day treatment programs – for individuals' successful integration into the community (see E. Jones Aff. Ex. A at Ex. 1; E. Jones Dep. 6-8, 9-12, 16, 18).

In her positions as the Director of St. Elizabeth's Hospital, an institution in Washington, D.C. for individuals with mental illness, Director/Acting Superintendent of Belchertown State School, an institution in Massachusetts for individuals with mental retardation, and District Manager for the Massachusetts Department of Mental Health,[4] Ms. Jones ensured compliance with federal court orders and consent decrees mandating the provision of services in community-based settings. (E. Jones Aff. Ex. A; id. at Ex. 1 at 3-5; E. Jones Dep. 9-12, 14-17, 18-20.) She worked closely with clinicians, families, and service providers to evaluate and develop the supports needed by each individual. (E. Jones Aff. Ex. A at Ex. 1 at 3-5; E. Jones Dep. 9-12, 14-16, 18-20.) She has also served in leadership roles within several mental health systems. For example, as Chief Operating Officer of the Commission on Mental Health Services in Washington, D.C., Ms. Jones was responsible for ensuring compliance with court orders arising out of the Dixon case. (E. Jones Aff. Ex. A at Ex. 1 at 2-3; E. Jones Dep. 32-33.)

Ms. Jones has also served as an expert witness on mental health and mental retardation issues in numerous federal and state court actions involving the rights of individuals in nursing homes and hospitals. (E. Jones Aff. Ex. A at Ex. 1 at 6-9.) She was also appointed by the Maine Superior Court as the Receiver for a state hospital in a class action brought to ensure the provision of mental health treatment to current and former patients. (Id. at 1-2.) She has served since February 2004 as a court-appointed monitor in Evans v. Williams, 206 F.3d 1292 (D.C. Cir. 2000), a federal class action in Washington, D.C., to oversee the development and

---

[4] As District Manager for the Massachusetts Department of Mental Health, Ms. Jones supervised the development of community-based services that, pursuant to court orders, would replace the need for Northampton State Hospital, a state psychiatric hospital. (See E. Jones. Dep. 9-11.) Her responsibilities consisted of overseeing and directing the implementation of the court orders and managing both the state hospital and the community services. (See id.; E. Jones Aff. Ex. A at Ex. 1 at 3.)

implementation of individualized community-based services for individuals with mental retardation and developmental disabilities who formerly resided in a state institution. (Id. at 1-2.) She has also served as a consultant in the development of alternative, community-based services for people with mental disabilities in several states and five countries. (See id. at 6-8.)

In this case, Ms. Jones spent approximately 175 hours observing and talking with residents of each of the adult homes at issue in this litigation, focusing her attention on three homes in particular – Seaview Home, Riverdale Manor, and Garden of Eden. (E. Jones. Aff. Ex. A at 1.) These three homes were chosen for additional focus as a representative sample of the homes based on their size, location, and participation in the Assessment Project. (Id. at 2.) Ms. Jones met with 179 adult home residents, and her conversations with each resident ranged from several minutes to two hours. (Id. at 1-2; Id. at Ex. 2; E. Jones Dep. 60-64, 130.) At Seaview Home, Riverdale Manor, and Garden of Eden, Ms. Jones assigned three clinically trained social workers to supplement her work by interviewing, observing, and reviewing records of sixty-two residents and preparing summaries of their observations for her review.[5] (E. Jones Aff. Ex. A at 2; E. Jones Dep. 70-75.)

Ms. Jones also reviewed the adult home and mental health program records for approximately 130 residents. (E. Jones Aff. Ex. A at Ex. 3; E. Jones Ex. B at Ex. 1; E. Jones Dep. 82-83, 266-268.) One hundred and twenty of these records, which were randomly selected from the 1,258 individuals whom DAI had identified as qualified to transfer to community-based housing, were also reviewed by Defendants' expert Dr. Geller in preparation for his report. (See id.; Declaration of Jeffrey L. Geller Ex. A at 33-34 (Docket Entry #148).) In addition, Ms. Jones reviewed the deposition transcripts and exhibits of twelve adult home residents, and incident and

---

[5] It is not clear how the sixty-two residents were selected, but Ms. Jones and her team did not use a random sample methodology. (E. Jones Dep. 56-59.)

inspection reports for each adult home.  (E. Jones Aff. Ex. A at Ex. 3.)  Based on her meetings

with residents and extensive review of mental health records and other relevant documents, Ms.

Jones concluded that "[a]dult home residents are capable of living in supported housing and

other more integrated settings."  (Id. at Ex. A at 3.)  While some residents "will require some

support, for some period of time with the use of community resources and with the activities of

daily living," Ms. Jones concluded that these kinds of needs are "routinely managed by

community providers in New York," and that, "as residents gain confidence and relearn skills,

their supports can be withdrawn or reduced."  (Id. at 11-12.)

    The court finds that Ms. Jones conducted a thorough and lengthy evaluation of the

capabilities and qualities of adult home residents and the characteristics of adult homes.  DAI has

met its burden to prove that Ms. Jones's opinions are based on her extensive experience and

review of reliable data.  Contrary to Defendants' assertion, that Ms. Jones lacks a clinical degree

does not render her testimony inadmissible.  (Def. Mem. Supp. Mot. Exclude 13.)  The Advisory

Committee Notes to Rule 702 provide that "the text of Rule 702 expressly contemplates that an

expert may be qualified on the basis of experience.  In certain fields, experience is the

predominant, if not sole basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702

Advisory Comm. Note (2000); see also Kumho Tire Co., 526 U.S. at 152 (noting that expert

testimony may be based on professional studies or personal experience).  As detailed above, Ms.

Jones has more than thirty years developing and implementing community-based services,

including assisting with the transition of thousands of individuals with mental illness and mental

retardation from institutions to integrated settings, and she has been retained as a mental health

expert by a number of litigants, courts, and governments.  (E. Jones Aff. Ex. A at 1; id. at Ex. A

at Ex. 1.)

Nor are Ms. Jones's opinions rendered inadmissible by her testimony that the industry standard for assessing the supports a patient would need *after* being discharged from a psychiatric institution to another setting involves an evaluation by a treatment team, and that she and her team of social workers did not test the cognitive abilities of individual residents or consult adult home staff about individual residents' qualifications. (E. Jones Dep. 18-20, 26, 81, 88; E. Jones Aff. Ex. A at 11.) As discussed above, this testimony does not refer to whether or not an adult home resident is capable of living in alternative housing; rather, it addresses what individualized planning and support an individual would need upon moving to alternative housing.

As is the case with the Plaintiff's other experts, Defendants' critique of Ms. Jones's qualifications, methodology, and assumptions are best addressed on cross-examination. McCollock, 61 F.3d at 1044; Blue Cross & Blue Shield, 141 F. Supp. 2d at 324.

### 4. Dr. Ivor Groves

Dr. Ivor Groves has a Ph.D. in psychology and has worked for more than thirty-five years in the field of mental health. (See Groves Aff. Ex. A at Ex. 1; Groves Aff. Ex. A at 1.) Dr. Groves has provided consultation and training to state human service and educational agencies for the past thirteen years, including agencies in New York, Arizona, Missouri, and Tennessee. (Id.) In Florida, Dr. Groves served as the Assistant Secretary for Alcohol, Drug Abuse, and Mental Health Programs. (Groves Aff. Ex. A at Ex. 1 at 2.) He currently serves as a federal court special master, overseeing the implementation of injunctive relief granted in Emily Q. v. Diana Bonta, 208 F. Supp. 2d 1078 (M.D. Cal. 2001), a class action lawsuit regarding the provision of community therapeutic behavior services to children in California. (Id. at 1-2.) Dr. Groves also serves as a federal court monitor for the statewide implementation of a consent

decree in Alabama requiring reforms to educational and mental health services provided to children with special needs.  (Id. at 1.)  He previously worked for eight years as chief psychologist in a Georgia state hospital that housed persons with mental illness and developmental disabilities.  (Id. at 4.)

To form his opinion, Dr. Groves analyzed the instruments used and data collected in the Assessment Project.  The Assessment Project was directed by Dr. Martha Bruce, Ph.D., M.P.H. of the Psychiatry Department at Weill Cornell Medical College.  (Martha Bruce Dep. 22-23 (Murray Decl. Ex. 21).)  Dr. Bruce led a team of fifteen professionals, including a statistician, a cognitive psychologist, a geriatric psychologist, a psychiatrist, three doctors, and several nurse assessors.  (Id.)  Dr. Bruce's team completed assessments of 2,611 residents of nineteen adult homes; 2,080 of those residents resided in fifteen of the adult homes at issue in this case.  (Bruce Dep. 64, 72-73; Groves Aff. Ex. A at 2; Adult Home Assessments, PowerPoint Presentation-Draft at 3 (Nov. 2006) (Murray Decl. Ex. 74).)  A resident's participation in the assessment was voluntary, not mandatory (Bruce Dep. 91, 136-37), and 74% of the eligible residents participated in the assessment (Affidavit of David V. Wollner ¶ 27 (Docket Entry #164)).  Officials from OMH and DOH provided input into the design of the assessment instrument for the Assessment Project.  (Bruce Dep. 27-28.)  Among the several intended uses of the data was to assess the ability of individuals to live in more integrated settings and to determine whether there were people who wanted to live in other settings.  (Bruce Dep. 66-67; Glenn Liebman Dep. 25, 54 (Murray Decl. Ex. 36); Analytic Plan for Adult Home Assessments (Murray Decl. Ex. 118) ("Question 1. 'How many adult home residents with mental illness would want to and be capable of living independently in the community with reasonable supports?'").)  After evaluating the assessment instruments, the answers to assessment questions, and the deposition testimony of Dr.

Bruce, Dr. Groves concluded that he "would not hesitate to use [the assessments] . . . as an indicator of the potential of Adult Home residents to live in a community setting of their choice with appropriate supports." (Groves Aff. Ex. A at 5.)

In analyzing the data, Dr. Groves sought to identify people who were able and willing to move from adult homes to more independent settings. (Groves Dep. 57.) He identified assessment questions most closely related to the issues of living preferences, functional daily living skills, and cognitive capacities, excluding from his analysis questions with low response rates. (Groves Aff. Ex. A at 2; Groves Dep. 158-59; see also Groves Aff. Ex. A at 3 tbl.2 (listing in detail criteria used to determine consumer preferences and capacity).) In many cases, the data for residents also included results from a "mini mental status examination," which Dr. Groves reviewed for information on residents' cognitive function, and a survey on Instrumental Activities for Daily Living, which Dr. Groves reviewed for information on the extent to which residents needed assistance in performing essential daily activities. (See Groves Dep. 121, 142.)

Dr. Groves found that of the 2,080 individuals assessed in the Assessment Project who reside in the adult homes at issue, 1,546 residents were not averse to moving. (Groves Aff. Ex. A at 4.) With respect to the types of support the residents would require in order to move from their homes, Dr. Groves found that 1,769 residents would likely not require intensive support for moving, while 311 residents would likely require intensive support. (Id.) Dr. Groves concluded that "most, if not all, of the residents of Adult Homes could live in the community with appropriate levels of support." (Id.)

In addition to his analysis of the Assessment Project data, Dr. Groves also examined numerous reports produced in this case and summaries of interviews of adult home residents conducted by or under the supervision of Elizabeth Jones. (See Groves Aff. Ex. A at Ex. 2;

Groves Dep. 62-63.) Dr. Groves also spent time in two adult homes, Queens Adult Care and Ocean House, where he met with adult home residents to discuss their experiences living in these homes and their preferred living arrangements. (Grove Dep. 109-111.) In addition, he examined the supports available to people with mental disabilities living outside of adult homes by touring the Pathways to Housing program and meeting with several other mental health housing providers. (Id. at 138-139.) Based on his analysis and research, Dr. Groves concluded that virtually all adult home residents with mental illness could live in more integrated housing. (Groves Aff. Ex. A at 4.)

Defendants contend that Dr. Groves's opinion should be excluded because the adult home assessments he analyzed were, according to Dr. Bruce, not intended to make a "final determination" concerning housing placements, but was "merely a screening process that would identify residents who might need further evaluation by professionals concerning their housing needs." (Def. Mem. 10, 14; Bruce Dep. 55-56, 132, 201-03.) But, as discussed above, evidence in the record indicates that one of the several intended uses of the Assessment Project Data was to assess the ability of individuals to live in a more independent setting and determining if there were people who wanted to live in other settings. (Liebman Dep. 25, 54; Analytic Plan for Adult Home Assessments; Bruce Dep. 66-67.) Moreover, Plaintiff correctly notes that Defendants take contradictory positions concerning the Assessment Project data; they argue in support of their Motion for Summary Judgment that they are using those very assessments to identify people who can live in more integrated settings. (See Def. Mem. Supp. Summ. J. 20-21 (Docket Entry #172).)

In addition, for the reasons discussed above with respect to Plaintiff's other experts, Dr. Groves's testimony that an individual assessment of each resident would be necessary to

determine what supports a resident would require *after* moving from an adult home does not render inadmissible Plaintiff's opinion on whether residents are qualified to move from an adult home.  (See Groves Dep. 145, 128.)

The court finds that DAI has met its burden to prove that in forming his opinions, Dr. Groves used reliable data, and that his methodology of reviewing that data is itself reliable.  Dr. Groves's testimony, reports, and opinions are thus admissible under Rule 702.

## II.  Defendants' Motion to Strike

Defendants have submitted a Motion to Strike the declarations of five adult home residents, portions of affidavits and declarations of three of DAI's fact witnesses, and various items of documentary evidence.  (Def. Mot. Strike (Docket Entry #219); Def. Mem. Supp. Strike (Docket Entry #220).)  The court considers each type of evidence in turn.  For the reasons discussed below, Defendants' Motion is granted with respect to: paragraphs thirteen, fifteen, and the last sentence of paragraph twelve of the Affidavit of Clarence Sundram (Docket Entry #211); paragraph fourteen of the Affidavit of Linda Rosenberg (Docket Entry #206); articles by Clifford Levy published in The New York Times (Murray Decl. Exs. 66-68); and the Report of the Adult Home Work Group (Murray Decl. Ex. 57).

### A.  Declarations of Five Adult Home Residents

In opposition to Defendants' Motion for Summary Judgment, DAI has submitted the declarations of five adult home residents, H.S., B.R., N.B., R.A., and O.J.[6]  Defendants seek to preclude the use of these declarations on summary judgment and at trial on the grounds that DAI failed to properly identify the witnesses as required by Rule 26(a) of the Federal Rules of Civil Procedure, and thus cannot use those witnesses to supply evidence on a motion or at trial under

---

[6] Pursuant to a Protective Order dated May 19, 2004, the declarations were filed manually on December 3, 2007 and were not docketed on ECF.

Rule 37(c). (Def. Mem. Supp. Strike 3.) For the reasons discussed below, the court does not preclude the use of the declarations.

Rule 26 of the Federal Rules of Civil Procedure requires that parties disclose individuals likely to have discoverable information and that such disclosures be supplemented when appropriate. Fed. R. Civ. P. 26(a)(1)(a) & 26(e). Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." This preclusionary rule applies on motions for summary judgment. See, e.g., Fleming v. Verizon New York Inc., No. 03-CV-5639 (WHP), 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006); Ebewo v. Martinez, 309 F. Supp. 2d 600, 607 n.2 (S.D.N.Y. 2004). "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence." Id. at 607. Courts have found that Rule 26(a) disclosures may be made through interrogatory responses. Fleming, 2006 WL 2709766, at *8.

Despite the mandatory language of Rule 37(c)(1), the Second Circuit has held that preclusion is a discretionary remedy, even if "the trial court finds that there is no substantial justification and the failure to disclose is not harmless." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006). In deciding whether to exercise its discretion to impose sanctions, a court should consider: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (quoting Sofitel, Inc. v. Dragon Med. & Sci. Commons, Inc., 118 F.3d 955, 961 (2d Cir. 1997). These factors also apply to a party's failure to comply with the court's discovery orders. See,

e.g., <u>Sofitel</u>, 118 F.3d at 955.  Although Rule 37(c)(1) does not require a movant to show bad faith on the part of the offending party, <u>see</u> <u>Design Strategy</u>, 469 F.3d at 296, "it is well-recognized that 'preclusion of witness testimony is a drastic remedy and should be exercised with discretion and caution.'"  <u>Morgenstern v. County of Nassau</u>, No. 04-CV-0058 (JS) (ARL), 2008 WL 4449335, at *1 (E.D.N.Y. Sept. 29, 2008) (internal citation omitted.)

### B.  DAI's Disclosures and the Status Conference Before Judge Go

The parties dispute whether DAI complied with Rule 26(a) and Magistrate Judge Go's discovery order at a status conference on July 29, 2005 regarding the disclosure of the five adult home residents.

One of the issues at the status conference was a dispute over when DAI should be required to supplement its initial response to an interrogatory from Defendants directing DAI to "[i]dentify each and every resident of the 26 adult homes listed in the Complaint . . . who is mentally ill, and whom plaintiff alleges is qualified to transfer to housing which plaintiff contends is more integrated and/or community-based, and who does not oppose the transfer to such housing."  (DAI's Second Supp. Responses & Obj. to Def. First Set of Interrogatories 3 (Declaration of Barbara K. Hathaway, Ex. DD (Jan. 31, 2008) (Docket Entry #217)); Tr. Status Conf. 2-3 (July 29, 2005) (Declaration of Anne S. Raish, Ex. 69 (Feb. 20, 2008) (Docket Entry #226)).)  DAI objected to answering the interrogatory on several grounds, including that its experts had not yet completed their analysis of which residents were qualified to transfer.  (<u>See</u> Tr. Status Conf. 4-6.)  Defendants argued that they needed the information to obtain discovery from those residents before the close of fact discovery.  (<u>Id</u>. at 20.)  Judge Go resolved the dispute by ordering DAI to disclose on September 30, 2005 those adult home residents it planned to call as trial witnesses, noting that "[i]t's essentially a preclusion date."  (<u>Id</u>. at 35; <u>see</u> <u>also</u>

Minute Entry for Status Conf., Hathaway Decl. Ex. W (stating that "[f]ailure to identify any resident may result in preclusion").)  Judge Go extended fact discovery concerning those residents to December 19, 2005.  (Id. at 31.)  She also added that she would consider later requests by DAI to add witnesses (see id. at 36), and clarified that if DAI were to disclose any additional names after September 30, 2005, Defendants were not precluded from deposing those witnesses.  (See id. at 35.)

On September 30, 2005, DAI responded to the interrogatory by listing every adult home resident who it contends is qualified to move to more integrated settings – approximately 1,500 names – and disclosed to Defendants by letter the names of twenty-two adult home residents it intended to call as trial witnesses, explicitly stating that it might later seek leave of the court to add as trial witnesses any of the residents identified in the interrogatory response.  (Hathaway Decl. Exs. DD, X.)  The names of the five declarants at issue were included in the list provided in response to the interrogatory, but not the list of trial witnesses.  (Id.)

Defendants contend they are prejudiced by DAI's failure to disclose the five names in its list of residents to be called as trial witnesses, because they deposed the other residents on the list, and that the "some 1500 names" disclosed in response to the interrogatory did not put them on notice that the five declarants, in addition to the twenty-two resident witnesses, would be called to testify.  (Def. Mem. Supp. Strike 3-4; Def. Rep. Mem. Supp. Strike (Docket Entry #228).)  While Defendants issued numerous subpoenas requesting documents relating to all of the individuals listed in DAI's interrogatory response, including the five declarants (Raish Decl. Exs. 70-73), the court agrees that it would be unreasonable to expect Defendants to have *deposed* the five residents at issue on the basis of the interrogatory response.

The court declines, however, to impose the "drastic remedy" of preclusion regarding DAI's failure to include the five declarants in its list of trial witnesses. While the Second Circuit has noted that a requirement of bad faith should not be read into Rule 37(c), the presence of bad faith may still factor into a court's analysis of whether to preclude witnesses. Design Strategy, Inc., 469 F.3d at 296. Preclusion is not mandatory even where "the trial court finds that there is no substantial justification and the failure to disclose is not harmless." Id. Here, looking to the Patterson factors listed above, the court finds that while DAI should have disclosed the five declarants in its list of twenty-two resident witnesses, DAI nonetheless indicated to the court at the status conference and in its submissions to Defendants that it would later seek leave to include additional adult homes residents as trial witnesses. There is no indication that DAI attempted to "sandbag" Defendants with new evidence. Cf. Pal v. New York Univ., No. 06-CV-5892 (PAC) (FM), 2008 WL 2627614, at *5 (S.D.N.Y. June 30, 2008) (precluding two patient-witnesses in action against medical school in part because the defendant never mentioned that it might seek to call *any* of its patients as witnesses.) While DAI's failure to include the five declarants effectively foreclosed Defendants' opportunity to depose them prior to moving for summary judgment, the court concludes that any harm does not rise to the level of prejudice, especially given the voluminous amount of documentary evidence Defendants sought regarding the individual adult home residents, including the five declarants.[7]

### C. Affidavits/Declarations of Clarence Sundram, Geoffrey Lieberman, and Linda Rosenberg

Defendants seek to strike portions of the affidavits of Clarence Sundram and Linda Rosenberg and the declaration of Geoffrey Lieberman, all of which DAI submitted in opposition

---

[7] For each of the adult home residents listed in DAI's interrogatory response, Defendants subpoenaed numerous documents, including admission agreements to the adult home, all documents relating to any efforts taken to seek or obtain alternate living arrangements and the outcome of any such efforts, and all documents relating to medical, mental health, and case management services. (See Raish Decl. Exs. 70-73.)

to Defendants' Motion for Summary Judgment.  (Docket Entries #211, 206, 212.)  Defendants contend that the disputed portions of the affidavits and declaration are not admissible as lay opinion testimony because they are based on specialized knowledge and thus constitute undisclosed expert testimony.  (See Def. Mem. Supp. Strike 7.)  Defendants also contend that the affidavits and declaration are conclusory and opine on ultimate legal issues in the case.  (See id.) For the reasons discussed below, the court strikes the following: the last sentence of paragraph twelve and all of paragraphs thirteen and fifteen of Mr. Sundram's Affidavit, and paragraph fourteen of Ms. Rosenberg's Affidavit.

### 1.  Lay Opinion Testimony under Rule 701

Rule 56(e) of the Federal Rules of Civil Procedure provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  A court may "strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized or conclusory statements."  Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999), cert. denied, 528 U.S. 965, rehr'g denied, 528 U.S. 1107, 531 U.S. 940 (2000).

Under Rule 701 of the Federal Rules of Evidence, a witness may testify in the form of a conclusion or opinion that is a) rationally based on the perception of the witness, b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and c) not based on scientific, technical, or other specialized knowledge . . . ."  Fed. R. Evid. 701.  The Second Circuit has interpreted the scope of permissible testimony under Rule 701 broadly.  U.S. v. Ferguson, No. 06-CR-137 (CFD), 2007 WL 4556625, at *2 (D. Conn. Dec. 20, 2007) (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[1] (2d ed.

2008)).   Witnesses who testify to opinions "based on scientific technical, or other specialized knowledge" must be qualified as experts under Rule 702.  Fed. R. Evid. 701, Advisory Committee Note (2000); United States v. Garcia, 413 F.3d 201 (2d Cir. 2005).  At the same time, however, Rule 701 "does not distinguish between expert and lay *witnesses,* but rather between expert and lay *testimony.*"  Fed. R. Evid. 701, Advisory Committee Note (2000) (emphasis in original).

The Second Circuit has held that a witness's specialized knowledge does not preclude the witness from testifying under Rule 701, provided that the testimony was rooted in personal perception, regardless of whether the witness could have testified on other matters as an expert. See United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007) (former company accountant may testify as lay witness about company's books, including effects of allegedly fraudulent debt reclassifications on company's relationship with other business entities, because testimony was based on witness's observations during twenty months as a company employee); Bank of China v. NBM LLC, 359 F.3d 171, 181-82 (2d Cir. 2004) (holding that, to the extent a witness's testimony was "grounded in the investigation he undertook in his role as a Bank of China employee" rather than on his specialized knowledge of international banking, "it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his *perceptions*." (emphasis in original); see also Garcia, 413 F.3d at 215 (noting that "a court must focus on the 'reasoning process' by which a witness reached his proffered opinion" and that lay opinion testimony must be "informed by reasoning processes familiar to the average person in everyday life").  Lay opinion testimony is also admissible when the inference is a conclusion drawn from a series of personal observations over time.  4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[1] (2d ed. 2008); Searles v. First Fortis Life Ins. Co., 98

F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (noting that conclusions based on "a series of personal observations over time" may constitute personal knowledge).

Lay opinion testimony bearing on the ultimate issue in the case is not inadmissible.  Fed. R. Evid. 704(a); see United States v. Rea, 958 F.2d 1206, 1214-15 (2d Cir. 1992) ("Since neither Rule 701 nor Rule 704(a) limits the subject matter of lay opinion testimony, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to [the ultimate issue in the case].").

### 2.  Sundram Affidavit

Clarence Sundram served as the Chairman and Chief Executive Officer of the New York State Commission on the Quality of Care for the Mentally Disabled ("the Commission") from 1978 to 1998.  (Sundram Aff. ¶ 3.)  The Commission is an independent state agency charged with assisting the governor and the legislature in developing policies to improve the mental health system and evaluating the quality of care in mental health facilities.  See N.Y. Mental Hyg. L. § 45.07 (McKinney 2006).  During Mr. Sundram's tenure, the Commission "conducted studies requested by the state legislature into conditions, services, and regulation of adult homes serving significant numbers of persons with mental illness."  (Sundram Aff. ¶ 6.)  Mr. Sundram personally "visited several adult homes in different parts of the state, conducted interviews with residents, staff, administrators and on-site medical and mental health providers, and staff of state regulatory agencies."  (Id.)

Defendants seek to strike paragraphs seven through fifteen of the Affidavit.  (Def. Mem. Supp. Strike 8.)  These paragraphs contain statements of historical fact about Defendants' service delivery system.  (See Sundram Aff. ¶ 8 ("The placement of large numbers of persons with mental illness into adult homes . . . was the result of a conscious state policy to discharge patients

from state psychiatric hospitals into these facilities due to the absence of other housing alternatives . . . ."); id. at ¶ 9-10.)  The paragraphs also contain statements about present issues in this case.  (See id. at ¶ 7 "adult homes are segregated institutions that deprive their residents of the benefits of living in the community"; id. at ¶ 11 (persons discharged from hospitals "often ended up in adult homes because they had no other choices"); id. at ¶ 13 ("In my experience, there is no valid clinical or programmatic reason that persons with mental illness need to be served in adult homes."); id. at ¶ 14 (adult home residents "are essentially captives whose presences is essential for the continuation of the proprietor's business but not for their own welfare.").)  The affidavit also describes the types of costs associated with adult homes, such as the costs of medical and mental health services, use of emergency rooms, and infrastructure improvements, and opines that "[w]hen all of these costs are considered, the true cost of segregating persons with mental illness in adult homes is approximately the same as providing them with supported housing in the community."  (Id. at ¶ 12; id. at ¶ 13 "[P]eople who can survive in adult homes can thrive in supported housing and at roughly the same overall cost.")  In addition, Mr. Sundram also attests that the methodologies used by DAI's experts "are consistent with the methods used by [the Commission] in conducting public policy studies which were relied upon by the governor and the state legislature."  (Id. at ¶ 15.)

Mr. Sundram's statements in paragraphs seven through eleven and paragraph fourteen are admissible lay testimony, because they are based on Mr. Sundram's personal observations over time.  See Searles, 98 F. Supp. 2d at 461; 4 Weinstein's Federal Evidence § 701.03[1].  Defendants' contention that Mr. Sundram left state employ ten years ago and that his observations might not be current goes to the weight, not admissibility, of the testimony.  In addition, the statements regarding state policies and practices are admissible based on the ample

opportunities Mr. Sundram had in his twenty years as the Chairman and CEO of the Commission to observe both the actions of New York's policymakers regarding adult homes and the underlying circumstances.  See 4 Weinstein's Federal Evidence, § 701.03[2] ("When the lay opinion relates to a policy or practice of a party to the lawsuit, [admissibility] depends on the sufficiency of the witness's opportunities to observe both the actions of the individuals who make policy and the circumstances underlying the activity in question."); see also Bank of China, 359 F.3d at 181 ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [ ] position in the business.") (citing Fed. R. Evid. 701, Advisory Committee Note (2000)).  That some of the statements concern ultimate issues in the case does not render the statements inadmissible.[8]  Rea, 958 F.2d at 1214-15.  The statements in paragraphs seven through eleven, paragraph fourteen, and the first three sentences of paragraph twelve of the Affidavit fall well within the scope of Rule 701 as construed by the Second Circuit.

The last sentence of paragraph twelve and all of paragraphs thirteen and fifteen are inadmissible as lay opinion testimony.  The first three sentences of Paragraph twelve describe, without citing any specific numbers or percentages, what general types of costs are associated with adult homes, such as the costs of medical and mental health services, transportation to doctors and day programs, case management, and facility infrastructure improvements.  This is permissible lay testimony because it is based on Mr. Sundram's observations over time given his former position as Chairman and CEO of the Commission.  The last sentence of the paragraph,

---

[8] As DAI points out, Defendants have also submitted numerous affidavits from non-experts that address "ultimate" issues in this case, such as defendants' "fundamental alternation" defense.  (See, e.g., Affidavit of Robert Myers ¶¶ 17, 251 (the relief sought would result in a "fundamental alteration") (Docket Entry #156); id. at ¶ 60 (adult home residents are "living in the community" within the meaning of Olmstead).)

however, which states that the "true cost of segregating persons with mental illness in adult homes is approximately the same as providing them with supported housing in the community," and the last sentence of paragraph thirteen, which states that "people who can survive in adult homes can thrive in supported housing and at roughly the same overall cost," are inadmissible; the statements cross the line from what can be observed over time by someone in Mr. Sundram's position to a comparative analysis of the cost of adult homes, which presumably requires and relies on specialized knowledge and experience.  See Bank of China, 359 F.3d at 131.  For the same reasons, the court also strikes the rest of paragraph thirteen, which includes the statement that "[i]n my experience, there is no valid clinical or programmatic reason that persons with mental illness need to be served in adult homes."

Also inadmissible is paragraph fifteen, which concerns the reliability of methodologies used by DAI's experts, which DAI contends is based on "Mr. Sundram's personal experience with conducting investigations for the State of New York."  (Pl. Opp. Strike 10 (Docket Entry #227).)  While Mr. Sundram has personal experience with investigations for the state, the disputed statement regarding the methodologies used by DAI's experts is not based on his perceptions arising out of his own investigations, but is an evaluation of other investigations; such a comparison is not based on personal perception and requires specialized knowledge and experience.  Bank of China, 359 F.3d at 131.

### 3. Rosenberg Affidavit

Linda Rosenberg served for nearly thirty years in positions of responsibility in New York's mental health system, including eight years as the Senior Deputy Commissioner of OMH from 1997 to 2004.  (Rosenberg Aff. ¶¶ 2, 4, & Attachment (Rosenberg CV).)  As Senior Deputy Commissioner of OMH, Ms. Rosenberg "oversaw New York's community-based mental health

treatment and rehabilitation system." (Id. at ¶ 2.) For part of her tenure, she "had responsibility for both state hospitals and the community-based system." (Id.) Ms. Rosenberg was also "responsible for service design and implementation, as well as operational oversight." (Id.) Since leaving OMH, she has served as Chief Executive Officer of the National Council for Community Behavioral Healthcare, a national association of 1,300 mental health service providers serving approximately 6 million people annually. (Id. at ¶ 3.)

Defendants seek to strike paragraphs five to fifteen of Ms. Rosenberg's Affidavit on the grounds that 1) the disputed portions contain undisclosed expert testimony; and 2) that admitting the disputed portions would violate OMH's attorney-client privilege. (Def. Mem. Supp. Strike 10.) The paragraphs at issue include observations and opinions about state policies. (Rosenberg Aff. ¶ 5 (when the state "deinstitutionalized" during the 1970s and 1980s, it "made a policy decision to serve large numbers of former hospital patients in adult homes."); id. at ¶ 8 ("Thousands of mentally ill New Yorkers live and receive services in adult homes as a result of deliberate state policy.").) The contested paragraphs also contain observations about adult homes (id. ¶ 6 ("adult homes are anachronisms" and are "more like institutions than community settings"); id. at ¶ 12 ("The adult homes that are the subject of this case are large, segregated institutions") and the relative benefits of supported housing (id. ("supported housing is a more integrated setting than an adult home"); id. at ¶ 13 ("Services to individuals in supported housing are tailored to their needs")). In addition, the Affidavit addresses Defendants' capacity to change the programs they administer (id. at ¶ 11), as well as the ability of adult home residents to live in supported housing (id. at ¶ 14 ("I am familiar with the eligibility criteria, operation, and capabilities of supported housing in New York. Virtually all adult home residents with mental

illness are qualified to live in supported housing and could do so successfully . . . [and] would choose to live in such housing if given adequate information and support.").

The court concludes that all of Ms. Rosenberg's statements except for paragraph fourteen are admissible lay opinion testimony. The statements regarding state policies are admissible, because Ms. Rosenberg has been well-positioned to observe state policies and practices due to her positions in the state mental health system. 4 Weinstein's Federal Evid., § 701.03[2] ("When the lay opinion relates to a policy or practice of a party to the lawsuit, [admissibility] depends on the sufficiency of the witness's opportunities to observe both the actions of the individuals who make policy and the circumstances underlying the activity in question."); see also Bank of China, 359 F.3d at 181 ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [ ] position in the business.") (citing Fed. R. Evid. 701, Advisory Committee Note (2000)). The statements regarding observations about adult homes and about the relative benefits of supported housing are admissible, as well as the statement regarding Defendants' capacity to change the programs they administer, because they are based on Ms. Rosenberg's firsthand observations during decades of work in the mental health system.

Ms. Rosenberg's statements in paragraph fourteen regarding the qualifications and willingness of adult home residents to move to supported housing, and the statement that "it would be less expensive for defendants to serve current and future adult home residents in supported housing instead of adult homes," are inadmissible for the same reasons as are similar statements in Mr. Sundram's Affidavit, and the court strikes paragraph fourteen in its entirety.

The court also addresses Defendants' objection to paragraphs five through fifteen on the grounds of breach of OMH's attorney-client privilege. (Def. Mem. Supp. Strike 10.) Rule 501 of the Federal Rules of Evidence provides that privileges in federal courts are governed by federal common law, except where state law supplies the rule of decision for a particular claim or defense. See Fed. R. Evid. 501; Lego v. Stratos Lightwave, Inc., 224 F.R.D. 576, 578 & 578 n.5 (S.D.N.Y. 2004) (citing cases). It is the burden of the party claiming privilege to "establish the essential elements of the privilege." United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996). To invoke the attorney-client privilege, a party must establish that there was "(1) a communication between client and counsel, which 2) was intended to be and was in fact kept confidential, and 3) made for the purpose of obtaining or providing legal advice." Id. The Supreme Court has held that the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." Upjohn Co. v. United States, 449 U.S. 383, 395-396 (1981); accord Muriel Sieberg & Co. v. Intuit Inc., 8 N.Y. 3d 506, 511 (2007). The Second Circuit "construe[s] the privilege narrowly because it renders relevant information undiscoverable; we apply it 'only where necessary to achieve its purpose.'" In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007) (internal citation omitted.)

Ms. Rosenberg was Senior Deputy Commissioner of OMH when this action was filed, and Defendants assert that she was at a number of meetings with senior OMH management and OMH counsel at which this case, including legal strategy, was discussed. (Def. Mem. Supp. Strike 10, 11.) Defendants further contend that "the conclusions presented in her affidavit are of necessity informed by and inextricably intertwined with what she heard in those meetings, and her affidavit thus intrudes upon privileged matter." (Id. at 11.) In support, Defendants have

requested that the court consider *in camera* a Declaration of Joseph J. Reilly.  (In Camera

Declaration of Joseph J. Reilly (Jan. 29, 2008) (not docketed on ECF).)  The court notes that the

confidential Declaration does not describe any particular communications between OMH

officials and legal counsel, nor does it indicate which statements in Ms. Rosenberg's Affidavit

disclose privileged communications.  While the court accepts Defendants' claims that Ms.

Rosenberg was present at meetings during which legal strategy was discussed, Defendants have

not met their burden to establish that the information in Ms. Rosenberg's Affidavit discloses any

*communications* that would be protected by the attorney-client privilege.  Ms. Rosenberg is not

precluded from testifying about underlying facts.  Upjohn, 449 U.S. at 395-396.  The court thus

declines to strike the disputed portions on the basis of Defendants' asserted attorney-client

privilege.[9]

Defendants also assert that Ms. Rosenberg's Affidavit violates Section 73(8)(a)(ii) of the

New York Public Officers Law.  This provision provides that:

> No person who has served as a state officer of employee shall after the
> termination of such service or employment appear, practice, communicate or
> otherwise render services before any state agency or receive compensation for any
> such services rendered by such former officer or employee . . . in relation to any
> case, proceeding, application or transaction with respect to which such person was
> directly concerned and in which . . . she personally participated during the period
> of . . . her service or employment, or which was under . . . her active
> consideration.

N.Y. Pub. Off. L. § 73(8)(a)(ii) (McKinney 2008).  The statute prohibits two categories of

activities: appearing before a state agency and receiving compensation.  The purpose of the

---

[9] Defendants also assert that while they were not privy to any discussions between DAI or DAI's counsel and Ms. Rosenberg that led to the submission of the affidavit, it would have been improper under New York State law for DAI's counsel to obtain confidential or privileged information from a former OMH official.  Muriel Siebert, 8 N.Y.3d at 511-12.  Muriel Siebert provides that while the right to conduct ex parte interviews of an opposing party's former employee is not "a license for adversary counsel to elicit privileged information," such interviews are proper "as long as measures are taken to steer clear of privileged or confidential information . . . ." Id.  While the state law of privileges does not apply to a federal question case containing only federal claims, see Fed. R. Evid. 501, the court notes in any event that Defendants have not demonstrated that any privileged or confidential information was disclosed or elicited here.

provision is "to prevent former agency employees from attempting to further their own monetary interest, or the interests of other individuals and entities, by utilizing inside information obtained during State service or asserting undue influence on former colleagues who continue to be employed by the State." McCullough v. N.Y. State Ethics Comm'n, 728 N.Y.S.2d 850, 855 (3d Dep't 2001). Defendants have submitted two Advisory Opinions of the New York State Ethics Commission; both are inapposite, as one concerns the provision of fee-based consulting services, and the other concerns expert testimony in a RICO case. (N.Y. State Ethics Comm'n Advisory Op. Nos. 94-18 and 95-40 (Hathaway Decl. Exs. BB, CC).) Here, Ms. Rosenberg is neither rendering services before any agency nor receiving compensation relating to this litigation. (See Pl. Opp. Strike 14) (stating that Ms. Rosenberg is not receiving compensation).) Therefore, the Public Officers' Law is not applicable.

### 4. Lieberman Declaration

Geoffrey Lieberman is the Executive Director of the Coalition for Institutionalized and Disabled (CIAD) in New York City, a non-profit, consumer-led advocacy organization of adult home and nursing home residents and residents' councils. (Lieberman Decl. ¶ 2.) CIAD "work[s] directly with residents of adult homes to provide them with the information and skills they need to advocate for themselves, to protect and promote the rights of residents, and to improve the quality of their lives and their care." (Id.) A primary focus of CIAD's advocacy is "the lack of available community alternatives – including supported housing – for the thousands of adult home residents who would like to live in a more integrated setting." (Id.)

Defendants seek to strike paragraphs four, six, seven, and eight of Lieberman's Declaration. (Def. Mem. Supp. Strike 9.) These paragraphs contain statements that people with mental illness in adult homes were not considered a target group for OMH supported housing

until 2005 and thus "effectively excluded from these types of housing" (Lieberman Decl. ¶ 4);
that even after adult home residents were designated as a target group, "[o]ther target groups
were given higher priority than adult home residents, and thus received all but a few of the
supported housing beds made available by OMH" (id. at ¶ 6); and that the only supported
housing beds that adult home residents have a "realistic chance" of securing are the 60 beds New
York has recently set aside specifically for this population (id. at ¶ 8).

This testimony is admissible as lay opinion testimony because it is based on Lieberman's
own observations over time.  His position as an advocate for adult home residents makes him
well-situated to observe and reach conclusions about the effect of OMH policies on adult home
residents.  Bank of China, 359 F.3d at 181-82; 4 Weinstein's Federal Evidence, § 701.03[2].
Defendants' contention that Mr. Lieberman's opinion, based on his own observations, that the
designation of adult home residents had "virtually no effect" on their access to housing is
contradicted by statistics in the record goes to the weight, not the admissibility of the disputed
evidence.  Therefore, Lieberman's Affidavit is admissible in its entirety.

### D.  Newspaper Articles

Defendants seek to exclude three articles by Clifford Levy published in The New York
Times, Exhibits 66-68 of the Murray Declaration, on the grounds that the articles are
inadmissible hearsay and irrelevant.  The court excludes these articles.

DAI seeks to offer the articles not for the truth of the matters asserted therein, but
"because they provide crucial background and historical context to DAI's allegations."  (Pl. Opp.
Strike 16.)  DAI contends that the articles, which chronicle the long history of neglect that has
generally characterized the adult homes, or "psychiatric flophouses," serve to illuminate the
circumstances that prompted this lawsuit.  (Pl. Opp. Summ. J. 12 (Docket Entry #202).)  DAI has

cited district court cases admitting newspaper articles as background. See Jackson v. Jimino, 506 F. Supp. 2d 105, 113 (N.D.N.Y. 2007); Creek v. Village of Westhaven, No. 83-C-1851, 1993 WL 512825, at *2 (N.D. Ill. Dec. 9, 1993); Yarborough v. City of Warren, 383 F. Supp. 676, 682 (E.D. Mich. 1974). In Jackson v. Jimino, a First Amendment case, newspaper articles were admitted to show that the speech was a matter of public concern, as well as that the statements were made and published and were relevant to the defendant's state of mind. In Creek v. Village of Westhaven, the court admitted newspaper articles on the basis of the plaintiffs' argument that the articles were offered only to show that an allegedly discriminatory housing development was "a matter of public concern" and that the truth of the matters reported was of "no significance." Creek, 1993 WL 512825, at *2.

In this case, however, it would be impossible to separate the "background" and "context" that the articles ostensibly provide without looking to the truth of the matters asserted. Cf. Yarborough, 383 F. Supp. at 682 (admitting articles as "background information," as evidence of "historical context," and "with an eye toward allowing a complete airing of plaintiff's claims."). Moreover, DAI has submitted a substantial amount of admissible evidence providing background and context for its claims, for example, government reports on adult homes dating as far back as 1979. (See, e.g., Murray Decl. Exs. 69, 70.) The articles are thus excluded as inadmissible hearsay.[10]

---

[10] The court notes that then-Governor Pataki convened the Adult Home Facilities Workgroup, which issued a report DAI has submitted as evidence, specifically in response to the publication of the New York Times articles. (Pl. Opp. Strike 17; Adult Home Facilities Workgroup Report (Declaration of Anne S. Raish, Ex. 57 (Aug. 31, 2007) (Docket Entry #183).) While the New York Times articles themselves are inadmissible hearsay, Plaintiff may offer evidence that the Adult Home Facilities Workgroup was created in response to the articles.

### E. Adult Home Work Group Report

Defendants move to strike a report of the Adult Home Work Group,[11] "There's No Place Like Home: Recommendations for Improving the Quality of Life in Adult Homes Serving People with Mental Illness" ("Work Group Report") (Murray Decl. Ex. 57), on the grounds that the report is hearsay and "reflects no trustworthy method of investigation or data-gathering." (Def. Mem. Supp. Strike 6.) DAI has cited the Work Group Report in opposition to Defendants' Motion for Summary Judgment to support the claim that as New York downsized its state hospital system, it increasingly relied on adult homes to provide housing for people with mental illness. (See Pl. Opp. Summ. J. 9.) While the court accepts DAI's assertion that the Work Group Report is trustworthy, it nonetheless finds it inadmissible hearsay, because it does not constitute a public record or report pursuant to Rule 803(8) of the Federal Rules of Evidence.

The Work Group Report came about as the result of a symposium on adult homes hosted by the Schuyler Center for Analysis and Advocacy, formerly the State Communities Aid Association ("SCAA"), an organization that advises policymakers on comprehensive improvements to health, education, and human services; the National Alliance on Mental Illness ("NAMI"), a grassroots advocacy organization dedicated to improving the lives of people with mental illness; and State Senator Thomas Libous and State Assemblymember James Brennan. (Work Group Rep. 4.) After the symposium, the SCAA and NAMI convened the Work Group "to develop and promote policies to improve the quality of life for residents of adult homes serving people with mental illness." (Id.) Members of the Work Group included "representatives from adult homes, mental health providers, local mental hygiene directors, social service commissioners, legal advocates, family members and advocates for the mentally

---

[11] This exhibit is different from a report of the Adult Home Facilities Workgroup, the admissibility of which is not contested. (Raish Decl. Ex. 57; Def. Mem. Supp. Strike 6.)

ill." (Id.) Staff from OMH, DOH, and the Commission provided "significant technical assistance" to the Work Group. (Id.)

While the Work Group Report was written by a group that included local government representatives, see id., there is no indication that the Work Group Report is a record or report "of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law . . . ." Fed. R. Evid. 803(8)(c). Therefore, it is excluded as inadmissible hearsay.

### F. 1979 Reports of New York Deputy Attorney General and New York City Council Subcommittee on Adult Homes

Defendants seek to exclude reports issued in 1979 by a New York Deputy Attorney General and a New York City Council Subcommittee on Adult Homes, Exhibits 69 and 70 of the Murray Declaration. Defendants contend that the reports should be excluded as hearsay, and in any event, are irrelevant, because a case seeking injunctive relief must focus on the current state of affairs. (Def. Mem. Supp. Strike 6.) While hearsay, the reports are nonetheless admissible as official government records, pursuant to Rule 803(8). While government records are not admitted if "the sources of information or other circumstances indicate lack of trustworthiness," Fed. R. Evid. 803(8)(c), a review of the evidence shows there is no indication that the government reports are untrustworthy or based on flawed methodology. Defendants merely point to an inapposite case, United States v. Durrani, 659 F. Supp. 1183 (D. Conn.), aff'd, 836 F.2d 410 (2d Cir. 1987), which holds that an investigation conducted two years after the events at issue lacked trustworthiness because "important failures of recollection by major policymakers [were] apparent," id. at 1186-87. No such circumstances are present here. In addition, Defendants' contention that the reports are irrelevant is unpersuasive. The reports are offered in

support of DAI's allegation that adult homes are not integrated settings; specifically, that state officials had a longstanding recognition that adult homes function as institutions. (Pl. Opp. Strike 17-18.) Defendants' Motion is thus denied with respect to these reports.

### G. Reports of the New York State Commission on Quality of Care

Defendants seek to exclude two reports from the New York State Commission on Quality of Care ("the Commission"), Exhibits 79, 86, and 125 of the Murray Declaration,[12] on the grounds that the reports are hearsay and irrelevant. (Def. Mem. Supp. Strike 6-7.) As discussed above, the Commission is an independent state agency created by statute. Its duties include "[r]eview[ing] the cost effectiveness of mental hygiene programs and procedures provided for by law with particular attention to efficiency, effectiveness and economy in the management, supervision and delivery of such programs." N.Y. Mental Hyg. L. § 45.07(b) (McKinney 2006). The Commission is also required to "[r]eview the organization and operations of the department of mental hygiene and advise and assist the governor in developing policies, plans and programs for improving the administration of mental hygiene facilities and the delivery of services therein and for ensuring that the quality of care provided to persons with mental disabilities in the state is of a uniformly high standard." Id. at § 45.07(a). There is no dispute that these reports, entitled "Adult Homes Serving Residents with Mental Illness: A Study on Layering of Services" ("Layering Report") and "Exploiting Not-For-Profit Care in an Adult Home: The Story Behind Ocean House Center, Inc." ("Ocean House Report"), constitute factual findings resulting from investigations carried out pursuant to statutory authority. There is no indication, nor do Defendants contend, that the reports lack trustworthiness. The records are thus admissible under Rule 803(8)(c).

---

[12] Exhibits 86 and 125 are the same document.

Defendants' contention that the reports should be excluded on relevancy grounds is unpersuasive.   The reports, which analyze the costs of treating people with mental illness in adult homes, are offered to rebut Defendants' "fundamental alteration" defense.  (Pl. Opp. Strike 18-19.)  Defendants' contention that the Layering Report's conclusions concerning the costs in 11 adult homes cannot automatically be applied to all adult homes at issue goes to the weight, not the admissibility, of the proffered evidence.  The court also finds that the Ocean House Report, which details financial improprieties at an adult home that is now closed, is relevant to DAI's claims in this action.  Defendants' Motion is thus denied with respect to the Commission's reports.

## III.     Conclusion

For the foregoing reasons, Defendants' Motion to Exclude Expert Testimony, Reports, and Opinions of DAI's Experts (Docket Entry #173) is denied in its entirety.  Defendants' Motion to Strike Evidence (Docket Entry #219) is granted in part and denied in part. Specifically, the court grants the Motion to Strike with respect to: paragraphs 13, 15, and the last sentence of paragraph 12 of the Affidavit of Clarence Sundram; paragraph 14 of the Affidavit of Linda Rosenberg; the articles published in The New York Times (Murray Decl. Exs. 66-68); and the Report of the Adult Home Work Group (Murray Decl. Ex. 57).

SO ORDERED.

 _[s] Nicholas G. Garaufis___

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
      December 22, 2008          United States District Judge