UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DISABILITY ADVOCATES, INC.,

**MEMORANDUM & ORDER**

03-CV-3209 (NGG) (MDG)

Plaintiff,

-against-

DAVID A. PATERSON, in his official
capacity as Governor of the State of New
York, RICHARD F. DAINES, in his official
capacity as Commissioner of the New York
State Department of Health, MICHAEL F.
HOGAN, in his official capacity as
Commissioner of the New York State Office
of Mental Health, THE NEW YORK STATE
DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

Defendants.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

The "integration mandate" of Title II of the American with Disabilities Act ("ADA") and

Section 504 of the Rehabilitation Act ("RA"), as expressed in federal regulations and Olmstead

v. L.C., 527 U.S. 581 (1999), requires that when a state provides services to individuals with

disabilities, it must do so "in the most integrated setting appropriate to their needs." The

Supreme Court explicitly held in Olmstead that "[u]njustified isolation . . . is properly regarded

as discrimination based on disability," observing that "institutional placement of persons who

can handle and benefit from community settings perpetuates unwarranted assumptions that

persons so isolated are incapable of or unworthy of participating in community life." 527 U.S. at

600.

Plaintiff Disability Rights Advocates, Inc. ("Plaintiff" or "DAI") is a protection and advocacy organization authorized by statute to bring suits on behalf of individuals with disabilities. It brings this suit on behalf of adults with mental illness who live in twenty-one "adult homes." Adult homes are residential adult care facilities licensed by the State of New York (the "State") to provide long-term care and supervision to people with disabilities and/or mental illness. DAI alleges that these particular adult homes – all of which are located in New York City and have more than 120 residents, more than 25% of whom have mental disabilities – are segregated settings akin to psychiatric institutions. According to DAI, many of its constituents are qualified to live in "supported housing," an alternative form of housing in which individuals with mental illness live in their own apartments scattered throughout the community and receive supportive services. DAI thus alleges a violation of the integration mandate, claiming that its constituents are not receiving services in the "most integrated setting appropriate for their needs."

DAI has named as defendants the New York State Department of Health ("DOH") and the New York State Office of Mental Health ("OMH"), as well as Governor David A. Paterson and the Commissioners of DOH and OMH (collectively, "Defendants"), each sued in their official capacities.[1] DAI seeks declaratory and injunctive relief requiring Defendants "to take such steps as are necessary to enable Plaintiff's constituents to receive services in the most integrated setting appropriate to their needs" (Compl. 34 (Docket Entry #1)), and proposes an order requiring Defendants to offer supported housing to those of DAI's constituents who are qualified to move. (Pl. Mem. Opp. Summ. J. ("Pl. Opp.") 27 (Docket Entry #202).)

---

[1] The court has substituted the names of Defendants sued in their official capacities pursuant to Rule 25 of the Federal Rules of Civil Procedure.

Defendants have brought a Motion for Summary Judgment. (Def. Mot. Summ. J. (Docket Entry #145); Def. Mem. Supp. Summ. J. ("Def. Mem.") (Docket #172).) First, Defendants contend that DAI lacks standing to bring these claims and to seek system-wide injunctive relief. Second, they argue that Title II of the ADA does not apply to DAI's claims, because the adult homes are privately operated and the State merely licenses and inspects them. Third, they claim that adult home residents are already in the "most integrated setting," because adult homes and supported housing are "equally integrated" with the community. Fourth, they argue that DAI has not established that adult home residents are qualified to move to alternative housing. Fifth, they contend that the Governor is not a proper defendant. (See Def. Mem. 35, 44, 65, 82.)

In addition to these arguments on the merits of DAI's case, Defendants also seek summary judgment on their "fundamental alteration" affirmative defense. This defense, described in the regulations and discussed in Olmstead, provides that even if the individuals whose placement is at issue are not in the most integrated settings appropriate to their needs, the State need not take a particular action that would constitute a "fundamental alteration" of its programs and services, taking into account the State's available resources and its obligations to provide services to others with disabilities. Defendants contend that even if DAI could establish a violation of the integration mandate, Defendants should not be required to move adult home residents to alternative settings because doing so would impose a fundamental alteration. (See id. at 70-71.)

DAI has also brought a Motion for Partial Summary Judgment solely on the fundamental alteration defense. (Pl. Mot. Partial Summ. J. (Docket Entry #176).) It contends that Defendants have failed to develop an effective plan to comply with the integration mandate of Title II and

Olmstead – an "Olmstead plan" – with respect to adult home residents, and that this failure precludes Defendants from asserting a fundamental alteration defense. (Pl. Mem. Supp. Partial Summ. J. ("Pl. Mem.") (Docket Entry #176).)

For the reasons below, the parties' Motions are DENIED. The court concludes that DAI has standing, that Title II applies to DAI's claims, and that the Governor is a proper party. Regarding whether DAI's constituents are in the "most integrated setting appropriate to their needs," including whether they are qualified to move to alternative settings, Defendants have not met their burden for summary judgment. On the fundamental alteration defense, summary judgment is denied to both Plaintiff and Defendants; the issues for trial are set forth below.

## I.    PROCEDURAL HISTORY

Plaintiff filed this case on July 1, 2003. (Docket Entry #1.) Discovery concluded on November 14, 2006. (Status Conf. before Magistrate Judge Marilyn D. Go, Nov. 14, 2006.) The parties filed their Motions for Summary Judgment on August 10, 2007, with opposition and reply memoranda to follow. (Scheduling Order dated Aug. 7, 2007 (Docket Entry #179).) The parties requested extensions of time, and the two Motions were fully briefed on January 31, 2008.[2] (Docket Entries #221-223.)

In conjunction with the Motions for Summary Judgment, Defendants also submitted two evidentiary motions seeking to exclude portions of Plaintiff's evidence. (Docket Entries #173, 219.) One was fully briefed on January 31, 2008; the other was fully briefed on February 29, 2008. (Docket Entries #218, 229.) The court ruled on these motions on December 22, 2008 and presumes familiarity with that Memorandum & Order. See Disability Advocates, Inc. v.

_____

[2] After granting the parties' requests for additional time to file their opposition and reply memoranda, the court ordered the parties to withdraw and resubmit their initial motion papers. (Docket Entry #193.) This order did not affect the filing dates for the parties' opposition and reply memoranda.

Paterson ("December M&O"), No. 03-CV-3209 (NGG) (MDG), 2008 WL 5378365 (E.D.N.Y. Dec. 22, 2008).

Currently before the court are the parties' Motions for Summary Judgment. The claims on which the parties seek summary judgment are fact-intensive and rely on a voluminous and comprehensive record containing more than 13,000 pages. The parties have provided hundreds of pages of briefing on the factual and legal issues and have submitted approximately 675 exhibits, including affidavits and declarations of fact and expert witnesses, government reports, and deposition testimony. The court wishes to compliment the parties on their extensive and thoughtful analysis of the complex legal and factual issues in this case. While the court is not required to look beyond the evidence cited in the parties' Rule 56.1 Statements and responses, see Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008) (discussing Local Civ. R. 56.1), it has considered additional evidence cited in the parties' memoranda of law in the interest of thoroughness.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issue of material fact exists. See Fed. R. Civ. P. 56(c); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), cert. denied, 524 U.S. 911 (1998). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994).

The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-252.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "Therefore, summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted).

In ruling on a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ."  Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).  As such, the non-movant "will have [his or her] allegations taken as true, and will receive the benefit of the doubt when [his or her] assertions conflict with those of the movant."  Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (internal quotation marks and citation omitted).  "Stated more succinctly, "[t]he evidence of the non-movant is to be believed."  Lucente, 310 F.3d at 254 (citing Anderson, 477 U.S. at 255).

When parties have filed cross-motions for summary judgment, "the court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  Bronx Household of Faith v. Bd. of Educ., 492 F.3d 89, 96 (2d Cir. 2007) (citation omitted).  When there is no issue of fact as to an affirmative defense, courts have granted partial summary judgment striking that defense.  See, e.g., Northwestern Mut. Life Ins. Co. v. Fogel, 78 F. Supp. 2d 70 (E.D.N.Y. 1999).

## III.    BACKGROUND

The following background sets forth only some of the relevant evidence.  More detail is provided in the discussion and analysis of each claim.

### A.    Adult Homes

Adult homes are a type of adult care facility licensed by the State of New York and authorized "to provide long-term residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator."  N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485.2(b), 487.2(a).  All of the adult homes in New York State are populated entirely by people with disabilities and/or mental illness.  (DOH, Adult Care Facility Census Rep. 2006 (Declaration of Anne S. Raish ("Raish Decl.") Ex. 2 (Docket Entries #182-83)); DOH, Adult Care Facility Census Rep. 2004-2005 (Raish Decl. Ex. 31).)  The adult homes are privately owned.  (See, e.g., Affidavit of David V. Wollner ("Wollner Aff.") ¶ 2 (Docket Entry #164); Affidavit of Leon Hofman ("Hofman Aff.") ¶ 3 (Docket Entry #151).)  Defendant agencies DOH and OMH license, certify, and monitor the adult homes as well as the mental health services provided; the adult homes are subject to a comprehensive statutory and regulatory scheme, discussed in Section IV.A below.

There are currently 380 licensed adult homes in New York State, 44 of which are in New York City.  (Def. 56.1 Statement ¶¶ 12, 13 (Docket Entry #171).)  While the State does not require anyone to live in an adult home, a State statute provides that State hospitals and other psychiatric facilities licensed by the State will use adult homes for discharge.  See N.Y. Mental Hyg. L. § 29.15(i)(2)(II).  According to Plaintiff's evidence, many individuals currently living in adult homes have come to live there following their discharge from State psychiatric centers and hospitals and other institutional settings, such as nursing homes.  (See, e.g., Affidavit of Clarence

Sundram ("Sundram Aff.") ¶¶ 8-11 (Docket Entry #211); B.R. Decl. ¶¶ 7-8; N.B. Decl. ¶¶ 9; S.B. Dep. 136-38; Declaration of Dennis Jones ("D. Jones Decl.") Ex. A at 5-7 (Docket Entry #207); Ocean House Resident Matrix (Declaration of Francine N. Murray ("Murray Decl.") Ex. 124 (Docket Entry #214)) (indicating that 65 out of 107 residents who were at Ocean House at the time of its closure had been admitted from State psychiatric hospitals, including one as recently as 2005).)[3] In recent years, however, a much smaller percentage of patients discharged from State hospitals have gone to adult homes; since 2003, less than 5% of such patients have been discharged to adult homes. (Def. 56.1 Statement ¶ 11.) In addition to State hospitals and psychiatric centers, adult home residents have also come to live in the adult homes from other venues, including private hospitals, the New York City shelter system, other adult homes in the State, and their families' homes. (Id. ¶ 10.)

In 2002, there were 12,586 recipients of mental health services residing in adult homes statewide. (OMH, 2004-2008 Statewide Comprehensive Plan for Mental Health Servs. ("OMH 2004-2008 Plan") 69 (Raish Decl. Ex. 56).) 10, 971 of these were in "impacted" adult homes (id.); "impacted" refers to adult homes in which at least 25% or 25 residents, whichever is fewer, have mental disabilities. The number of individuals in impacted adult homes is more than twice the number of adults with mental illness in State-operated hospital inpatient programs.[4]

---

[3] To preserve confidentiality, the court refers to current and former residents of adult homes by their initials only. Pursuant to a protective order issued by Magistrate Judge Marilyn D. Go on May 19, 2004 (Docket Entry #46), the declarations of adult home residents B.R., N.B., O.J., H.S., and R.A., were not filed electronically, but were submitted to chambers on December 3, 2007.

Excerpts from the depositions of former and current adult home residents are included as exhibits to the Declaration of Francine N. Murray and the Declaration of Scott J. Spiegelman (Docket Entry #161) and will be cited throughout simply as "__ Dep."

[4] The state's non-forensic psychiatric centers have a total inpatient census of less than 4,200. (Def. 56.1 Statement ¶ 57.)

In New York City, there are are approximately 4,000 adults with mental illness currently living in adult homes. (Pl. 56.1 Statement ¶ 70 (Docket Entry #177).) Of the forty-four adult homes in New York City, thirty-eight are impacted.[5] (Def. 56.1 Statement ¶ 13.) Of these thirty-eight homes, twenty-eight are certified for more than 120 beds. (Id. ¶ 14.) The relief DAI seeks is directed exclusively at twenty-one impacted adult homes in New York City with more than 120 beds.[6] (Compl. ¶ 35.) At the end of 2006, in fifteen of those homes, 95% or more of the residents had mental illness, and four of the homes were populated entirely by individuals with mental illness. (Pl. 56.1 Statement ¶¶ 5, 6.)

## B.    The Development of Adult Homes

According to several former State officials, the placement of large numbers of individuals with mental illness in adult homes developed in response to the State's deinstitutionalization movement of the 1970s and 1980s, when the State reduced the number of mentally ill individuals in State psychiatric hospitals.[7] Linda Rosenberg attested that when New York State deinstitutionalized, the State made a "policy decision" to serve large numbers of former patients in adult homes. (Affidavit of Linda Rosenberg ("Rosenberg Aff.") ¶ 5 (Docket Entry #206).) Ms. Rosenberg worked in positions of responsibility in New York's mental health system for

[5] The parties dispute whether certain of the homes at issue were impacted in 2002. Specifically, Defendants have provided an affidavit from DOH official Mary Hart stating that that Harbor View Home, Palm Beach, Long Island Hebrew Living Center, and Thomas Jefferson Home were not impacted in 2002. (Affidavit of Mary E. Hart ("Hart Aff.") ¶ 10 (Docket Entry #149).) DAI has provided statistics from DOH indicating that each of these homes in 2002 had more than 25% of the residents receiving mental health services, indicating that they were impacted. (DOH, Adult Care Facilities by Current Region & Facility Type Statistical Report – Recipients of Any Type of Mental Health Servs. 8-11 (Murray Decl. Ex. 127).)

[6] The twenty-one homes are: Anna Erika, Bayview Manor, Belle Harbor Manor, Brooklyn Adult Care Center, Elm-York Home, Garden of Eden, Lakeside Manor, Long Island Hebrew, Mermaid Manor, New Central Manor, New Gloria's Manor, New Haven Manor, Oceanview Manor Home for Adults, Park Inn, Parkview Home for Adults, Queens Adult Care Center, Riverdale Manor, Sanford Home, Seaview Manor, Surf Manor Home for Adults, and Surfside Manor. (Compl. ¶ 35.) While Defendants admitted in their Answer that twenty-one of the homes were impacted (Ans. ¶ 33 (Docket Entry #19)), they now contend that four of the homes are not impacted (Hart Aff. ¶ 10).

[7] It is undisputed that the population of the New York State psychiatric centers fell from approximately 93,000 in the 1950s to 5,309 in 1998. (Def. 56.1 Statement ¶ 56.)

thirty years and served as the Deputy Commissioner of OMH from 1997 to 2004. Similarly, Clarence Sundram served from 1978 to 1998 as the Chairman and Chief Executive Officer of the New York State Commission on the Quality of Care for the Mentally Disabled (now the Commission on Quality of Care and Advocacy for Persons with Disabilities) ("CQC"), an independent State agency. (Sundram Aff. ¶ 3.) He attested that the placement of large numbers of people with mental illness into adult homes was the result of a "conscious State policy" to discharge patients from psychiatric hospitals into these facilities "due to the absence of other housing alternatives at a time when psychiatric centers were under pressure to downsize." (Id. ¶ 8.) According to Mr. Sundram, to meet the growing need for housing created by the large numbers of discharges from state psychiatric hospitals, the state licensed private providers to create adult homes using under-utilized facilities, such as hotels, motels, YMCAs, and other similar buildings. (Id. ¶ 9.) James Stone, the defendant Commissioner of OMH when this suit was filed, similarly noted in a memorandum that "[a]dult homes developed in a response to a need – lack of community based housing resources. . . . Deinstitutionalization happened and the community resources weren't up to speed with state operated bed reductions." (Mem. to Members of Mental Health Servs. Council from OMH Comm'r James Stone (Nov. 22, 2002) (Raish Decl. Ex. 38).)

Plaintiff points out that the State has long characterized adult homes as institutions. In government reports published in 1979, New York State and New York City officials referred to these adult homes as "de facto mental institutions" and "satellite mental institutions." (Deputy Att'y Gen. Charles J. Hynes, Private Proprietary Homes for Adults 38 (Mar. 31, 1979) (Murray Decl. Ex. 69); New York City Council Subcomm. on Adult Homes, The Adult Home Industry: A

Preliminary Report 14 (Murray Decl. Ex. 70).) On its website, OMH currently characterizes adult homes as an "institutional setting[]" in which people with mental illness are "stuck":

> [T]he unmet need for decent, safe and affordable housing – often with supports – is very substantial for people with mental illness. As a consequence of poor access to community housing, inadequate levels of mental health housing, and clinical programs that do not support people in getting/keeping housing successfully, many people with a mental illness are poorly housed or institutionalized. Thus, many people with a mental illness are 'stuck' in . . . institutional settings (nursing homes, adult homes, state psychiatric centers).

(OMH, Guiding Principles for the Redesign of the OMH Housing and Community Support Policies 1 (Murray Decl. Ex. 71).)

### C. Facts and Characteristics about the Adult Homes at Issue

On the issue of whether adult home residents are in the most integrated setting appropriate to their needs, the parties have submitted voluminous evidence about the characteristics of adult homes.[8] Both parties have submitted evidence on the extent to which the adult homes share characteristics of institutions, opportunities for adult home residents to interact with people outside the adult homes, and programs and services offered in the homes. Some evidence is set forth here as background and other evidence is discussed in the analysis of the parties' claims below. The parties rely on expert testimony;[9] depositions and declarations of twenty-three individuals who live (or have lived) in adult homes;[10] and affidavits and depositions

---

[8] Unless otherwise indicated, from this point forward, "adult homes" and "adult home residents" refer to the impacted adult homes in New York City at issue in the litigation and their residents.

[9] The basis and methodologies for the opinions of Plaintiffs' experts, Elizabeth Jones, Dennis Jones, Kenneth Duckworth, and Ivor Groves – as well as the experts' qualifications – are described at length in the court's December M&O.

[10] Four of these individuals no longer resided in an adult home at the time of their depositions. (See A.M. Dep. 6-7 (supported housing); P.C. Dep. 15 (housing funded by the state); M.B. Dep. 10-12 (private residence); J.M. Dep. 7 (private residence).)

      The parties dispute whether another resident, D.N., still lives in an adult home. Defendants point to D.N.'s testimony in 2005 at her deposition that she planned to move to Pennsylvania to live with her family. (D.N. Dep. 59-62.) Plaintiff's counsel declared that he called the adult home in October 2007 and spoke with D.N. to confirm that she still lived in the adult home. (Declaration of John Gresham ¶ 4 (Oct. 17, 2007) (Docket Entry #213).)

of numerous fact witnesses, including former and current New York state officials, mental health service providers, and staff in adult homes and supported housing programs.

While it is undisputed that the adult homes share certain characteristics of medical facilities and inpatient psychiatric facilities, the parties' expert and fact witnesses ultimately disagree as to whether the homes are akin to "institutions." Defendants characterize adult homes as facilities that "provide a place to live, meals, housekeeping and laundry services," as well as "assistance with self-administration of medications, and some assistance with personal needs such as grooming and dressing." (Affidavit of Mary E. Hart ("Hart Aff.") ¶ 7 (Docket Entry #149).) DAI's and Defendants' experts observed that adult homes share characteristics of medical facilities and inpatient psychiatric facilities. (Decl. Alan G. Kaufman ("Kaufman Decl.") Ex. Kaufman-A at 8 (Docket Entry #152); see Affidavit of Elizabeth Jones ("E. Jones Aff.") Ex. A at 8 (Docket Entry #208); D. Jones Decl. Ex. A at 9-10; Rosenberg Aff. ¶ 12; Sundram Aff. ¶ 7; Schwartz Dep. 297-300.[11])

Plaintiff has provided evidence about the regimented nature of the adult homes. For example, individuals with mental illness in the adult homes reside in close quarters entirely with other persons with disabilities and with significant numbers of other persons with mental illness. (E. Jones Aff. Ex. A at 8; D. Jones Decl. Ex. A at 9; Sundram Aff. ¶ 7; Rosenberg Aff. ¶ 12.) Residents have testified that they receive treatment from on-site doctors and nurses. (S.B. Dep. 88-89, 45; P.B. Dep. 132; N.B. Decl. ¶ 28.) At some adult homes, residents line up to receive medications from adult home staff, and self-administration of medication is discouraged. (Schwartz Dep. 319-320; S.B. Dep. 124-125; D.N. Dep. 89; G.L. Dep. 202-204; P.B. Dep. 131; S.P. Dep. 64; Affidavit of Kenneth Duckworth ("Duckworth Aff.") Ex. A at 9, 13 (Docket Entry

---

[11] Excerpts from depositions are attached as exhibits to the Declarations of Francine N. Murray, Scott J. Spiegelman (Docket Entries #165-170), and Anne S. Raish. They are cited here as "__ Dep."

#209).)  According to one adult home resident, aides instruct residents as to what to do at various times of the day, including when to eat, bathe, and take medications.  (O.J. Decl. ¶¶ 17-20.) Another resident stated that at her adult home, all residents with diabetes must eat together a half-hour before everyone else takes their meal.  (B.R. Decl. ¶ 12.)  Residents testified that they are assigned roommates and lack privacy.  (S.P. Dep. 134-136; O.J. Decl. ¶ 13; H.S. Decl. ¶ 11; G.H. Dep. 128; E. Jones Aff. Ex. A at 5.)  Adult home residents have testified that they can only receive calls coming through the adult home switchboard and/or on extensions or pay phones in common areas (B.J. Dep. 125-126; S.P. Dep. 68-69) that lack privacy and are often chaotic (L.G. Dep. 116-118; J.M. Dep. 53-54; D.N. Dep. 238-244).

Plaintiff has provided evidence that adult homes have visiting hours (E. Jones Aff. Ex. A at 3; P.B. Dep. 109; G.L. Dep. 227; D.W. Dep. 132; S.P. Dep. 118), and visitors must identify themselves and sign in with the home (E. Jones Aff. Ex. A at 3, 8; D.W. Dep. 132; B.J. Dep. 115; L.G. Dep. 146).  Visitors are received in noisy common areas (D.N. Dep. 238-41; D.W. Dep. 131-132; E. Jones Aff. Ex. A at 3), unless the resident's roommate or management grants permission for visitors to enter their bedroom (E. Jones Aff. Ex. A at 3; L.G. Dep. 149-150). Some residents have testified that their adult homes do not permit visitors to join in meals or stay overnight.  (B.J. Dep. 115, 121; D.W. Dep. 132.)

### D.       Discharge Planning and/or Information About Alternative Housing Options

The parties dispute whether and to what extent residents of adult homes receive discharge planning or information about alternative housing options.  Defendants assert that adult home residents receive information about alternative housing and assistance in filling out forms to apply for alternative housing.  (See Bear Dep. 53-54 (testifying that staff would help an adult home resident obtain alternative housing "if a client identifies that they want to move"); Aff.

Jonas Waizer ¶ 67 (Docket Entry #163) (attesting that staff helped one resident fill out application forms); Affidavit of Flora Bienstock ("Bienstock Aff.") ¶ 6 (Docket Entry #146) (attesting that staff assisted "a number of adult home residents with the application and interview process" for alternative living arrangements); Burstein Dep. 127-129 (testifying that when she reviews case management records and sees a notation about a resident wanting to move, she finds out whether the social worker has completed an application for alternative housing); Lockhart Dep. 70-87, 35-38, 49, 26 (testifying that staff: (1) informs residents about alternative housing, including supported housing, (2) provides residents with HRA 2000 application forms for supported housing, and (3) has helped approximately five residents fill out HRA 2000 forms).)[12]

According to Plaintiff's witnesses, and even Defendants' expert, Dr. Jeffrey Geller, adult home residents are not adequately informed about what their options are regarding housing.[13] (E. Jones Aff. Ex. A at 10; Geller Dep. 181 (testifying that residents are unable to make informed choices about their housing options because they are not adequately informed about the available alternatives).) Plaintiff's experts have observed that adult homes are permanent placements, and that "comprehensive discharge planning is non-existent." (E. Jones Aff. Ex. A at 3, 5; Duckworth Aff. Ex. A at 9; Duckworth Dep. 119-120.)

---

[12] Lockhart also testified that staff assisted one adult home resident with moving into independent housing not licensed by OMH, and helped that person by looking at the apartment and providing a security deposit and furniture. (Lockhart Dep. 26-28.)

[13] Moreover, Plaintiff has provided evidence that many residents of adult homes were not given a meaningful choice when they moved into an adult home. Dr. Duckworth observed that "adult home residents I met were frequently given no choice about where to live. At best, if they were given a choice, it was between two adult homes." (Duckworth Aff. Ex. A at 15; see also E. Jones Aff. Ex. A at 9 ("Residents were admitted to the adult homes with little or no choice.").) Plaintiff has also provided declarations and deposition testimony of current and former adult home residents indicating that they did not have a choice about whether to go to an adult home. (See H.S. Decl. ¶ 7 ("When they moved me out of Seaport, they didn't give me a choice about whether to go to an adult home or not. I had to go to an adult home."); B.R. Decl. ¶¶ 8-9; P.B. Dep. 30; M.B. Dep. 19; L.G. Dep. 9-10; G.H. Dep. 267-268; T.M. Dep. 28-29; J.M. Dep. 10; D.N. Dep. 13; S.P. Dep. 93; D.W. Dep. 192-193.)

Adult home residents have testified that they have not received assistance in making or executing sound discharge or transfer plans.  (R.A. Decl. ¶¶ 13-16; N.B. Decl. ¶¶ 11, 23-30; O.J. Decl. ¶¶ 22-24; B.R. Decl. ¶¶ 6, 19-22; H.S. Decl. ¶¶ 7, 12-19; P.B. Dep. 184-187; S.P. Dep. 105-107; S.B. Dep. 119-120.)  Residents have testified that they are not provided with information about supported housing or other resources and benefits that might be available to them.  (D.N. Dep. 136-137, 255; P.B. Dep. 175, 102-103; S.B. Dep. 90-92; L.G. Dep. 105-107; S.H. Dep. 102, 133-145; A.M. Dep. 134-136; S.P. Dep. 107, 110, 111; C.H. Dep. 119.)  One of DAI's experts, Dr. Kenneth Duckworth, observed that mental health program staff are ill-informed about supported housing.  (Duckworth Aff. Ex. A at 14; <u>see also</u> Mendel Dep. 63-65 (associate administrator of adult home testifying that he did not know whether there were different models of supportive housing, who generally operates supportive housing, or whether any residents have moved to supportive housing).)  Residents have testified that they are discouraged by staff from expressing an interest in moving out.  (<u>See</u>, <u>e.g.</u>, G.L. Dep. 102-103, 105-107, 123-124.)

One administrator testified that she was "not sure" whether, when she worked directly with residents as a social worker, she had been aware of supported housing being available to adult home residents.  (Levine Dep. 71-75.)  She also testified, however, that the social workers helped residents apply for "less restrictive housing," and that she assisted two residents with applications, both of which were accepted.  (Id. at 173-77.)  She testified that there were other residents besides who were interested in other housing, but that she did not work with them to pursue it because "[t]here might have been other things that at the time were more pressing" to those residents.  (<u>Id</u>. at 177.)

Plaintiff has provided testimony from adult home residents describing unsuccessful attempts to obtain assistance from social workers or treatment professionals in applying for housing. A former adult home resident testified that it took six months for his social worker from the day treatment program to complete his housing application. (A.M. Dep. 128-132.) Another former adult home resident testified that while his social worker helped him fill out a housing application, the application was never filed because the social worker did not complete the form before leaving his job. (M.B. Dep. 116-121.) One resident testified that she talked to her therapist about wanting to move out of the adult home, but the therapist never told her about supported housing, OMH housing, or applying for housing. (L.G. Dep. 105-106.)

**E.    Desire of Adult Home Residents to Move Out of the Adult Homes**

Plaintiff has provided evidence in the form of deposition testimony, a study commissioned by DOH, and expert testimony indicating that a large percentage of adult home residents want to move out of the adult homes.[14] For example, many adult home residents have expressed a desire to move out of their adult home. (See R.A. Decl. ¶ 9 ("I want to move out of this place. I feel stuck here."); N.B. Decl. ¶¶ 11-18; O.J. Decl. ¶ 7 ("I would like to move because I want to do my own cooking, cleaning, decorating, and shopping, and I want to handle my own money."); B.R. Decl. ¶ 6 ("I would like to move out. I want to experience being out in life again."); H.S. Decl. ¶¶ 10-11; S.B. Dep. 98, 111; L.G. Dep. 102; L.H. Dep. 121-122; G.H. Dep. 8-10; C.H. Dep. 127-129; I.K. Dep. 94-95; G.L. Dep. 101-102; D.N. Dep. 155; T.M. Dep. 98; S.P. Dep. 106-107, 137; D.W. Dep. 144, 187.)

---

[14] Defendants have provided evidence that not all adult home residents want to move out. For example, B.J. testified that there was not any place she would rather live "right now" and that she liked living at Brooklyn Manor because she had not been hospitalized in the twenty years she had been living there. (B.J. Dep. 31-34; see also id. at 92-93 (testifying that adult homes are the "[b]est thing that could ever happen to mental patients.").)

Plaintiff has also provided evidence that some adult home residents have expressed feelings of isolation in the adult home. (See, e.g., R.A. Decl. ¶ 9 ("I feel stuck here."); N.B. Decl.¶ 15 ("There isn't any opportunity to interact with people who aren't patients here."); O.J. Decl. ¶ 16 ("[T]he area over here feels deserted."); B.R. Decl. ¶ 18 ("I don't know anyone in the neighborhood outside of Garden of Eden"); T.M. Dep. 110 ("It's difficult to meet different people now . . . [because y]ou're in program, you're in home."); S.P. Dep. 58 (stating that he feels "isolated" living in his adult home because "they don't do anything [and e]verybody's like indoors on top of one another.")

Plaintiff also points to a study commissioned by DOH as evidence that adult home residents want to move. In December 2002, officials at DOH paid New York Presbyterian Hospital ("NYPH") $1 million to conduct an assessment of residents in various adult homes in New York City, resulting in the New York State Adult Home Assessment Project ("Assessment Project"). (Pl. 56.1 Statement ¶¶ 16-18.) The Assessment Project assessed 2,611 residents in nineteen adult homes, including fifteen of the homes at issue in this case.[15] (Pl. 56.1 Statement ¶ 19.) According to Assessment Project data documentation, 35% of the adult home residents with mental illness who were assessed stated that they wanted to move to their own apartment, and another 21.2% stated that they wanted to move in with their family.[16] (Bruce Dep. 94-95; Adult Home Assessment Project Data Documentation, 2003-2005 (Raish Decl. Ex. 7).) Glenn Liebman, the DOH official who was principally charged with overseeing the Assessment Project,

---

[15] The Assessment Project was directed by Dr. Martha Bruce, Ph.D., M.P.H. of the Psychiatry Department at Weill Cornell Medical College. (Bruce Dep. 22-23.) Dr. Bruce testified that she led a team of fifteen professionals, including a statistician, a cognitive psychologist, a geriatric psychologist, a psychiatrist, three doctors, and several nurse assessors. (Id.) Dr. Bruce testified that a resident's participation in the assessment was voluntary, not mandatory (Bruce Dep. 91, 136-37), and 74.1% of the eligible residents participated in the assessment (Wollner Aff. ¶ 27; Bruce Dep. 73). Officials from OMH and DOH provided input into the design of the assessment instrument for the Assessment Project. (Bruce Dep. 27-28.)

[16] As discussed below, the parties dispute the use of the Assessment Project data, including whether the Assessment Project was intended to assess the interest of adult home residents in living in alternative housing.

testified that the percentage of residents wanting their own apartment was 44%. (Liebman Dep. 100.)

One of Plaintiff's experts, Dr. Ivor Groves, analyzed the Assessment Project data, excluding the four homes not at issue in the litigation, and concluded that that a significant number of those assessed want to move out of an adult home. Dr. Groves determined that 2,080 of those assessed in the Assessment Project lived in fifteen of the adult homes at issue in this case. (Groves Aff. Ex. A at 2.) Analyzing the data for those 2,080 residents, Dr. Groves concluded that "1,536 expressed either (A) explicit interest in living elsewhere, including in an apartment, in supported living, or with family and relatives, or (B) did not express a preference for living in the Adult Home where they were residing." (Groves Aff. Ex. A at 4.) Lisa Wickens, the Deputy Director of DOH's Office of Health Systems Management, testified that when she explained the Assessment Project to adult home residents at "town hall" meetings, residents asked her, "When do I do the assessment, when can I leave?" (Wickens Dep. 74.)

In addition, Plaintiff's experts have opined that the Assessment Project data "greatly underestimates those who would want to move if given a meaningful choice." (Duckworth Aff. Ex. A at 14; see E. Jones Aff. Ex. A at 10; Groves Aff. Ex. A at 4-5.) Dr. Duckworth noted that when residents answered questions as part of the Assessment Project, they "were never told about what alternatives would be available or what supports could be offered to meeting their needs in the community." (Duckworth Aff. Ex. A at 14; see also Bruce Dep. 97 (testifying that when participants were asked about their own apartment, there was no effort to educate them about the availability of supported housing as an option).)

In addition to analyses of the Assessment Project data, Plaintiff has provided other expert testimony that a significant number of adult home residents want to move. One of Plaintiff's

experts, Elizabeth Jones, found that roughly 90% of the 179 adult home residents whom she interviewed expressed a desire to live somewhere else if there were other options available. (E. Jones Aff. Ex. A at 3; E. Jones Dep. 130.) Plaintiff points out that even Defendants' expert, Dr. Geller, concluded that 67 out of 134 residents whose records he reviewed want to live in a place other than the adult home. (Geller Dep. 209.)

### F. Supported Housing and Other Types of OMH Housing for Persons with Mental Illness

The alternative housing that DAI seeks for its constituents is supported housing. This section provides a brief background on supported housing and other types of OMH-funded and/or OMH-licensed housing for individuals with mental illness, referred to collectively as "Housing for Persons with Mental Illness." OMH currently provides 29,050 units of Housing for Persons with Mental Illness and has committed funds to develop an additional 9,800 supported housing beds. (See, e.g., Affidavit of Robert Myers ("Myers Aff.") ¶¶ 68-69 (Docket Entry #156).)

### 1. Supported Housing

OMH funds supported housing, which is a category of Housing for Persons with Mental Illness in which residents live in apartments that are generally "scattered-site." That is, the apartments are scattered throughout the community in numerous apartment buildings. (Bear Dep. 109, 150; Schwartz Dep. 198-199; Tsemberis Dep. 20.) Service provider Raymond Schwartz has testified that residents in supported housing can do "what anyone else can or cannot do in their apartment as an adult." (Schwartz Dep. 202.) OMH official Christine Madan attested that there is only a two percent vacancy rate for scattered-site supported housing, which has "very little turnover" and "high demand." (Affidavit of Christine S. Madan ("Madan Aff.") ¶ 14 (Docket Entry #154).)

In addition to scattered-site housing, supported housing also includes single-site housing, such as single-room occupancy ("SRO") or single-site apartments, in which there are a number of apartments within one building, all occupied by persons with mental illness. (Aff. Michael A. Newman ("Newman Aff.") ¶¶ 34, 36 (Docket Entry #157); Madan Aff. ¶ 10.) Plaintiff has provided evidence that some providers of "single site" supported housing try not to have more than a certain percentage of apartments in one building occupied by people with mental illness. (Tsembris Dep. 20-23.)

Plaintiff has provided evidence that supported housing is permanent housing, and that the residents either lease the apartment themselves or are sub-tenants of the housing provider. (Tsemberis Dep. 46-47; <u>see also</u> NYS OMH, NYC Field Office, Request for Proposals, Supported Housing for Adult Home Referrals 8 (Jan. 2007) ("OMH January 2007 RFP") (Murray Decl. Ex. 81) (indicating that a "key principle" of supported housing is that it is "considered extended stay/long term.").) According to OMH, supported housing providers may not impose exclusionary admission criteria related to past or current substance abuse. (<u>Id.</u>)

The parties dispute what level of services supported housing is designed to provide, and what that means in practice. According to Defendants' witnesses, supported housing is designed to provide only minimal support. OMH official Christine Madan attested that supported housing is "designed for the most independent individuals, who are expected to have good independent living skills and need only minimal staff assistance." (Madan Aff. ¶ 10.) Literature from the Center for Urban Community Services ("CUCS"), an organization providing housing services, describes supported housing as "[e]xclusively for people with mental illness who are able to live independently with minimal support services." (Affidavit of Jan Tacoronti ("Tacoronti Aff.") Ex. Tacoronti-B (CUCS, Supportive Housing Options NYC) at 7 (Docket Entry #162).) Michael

Newman, the Director of OMH's Housing Services Unit, attested that the supported housing scattered-site apartment model is "designed for individuals who typically have a high level of independent living skills and need only minimal case management support." (Newman Aff. ¶ 38.)

According to Plaintiff's witnesses and OMH literature, on the other hand, supported housing is designed for people who need varying levels of support. (Rosenberg Aff. ¶ 13; Tsemberis Dep. 48; OMH January 2007 RFP 4-5 ("Many recipients will be . . . at various stages of recovery" and "[s]ervices provided by the sponsoring agency will vary, depending upon the needs of the recipient").) OMH's January 2007 RFP provides that "[r]ecipients of supported housing may be able to live in the community with a minimum of staff intervention from the sponsoring agency," while "[o]thers may need the provision of additional supports," such as an Assertive Community Treatment (ACT) team of Blended Case Management (BCM) services.[17] (Id.) "It is expected that the need for services provided by the sponsoring agency will decrease over time as the recipient is more fully integrated into the community." (Id. at 5.) An OMH description of residential programs in New York City and OMH's Housing Development Manual for New York City describes the target population of scattered-site supported housing as "individuals who can live independently in generic housing with some community supports." (Newman Aff. Exs. Newman-I, Newman-J.)

According to Plaintiff's evidence, the services provided with supported housing are designed to be flexible, so that residents may receive help with cooking, shopping, budgeting, medication management and making appointments as needed, but can do all of these things themselves if they are able to. (Schwartz Dep. 191, 193-196, 288-290; Tsemberis Dep. 28-29,

---

[17] An ACT team is a multidisciplinary team that consists of six to eight staff members from the fields of psychiatry, nursing, and social work, and professionals with other types of expertise such as substance abuse treatment and vocational rehabilitation. (OMH, Assertive Community Treatment 1-2 (Murray Decl. Ex. 72).)

48; Lasicki Dep. 68, 70; Duckworth Aff. Ex. A at 10.) Service providers have testified that the flexibility of services for residents of supported housing means that the services can be increased or withdrawn as necessary and are usually more intensive when a person first moves in. (Bear Dep. 108-109; Schwartz Dep. 187-188; Lasicki Dep. 68; Tsemberis Dep. 76.)

Defendants point to evidence that, in practice, scattered-site supported housing residents receive as little as one or two visits per month from staff. (Bear Dep. 108, 115 (describing "graduate supported housing," the "least restrictive of all the apartment programs"); Madan Aff. ¶ 10.) In contrast, Plaintiff points to evidence that residents in supported housing may receive case management services from a multi-disciplinary ACT team. (OMH, Assertive Community Treatment 1-2 (Murray Decl. Ex. 72); see also OMH Jan. 2007 Supported Housing RFP (Murray Decl. Ex. 81).) ACT services are "adjust[ed] over time to meet the recipient's changing needs." (OMH, Assertive Community Treatment.) A proposal to operate a supported housing program for adult home referrals states that program staff remain on-call and available to supported housing recipients 24 hours per day. (Proposal to Operate 20-Bed Supportive Housing Program for Adult Home Referrals 7 (Murray Decl. Ex. 137).)

### 2. Additional Types of OMH Housing for Persons with Mental Illness

In addition to supported housing, OMH also funds and/or licenses other types of Housing for Persons with Mental Illness. (Def. 56.1 Statement ¶ 41.) Licensed housing programs include: (1) congregate treatment programs (referred to as group homes or supervised community residences), (2) apartment treatment programs, and (3) community residence single-room occupancy ("CR-SRO") programs. (Id. ¶ 42.) Group homes are single-site facilities that provide meals, on-site rehabilitative services, and 24-hour staff coverage for up to forty-eight people. (Id. ¶ 43.) Group homes generally range in size from eight to forty-eight beds. (Lasicki

Dep. 60-61; Association for Community Living, Licensed Housing (Murray Decl. Ex. 126).) According to OMH, group homes average 14.6 people per home. (OMH, Guiding Principles for the Redesign of the Office of Mental Health Housing and Community Support Policies (May 16, 2007) (Murray Decl. Ex. 71).)

Apartment treatment programs provide transitional housing in shared apartments that usually house two to four people, and can be scattered-site units or occupy an entire building. (Def. 56.1 Statement ¶ 44.) Plaintiff has provided evidence that according to Agency for Community Living New York State ("ACLNYS") – a statewide membership organization of not-for-profit agencies that provide housing and rehabilitation services to more than 20,000 people with psychiatric disabilities – licensed apartment treatment programs offer "staff visits as necessary to provide rehabilitative services designed to improve functioning and develop greater independence." (ACLNYS, Licensed Residential Program Descriptions (Murray Decl. Ex. 126).)

CR-SRO programs provide extended-stay housing in which residents have their own rooms designed as studio apartments or as suites with single bedrooms around shared living spaces. (Def. 56.1 Statement ¶ 45.) ACLNYS describes CR-SROs as "geared toward maintaining or improving functioning." (ACLNYS, Licensed Residential Program Descriptions.) CR-SROs are usually located in one building and house up to one hundred individuals. (Def. 56.1 Statement ¶ 46), although Plaintiff has provided evidence that CR-SROs generally average thirty-five to sixty-five units (CUCS, Supportive Housing Options NYC (Murray Decl. Ex. 136)).

Defendants have provided evidence that some housing providers of group homes, apartment treatment programs, or CR-SRO programs set their own rules and policies and may

have admission criteria, for example, a period of sobriety prior to admission.  (Madan Aff. ¶¶ 12-13 & Exs. A & B.)  DAI has provided evidence that apartment treatment programs do not have curfews or visiting hours.  (Lasicki Dep. 70, 71.)

### 3. Obtaining OMH Housing for Persons with Mental Illness

Regarding how individuals with mental illness obtain OMH Housing for Persons with Mental Illness, Defendants have provided testimony from State officials that individuals seeking such housing must submit a formal application – known as the "HRA 2000" – to the New York City Human Resources Administration ("HRA"), which determines eligibility and the level of services to be provided.  (Madan Aff. ¶ 11.)  In contrast, Plaintiff has provided testimony from supported housing providers that the HRA 2000 application is not required and that individuals often enter OMH housing programs without completing the HRA 2000 application.  (Tsemberis Dep. 32-36 (testifying that the HRA 2000 application is not required for his agency providing supported housing and that agencies have contracts with hospitals and shelter programs to receive residents directly from those programs); Schwartz Dep. 145-147.)  OMH's Supported Housing Implementation Guidelines do not mention a requirement of an application.  (OMH, Supported Housing Implementation Guidelines (Raish Decl. Ex. 50).)  In addition to the HRA process, OMH has also created a Single Point of Access ("SPOA") system for OMH housing programs in New York City, in which all applications for OMH Housing for Persons with Mental Illness are sent to a centralized source rather than to every housing provider.  (Affidavit of Keith Simons ("Simons Aff.") ¶¶ 75-78 (Docket Entry #160); Myers Aff. ¶ 89.)

### G. Whether Adult Home Residents with Mental Illness Are Qualified for Supported Housing

The parties dispute whether, and how many, adult home residents with mental illness are qualified for supported housing.  DAI's four experts, Dr. Kenneth Duckworth, Elizabeth Jones,

Dennis Jones, and Dr. Ivor Groves, concluded that almost all adult home residents with mental illness are qualified for supported housing.  Specifically, Dr. Duckworth concluded, based on his review of residents' records and in-person interviews, that "existing supported housing programs in New York could appropriately serve virtually all of the adult home residents with mental illness in the homes that are the subject of this litigation."  (Duckworth Aff. Ex. B at 2; Duckworth Aff. Ex. A at 5 ("There are no material clinical differences between adult home residents and supported housing clients.").)  Based on her interviews of 179 residents of twenty-three impacted adult homes in New York City, Ms. Jones similarly opined that the vast majority of those residents were qualified for supported housing with appropriate supports.  (E. Jones Aff. Ex. A at 1, 3; E. Jones Dep. 78, 88, 93-94.)  Based on his analysis of the Assessment Project data, Dr. Groves concluded that of the 2,080 residents assessed who are or were in the adult homes at issue, "most, if not all, of the residents of Adult Homes could live in the community with appropriate levels of support."  (Groves Aff. Ex. A at 4.)  DAI has also provided what appears to be an internal draft of a State presentation from November 2006 indicating that of the 1,688 residents examined in the Assessment Project for whom mental health diagnoses and complete cognitive scores were available, 650 (39%) were judged to have sufficient cognitive functioning for independent living.  (Adult Home Assessments, PowerPoint Presentation – Draft 28 (Nov. 2006) (Murray Decl. Ex. 74).)

DAI has provided additional evidence indicating that a substantial number of adult home residents with mental illness are qualified to move out of the adult homes.  Plaintiff points out that Defendants' expert, Dr. Geller, testified that 66.5% out of a group of 188 adult home residents are not in the "most appropriate residential setting appropriate for their needs."  (Geller Dep. 135; see Declaration of Jeffrey L. Geller ("Geller Decl.") Ex. A at 44 (Docket Entry #148)

(indicating that 33.5% of the 188 adult home residents should remain in Adult Homes).)  In a separate analysis of a group of 206 residents, Dr. Geller found that 134 residents were eligible for OMH's community housing programs.[18]  (Geller Decl. Ex. B at 6-7.)  Of those 134 residents, sixty-six could leave the adult home and go into supportive housing, including fifty-nine who could go to supported housing, with or without ACT, and seven who could go to supportive housing after transitional residence.  (Geller Dep. 196-199; 210.)  A report submitted to the Commissioner of DOH by the Adult Care Facilities Workgroup concluded that of the 12,000 residents with psychiatric disabilities in adult care facilities, 6,000 "could reside in a more integrated setting."[19]  (Report of the Adult Care Facilities Workgroup ("Workgroup Report") 30 (Oct. 2002) (Raish Decl. Ex. 57).)  Plaintiff has provided testimony from state officials that there are residents of adult homes with mental illness who "could live in more integrated settings" (Wickens Dep. 46), in supported housing or apartments (Tacaronti Dep. 225-226; see also Affidavit of Joseph Reilly ("Reilly Aff.") ¶ 25 (Docket Entry #158)).

In response, Defendants dispute the opinions of Plaintiff's experts.  They rely on evidence that the experts did not do clinical assessments of each individual with an evaluation by a multi-disciplinary treatment team.  (See, e.g., Def. 56.1 Statement ¶¶ 67, 68, 70; id. ¶ 64 and Response (disputing whether Dr. Duckworth conducted clinical assessments).)  They argue that because DAI's experts did not conduct clinical assessments with a multi-disciplinary team, they did not follow the "well-accepted methodology" for determining whether a person is qualified to

_____

[18] Dr. Geller found that at the time of his analysis of the 206 residents, fifty-six were no longer living in adult homes and sixteen were not eligible for any OMH services.  (Geller Dep. 196-97.)

[19] The Adult Care Facilities Workgroup was convened by then-Governor Pataki in 2002 to evaluate the strengths and weaknesses of the State's adult care facility model and to develop recommendations for new approaches, including "Recommendations for Improving Quality of Life and Services for Current Adult Home Residents, Recommendations for Future Restructuring of Housing and Services for Adult Home Residents, and Potential Fiscal Impact of the Recommendations."  (Workgroup Report ii-iii (Raish Decl. Ex. 57).)  According to DOH official David Wollner, DOH and OMH participated in formulating these recommendations.  (See Wollner Aff. ¶ 23.)

live in a particular setting. The court has ruled that this challenge relates to the weight, not the admissibility, of the evidence. See Dec. M&O, 2008 WL 5378365. Defendants also point to evidence that some of DAI's constituents are not qualified for supported housing based on notations from treatment providers in the records of six adult home residents indicating that those residents are not ready for discharge from the adult home. (Declaration of Barbara K. Hathaway ("Hathaway Decl.") Exs. Hathaway-L, Hathaway-M, Hathaway-N, Hathaway-O, Hathaway-P, Hathaway-Q (Docket Entry #150).)

## IV. STANDING

The threshold issue on which Defendants seek summary judgment is standing. DAI is an authorized protection and advocacy ("P&A") organization pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq. (Affidavit of Cliff Zucker ("Zucker Aff.") ¶ 4 (Docket Entry #205); Ans. ¶ 8.) DAI's mission is "to protect and advance the rights of adults and children who have disabilities so that they can freely exercise their own life choices, enforce their rights, and fully participate in their community life." (Disability Advocates, Inc. (Murray Decl. Ex. 52).) Its constituents consist of "individuals with mental illness," as defined under PAIMI.[20] 42 U.S.C. § 10802(4). PAIMI authorizes P&A organizations to advance the rights of individuals with disabilities. See 42 U.S.C. § 10801 et seq. By its terms, Section 10805(a)(1)(B) allows agencies with statutory authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness . . . ."

It is well-established in this district that P&A organizations have standing to sue on behalf of their constituents, provided they meet the constitutional requirements for associational

---

[20] Plaintiff brings this action on behalf of adults who have mental illness that substantially limits one or more major life activities, and who are in or are at risk of entry into impacted adult homes in New York City that have more than 120 beds. (Compl. ¶ 9.)

standing.  See, e.g., Joseph S. v. Hogan, 561 F. Supp. 2d 280, 307 (E.D.N.Y. 2008) (holding that DAI has standing to bring lawsuits to protect the rights of individuals with mental illness in New York); Monaco v. Stone, No. 98-CV-3386 (CPS), 2002 WL 32984617, at *21 (E.D.N.Y. Dec. 20, 2002) ("Congress has authorized [P&A] organizations . . . to bring suit on behalf of their constituents if they can meet the traditional test of associational standing."); Brown v. Stone, 66 F. Supp. 2d 412 (E.D.N.Y. 1999) (finding that plaintiff P&A organization had standing under Section 10805(a)(1)(B) to sue on behalf of current residents of state hospital).

Defendants make several arguments challenging DAI's standing to bring this action. They argue that Section 10805(a)(1)(B) does not authorize P&A organizations to sue on behalf of their constituents.  They also assert that DAI lacks associational standing to bring the claims asserted.  Finally, they argue that DAI lacks standing to pursue system-wide relief.  Considering these arguments in turn, the court rejects Defendants' contention that DAI lacks standing.

### A.     DAI's Enabling Statute

Defendants argue that DAI lacks standing under Section 10805(a)(1)(B) of its enabling statute.  They argue that Section 10805(a)(1)(C) is "the only provision that authorizes PAIMI groups to bring actions 'on behalf of its constituents,'" and that, therefore, Section 10805(a)(1)(B) does not confer standing on DAI to bring this suit.[21]  (Def. Mem. 43.)

Defendants have cited no authority for the proposition that lawsuits may only be brought under Section 10805(a)(1)(C), and as noted above, Section 10805(a)(1)(B) explicitly authorizes P&A organizations to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."

---

[21] 42 U.S.C. § 10805(a)(1)(C) provides that authorized P&A organizations shall have the authority to:
    [P]ursue administrative, legal, and other remedies on behalf of an individual who –  (i) was an
    individual with mental illness; and (ii) is a resident of the State, but only with respect to matters
    which occur within 90 days after the date of the discharge of such individual from a facility
    providing care or treatment . . . .

42 U.S.C. § 10805(a)(1)(B) (emphasis added). Indeed, courts in this circuit and elsewhere have explicitly rejected Defendants' view. See Joseph S., 561 F. Supp. 2d at 306-308 (holding that DAI had associational standing to bring claims on behalf of constituents under § 10805(a)(1)(B)); Brown, 66 F. Supp. 2d at 425 (finding P&A plaintiff had standing under § 10805(a)(1)(B) to sue on behalf of current residents of state hospital); Trautz v. Weisman, 846 F. Supp. 1160, 1163 (S.D.N.Y. 1994) ("[I]f Congress merely intended for state systems to act as advocates [and not as plaintiff] on behalf of mentally [ill] individuals, it would not have included (a)(1)(B) in the statute in addition to (a)(1)(C)."); see also Univ. Legal Servs., Inc. v. St. Elizabeths Hosp., No. 05-CV-00585 (TFH), 2005 WL 3275915, at *5 (D.C. Cir. July 22, 2005) ("PAIMI authorizes organizations like ULS to pursue claims for system-wide change on their own behalf as an advocacy organization under § 10805(a)(1)(B)."); Oregon Advocacy Ctr. v. Mink, 322 F.3d 1101, 1113 (9th Cir. 2003) (citing Section 10805(a)(1)(B) and holding that "Congress clearly intended PAIMI to confer standing on [P&A organizations] to litigate on behalf of those suffering from mental illness"). The court concludes, in accordance with the case law, that DAI has statutory authority to represent its constituents in this suit.

**B.     Associational Standing**

An association has standing to bring claims on behalf of its members if the following three criteria are met: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1997). The first two elements of this test are constitutionally required, while the third element is a prudential

consideration.  See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 555 (1996).  Only the first element is at issue here.[22]

Defendants argue that DAI lacks standing under Hunt because it has not established that a single one of its constituents has standing to sue in his or her own right.  To establish standing, a plaintiff must show that he or she suffered an injury-in-fact that is fairly traceable to the defendants' allegedly unlawful action, and which is likely to be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The "injury-in-fact" alleged here is that DAI's constituents are not in the "most integrated settings appropriate to their needs" – that is, that they are subject to unjustified segregation and are qualified to receive services in a more integrated setting.  DAI has put forth substantial evidence in support of its claim that more than one thousand of its constituents are suffering this injury as a result of the State's policies, procedures, and activities.[23]  (See Def. Mem. 65 ("DAI produced a list of 1536 residents who they claim are qualified to move to purportedly more integrated settings."); see

_____

[22] Defendants explicitly concede that DAI has met the second element and do not contend that DAI has failed to satisfy the third element.  (See Def. Mem. 36 & n.52.)  In Hunt, there was no congressional enactment explicitly bestowing standing on an organization.  In United Food, the Supreme Court noted that Congress abrogated the third part of the Hunt test in enacting the WARN Act, which authorized unions to sue on behalf of their members.  United Food, 517 U.S. at 558.  Several courts have concluded that, in enacting PAIMI, Congress explicitly granted associational standing to P&A organizations, thereby eliminating the need for plaintiffs to meet the third part of Hunt.  See Joseph S., 561 F. Supp. 2d at 307 (citing cases).
    Even if DAI were required to satisfy the third part of Hunt, the court would conclude that the claims DAI asserts and the relief it seeks are not so individualized as to defeat associational standing.  An organization lacks associational standing "where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' or where 'the relief requested [would] require[ ] the participation of individual members in the lawsuit.'"  Bano v. Union Carbide Corp., 361 F.3d 696 (2d Cir. 2004) (internal citations omitted); see Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock, 477 U.S. 274, 283-84 (1986).  In Joseph S., the district court concluded that DAI had associational standing to pursue claims for injunctive relief on behalf of its constituents, whom it alleged were placed in nursing homes without individualized assessments in violation of the ADA.  561 F. Supp. 2d at 307-308.  The court relied on Bano and Brock to conclude that the claims may be resolved without individualized proof of a violation of the ADA, even though defendants may need to undertake individualized assessments if the court were to grant the requested relief.  See id. at 308.  The court finds the analysis of the third element of Hunt in Joseph S. persuasive and applicable here.

[23] Defendants' contention that DAI has not established that its constituents are "qualified" to move to more integrated settings is a challenge to the merits of the case and does not deprive DAI of standing.  See, e.g., Monaco, 2002 WL 32984617, at *21 ("Whether or not plaintiff . . . can produce evidence to establish the liability of defendant . . . is the 'very heart of the matter in [this] case and does not implicate standing.'") (citation omitted, alteration in original).

also Duckworth Aff. Ex. A at 5; E. Jones Aff. Ex. A at 11.) In terms of redressability, DAI seeks an order compelling Defendants to change the manner in which they administer New York's mental health service system so as to enable adult home residents to live and receive services in the most integrated setting appropriate to their needs. (Compl. 34.) If Plaintiff prevails on its claims, the requested relief would redress the alleged injury. See Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock, 477 U.S. 274, 283-84 (1986) (plaintiff union had associational standing because it did not seek the Court's determination that benefits are due each of its members, but an order compelling defendant correctly to determine such benefits). DAI has thus satisfied the requirements of Lujan and the first element of associational standing in Hunt.

Defendants also argue that DAI cannot establish injury-in-fact with respect to adult home residents who have not filed formal applications – HRA 2000s – to move to alternative housing programs. The court rejects this argument. First, standing to bring an ADA integration claim does not depend on whether a plaintiff has submitted an application for an agency program, service, or activity. Olmstead, 527 U.S. at 601-603 (defining "qualified" as able to "meet[] the essential eligibility requirements" to receive community-based services with or without reasonable accommodation). Moreover, contrary to Defendants' assertions, DAI has submitted evidence indicating that participation in the HRA 2000 application process is not a prerequisite for obtaining more integrated residential services, and that individuals can be placed in supported housing without completing an HRA 2000 application. (See Tsemberis Dep. 32-33; Schwartz Dep. 146-47, 167; see also OMH, Supported Housing Implementation Guidelines (Raish Decl. Ex. 50).) Second, Defendants concede that some of DAI's constituents filed HRA 2000 applications. (Def. Mem. 37 (noting that their expert did a random sample of the 1,536 residents

whom DAI claims are qualified to move and found that eighteen of the 206 residents in the sample had filed HRA 2000 applications).)  Associational standing simply requires that "<u>one</u> or more of [the association's] members has suffered a concrete and particularized injury."  Building & Const. Trades Council v. Downtown Dev., Inc., 448 F.3d 138, 145 (2d Cir. 2006) (emphasis added).  DAI has met this requirement.[24]

C.       Standing to Seek System-Wide Injunctive Relief

Defendants also contend that even if DAI could show that any of its constituents have standing, DAI lacks standing to obtain <u>system-wide</u> relief, claiming that the "scope of DAI's standing, and the corresponding remedy it may seek, is limited by the number of DAI's constituents who meet the <u>Olmstead</u>-required elements of being qualified and having a desire to move to alternate housing."  (Def. Mem. 39.)   In response, DAI contends that Defendants conflate two distinct issues:  (1) whether DAI has standing to seek injunctive relief, and (2) the scope of the relief ultimately ordered, should DAI prevail.  The court agrees that this distinction is significant here.  Whether DAI may ultimately be entitled to the requested injunctive relief is not the same question as whether DAI has standing to seek injunctive relief.

Defendants cite cases addressing whether a plaintiff had standing to seek <u>any</u> prospective injunctive relief, not whether the relief could be system-wide.  For example, in <u>Small v. General Nutrition Companies, Inc.</u>, 388 F. Supp. 2d 83 (E.D.N.Y. 2005), in which an individual plaintiff

---

[24] Defendants' contention that DAI is attempting to "evade" Rule 23 of the Federal Rules of Civil Procedure is without merit.  (Def. Mem. 40.)  Associational standing is a substitute for class certification.  <u>See</u>, <u>e.g.</u>, <u>Brock</u>, 477 U.S. at 289 (permitting union to assert claims on behalf of its members and recognizing that the "pre-existing reservoir of expertise and capital" that an association can bring to the litigation may make an individual action by an association superior to a class action).  Defendants have cited no authority requiring P&A plaintiffs to fashion their claims as class claims rather than individual ones.  P&A organizations are regularly allowed to bring cases as plaintiffs on constituents' behalf without seeking class certification.  <u>See</u>, <u>e.g.</u>, <u>Brown</u>, 66 F. Supp. 2d at 425 (allowing P&A plaintiff to bring suit on behalf of constituents); <u>Trautz</u>, 846 F. Supp. at 1166 n.7 (holding that DAI had standing to pursue injunctive relief and noting that if DAI prevailed, the "practical effect may be indistinguishable from that of a successful class action for injunctive relief.").

32

and a plaintiff organization alleged discrimination based on the inaccessibility of a retailer's stores to wheelchair users, the court found that the plaintiff organization failed to satisfy the first prong of <u>Hunt</u>.  The organization failed to allege that a single one of its members had encountered barriers in the retailer's stores or would have been likely to visit those stores in the future but for those barriers.  <u>Id.</u> at 96-97.  The organizational plaintiff in <u>Small</u> did not have standing because it failed to allege that its constituents had been subject to harm or would be in the future, and, therefore, could not seek an injunction.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Clark v. Burger King Corp.</u>, 255 F. Supp. 2d 334, 345 (D.N.J. 2003) (plaintiff failed to allege when any constituent visited allegedly inaccessible restaurant and when any constituent planned to return); <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105-06 (1983) (plaintiff lacked standing to seek prospective injunctive relief; fact that he was illegally stopped and choked by police did not establish an immediate threat that he would be stopped and illegally choked in the future).  Here, however, DAI has alleged and provided evidence of an ongoing, system-wide harm to its constituents that could be redressed by the injunctive relief it seeks – an order requiring Defendants to move DAI's constituents to alternative housing.

Other cases on which Defendants rely are similarly inapposite.  Defendants rely on several cases that refused to order system-wide injunctive relief.  (See Def. Mem. 41-42; Def. Reply Mem. Supp. Summ. J. ("Def. Reply Mem") 3 (Docket Entry #218).)  In those cases, however, the issue was whether system-wide relief was warranted based on the evidence presented at trial.   None addresses whether the plaintiffs had standing to bring a claim seeking system-wide relief.  <u>Lewis v. Casey</u>, 518 U.S. 343, 359 (1996) (holding that two instances of unlawful conduct were an inadequate basis for system-wide relief); <u>Rizzo v. Goode</u>, 432 U.S. 362, 379 (1976); <u>Warth v. Seldin</u>, 422 U.S. 490, 515 (1975) (noting that declaratory and/or

injunctive relief are prospective in nature, and that "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.").

## V.     TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND THE INTEGRATION MANDATE

The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1). Title II of the ADA prohibits discrimination in access to public services, requiring that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.[25]  To establish a violation of Title II of the ADA, a plaintiff must prove that (1) he or she is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3) that he or she was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was discriminated against by defendants, by reason of his or her disability.  Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

One form of discrimination "by reason of . . . disability" is a violation of the ADA's so-called "integration mandate."  This mandate – arising out of Congress's explicit findings in the ADA, regulations of the Attorney General implementing Title II, and the Supreme Court's

---

[25] Section 504 of the Rehabilitation Act has a similar provision:

> No otherwise qualified individual with a disability in the United States . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  Because claims under the two statutes are treated identically unless – unlike here – one of the "subtle differences" in the two statutes is pertinent to a claim, the court will treat the RA claims as identical to the ADA claims.  Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

decision in <u>Olmstead v. L.C.</u>, 527 U.S. 581 (1999) – requires that people with disabilities receive services in the "most integrated setting appropriate to their needs."

In enacting the ADA, Congress explicitly found that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. §12101(a)(5); <u>see also id.</u> § 12101(a)(2) ("[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"). The Attorney General's implementing regulations provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[26] 28 C.F.R. § 35.130(d) ("integration regulation"); <u>see also</u> 42 U.S.C. § 12134(a) (requiring Attorney General to issue implementing regulations). The regulations define "most integrated setting" in Section 35.130(d) as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d), App. A.

The Supreme Court addressed the scope of the integration mandate in <u>Olmstead</u>. At issue in that case was "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than institutions." 527 U.S. at 587. The Court concluded that the answer was "a qualified yes." <u>Id.</u> The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" <u>Id.</u> at 600. It noted that "institutional placement of persons who can handle and benefit from community settings perpetuates

---

[26] As Congress directed, <u>see</u> 42 U.S.C. § 12134(b), this regulation is consistent with a similar regulation implementing Section 504 of the Rehabilitation Act, which requires recipients of federal funds to administer programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Id. The Supreme Court thus held explicitly that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." Id.

A state's obligation under the integration mandate is not limitless, however. Id. at 603. Under Title II's implementing regulations, a state must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination," but it need not do so if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7). The plurality in Olmstead thus concluded that the integration mandate is violated when:

> the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

527 U.S. at 587.

In its analysis of the integration mandate, the Supreme Court deferred to the Attorney General's interpretation of Title II. See id. at 597-98 ("[i]t is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (internal quotation marks and citations omitted). Thus, following Olmstead, courts have looked to the language of the Attorney General's regulations, as well as the holding in Olmstead as the standard by which to determine a violation of the integration mandate of the ADA. For example, the Ninth Circuit has explained that "[t]he plain language of the integration regulation [28 C.F.R. § 35.130(d)], coupled with the reasoning and holding of Olmstead, direct our analysis in this case." Townsend v. Quasim, 328 F.3d 511, 516, 520 (9th Cir. 2003). Similarly, in Joseph S.,

561 F. Supp. 2d at 289-290, the court observed that "[a] failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate." See also Helen L. v. DiDario, 46 F.3d 325, 332 (3rd Cir. 1995), cert. denied, 516 U.S. 813 (1995) (concluding, pre-Olmstead, that 28 § 35.130(d) had the force of law).

## VI. APPLICABILITY OF TITLE II

As set forth above, the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendants contend that DAI has failed to identify any State "service, program, or activity" that is subject to the ADA or subjects DAI's constituents to discrimination, because the State merely licenses and inspects the privately owned adult homes. (Def. Mem. 44.) Defendants further contend that DAI's complaint lies with the adult homes themselves, with the manner in which they are operated and the nature and quality of the services residents receive, and that government agencies cannot be held liable for discriminatory conduct on the part of their licensees. (Id.) DAI responds that it does not challenge adult homes' failure to comply with the ADA; rather, it challenges Defendants' policies of relying on adult homes, rather than the more integrated setting of supported housing, to provide residential and treatment services to thousands of individuals with mental illness. (Pl. Opp. 41.) For the reasons below, the court concludes that Title II applies to DAI's claims against Defendants.

### A. Defendants' Administration of New York's Mental Health Services

New York has a comprehensive statutory and regulatory scheme governing the State's administration of services for people with mental illness, including adult homes. Defendants are

obligated under State law to develop a "comprehensive, integrated system of treatment and rehabilitative services for the mentally ill." N.Y. Mental Hyg. L. § 7.01. In particular:

> It shall be the policy of the state . . . to develop a comprehensive, integrated system of treatment and rehabilitative services for the mentally ill. Such a system . . . should assure the adequacy and appropriateness of residential arrangements . . . and it should rely upon . . . institutional care only when necessary and appropriate.

Id.

Defendants administer the State's system of mental health care, including residential and treatment services provided by public and private entities. N.Y. Mental Hyg. L. §§ 5.07, 7.07. One of the Defendant agencies, the Office of Mental Health ("OMH"), funds and oversees an array of mental health housing and support service programs statewide (Pl. 56.1 Statement ¶ 15), including community support, residential, and family care programs (OMH, About OMH (Murray Decl. Ex. 53); see also N.Y. Mental Hygiene L. §§ 41.03, 41.42, 41.39 (defining community support services, family support programs, and vocational programs and sheltered workshops)). To fund various services, such as housing programs, OMH contracts with private providers by issuing requests for proposals ("RFPs").[27] (See, e.g., Newman Aff. ¶¶ 60-63; Supported Housing RFPs (Murray Decl. Exs. 128, 55, 56, 81).)

OMH is responsible for planning what mental health services the State will provide, and allocating resources to those services. OMH is also required by law to plan how and where New York's mental health services will be delivered. N.Y. Mental Hyg. L. § 7.07. In particular, OMH is obligated to "develop an effective, integrated, comprehensive system for the delivery of all services to the mentally ill and . . . create financing procedures and mechanisms to support such a system of services . . . [and] shall make full use of existing services in the community

_____

[27] For example, in January 2007, OMH issued a request for proposals to provide supported housing beds specifically for adult home residents. (OMH January 2007 RFP (Murray Decl. Ex. 81).)

including those provided by voluntary organizations." N.Y. Mental Hyg. L. § 7.07. OMH is also responsible for "assuring the development of comprehensive plans, programs, and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and the training of the mentally ill."[28] N.Y. Mental Hyg. L. § 7.07(a).

Moreover, each year, OMH must "formulate a statewide comprehensive five-year plan for the provision of all state and local services for the mentally ill," known as the "5.07 Plan," which includes "establish[ing] priorities for resource allocation" and "analyz[ing] current and anticipated utilization of state and local, and public and private facilities and programs." Id. § 5.07. For example, in its Statewide Comprehensive Plan for Mental Health Services 2004-2008, OMH emphasizes its "accountability for results" regarding the design and delivery of services, as well as "coordination of care," referring to a "coordinated, comprehensive networks of providers [that] deliver a balanced array of medical, self-help, social, supportive, and rehabilitative services and programs." (OMH 2004-2008 Plan (Raish Decl. Ex. 56).)

The other Defendant agency, the Department of Health ("DOH") is responsible for, among other things, promoting the "development of sufficient and appropriate residential care programs for dependent adults." N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485.3(a)(1), 487.1(b). In particular, DOH licenses and monitors adult homes and enforces the statutes and regulations applicable to adult homes. (Pl. 56.1 Statement ¶ 10.) Specifically, DOH issues operating certificates to establish and operate adult homes. N.Y. Comp. Codes R. & Regs. tit. 18, § 485.3(a)(3). These operating certificates must be reissued at least every four years and may be revoked or suspended if the DOH determines that if the facility does not comply with State regulations. Id. §§ 485.5(c), (l), (m). DOH can also revoke, suspend, or terminate an operating

---

[28] OMH also "advise[s] and "assist[s] the governor in developing policies designed to meet the needs of the mentally ill and to encourage their full participation in society." N.Y. Mental Hyg. L. § 7.07(b).

certificate if it determines that such an action is in the public interest because it would conserve resources.  Id. § 485.5(m)(1)(i).  In addition, DOH has the authority to seek appointment of a receiver to take over operation of an adult home, id. § 485.9, and DOH has exercised that authority to replace operators and appoint temporary operators at Brooklyn Manor and Ocean House, two of the homes at issue in this litigation (Hart Aff. ¶ 61).

Both DOH and OMH monitor and inspect adult homes.  See N.Y. Const. Art. XVII, § 4 (providing that the "department of mental hygiene shall visit and inspect . . . all institutions either public or private used for the care and treatment of persons suffering from mental disorder or defect"); N.Y. Comp. Codes R. & Regs. tit. 18, § 485.3(b)(1) (stating that DOH has statutory authority to inspect adult homes and that OMH may participate in inspections).  DOH is required by statute to conduct at least one unannounced full inspection of all adult care facilities, including adult homes, every twelve or eighteen months, depending on the facility's record. N.Y. Soc. Serv. L. § 461-a(2)(a).  DOH may bring enforcement proceedings to assess civil fines, or to suspend, modify, limit or revoke an operating certificate.  N.Y. Comp. Codes R. & Regs. tit. 18, § 486.4.  Regulations added in 2002 permit DOH to assess fines immediately for the more serious violations, those which endanger residents (known as endangerment violations).  (Def. 56.1 Statement ¶ 29.)  According to OMH official Jan Tacoronti, who directed OMH's Adult Home Monitoring and Training Team (the "Adult Home team") from 2003 to 2006, the Adult Home Team responds to and investigates complaints and incidents by adult home residents about services provided by mental health providers certified by OMH, and participates in joint inspections of adult homes with DOH and the Commission on Quality of Care and Advocacy for

Persons with Disabilities ("CQC"), an independent State agency.[29] (Tacaronti Aff. ¶¶ 8, 16, 20-22; see also Reilly Aff. ¶ 13 & Ex. Reilly-A (stating that OMH participates in inspections of adult homes).)

State regulations address many areas of adult home administration and operation, including resident rights, the number and qualifications of staff, and physical and environmental standards.[30] (Def. 56.1 Statement ¶ 5.) In particular, the regulations provide that adult home residents "shall be permitted to leave and return to the facility and grounds at reasonable hours." N.Y. Comp. Codes R. & Regs. tit. 18, § 487.5(a)(3)(xii). Adult homes are required to provide case management services "as are necessary to support the resident in maintaining independence of function and personal choice," including "assisting each resident to maintain family and community ties and to develop new ones," "encouraging resident participation in facility and community activities" and "assisting residents in need of alternative living arrangements to make and execute sound discharge or transfer plans." Id. § 487.7(g). The regulations also require adult homes to provide a program of activities in the facility and the community, and must include "arrangement for resident participation in community-based and community-sponsored activities." Id. § 487.7(h).

In addition, OMH funds, oversees, licenses and credentials mental health care providers who provide services for people with mental illness in adult homes. (Pl. 56.1 Statement ¶ 13.) Impacted adult homes must enter into a written agreement with a provider of mental health services for assistance with the assessment of mental health needs, the supervision of mental

---

[29] The CQC is an independent state agency charged with assisting the governor and the legislature in developing policies to improve the mental health system and evaluating the quality of care in mental health facilities. See N.Y. Mental Hyg. L. § 45.07.

[30] OMH has the authority and responsibility pursuant to Article 31 of the Mental Hygiene Law to set standards and issue regulations regarding the quality of programs that provide mental health services. See N.Y. Mental Hyg. L. §§ 31.01; 31.04.

health care, and the provision of case management for residents enrolled in mental health programs.  N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7(b).  In addition to approving contracts between impacted adult homes and service provides, OMH also provides treatment services directly inside some adult homes.  (OMH, South Beach Psychiatric Center (Murray Decl. Ex. 62); OMH, Creedmoor Psychiatric Center Outpatient Servs. (Murray Decl. Ex. 63); S.P. Dep. 16-17; N.Y. Comp. Codes R. & Regs. tit. 18, §§ 487.7(b).)

### B.       Scope of Title II

Title II covers all programs, services, and activities of a state or local government entity "without any exception."  Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 209 (1998); see also Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 (2d Cir. 1997) (holding that zoning decisions are subject to the ADA and noting that "programs, services, or activities" is a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context."), overruled on other grounds by Zervos v. Verizon New York, 252 F.3d 163, 171 n.7 (2d Cir. 2001).  Federal regulations provide that "[a] public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability," but "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part."  28 C.F.R. § 35.130(b)(6).

Olmstead itself concerned the obligation of Georgia's Department of Human Resources ("Department") to comply with the ADA's integration mandate.  Because the Department delivered services in segregated state hospitals as well as integrated community settings, the Supreme Court found that the Department had an obligation to ensure that the plaintiffs were not unnecessarily hospitalized when they could be served instead in community facilities, unless

doing so would fundamentally alter the service system.  See id.  While the plaintiffs in that case were institutionalized in a state hospital, DAI has pointed out that the community facilities that were part of the state's service system were privately operated.  (Pl. Opp. 51; Olmstead v. L.C., Resp. Br., 1999 WL 144128, at *5 (noting that "the Georgia legislature amended its laws to allow state funds appropriated for mental disability programs to be transferred from institutional to community services" and "restructured the state service delivery system and gave it authority to contract with private providers of such services in the community.").)  Olmstead thus imposes an obligation on states, which are responsible for providing services, 527 U.S. at 607, not on the particular facilities in which service recipients are alleged to be segregated.

While the Second Circuit has not yet addressed the applicability of the Title II's integration mandate to cases where a state's service system relied on privately operated facilities, other courts have applied the ADA's integration mandate to contexts where a state uses private entities to deliver services to people with disabilities.  In Radaszewski v. Maram, 383 F.3d 599 (7th Cir. 2004), the Seventh Circuit considered whether Title II of the ADA and the RA required Illinois to fund private at-home care for a person with disabilities.  In discussing the state's "fundamental alteration" defense under Title II, the court assumed that the state would have to pay for some type of private care for the plaintiff, whether at a private institutional facility reimbursed by the state, or at the plaintiff's home.  See id. at 614 ("If the state would have to pay a private facility to care for Eric . . . and the cost of that placement equaled or exceeded the cost of caring for him at home, then it would be difficult to see how requiring the State to pay for at-home care would amount to an unreasonable, fundamental alteration of its programs and services.").

Similarly, other courts have focused on a state's obligation to administer its services for people with disabilities in the most integrated setting appropriate for their needs, finding irrelevant the ownership of the facilities where the individuals were allegedly segregated. See Martin v. Taft, 222 F. Supp. 2d 940, 946, 981 (S.D. Ohio 2002) (denying motion to dismiss Olmstead claims where plaintiffs were institutionalized in both public and private facilities and noting that "liability does not hinge upon whether the setting in question is owned or run directly by the State"); Roland v. Cellucci, 52 F. Supp. 2d 231, 237 (D. Mass. 1999) (finding it immaterial for purposes of Olmstead claim against state that many of the plaintiffs lived in private rather than government-operated nursing facilities).[31]

## C.    Applicability of Title II

The court concludes that Title II of the ADA applies to the claims in this case. An Olmstead claim concerns a public entity's obligation to make reasonable modifications to its service system to enable individuals with disabilities to receive services in the most integrated setting appropriate to their needs. Defendants, as required by New York law, administer the State's mental health service system, plan the settings in which mental health services are provided, and allocate resources within the mental health service system. Accordingly,

---

[31] In addition, the Ninth, Tenth, and Third circuits have held that Title II of the ADA applies to nursing homes covered by Medicaid, without explicitly addressing whether the nursing homes at issue were operated by the government or private providers. See Townsend, 328 F.3d 511 (state's decision to fund nursing services for certain Medicaid recipients only in nursing homes would violate ADA unless the state could demonstrate fundamental alteration defense); Fisher, 335 F.3d 1175 (state's decision to fund more prescription drugs in Medicaid-covered nursing homes than in its Medicaid home and community-based waiver program would violate ADA unless state could demonstrate fundamental alternation defense); Helen L., 46 F.3d at 328.

DAI has provided statistics from an empirical study indicating that the vast majority of Medicaid-covered nursing homes are privately operated. (Pl. Opp. 51 n.40, citing Dep't of Soc. & Behavioral Sci., Univ. of Calif. San Francisco, State Data on Nursing Facilities, Staffing, Residents, and Facility Deficiencies, 1995-2001, at 20 (Murray Decl. Ex. 95) (noting that in 2001, only 6.4% of Medicaid- and Medicare-certified nursing homes across the country were government operated).)

Defendants' contention that DAI has failed to identify any State service, program, or activity related to DAI's claim that is subject to the ADA is without merit.[32]

It is immaterial that DAI's constituents are receiving mental health services in privately operated facilities.  Cellucci, 52 F. Supp. 2d at 237.  Public entities are required under the ADA to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added).  Discrimination, in the form of unjustified segregation of individuals with disabilities in institutions, is thus prohibited in the administration of state programs.  The statutory and regulatory framework governing the administration, funding, and oversight of New York's mental health services – including the allocation of State resources for the housing programs at issue here – involves "administration" on the part of Defendants.  The State cannot evade its obligation to comply with the ADA by using private entities to deliver some of those services.

The essence of Defendants' argument to the contrary is that they cannot be held responsible under Title II for actions of the adult homes themselves.  (See Def. Mem. 45; Def. Reply Mem. 5-6.)  Although this proposition is correct, see 28 C.F.R. § 35.130(b)(6) ("The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part"),[33] it is inapposite in the context of DAI's Olmstead claim.  DAI does not challenge the conduct of adult homes licensed and certified by the State; instead, it challenges the manner in which Defendants administer New York's mental health service

---

[32] Indeed, although contesting the existence of any State programs or activities, Defendants' memorandum of law refers to OMH's "activities and programs that are designed to help adult home residents . . . access [OMH] Housing for Persons with Mental Illness."  (Def. Mem. 23 (emphasis added).)

[33] See also Dep't of Justice, ADA Technical Assistance Manual II-3.7200 (Decl. of Barbara K. Hathaway, Ex. Hathaway-A (Docket Entry #150)) (noting that "[t]he State is not accountable for discrimination in the . . . practices of a licensee if those practices are not the result of requirements or policies established by the State.  Although licensing standards are covered by title II, the licensees' activities themselves are not covered.  An activity does not become a 'program or activity' of a public entity merely because it is licensed by the public entity.").

system. In other words, DAI challenges the State's choice to plan and administer its mental health services in a manner that results in thousands of individuals with mental illness living and receiving services in allegedly segregated settings. This suit does not challenge the conduct of any particular adult home.

Accordingly, Defendants' reliance on cases addressing whether a public entity must correct discriminatory conduct by service providers it licenses is misplaced, because those cases concern discrimination by the licensees, not the public entity itself. See, e.g., Tyler v. City of Manhattan, 849 F. Supp. 1429, 1441-42 (D. Kan. 1994) (holding that city had no duty under Title II of the ADA to force restaurants and stores that it licensed and inspected to comply with the businesses' obligation under the ADA to provide wheelchair access); Reeves v. Queen City Transp., Inc., 10 F. Supp. 2d 1181, 1183-88 (D. Colo. 1998) (holding that the public utility commission that issued a certificate to a bus company was not liable under Title II for the bus company's disability discrimination).[34]

Defendants additionally contend that Title II is in applicable because "the State does not require that anyone live in an adult home or receive services in adult homes." (Def. Mem. 49.) They argue that adult home residents "could move out of the adult home or remain and choose to receive services elsewhere." (Id.) In a similar vein, Defendants further contend that DAI has failed to articulate a specific act or policy that requires individuals to receive services in adult homes. They rely on cases challenging specific state policies providing different services in institutions than were available in the community. (Id., citing Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1181 (10th Cir. 2003) (challenging policy of funding more prescription drugs in

---

[34] Defendants' citation to cases holding that private hospitals were not themselves subject to suit under Title II is similarly inapposite, because DAI does not argue that adult homes themselves are public entities or State actors. See Green v. City of New York, 465 F.3d 65, 78 (2d Cir. 2006) (holding that private hospital that contracted with the City was not itself subject to suit under Title II); Monaco, 2002 WL 32984617 (holding that private psychiatric hospitals licensed and monitored by OMH were not State actors).

nursing homes than in the community); Def. Reply Mem. 11, citing Townsend, 328 F.3d 511

(challenging policy failing to provide community-based services to "medically needy" persons,

while providing such care for "categorically needy" persons).)

These contentions are without merit.  As described in detail above, it is clear that

Defendants are required by State law to determine the settings in which New York provides and

funds mental health services.  Defendants do so by controlling the State's funding for services in

various settings, including adult homes and supported housing, and effectively control how many

adults receive services in any particular setting.  This is more than a "general obligation to

provide services," as Defendants contend.  While State officials do not require anyone to be in an

adult home, Defendants plan, fund and administer the State's existing service system such that

more than 12,000 adults are receiving the State's services in adult homes.  (OMH 2004-2008

Plan 69 (Raish Decl. Ex. 56).)

Defendants argue that DAI must point to a "specific act or policy" causing

discrimination, relying on the Supreme Court's decision in a Title VII disparate-impact case,

Wards Cove Packing Company, Inc. v. Atonio, 490 U.S. 642, 656 (1989).  (Def. Reply Mem. 7-

8.)  That case held that a plaintiff in a Title VII disparate-impact case is "responsible for isolating

and identifying the specific employment practices that are allegedly responsible for any observed

statistical disparities [in the employment of minorities]," and that to hold otherwise would result

in potential liability for "the myriad of innocent causes that may lead to statistical imbalances in

the composition of their work forces."  490 U.S. 642, 656 (citation omitted).  Defendants note

that while aspects of Ward's Cove were overruled by the Civil Rights Act of 1991, 42 U.S.C. §

2000e-2(k)(B)(I), in particular, the requirement of identifying a particular practice if the elements

of a decisionmaking process are not capable of separation for analysis, the ADA has had no such amendment. (Def. Reply Mem. 8 & n.3.)

The court will not read into Title II a new requirement that Plaintiff must prove a "specific act or policy" on the basis of a partially overruled Title VII disparate-impact case. The ADA prohibits discrimination in the <u>administration</u> of programs. 28 C.F.R. § 35.130(b)(6). Title II covers all programs, services, and activities of public entities "without any exception," and "prohibits all discrimination by a public entity, regardless of the context." <u>Yeskey</u>, 524 U.S. at 206; <u>Innovative Health Sys., Inc.</u>, 117 F.3d at 45. Defendants, and no other entities, are responsible for determining what services to provide, in what settings to provide them, and how to allocate funds for each program. This particular role is more than "the totality of defendants' choices and policies in overseeing the entire system," as Defendants contend.

In sum, Plaintiff alleges that Defendants' administration of services discriminates against adult home residents by unnecessarily segregating them, and claims that if Defendants allocated their resources differently, adult home residents could receive services in a more integrated setting. This claim falls squarely under Title II of the ADA.

## VII.    MOST INTEGRATED SETTING APPROPRIATE

In seeking summary judgment, Defendants contend that DAI's constituents are already in the "most integrated setting appropriate to their needs," because adult homes are integrated settings and the adult home residents are not qualified to move to supported housing. The court first evaluates the parties' claims regarding whether DAI's constituents are in the "most integrated setting" and then turns to whether supported housing is "appropriate to the[] needs" of DAI's constituents, that is, whether they are qualified for supported housing.

**A. Most Integrated Setting**

Defendants contend that even if the integration mandate of Title II and <u>Olmstead</u> applies to adult homes, adult homes are "integrated," community-based settings unlike the psychiatric hospital at issue in <u>Olmstead</u>, because adult home residents have "virtually unlimited opportunities to interact with nondisabled persons," and adult homes facilitate these interactions through community-based programs. (Def. Mem. 51-52.) Defendants further contend that adult homes and scattered-site supported housing models "offer equal opportunities for interaction with others in the community." (Def. Rep. Mem. 14.) In response, Plaintiff contends that the record evidence demonstrates that residents of the large, impacted adult homes at issue are not receiving services in the "most integrated setting" appropriate to their needs, because "most integrated setting" is defined in the regulations as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible," and that supported housing is more integrated than adult homes. (Pl. Opp. 53, 58.) The parties dispute the scope of the ADA's integration mandate, the extent to which adult home residents have opportunities for interaction with non-disabled people, and whether supported housing is a more integrated setting than adult homes. For the reasons below, the court concludes that the regulations set forth the proper inquiry, and that Defendants have failed to meet their burden for summary judgment.

**1. Definition and Scope of the Integration Mandate**

The parties do not dispute that the federal regulations, discussed above, define Title II's "integration mandate." They differ in their interpretation of what this definition means, and what these regulations and <u>Olmstead</u> require a plaintiff to show. Defendants contend that "under the regulatory definition of integration, the key is <u>whether persons with disabilities have</u>

opportunities for contact with nondisabled persons, rather than the number of actual contacts."

(Def. Mem. 52) (emphasis added).  In contrast, DAI contends that, given the regulations' "most

integrated setting" language, the proper inquiry is not simply whether a setting is "integrated" or

not.  Rather, "providing services in settings with some opportunities for interaction is unlawful if

another appropriate setting would provide more opportunities, and the individual in question

does not oppose the more integrated setting."  (Pl. Opp. 56-57.)  For the reasons discussed

below, the court concludes that the proper interpretation of the regulations' definition of "most

integrated setting" is set forth in the regulations themselves: whether a particular setting "enables

individuals with disabilities to interact with nondisabled persons to the fullest extent possible."

28 C.F.R. § 35.130(d), App. A.

 Nowhere in Title II, its implementing regulations, or in Olmstead is there a definition of

what constitutes an "institution" or "community-based" setting.  While it is clear that, "where

appropriate for the patient, both the ADA and the RA favor integrated, community-based

treatment over institutionalization," Frederick L. v. Department of Public Welfare (Frederick L.

I), 364 F.3d 487, 491-92 (3d Cir. 2004), Olmstead and lower courts considering Olmstead claims

have typically confronted situations in which the "institutional" or "community-based" nature of

particular settings was not in dispute.  In Olmstead, for example, plaintiff L.C. had already been

removed from the psychiatric hospital – in which she had undisputedly been "institutionalized" –

and placed in a "community-based program," but the opinion did not describe the nature of the

community-based program.[35]  527 U.S. at 593-94; see also, e.g., Townsend, 328 F.3d at 517

(considering state policy requiring certain Medicaid recipients with disabilities to receive

---

[35] The Supreme Court noted that "L.C.'s pleading requested, among other things, that the State place her in a community care residential program, and that she receive treatment with the ultimate goal of integrating her into the mainstream of society."  527 U.S. at 594.

services in nursing homes rather than "community-based" settings, without describing "community-based" settings). Indeed, even psychiatric hospitals – which are undisputedly "institutions" – may permit some contact with non-disabled people; while some forms of supported housing – which are undisputedly "community-based"– might not fully preclude people with disabilities from experiencing isolation.[36]

The court concludes that the federal regulations mean what they say. Based on their plain language – coupled with Olmstead's explicit holding, based on congressional findings, that "unjustified isolation" is discrimination – the proper inquiry is whether DAI's constituents are in the "most integrated setting appropriate to their needs," defined as "enable[ing] individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d) & App. Inquiring simply "whether" individuals with disabilities have any opportunities for contact with non-disabled persons ignores the "most integrated setting" and the "fullest extent possible" language of the regulations.

Defendants assert that reading the regulations' "most" language literally will lead to absurd results. For example, they argue that it would "require the State to move persons with mental illness from family homes where . . . family members frustrate efforts for contact with nondisabled persons." (Def. Reply Mem. 16.) But Title II's integration mandate requires nothing of the sort; Title II covers the administration of state programs, activities and services. In Defendants' proposed scenario, the actions of the family of a person with disabilities would

---

[36] DAI notes that according to the factual record in Olmstead, plaintiff L.C. had some opportunities for contact with people outside the hospital. (Pl. Opp. 57-59.) For example, as L.C.'s condition improved while in the state hospital, she:

> receive[d] a wide variety of community-care services . . . leaving during the day . . . via public transportation for persons with disabilities, to attend a daily community-based program that included social activities, vocational opportunities, and field trips; L.C. returned on the bus each evening to the institution.

Pet. Reply Br., Olmstead v. L.C., 527 U.S. 581 (1999) (No. 98-536), 1999 WL 220130, at *17-18.

not arise out of any service provided by the State, and would not implicate the integration

mandate. Defendants also speculate about other hypothetical situations, such as complaints that

residences in rural or suburban areas are "less integrated" than those in the city, or that housing

in an OMH-licensed CR/SRO is "not integrated" because of a curfew or visiting hours. These

situations are not before this court, and, in any event, the inquiry is fact-specific and subject to

the "fundamental alteration" defense. The question before the court is whether the large,

impacted adult homes at issue enable interactions with non-disabled persons to the fullest extent

possible. 28 C.F.R. § 35.130(d) & App.

### 2. Evidence on the Nature and Characteristics of Adult Homes

The parties have presented voluminous evidence regarding the nature and characteristics

of the large, impacted adult homes at issue and supported housing, and the extent to which adult

home residents are afforded – and pursue – opportunities to interact with non-disabled

individuals. At the summary judgment stage, the court's "function is not to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Anderson, 477 U.S. at 249. Because Defendants seek summary judgment on DAI's Olmstead

claim, the court construes the facts in the light most favorable to DAI, and for the purposes of

Defendants' Motion, credits DAI's evidence. Lucente, 310 F.3d at 254. DAI has provided

evidence that adult homes are segregated settings akin to institutions that impede residents'

interaction with individuals without disabilities, particularly relative to supported housing. A

reasonable finder of fact could conclude that adult homes do not enable residents' interactions

with non-disabled individuals to the fullest extent possible. Defendants have thus failed to meet

their burden for summary judgment.

### a. Residents' Freedom to Leave and Return from the Adult Homes

The parties dispute to what extent adult home residents are free to leave and return to the adult home facilities in practice. Plaintiff has provided evidence that most aspects of residents' daily lives take place inside their adult homes. (E. Jones Aff. Ex. A at 8.) Adult home residents are limited in the times that they can leave the adult homes, given rigid schedules for meals, medications, and distribution of personal need allowances. (Levine Dep. 250-251; Schwartz Dep. 317-318; O.J. Decl. ¶¶ 17-20; E. Jones Aff. Ex. A at 5-6, 8.) For example, a resident of the Queens Adult Care Center testified that residents must be present at times when their medication is dispensed, usually at meal times and at nighttime, or they are penalized. (D.W. Dep. 75-77.)

Defendants provided evidence that some adult homes do not have curfews.[37] For example, Defendants cite the testimony of a case manager at Oceanview Manor Home that "residents are free to come and go as they please" (Davis Dep. 35). On the other hand, Plaintiff has provided evidence that Oceanview Manor and Seaview have curfews after which doors are locked (Kessler Dep. 423-25; P.C. Dep. 98; S.B. Dep. 83-85), and that residents at those homes and Park Inn are not provided keys to the front doors (Burstein Dep. 19-20; Kessler Dep. 425). Some residents have complained that they have trouble getting back into their buildings. (P.C. Dep. 99; Schwartz Dep. 325.) Even at some homes where there is no curfew, residents must tell staff where they are going each time they leave the facility. (See, e.g., D.N. Dep. 169-171.)

---

[37] See Mendel Dep. 24 (New Central Manor); Yunger Dep. Dep. 59, C.H. Dep. 103 (Queens Adult Care); P.B. Dep. 64, 66, G.L. Dep. 100 (Ocean House); R.H. Dep. 113, 151, A.M. Dep. 157, 185 (Sanford); L.G. Dep. 90-91, L.H. Dep. 76 (Anna Erika); I.K. Dep. 85 (Surf Manor); T.M. Dep. 54-55 (New Haven Manor); S.P. Dep. 59 (Parkview); D.N. Dep. 169-171 (Surfside Manor); see also M.B. Dep. 99 (testifying that "they never worried about me even if I came [back at] 2:00 in the morning.").

### b. Residents' Access to Neighborhood Amenities

Defendants contend that each of the eighteen adult home residents deposed in this case "regularly" leaves the adult home to visit neighborhood amenities, such as shops, parks, restaurants, religious institutions, entertainment facilities. (See, e.g., M.B. Dep. 40-50, 102-112 (testifying that he went to stores, religious services, and restaurants outside the facility when he lived at Oceanview); L.G. Dep. 14-18, 21-26; R.H. Dep. 33-41, 66, 80-82, 123-24; G.J. Dep. 33-34; A.M. Dep. 59; S.B. Dep. 13-25.)[38] Defendants have also provided testimony from adult home administrators that some residents leave the facilities on their own on occasion to go shopping, to the library, and to restaurants, and that some residents have reduced-fare Metrocards to use on public transportation. (See, e.g., Burstein Dep. 45-46, 89-90; Mendel Dep. 51; Yunger Dep. 40 (testifying that he has seen residents at stores).)

Relying on the same eighteen depositions, Plaintiff characterizes the testimony as providing a varied picture of what the residents actually do. While some adult home residents leave the facilities, not all do, and those who leave do not necessarily do so frequently. For example, while a former resident of Sanford testified that he attended church outside the facility, he only went to church three times while he lived there. (A.M. Dep. 56-57.) Some residents testified that they never used the subway and did not know the bus system in the area. (See, e.g., P.B. Dep. 53-57.) A resident of Queens Adult Care testified that "none of the residents ha[s] a [Metro]card." (C.H. Dep. 83-84.) A former adult home resident testified that only eight of the

---

[38] Other residents provided similar testimony. (See, e.g., S.P. Dep. 8-12; D.W. 30-32, 156-158; P.B. Dep. 50-53, 148 (testifying that she goes to a restaurant once or twice a month, walks to Church each Sunday, and goes to the library); L. H. Dep. 49-50, 117-118 (testifying that she walks around the neighborhood every day and goes to a restaurant once a week); T.M. Dep. 45-47 (testifying that he leaves the facility at least once each day to "sit[] and enjoy the day," occasionally goes clothes shopping, never goes grocery shopping, and goes to a restaurant at least once per month); G.H. Dep. 97-99, 130-145 (testifying that he goes shopping several times per year, eats at restaurants every day for the first ten days of the month when he receives his allowance, and used to take public transportation to country music concerts from 1997 to 2001); C.H. Dep. 21-22, 63-65 (testifying he took the subway to sports events and concerts about every three months, and went to a restaurant about once every month); I.K. Dep. 45-46, G.L. Dep. 50 (testifying that they and others go to corner stores several times per week).)

216 residents of Brooklyn Manor go to restaurants in the neighborhood; moreover, he never went to concerts, movies, the library, the beach, a street fair, or sporting event while he was at that facility. (J.M. Dep. 54-59.) A Seaview resident testified that there were a few residents who never leave the building, and he estimated that "maybe ten" of the other residents go to the boardwalk. (S.B. Dep. 63-64.) A resident of Parkview testified that he has seen only one or two other residents take the buses that he takes, and has never seen another resident take the subway. (S.P. Dep. 13-16.) A resident of Surfside testified that he had seen only four other residents walking on the boardwalk, and two or three residents at the library. (D.N. Dep. 14-19, 31-34.)

The locations of the adult homes may influence the level of interaction that residents have with people outside the home. Defendants have provided evidence that the adult homes at issue are located within several blocks of one or more of following: stores, restaurants, religious institutions, libraries, parks and/or beaches and boardwalks, and public transportation.[39] Plaintiff has provided evidence, however, that the proximity of the adult homes to these entities varies from home to home (Kessler Dep. 73-79; E. Jones Aff. Ex. A at 8), and accessibility to adult home residents depends on how far particular residents can walk (Kessler Dep. 74; S.B. Dep. 13-14; P.C. Dep. 222; R.H. Dep. 81-82). For example, a resident of Seaview Manor testified that there was a convenience store selling sandwiches and coffee within a ten-minute walk, but residents had to take the train to go to a supermarket. (S.B. Dep. 15.) In addition, Plaintiff has provided evidence that some residents are unfamiliar with public transportation (see, e.g., P.B. Dep. 53-54), and that while homes provide transport services to residents, adult home residents do not have opportunities to learn how to travel by themselves (Kessler Dep. 418). Because

---

[39] See Burstein Dep. 9-10 (Park Inn); Mendel Dep. 18-19, 75 (New Central Manor Home); Davis Dep. 107-109 (Oceanview Manor); Yunger Dep. 23, 39-41 (Queens Adult Care); P.B. Dep. 51-53 (Ocean House); P.C. Dep. 96-98 (King Solomon); L.G. Dep. 15, 21 (Anna Erika); S.B. Dep. 19, 130-132 (Seaview Manor); R.H. Dep. 34-41, 79-81 (Sanford); L.H. Dep. 52-54 (New Haven Manor); G.H. Dep. 152-155 (Surf Manor); Dep. B.J. 51-53 (Brooklyn Manor); D.N. Dep. 16-19; 32, 36-38, 68-69 (Surfside Manor); S.P. Dep. 13-14 (Parkview).

residents have limited income – a personal needs allowance of approximately $150 per month – subway or bus fares are sometimes unaffordable. (S.B. Dep. 19; E. Jones Aff. Ex. A at 3; G.L. Dep. 76-77; I.K. Dep. 57 (noting that she does not visit friends because of transportation costs).) A case manager at Oceanview Manor testified that while Oceanview is near a shopping center, bus stop, beach boardwalk, and park, she was "not aware of any resident that just goes on their own." (Davis Dep. 109.)

### c.     Organized Trips Outside the Homes

Defendants have provided evidence that adult home residents go on trips, for example, weekly trips to the movies for residents of Queens Adult Care Center. (Yunger Dep. 23.) Plaintiff has provided evidence that those trips are always with other residents of Queens Adult Care, not people from outside the home. (N.B. Decl. ¶ 20.) Plaintiff has provided additional evidence that trips organized by other adult homes are rare and often limited to a very small number of residents. (E. Jones Aff. Ex. A at 5-6; Levine Dep. 250-251; Schwartz Dep. 317-318.) For example, a resident of Anna Erika, which is certified for 427 residents, testified that outings were limited to thirteen people, or the total number of persons who can fit in a van. (L.G. Dep. 37; see also Levine Dep. 255 (describing trips limited to seven or eight adult home residents).) Two residents of Parkview, which is certified for 134 residents, testified that five or six residents had gone on each outing. (R.H. Dep. 49; S.P. Dep. 22-23.) A former resident of Sanford testified when he lived in the adult home, he made one trip to the zoo, attended one baseball game with about five other residents, and went to the movies "a couple of times." (R.H. Dep. 48-49, 126-127.) A former resident of Brooklyn Manor testified that although the facility had a van, he could only remember the facility organizing one trip, which involved eight or nine residents. (J.M. Dep. 43-44.)

### d.     Residents' Opportunities to Interact with Non-Residents

The parties also dispute to what extent adult home residents have opportunities to interact with people who do not live in the adult homes. Defendants have provided evidence that adult home residents met acquaintances on the street. (M.B. Dep. 97-102 (testifying that when he lived at Oceanview, he had "lots" of "street acquaintances"); A.M. Dep. 79-80 (testifying that when he lived at Sanford, he had two friends who lived outside the adult home, one of whom he met while she was walking her dog in the park); J.M. Dep. 64-67 (testifying when he lived at Brooklyn Manor, he talked to people on the street "[a]ll the time" and that they were kind to him); D.W. Dep. 29-32 (testifying that he speaks and waves to people on the street and that a deli employee knows him by name).)

Plaintiff has provided evidence that adult homes do not encourage residents to interact with non-residents, or provide them with such opportunities. (N.B. Decl. ¶¶ 15-20; B.R. Decl. ¶¶ 16-18; see also R.H. Dep. 96 (stating that he does not know any people who live in the neighborhood).) Based on their visits to numerous adult homes and interviews with adult home residents and staff, DAI's experts Elizabeth Jones and Dennis Jones observed that the adult homes do not encourage interaction with non-disabled members of the community. (E. Jones Aff. Ex. A at 3, 8; D. Jones Decl. Ex. A at 9.) Plaintiff has also provided evidence from Defendants' expert Alan Kaufman, who observed that for some adult home residents, "choices in friends/acquaintances were likely limited by the very location and nature of the home in which they resided." (Decl. Ex. Kaufman-A at 10-11.) Some adult home residents have testified that their friendships and romantic relationships either predated their admission to the adult home or were developed at the home with fellow residents. (R.H. Dep. 96-97; G.H. Dep. 120-124, 126-128, 240; B.J. Dep. 53; D.N. Dep. 15-16, 29, 26.)

The parties have provided conflicting evidence on the extent to which adult home residents visit their family and friends outside the home. Defendants have provided evidence that some adult home residents visit their family and friends outside the home. (P.B. Dep. 56-57; P.C. Dep. 101; L.G. Dep. 135-136; G.H. Dep. 117-127 (testifying that he has visited a friend outside the home six times in nine years, that he knows of a resident who stayed overnight with his mother who lived in the neighborhood, and that more than fifty of the two hundred residents visit their relatives outside the adult home); L.H. Dep. 54-55; B.J. Dep. 51-52, 72; D.N. Dep. 26 (testifying that he takes four buses each way to visit his uncle once per month); see also Yunger Dep. 22; Davis Dep. 199 (testifying that "quite a few" Oceanview Manor residents visit friends outside the home).) In contrast, Plaintiff has provided evidence that some adult home residents do not visit their family and friends outside the home. For example, R.H. testified that he does not have any family and friends with whom he keeps in touch. (R.H. Dep. 96.) Another resident testified that she has stayed overnight at a friend's house but has not done so in years. (I.K. Dep. 71.) One resident estimated that the most frequently anyone visited a relative outside the home is twice per month. (G.H. Dep. 117.)

### e.  Residents' Employment

The parties dispute the extent to which adult home residents have volunteer or paid employment outside the adult home. Defendants have provided testimony that some adult home residents have paid employment or volunteer positions. (See, e.g., G.L. Dep. 78-79 (testifying that he works for an advocacy organization as a community organizer for adult home residents); Burstein Dep. 82-84 (testifying that four or five adult home residents had jobs); A.M. Dep. 144-145 (testifying that the "helped out" at a coffee cart as a volunteer for a year); Rosado Dep. 166-68 (testifying that a resident of Surf Manor volunteered at the Botanical Garden); S.P. Dep. 16-

22, 29-31 (testifying that he found a "training job" by asking Bronx Psychiatric Center clinical staff stationed at his adult home, and his responsibilities involved housekeeping assignments inside the adult home and later at the state hospital itself).)

Plaintiff has provided evidence that only a few residents had jobs or volunteer positions, and many of those jobs were short-lived.  For example, a service provider testified that she could only recall one resident of Queens Adult Care becoming employed.  (Rosado Dep. 166-168.)  One resident at Parkview testified that only he and two other residents hold jobs.  (S.P. Dep. 31-32.)  A Seaview resident testified that a social worker had helped him obtain a part-time job as a messenger, but that he was fired after seven weeks.  (S.B. Dep. 40-42.)  A resident of Surf Manor testified that he had held a job at a newsstand since prior to his admission to the adult home, but that the job occupies about three or four hours per week and no longer involved interacting with customers.  (G.H. Dep. 102-103, 105.)

### f.    Voting

As evidence that some residents interact with the people outside the adult homes, Defendants have provided testimony that some adult home residents vote.  (See I.K. Dep. 60 (testifying that she votes at a school a block and a half away from the adult home and that other residents are registered to vote); R.H. Dep. 127-128 (testifying that he votes across the street from the adult home).)  Plaintiff has provided evidence indicating that other residents vote by absentee ballot or infrequently.  (See G.L. 57-58 (testifying that he and other adult home residents generally vote by absentee ballot but that he went to the poll for the presidential election, and that "not many" other residents voted, "maybe" 25%); G.H. Dep. 145-147 (testifying that he is registered to vote but had gone to the polls only once in the nineteen years he had been living in the adult home).)

g.    **Continuing Day Treatment Programs for Rehabilitation and Training in Supportive Skills**

The parties dispute to what extent the continuing day treatment programs offered in adult homes promote rehabilitation and foster independence.[40]  Defendants have provided evidence that the programs offered to adult home residents allow the residents to receive rehabilitative services.  OMH official Joseph Reilly,[41] attested that "[w]hile OMH has taken steps in recent years to improve such programs and strengthen their focus on recovery, opportunities existed for adult home residents to receive rehabilitative services apart from those efforts."  (Reilly Aff. ¶ 32.)  The clinical director of an agency that provides continuing day treatment to about 112 adult home residents, attested that her agency's program provides, among other things, medication education, symptom management, supportive skills training, and social skills training; and that the program assists residents in developing cooking, cleaning, and shopping skills.  (Bienstock Aff. ¶ 5.)  The social work supervisor at Oceanview testified that some of the residents attended a continuing day treatment program at a YMCA that provided an art group, a spirituality group, and life skills group offering training in money management.  (Levine Dep. 162-165.)  Another service provider testified that her agency offers continuing day treatment at Mermaid Manor, but could not identify any of the types of groups, other than that "there may be a group for ADLs

---

[40] Mental health providers offer a variety of services to adult home residents with mental illness, including mental health clinics, case management services, and continuing day treatment programs.  (Myers Dep. 38-49; Bienstock Aff. ¶ 7.)  Continuing day treatment is a type of mental health program licensed by OMH.  N.Y. Comp. Codes R. & Regs. tit. 14, § 587.4(c)(4)(ii); Reilly Aff. ¶ 33.  Under the regulations, such programs are required to offer the following services, among others: medication education, rehabilitation readiness development, and case management, psychiatric rehabilitation readiness determination and referral.  N.Y. Comp. Codes R. & Regs. tit. 14, § 587.10(d).  Continuing day treatment programs may – but are not required to – provide supportive skills training, defined as "the development of physical, emotional and intellectual skills needed to cope with mental illness and the performance demands of personal care and community living activities."  Id. §§ 587.10(e)(1); 587.4(c)(29).

[41] Mr. Reilly had been responsible for licensing and certifying mental health programs attended by adult home residents in New York City and is currently the Director of OMH's Hudson River Field Office and OMH's Adult Homes Project.  (Reilly Aff. ¶ 1.)

[Activities of Daily Living] to train consumers about adult daily living skills.  There may be a group on wellness."  (Bear Dep. 24-25.)

Plaintiff has provided evidence that the treatment programs do not consist of meaningful activities.  A December 2006 report from the CQC concludes that some day treatment programs serving individuals with mental illness are characterized by group television and movie watching and art "programs," which may only involve the provision of crayons, markers, and coloring books.  (NYS CQC, Continuing Day Treatment Review 1, 4-5, 19 (Dec. 2006) (Murray Decl. Ex. 78).)  The CQC report found that less than twenty percent of the participants in the continuing day treatment programs analyzed in the report had a treatment objective for finding work and about fourteen percent had an objective to obtain vocational training.  (Id. at 13.)

Plaintiff has provided testimony from adult home residents about the programs.  One adult home resident testified that some of the day programs offered in his adult home are "very child like, very, very very low kind of things" and that the activities were "mostly coloring books and pictures . . . little easy sewing things . . . but no intelligent talk groups or anything." (M.B. Dep. 54-55.)  Another resident testified that the adult home she lived in offered no "socialization group" and had only "very minimal" arts and crafts consisting of "crayons, magic markers, [and] paper" provided at set times two or three times per week.  (G.L. Dep. 40-41.)  A former adult home resident testified that the activities at the adult home, which were only offered on weekdays, "had you coloring, like a little kid; you play Bingo, like a little kid; you play domino, like a little kid; and you play cards, like a little kid."  (A.M. Dep. 34.)

The parties dispute to what extent adult home residents receive training in supportive skills.  Defendants have provided evidence that the programs teach such skills.  Mr. Reilly attested that "many programs provide opportunities to learn skills which could assist an

individual in finding employment or volunteer opportunities.  Many programs offer seminars or

groups on medication management, budgeting, and nutrition and cooking." (Reilly Aff. ¶ 34 &

Exs. J, K, L (brochures from service providers indicating that they offer programs designed to

teach skills including cooking, vocational skills, computer training, and budgeting at adult homes

and to adult home residents).)  The director of an organization providing case management and

other services at Queens Adult Care and Brooklyn Manor testified that the organization offers a

variety of services for adult home residents, including medication training, cooking skills,

shopping, and training in how to use public transportation, and supported employment.

(Lockhart Dep. 19-24, 55-57; see also Rosado Dep. 108-12 (describing ADL group for Queens

Adult Care residents as teaching "hygiene, eating, sleeping, how to take care of yourself . . .

basic 101 living skills," including cooking and shopping).)  A social work supervisor testified

that when residents at Oceanview participated in the continuing day treatment program, the

social worker and adult home resident would establish personal goals, including money

management skills, feeling more comfortable going out into the community, and wanting to get

vocational training.  (Levine Dep. 166-168.)   One adult home resident testified that he and seven

other residents participated in a budgeting money group, and he and six residents participated in

an ADL group that talked about grooming and hygiene.  (S.P. Dep. 27-28.)

     Defendants also provided evidence that the programs offer educational and/or vocational

training.  An adult home administrator testified that the adult home referred its residents to three

"prevocational programs" that teach "life skills and job skills, and if they follow through they are

actually placed on a job site," although only three or four residents attended each program at any

given time, and she was not familiar with the "specific things" the programs teach.  (Burstein

Dep. 49-50.)  A service provider testified that her agency provided a "computer skills group" for

adult home residents.  (Rosado Dep. 158-160.)  Another service provider attested that her agency's program offers pre-vocational training, work-related skills training, and computer and GED classes, and that there is an on-site thrift shop that is run and staffed by the residents. (Bienstock Aff. ¶ 5.)

Plaintiff has provided evidence that the programs do not teach such skills, pointing to testimony of adult home residents and administrators.  For example, Ms. Rosado testified that the computer group she described "really didn't teach computer skills, put it that way. . . . the way those groups were run needed a lot of improvement.  I mean, it would have been nice to meet the needs of the clients who wanted a higher level of learning."  (Rosado Dep. 158-160.)  One adult home resident testified that he had been attending a day treatment program for fourteen years where he and seventeen or eighteen other residents "go to groups all day" and providers "try to get us ready for the outside," but when asked to describe what he does in the ADL group, he testified, "I go to these groups a hundred times, I don't know what the heck they're talking about, but I go."  (C.H. Dep. 24-33.)  He also testified that the ADL group stopped teaching cooking skills because "[t]hey probably thought it was a waste of time," that his Budgeting/Money Management group did not teach any skills related to budgeting, and while the skills therapy groups "sometimes" talked about jobs, he could not remember anything that was said about jobs, and the group leaders never talked about applying for jobs, writing resumes, or looking in classified ads.  (Id. at 29-33.)  One resident testified that while he participated in a budgeting and ADL group, there were no groups that discussed cooking, computers, jobs, or living in alternative places.  (S.P. Dep. 27-28.)  An associate administrator at an adult home that houses 186 residents did not know of any resident who had obtained a GED since he became associated with the home as a volunteer at age 18.  (Mendel Dep. 6-7, 14, 76.)  An administrator at Park Inn

testified that the residents at Oceanview do not take classes or pursue their educations in any way.  (Davis Dep. 111.)

DAI's experts Elizabeth Jones and Dr. Kenneth Duckworth, as well as Raymond Schwartz, a manager of a private mental health agency in New York City who spent time visiting and monitoring adult homes in his previous employment with the New York City Department of Mental Health, observed that there is no emphasis in adult homes on the development or maintenance of basic living skills such as cooking, doing laundry, housekeeping, grocery shopping, and self-medicating.  (E. Jones Aff. Ex. A at 5; Duckworth Aff. Ex. A at 9; Duckworth Dep. 119-120, 142-143; Schwartz Dep. 15, 59, 331-332.)

Moreover, several adult home residents have declared that they would like to manage their own daily activities.  (See R.A. Decl. ¶¶ 17-24; N.B. Decl. ¶¶ 31-33; B.R. Decl. ¶¶ 22-23; H.S. Decl. ¶¶ 20-22.)  DAI's and Defendants' experts both testified that the adult homes foster "learned helplessness" among residents.  (Duckworth Aff. Ex. A at 9; Geller Dep. 158-59.)  For example, adult home residents have testified that they are not allowed to administer their own medications.  (A.M. Dep. 95-96; S.P. Dep. 64-65; G.L. Dep. 203-204.)

### 3.      Whether the Adult Homes Enable Interaction with Individuals Without Disabilities to the Fullest Extent Possible

Numerous witnesses, including DAI's and Defendants' experts, observed that adult homes share characteristics of psychiatric institutions.  (See D. Jones Decl. Ex. A at 9-10; E. Jones Aff. Ex. A at 8; E. Jones Dep. 159-161; Kaufman Aff. Ex. A at 8-9 (describing institutional characteristics of adult homes, including "inflexible schedules for meals and other daily activities; assigned roommates; rigid medication administration procedures and medication dispensing lines"); see also A.M. Dep. 154-155 (testifying that the adult home was no different from the state hospital other than that he could leave the grounds).)  In particular, Defendants'

expert, Alan Kaufman, reported that the adult homes' "provision . . . of laundry services, food services, housekeeping, and other daily living services – and the resident's lack of choice in performing these tasks him/herself – is characteristic of mental health institutional settings." (Kaufman Aff. Ex. A at 8-9.)  He concluded that "a large Adult home setting coupled with a high proportion of residents with mental illness can artificially limit the interactions of residents and constrict the diversity of friends and acquaintances."  (Kaufman Aff. Ex. A at 10; see also Schwartz Dep. 297, 298-300; Rosenberg Aff. ¶ 12 (the adult homes "are more like institutions than community settings[, and] they impede the community integration of people with mental illness.").)

As described above, DAI has provided evidence that most aspects of the residents' lives take place inside the adult homes (E. Jones Aff. Ex. A at 8), and that the residents are limited in the times they can leave the homes, given rigid schedules for meals, medications, and distribution of personal need allowances (Levine Dep. 250-51; Schwartz Dep. 317-318; O.J. Decl. ¶¶ 17-20; E. Jones Aff. Ex. A at 5-6, 8; D.W. Dep. 75-77).  DAI has provided evidence that the homes limit residents' ability to interact and maintain relationships with non-disabled individuals.  (See, e.g., N.B. Decl. ¶¶ 15-16, 19-20; B.R. Decl. ¶¶16-18; E. Jones Aff. Ex. A at 3, 8; D. Jones Decl. Ex. A at 9; Kaufman Aff. Ex. A at 10-11; Schwartz Dep. 297-300.)

Defendants assert that the residents' degree of interaction with individuals who do not have disabilities is a matter of choice, or at most, a function of the quality and effectiveness of the services offered by particular mental health providers, which are outside of the scope of the enforcement provisions of the ADA and RA.  See Olmstead, 527 U.S. at 603 n.14 ("We do not . . . hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with

disabilities.'"); P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990) ("The [Rehabilitation] Act does not require all handicapped persons to be provided with identical benefits.").  As described above in Section VI.A, State regulations require adult homes to: (1) permit residents to come and go at reasonable hours; and (2) encourage participation in community-based activities and assist residents in maintaining family and community ties.  N.Y. Comp. Codes R. & Regs. tit. 18, §§ 487.5(a)(3)(xii), 487.7(g).  Defendants assert that while they monitor the compliance of the adult homes with these regulatory provisions, they cannot be held responsible under the ADA for ineffective or low-quality services.

In response, DAI has provided evidence that even if all of the large, impacted adult homes at issue complied with State regulations, they could not overcome the institutional qualities inherent in a large facility.  For example, Ms. Jones observed that in adult homes, "[t]he physical environment is institutional" and that the homes "are designed to manage or control large numbers of people . . . by eliminating choice and personal autonomy, establishing inflexible routines for the convenience of staff, restricting access, implementing measures that maximize efficiency, and penalizing residents who break the rules."  (E. Jones Aff. Ex. A at 4.) Defendants' expert, Mr. Kaufman, similarly observed that "[S]ignificant numbers of residents suffer from serious mental illness . . . . The number of beds in many of the larger Adult Homes, as well as their physical layout, furnishings, and decorations, also give an appearance similar to that of an institutional setting."  (Kaufman Aff. Ex. A at 8.)

Defendants assert that "the size of the home and independence of the residents are irrelevant to opportunities for contact with nondisabled persons." (Def. Reply Mem. 14.)  While Defendants may present evidence supporting this proposition at trial, the court declines, at the summary judgment stage, to foreclose the possibility that a reasonable finder of fact could

conclude that a large, regimented adult home in which nearly all the residents have mental illness does not <u>enable</u> residents' interaction with non-disabled individuals to the fullest extent possible, given the evidence regarding adult homes and supported housing. While size may not be a dispositive factor, it is not irrelevant. Nor is the adult home residents' degree of independence irrelevant. A reasonable finder of fact could conclude that a setting that fosters "learned helplessness," a term that DAI's and Defendants' experts have used in referring to the adult homes, does not <u>enable</u> opportunities with non-disabled persons to the fullest extent possible.

Defendants similarly assert that DAI's evidence regarding the institutional nature of adult homes, such as the set meal and medication times and medication lines, fails to establish that "these factors affect opportunities for interaction" with non-disabled persons, contending that DAI relies on "conclusory" rather than "empirical" evidence. (Def. Reply Mem. 15 & n.7.) The court need not consider whether DAI has "established" its claims for purposes of Defendants' Motion for Summary Judgment; DAI's evidence is sufficient to raise an issue of disputed fact. DAI's expert Elizabeth Jones based her observations and opinion on visits to twenty-three adult homes and interviews with 179 adult home residents; her testimony is consistent with other evidence DAI has also presented from service providers and adult home residents themselves. While Defendants contend that the institution-like features of adult homes do not significantly limit opportunities for interaction with non-disabled individuals and have provided evidence that some adult residents can and do leave the adult homes, DAI has nonetheless raised an issue of disputed material fact as to whether the adult homes "enable interactions with non-disabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d), App. A.

In addition to DAI's evidence concerning the characteristics of adult homes, DAI has also provided evidence from which the finder of fact could conclude that the large, impacted adult

homes at issue do not provide services in the "most" integrated setting, because it could find that supported housing enables interaction with non-disabled persons to a greater extent than do the adult homes.[42]  DAI has provided evidence that residents of scattered-site supported housing live in apartment buildings with people who do not have disabilities and often have their own apartments or share with one or two others.  (See Schwartz Dep. 188, 198-99; 179-180; Tsemberis Dep. 101-102.)  According to DAI's witnesses, residents of supported housing set their own schedules and leave their apartments to conduct the activities of daily living – including grocery shopping, doing laundry, and seeing doctors.  (E. Jones Dep. 231.)  Mr. Jones observed that "[s]upported housing is . . . a home, not a residential treatment setting."  (D. Jones Decl. Ex. A at 25; see also Tsemberis Dep. 109 (supported housing is "real housing"); see also Duckworth Aff. 8 ("in contrast to the apartments in the supported housing model, adult homes have the look and feel of large custodial institutions").  As described above, adult home residents have testified that they want to move out of the adult homes and into their own apartments.  O.J., for example, declared that "I would like to move because I want to do my own cooking, cleaning, decorating, and shopping, and I want to handle my own money."  (O.J. Decl. ¶ 7.)

The court is skeptical of Defendants' assertion that adult homes and supported housing are "equally integrated because both are community placements that offer substantially similar opportunities for access to nondisabled persons."  (Def. Reply Mem. 16.)  In any event, viewing the evidence in the light most favorable to DAI, Defendants have failed to show an absence of a genuine issue of material fact that would entitle them to summary judgment.

_____

[42] Defendants have provided undisputed evidence that State psychiatric centers have explicit rules and policies.  For example, a patient's access to different parts of the facility and its grounds, as well as the community outside the facility, is tightly controlled according to the level of "privileges" he or she has attained.  (See Def. 56.1 Statement ¶¶ 58-61.)  Even assuming that this evidence demonstrates the existence of a less integrated setting than the adult homes, it is irrelevant to the determination of whether the adult homes are the "most integrated setting."

**B.      Whether DAI's Constituents Are Qualified for Supported Housing**

In Olmstead, the Supreme Court held that the State has an obligation to provide services and programs in community-based settings only if the individual with disabilities "meets the 'essential eligibility requirements' for habilitation in a community-based program," referring to the "most integrated setting appropriate" language in the regulations.  527 U.S. at 602 (citing 28 C.F.R. 35.130(d) (emphasis in original).)  The parties dispute whether supported housing is "appropriate" for adult home residents, that is, whether DAI's constituents are qualified to live and receive services in supported housing.  Viewing the evidence in the light most favorable to DAI, the court concludes that DAI has provided sufficient evidence from which the finder of fact could conclude that at least some of DAI's constituents are qualified for supported housing.

DAI has provided evidence that large numbers of the residents of the adult homes at issue are qualified to live and receive services in supported housing.  DAI's experts concluded that most, if not all of the adult home residents at issue could live in the community with appropriate supports.  (See, e.g., Duckworth Aff. Ex. A at 2; E. Jones Aff. Ex. A at 3, 9; Groves Aff. Ex. A at 4).  DAI notes that even Defendants' expert, Dr. Geller, found that approximately two-thirds of the residents in the group that he assessed were not in the "most appropriate residential setting appropriate for their needs," and in a separate analysis, more than thirty percent of the residents assessed were qualified to go into supportive housing.  (Geller Decl. Ex. B at 6-7; Geller Dep. 196, 210.)  In addition, the report of the Adult Care Facilities Workgroup concluded that 6,000 of the 12,000 residents with psychiatric disabilities in adult care facilities "could reside in a more integrated setting.") (Workgroup Report 30; see also Schimke Dep. 114-117 (testimony of Workgroup member that approximately eighty percent of the adults with mental illness living in adult homes "could benefit" from supported housing and other community-based programs with

appropriate supports).)  State officials have also testified that there are residents of adult homes with mental illness who "could live in more integrated settings" (Wickens Dep. 46), in supported housing or apartments (Tacaronti Dep. 225-226; Reilly Aff. ¶ 25).  This evidence is sufficient to preclude a grant of summary judgment to Defendants.

Defendants contend that although DAI has submitted the names of 1,536 adult home residents whom it contends are qualified to move to supported housing, Plaintiff has failed to "establish" that any of them are actually qualified to move.  (Def. Mem. 65.)  Defendants base their arguments on a critique of the methodologies of DAI's experts, and further argue that DAI's constituents fail to meet the "essential eligibility requirements" of supported housing, asserting that residents of supported housing need only "minimal" support, and that the HRA 2000 application is required to move to supported housing.  (Id. at 67; Def. Reply Mem. 21.)

The court concludes that these are factual questions that turn on the weight of the evidence and preclude granting summary judgment to Defendants.  Regarding the experts, the court accepts the opinions of Plaintiff's experts as true for purposes of summary judgment, because Plaintiff is the non-moving party.[43] Anderson, 477 U.S. at 255; see also Dec. M&O, 2008 WL 5378365 (holding that the opinions of Plaintiff's experts regarding adult home residents' qualifications to move are admissible).

Regarding the nature of supported housing, Plaintiff has produced evidence that it is designed to provide varying – and not just "minimal" – levels of support and can thus

---

[43] Defendants also argue that the treatment providers for six of the 1,536 adult home residents whom DAI contends are qualified to move have concluded that those residents are not qualified to move.  (Def. Mem. 67-68.)  In their memorandum of law, Defendants point to the medical records of the following six residents: M.M., G.R., E.R., P.W., L. B., and J.B.  (Def. Mem. 67; Hathaway Decl. Exs. L, M, N, O, P, Q.)

In response, Plaintiff has provided evidence indicating that some of these six residents are qualified to move.  In particular, a case manager's psychosocial assessment of M.M. determined that he was "ready for housing placement" and that he would "do well in supportive housing."  (Psychosocial Summary for M.M. (Murray Decl. Ex. 98).)  Plaintiff has also provided evidence that Defendants' expert examined the records of four of these residents and determined that three – M.M., P.W., and E.R. – were appropriate for supported housing.  (Evaluation of Residences for AH Residents (Murray Decl. Exs. 99, 100, 101, 102).)

accommodate individuals who require different levels of assistance, including those who initially require more intensive services. OMH itself has stated that supported housing is designed to provide "varying" levels of support, including an ACT team with case management services, an intensive form of support. (See OMH January 2007 RFP (Murray Decl. Ex. 81); see also Rosenberg Aff. ¶ 13; Tsemberis Dep. 48, 51 ("We basically offer the services of the [ACT] team to the tenant and the tenant selects among the available array . . . . Whatever the person needs, we are basically there to provide it."); E. Jones Dep. 35-37 (testifying that the number of contacts an ACT team has with a client each month is "highly variable" and that the team "might see the person every day . . . or they may come and see the person once a month, once a week.").) Residents may receive help with cooking, shopping, budgeting, medication management, and making appointments as needed, but can do those things themselves if they are able. (Schwartz Dep. 191, 193-196, 288, 289-290; Lasicki Dep. 70.) Services are flexible, and they are usually more intensive at first. (Bear Dep. 108-109; Schwartz Dep. 187-188; Lasicki Dep. 68.) One provider testified that 21% of supported housing residents have case managers to assist them in addition to the case management provided by the supported housing provider. (Lasicki Dep. 99-100.) What level of services can be provided in supported housing is an issue of material fact that must be resolved at trial.

Defendants' argument that DAI's constituents have not met the "essential eligibility requirements" of supported housing because some of them failed to file HRA 2000 applications is without merit. Under the ADA, a "qualified individual with a disability . . . with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Not every eligibility requirement is an "essential

eligibility requirement." <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 688 (2001). It does not appear

to be so here, given DAI's evidence that individuals obtain OMH housing without HRA 2000

applications.[44] (<u>See, e.g.</u>, Tsemberis Dep. 32-36.) In any event, Defendants acknowledge in

their memorandum of law that some of DAI's constituents have filed this application. (Def.

Mem. 37).

In sum, Defendants have not met their burden for summary judgment.

## VIII. FUNDAMENTAL ALTERATION DEFENSE

The ADA's integration requirement may be excused only where a state demonstrates that

compliance would result in a "fundamental alteration" of its services and programs. <u>Olmstead</u>,

527 U.S. at 603. States are required to make "reasonable modifications" to comply with the

integration mandate, but they need not take an action that would constitute a "fundamental

alteration." <u>See</u> <u>id.</u> at 604. Defendants have raised the "fundamental alteration" affirmative

defense here, which the court will only reach if DAI establishes that its constituents are not in the

most integrated setting appropriate to their needs. <u>See</u> <u>Messier v. Southbury Training Sch.</u>, 562

F. Supp. 2d 294, 323 (D. Conn. 2008) (noting that the fundamental alteration defense is used to

rebut a prima facie case of discrimination under the ADA); <u>see</u> <u>also</u> <u>Frederick L. I</u>, 364 F.3d at

493-94 (noting that once plaintiffs have established a prima facie case, the burden shifts to

defendants to establish the fundamental alteration defense).

DAI seeks injunctive relief, proposing an order requiring Defendants to "offer supported

housing to qualified DAI constituents with mental illness." (Pl. Opp. 27; Zucker Decl. ¶¶ 19-

20.) Defendants contend that the relief DAI seeks would constitute a "fundamental alteration" of

---

[44] The court is not convinced that a failure to file a formal application for supported housing bears on whether individuals are qualified to receive services in a "more integrated setting," that is, whether the setting is "appropriate to their needs." Indeed, <u>Olmstead</u> simply requires that the individual whose placement is at issue not be "opposed" to receiving services in a more integrated setting. 527 U.S. at 587. The HRA 2000 is a bureaucratic avenue to access housing programs; it is unrelated to the characteristics of the individual seeking services that would make him or her suitable for supported housing.

its programs and services because: (1) the requested relief would increase the State's costs; (2) requiring the State to earmark its resources to assess adult home residents and set aside supported housing beds and services for residents of the large, impacted adult homes in New York City would unfairly impact the State's ability to provide services to others with mental illness; (3) the requested remedy would "alter many of the State's programs, activities, and policies," and (4) the State has a comprehensive, effective Olmstead plan to enable people with disabilities who participate in State programs and services to receive those services in the "most integrated setting possible." (Def. Mem. 71.)

DAI has cross-moved for partial summary judgment, arguing that a comprehensive, effective plan to comply with the ADA's integration mandate – an "Olmstead plan" – is a necessary component of a fundamental alteration defense, and that Defendants' asserted Olmstead plan with respect to adult home residents is deficient as a matter of law. Plaintiff argues that Defendants' plan is deficient, because Defendants have admitted the following: (1) they do not perform any type of ongoing assessments of adult home residents to determine whether they are appropriate for placement in alternative settings; (2) they do not maintain a waiting list for residents of adult homes to move them to more integrated settings; (3) the Most Integrated Settings Coordinating Council, the organization charged by statute with developing a plan for the State to comply with Olmstead, is not developing a plan to move adult home residents out of adult homes; and (4) while the Assessment Project commissioned by DOH collected data about adult home residents, Defendants have not used the data to move adult home residents to more integrated settings. (Pl. Mem. 28.)

The parties have provided voluminous evidence regarding the components and nature of Defendants' Olmstead plan, as well as the expected costs of the relief DAI seeks. For the

reasons below, the court concludes that the sufficiency of Defendants' statewide <u>Olmstead</u> plan as it affects the adult home residents at issue is not a threshold determination that must be made in order for Defendants to assert a fundamental alteration defense.  Defendants' plan cannot be considered in isolation from the impact of the requested relief.  The court must undertake a specific, fact-based analysis of Defendants' planning and actions with respect to the adult home residents at issue <u>along</u> <u>with</u> its consideration of the prospective costs and impact on others with mental disabilities to determine whether the requested relief would be a fundamental alteration of Defendants' programs and services.  After conducting this analysis under the summary judgment standard, the court concludes that disputed material facts persist as to the fundamental alteration defense.  The court therefore denies summary judgment on the defense to both parties and sets forth below the disputed factual issues to be resolved at trial.

### A.    Overview of the Defense

The "fundamental alteration" defense is derived from the "reasonable modifications regulation," which states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  In <u>Olmstead</u>, the plurality described the defense as follows:

> Sensibly construed, the fundamental-alteration component of the reasonable modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

<u>Olmstead</u>, 527 U.S. at 604.

The Supreme Court stated that the standard would be met "if, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." Id. at 605-06. Therefore, before ordering relief, a court must consider the range of services that a state already provides to persons with mental disabilities, and it may not merely "order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions." Id. at 597, 606.

Courts have found that whether the requested relief constitutes a "fundamental alteration" is a "complex[,] fact-intensive" inquiry particularly inappropriate for summary judgment. Martin, 222 F. Supp. 2d at 986. Relying on Olmstead's language about the "allocation of available resources" and a state's responsibility for "the care and treatment of a large and diverse population of persons with mental disabilities," lower courts evaluating the fundamental alteration defense have focused on the costs of the requested relief in light of a state's obligations to other individuals with mental disabilities. Lower courts have thus required states to provide a "specific factual analysis" in order to demonstrate that the requested relief would constitute a "fundamental alteration." See, e.g., Fisher, 335 F.3d at 1183 (refusing to accept fundamental alteration defense absent specific evidence that the costs of providing the requested relief would "in fact, compel cutbacks in services to other Medicaid recipients" or be inequitable to others with disabilities); accord Townsend, 328 F.3d at 520.

Olmstead explicitly provides that states must assess and place individuals with disabilities in more integrated settings if it would be appropriate to the needs of the individuals and the individuals do not oppose the placement. 527 U.S. at 605-606. The ADA does not

require states to create new programs and services that it does not provide to anyone with disabilities.  Rodriguez v. City of New York, 197 F.3d 611, 619 (2d Cir. 1999).  Where individuals with disabilities seek to receive services in a more integrated setting – and the state already provides services to others with disabilities in that setting – assessing and moving the particular plaintiffs to that setting, in and of itself, is not a "fundamental alteration."

For example, in Messier v. Southbury Training School, the court rejected the argument that "fulfilling [the defendants'] obligation under the ADA to properly assess whether class members should be placed in the community would necessitate the creation of new programs." 562 F. Supp. 2d at 345.  Specifically, the court noted that:

> It is clear from the evidence that, where appropriate, community placement could be achieved through existing programs.  Placing class members in the community might result in some additional expense to the state, but, as discussed above, courts have held that minimal additional expense incurred as a result of a defendant's compliance with the integration mandate does not, alone, support a fundamental alteration defense.

Id. (emphasis added); see also Frederick L. v. Dep't of Public Welfare, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001) ("Olmstead does not allow the state to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities.").

Similarly, in Townsend v. Quasim, the Ninth Circuit concluded that "[P]olicy choices that isolate the disabled cannot be upheld solely because offering integrated services would change the segregated way in which existing services are provided."  328 F.3d at 519.  In particular, it noted that:

> Olmstead makes that clear, for precisely that alteration was at issue in Olmstead, and Olmstead did not regard the transfer of services to a community setting, without more, as a fundamental alteration.  Indeed, such a broad reading of fundamental alteration regulation would render the protection against isolation of the disabled substanceless.

Id.  Therefore, a transfer of services to existing community settings is not, by itself, a "fundamental alteration."

**B.    An Olmstead Plan as a Component of a the Defense**

The Second Circuit has not addressed, and the parties dispute, whether an Olmstead plan is a necessary component of a fundamental alteration defense.  Olmstead did not address whether a plan was necessary to assert the defense, and the Court was not asked, nor did it decide, what type of proof would suffice to establish the defense.  Rather, it proposed a "comprehensive, effectively working plan" for placement in "less restrictive settings" and a "waiting list that moved at a reasonable pace" as an example of how a state could establish the defense.  527 U.S. at 605-06.

DAI urges the court to follow the approach of the Third Circuit, the only circuit that has explicitly addressed whether compliance with Olmstead requires a plan.  In the Third Circuit, "a comprehensive working [Olmstead] plan is a necessary component of a successful 'fundamental alteration' defense."  Frederick L. v. Dep't of Pub. Welfare (Frederick L. II), 422 F.3d 151, 157 (3d Cir. 2005); see also Pa. Protection & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 381 (3d Cir. 2005).  DAI argues that Defendants' Olmstead plan, as it affects adult home residents, is insufficient as a matter of law, and thus Defendants cannot assert a fundamental alteration defense.  (Pl. Mem. 25-26.)

In response, Defendants contend that Olmstead does not require a plan, pointing to Olmstead's language that a plan is an example of how a state can establish a fundamental alteration defense.  527 U.S. at 605-06.  They urge the court to read the defense more flexibly, as the Ninth Circuit did when it upheld California's deinstitutionalization plan.  The Ninth Circuit interpreted Olmstead's language that states should be given "leeway" to "maintain a range of

facilities and to administer services with an even hand," 527 U.S. at 605, to suggest that "courts should be sympathetic to fundamental alteration defenses." ARC v. Braddock, 427 F.3d 615, 620 (9th Cir. 2005). In ARC v. Braddock, the Ninth Circuit noted that "our approach has been consistent with the Supreme Court's instructions: So long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons 'with an even hand,' we will not interfere." Id.; see also Sanchez v. Johnson, 416 F.3d 1051, 1067-68 (9th Cir. 2005) ("[W]here there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary constraints and the competing demands of other services that the State provides . . . is 'effectively working' . . . the courts will not tinker with that scheme.") (citations omitted).

A district court in Ohio has explicitly noted that "the fundamental alteration analysis entails far more than the comprehensive plan and reasonably paced waiting list example the Olmstead Court provided."[45] Martin, 222 F. Supp. 2d at 985. It noted that the example in Olmstead was "not actually an illustration of a fundamental alteration at all. Rather, it is a way the State may show that it has already provided a reasonable accommodation. If the state makes this showing, then there is simply no need to further modify the program." Id. The court explained:

> As a practical matter, if the parties dispute whether a comprehensive plan exists, and whether the list moves at a reasonable pace, a defendant would likely present evidence of the comprehensive plan and the pace of the list along with other evidence to support the fundamental alteration defense. In such a case, the Court would then weigh all of the evidence of the state's efforts along with the other factors in reaching its decision.

Id. at n.42.

---

[45] The court in Martin denied the plaintiffs' summary judgment motion on the basis that disputed issues of material fact existed as to the ADA claim, but "examine[d] briefly the fundamental alteration defense to afford the parties some guidance as they proceed to trial." 222 F. Supp. 2d at 984-85.

The court in Martin noted that the defendants "appear to concede that the State has no plan or waiting lists that move at a reasonable pace," and stated that "[a]lthough this is not a good thing for defendants, it does not necessarily mean that defendants cannot prevail." Id. at 985-86. The court cited Williams v. Wasserman, 164 F. Supp. 2d 591 (D. Md. 2001), which "thoroughly examined" evidence on the fundamental alteration defense during a thirty-two day bench trial, as an illustration of the "complexity" of the fundamental alteration defense. Id. at 986. It noted that the court in Williams "considered a vast array of evidence" on the fundamental alteration defense and weighed the state's plan and the progress made in moving individuals from institutions to the community together with evidence concerning the cost of the proposed modification to determine whether the requested relief would be a fundamental alteration. Id. at 985 n.42 and 986, citing Williams, 164 F. Supp. 2d at 630-38. The court in Martin thus noted that at trial, the parties should be prepared to present "evidence addressing all of these facets of the fundamental alteration defense." Id. at 986.

To evaluate Plaintiff's contention that a plan is a necessary component of a fundamental alteration defense, the court looks closely at the Third Circuit cases that so hold. In Frederick L., the district court had entered judgment for the state, finding that the integration patients requested was unavailable at the time because it would require a "fundamental alteration" of the state's mental health program in light of limited resources and its obligations to other segments of the population with mental disabilities. Frederick L. II, 422 F.3d at 154, citing 217 F. Supp. 2d 581, 594 (E.D. Pa. 2002). The plaintiffs appealed and the Third Circuit remanded for "further evaluation of whether there was sufficient evidence to justify acceptance of Pennsylvania's 'fundamental alteration' defense." Id., citing Frederick L. I, 364 F.3d at 501. The Third Circuit "based this determination largely upon [defendants'] failure to heed the Supreme Court's

admonition in <u>Olmstead</u> that a state <u>may</u> <u>avoid</u> liability" by providing a plan as described in

<u>Olmstead.</u>  <u>Id.</u>, <u>citing Frederick L. I.</u>, 364 F.3d at 494 (internal citations and quotation marks

omitted) (emphasis added).  It thus directed the district court, on remand, to instruct the state "to

devise a plan which would demonstrate a commitment to community placement 'in a manner for

which it can be held accountable by the courts.'" <u>Id.</u>, <u>citing</u> <u>Frederick L. I</u>, 364 F.3d at 500.

On remand, the district court again entered judgment for the state, but on appeal, the

Third Circuit again remanded, holding that the defendants' plan was insufficient.  While it

accepted as a factual matter that the requested relief would "constrain the state's ability to satisfy

the needs of other institutionalized patients," thus accepting that the requested relief risked

fundamentally altering the state's programs, it held nonetheless that the state "may not avail

itself of the 'fundamental alteration' defense to relieve its obligation to deinstitutionalize eligible

patients without establishing a plan that adequately demonstrates a reasonably specific and

measurable commitment to deinstitutionalization for which [the state] may be held

accountable."[46] <u>Id.</u> at 157.

Similarly, in <u>Pennsylvania Protection & Advocacy, Inc. v. Pennsylvania Department of</u>

<u>Public Welfare</u>, the Third Circuit explained that <u>Olmstead</u> "allows for a fundamental alteration

defense only if the accused agency has <u>developed and implemented a plan to come into</u>

<u>compliance with the ADA and RA</u>."  402 F.3d 374, 381 (3d Cir. 2005) (emphasis added).  That

case concerned residents of a psychiatric transitional facility who claimed they were

"systematically denied" participation in programs that would enable them to live in more

integrated settings.  <u>Id</u>. at 378.  The district court granted summary judgment to the defendant

---

[46] In evaluating the defendants' proposed plan, the Third Circuit noted that "[g]eneral assurances" and expressions of "good faith intentions" are insufficient.  <u>Frederick L. II</u>, 422 F.3d at 158.  It held that, "at a bare minimum," an <u>Olmstead</u> plan must set forth the following: (1) the time frame or target date for placement in a more integrated setting; (2) the approximate number of patients to be placed each time period; (3) the eligibility for placement; and (4) a general description of the collaboration required between the local authorities and the housing, transportation, care, and education agencies to effectuate integration into the community.  <u>Id.</u> at 160.

agency solely on the fundamental alteration defense, without determining whether the plaintiffs were in the most integrated setting appropriate to their needs. Pa. Protection & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 243 F. Supp. 2d 184 (M.D. Pa. 2003). The Third Circuit vacated and remanded. It found that "[a]dmissions made by [defendant] during the course of litigation foreclose the genuine contention that it has made a commitment to . . . compliance with the ADA and RA." 402 F.3d at 383. In particular, the defendant agency had admitted that it did not require regional offices to plan for or develop community-based services for the residents of the facility at issue. The court noted that "[a]ny interpretation of the fundamental alteration defense that would shield a state from liability in a particular case without requiring a commitment generally to comply with the integration mandate would lead to [a] bizarre result." Id. at 381 (emphasis added). Otherwise, the defense would "swallow the integration mandate whole," as "[a]ny program that runs afoul of the integration mandate would be fundamentally altered if brought into compliance." Id.

After review of the relevant authorities, the court concludes that Olmstead does not require a plan to comply with the integration mandate as a prerequisite to considering the other elements of a fundamental alteration defense. A state's efforts to comply with the integration mandate with respect to the population at issue are nonetheless an important consideration in determining the extent to which the requested relief would be a permissible "reasonable modification" or an impermissible "fundamental alteration." See Martin, 222 F. Supp. 2d at 985-86 & n.42. The court reads the Third Circuit cases to stand for the proposition that if a state does not make a genuine attempt to comply with the integration mandate in the first instance, it cannot establish that compliance would be a fundamental alteration of its programs and services, excusing its violation of the integration mandate. Given that courts often analyze the

fundamental alteration defense in terms of cost, the court agrees with approach of the Third

Circuit cases that a state must make efforts to comply with the integration mandate in order to

show that specific relief requested would be too costly.  Whether the relief would be a

<u>fundamental alteration</u> in light of the state's available resources and obligation to others with

disabilities, however, cannot be determined independently of an analysis of the state's existing

efforts to comply with the integration mandate.  <u>See</u> <u>Martin</u>, 222 F. Supp. 2d at 985-986 & n.42

(noting that the lack of a plan "does not necessarily mean that defendants cannot prevail" and

that it would consider evidence addressing <u>all</u> the facets of the fundamental alteration defense at

trial.).

The court will not evaluate Defendants' <u>Olmstead</u> plan independently of the evidence

concerning other factors relevant to the fundamental alteration defense.  In light of this legal

determination, Plaintiff's Motion seeking to strike the fundamental alteration defense solely on

the alleged inadequacy of Defendants' <u>Olmstead</u> plan must be denied.

### C.  Evidence Concerning Defendants' <u>Olmstead</u> Plan

Defendants' <u>Olmstead</u> plan is relevant to the determination of whether the requested

relief would be a fundamental alteration of Defendants' programs and services.  While

Defendants' position is that no <u>Olmstead</u> plan is necessary for adult home residents with mental

illness because they are already "in the community," they nonetheless assert that they maintain

an <u>Olmstead</u> plan – consisting of a variety of activities, programs, and services – which is

effective for all individuals with mental illness, including adult home residents.  It is undisputed

that Defendants have no single document constituting their "<u>Olmstead</u> plan," but the court has

reviewed all the components of Defendants' asserted plan, as set forth by the evidence cited in

the parties' 56.1 Statements and memoranda of law.

According to Defendants, their Olmstead plan consists generally of (1) activities, programs, and services intended to assist persons with mental disabilities to live and receive services in the community instead of an institution; (2) OMH's planning, program implementation and oversight of the mental health system; and (3) DOH's inspection and oversight of adult homes. (See generally Myers Aff. ¶¶ 97-149 (describing components of Olmstead plan); Simons Aff. ¶ 26-107 (describing Olmstead plan for adult home residents and OMH Statewide Comprehensive Plans).) Additionally, OMH officials have attested that much of the Olmstead planning is reflected in OMH's Statewide Comprehensive Plans for Mental Health Services. (Simons Aff. ¶ 31 ("Essentially all the Statewide Comprehensive Plans produced for OMH since 2001 . . . reflect defendants' Olmstead plan or system for individuals with mental illness living in adult homes."); id. ¶¶ 31-38; Myers Aff. ¶103.)

Defendants' witnesses have attested that Defendants' Olmstead plan also includes the State's formal efforts to ensure compliance with Olmstead, such as the statutorily created Most Integrated Setting Coordinating Council ("MISCC"). (Wollner Aff. ¶¶ 60-65 & Ex. BB (MISCC Report).) The State legislature found that to ensure New York's compliance with the ADA and Olmstead, "it is incumbent upon New York State to develop and implement a plan to reasonably accommodate the desire of people of all ages with disabilities to avoid institutionalization and be appropriately placed in the most integrated setting possible." N.Y. Exec. L. § 700. It created the MISCC to "develop and oversee the implementation of a comprehensive statewide plan for providing services to individuals of all ages with disabilities in the most integrated setting" and provided that the plan "shall be completed within one year" of the statute's effective date. Id. § 703.

Defendants point to specific activities, including the downsizing and closure of State-operated psychiatric centers and the reinvestment of funds related to those centers toward community-based services (Affidavit of Lewis Campbell ("Campbell Aff.") ¶ 16 (Docket Entry #147); Simons Aff. ¶¶ 80-84; Myers Aff. ¶¶ 32, 152; Affidavit of Martha Schaefer Hayes ("Schaefer Hayes Aff.") ¶¶ 68-71 (Docket Entry #159)) and the development of community-based programs available to all individuals with mental illness, such as Housing Programs, case management, clubhouses, and ACT teams (Myers Aff. ¶¶ 68-70, 105; Simons Aff. ¶¶ 39-40, 66). OMH officials also attested that their Olmstead plan includes the provision of 29,050 existing units of Housing for Persons with Mental Illness and the commitment of funds to develop an additional 9,800 state-subsidized supported housing beds. (Myers Aff. ¶¶ 68-69.)

Defendants' witnesses also assert that their Olmstead plan includes particular initiatives related to adult homes, such as the Assessment Project conducted by NYPH, the Adult Care Facilities Workgroup, OMH's adult home case management and peer support programs, DOH's EnAbLE program,[47] the Do Not Refer list,[48] enhanced inspections of adult homes,[49] and OMH's

---

[47] EnAble stands for "Enhancing Abilities and Life Program," in which DOH awards grants to adult homes to fund a variety of programs designed to maximize residents' abilities and improve their quality of life, including training on independent living skills. (Wollner Aff. ¶¶ 36-38.)

[48] This list precludes referral to adult homes that have failed to meet applicable standards. (Reilly Aff. ¶¶ 10-12.)

[49] DOH has taken a number of actions to strengthen and improve its inspections and enforcement activities relating to the adult homes at issue in this case. (Def 56.1 Statement ¶ 27.) For example, it has added 20 staff members to conduct inspections of adult homes in New York City. (Id.) The timeliness of inspections has improved in recent years. (Id. ¶ 28.) Inspections of the homes at issue in this case have cited a number of violations related to residents' rights and residents' ability to participate in their community and to learn independent living skills. (Id. ¶ 30.) Homes have been cited for failure to follow through on a resident's expressed desire to move, to have a sufficient program of activities, to allow residents to self-administer their own medications, and to ensure that the resident council met on a regular basis and that the issues raised by the council were addressed. (Id.) Several adult homes have closed or have had their operating certificates suspended as a result of DOH's enforcement actions. (Id. ¶¶ 32-34; ¶¶ Hart Aff. 90-98.)

Defendants also created the Inter-Agency Committee on Adult Homes in 2001, a collaboration between OMH, DOH, and the Commission on Quality of Care and Advocacy for Persons with Disabilities ("CQC") that provides for the sharing of information and joint inspection of adult homes. (Reilly Aff. ¶¶ 10-12 & Ex. Reilly-A.)

designation of adult home residents as a target population for Housing Programs.[50]   (Reilly Aff. ¶¶ 19-31; Wollner Aff. ¶¶ 27-31; Myers Aff. ¶¶ 128-149.)

Plaintiff has provided evidence about various components of Defendants' <u>Olmstead</u> plan, including admissions from Defendants, concerning whether Defendants are acting to identify and/or move adult home residents who could receive services in alternative settings.  Plaintiff has also provided evidence disputing whether and to what extent adult home residents have benefited from Defendants' creation of additional amounts of Housing for Persons with Mental Illness and the designation of adult home residents as a target population for supported housing. This evidence is discussed below.

### 1.      Relevant Components of the Plan

As a preliminary matter, the court recognizes that many components of the <u>Olmstead</u> plan are evidence of Defendants' commitment to the integration mandate in general, and are indeed important elements of Defendants' statewide and system-wide <u>Olmstead</u> plan.  These include the closure and/or downsizing of State psychiatric centers and the reinvestment of those funds into community programs, and the development of community-based programs such as case management, Housing Programs, and clubhouses that are available to all individuals with mental illness, and the development of 29,050 units of OMH Housing for Persons with Mental Illness and the allocation of funds for the development of 9,750 additional units.  (<u>See</u> Campbell Aff. ¶ 16; Simons Aff. ¶¶ 39-40, 66, 80-84; Myers Aff. ¶¶ 32, 68-70, 105, 152; Schaefer Hayes Aff. ¶¶ 68-71.)  These components are relevant here only to the extent that they are evidence of

---

[50] Defendants' witnesses also assert that the <u>Olmstead</u> plan also includes OMH's work to advance accountability, encourage best practices, improve effectiveness and quality of care, as well OMH's "basic and applied research in the mental health field" and efforts to promote general public health as it relates to mental health, wellness, suicide prevention, and the forensic system.  (Simons Aff. ¶¶ 15, 36-37, 85-88, 97; Myers Aff. ¶¶ 30, 40.)

Defendants' general commitment to deinstitutionalization and the development of community programs and services.

Other components of Defendants' plan address the conditions and services provided in adult homes. These components include the EnAble program, the Do Not Refer List, and increased enforcement and oversight of the adult homes through licensing and "enhanced inspections." (Wollner Aff. ¶¶ 10-12; Reilly Aff. ¶¶ 10-12, 19-31; Myers Aff. ¶¶ 128-149.) These elements are relevant to the extent that they enable Defendants to identify and/or assist qualified and interested adult home residents in moving to alternative settings.

The court will focus its analysis on aspects of Defendants' Olmstead planning that relate to identifying and/or moving adult home residents to alternative settings. These components include the activities of the Most Integrated Settings Coordinating Council ("MISCC"); the Adult Care Facilities Workgroup; the Assessment Project and OMH's case management program; discharge planning for psychiatric center patients who are discharged to adult homes; increased amounts of OMH Housing for Persons with Mental Illness; and the addition of adult home residents as a target population for supported housing. In addition, the court also finds relevant the parties' evidence on Defendants' absence of a waiting list for OMH Housing for Persons with Mental Illness and the number of adult home residents who have actually moved to alternative settings.[51] The court describes the parties' evidence below.

---

[51] In support of its argument that Defendants do not have a comprehensive Olmstead plan to identify and move adult home residents who are not in the most integrated setting appropriate to their needs, Plaintiff also relies on the testimony of State officials testifying on Defendants' behalf pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure that they are not aware of "specific" Olmstead plans with regard to adult home residents. (Pl. Mem. 28.) For example, DAI has provided testimony from OMH by and through Senior Deputy Commissioner Robert Myers that OMH is not aware of "specific" Olmstead planning with respect to adult home residents, but does a variety of planning and activities to meet the "spirit" of Olmstead. (OMH Dep. by and through Robert W. Myers 39-41 (Raish Decl. Ex. 19).) While the parties are free to present evidence on this topic at trial as it relates to particular elements of Defendants' plan, the relevant legal inquiry is not whether particular officials – even those designated to testify on behalf of Defendants – are aware of an overall, system-wide plan for adult home residents, but what Defendants actually plan and do with respect to identifying and/or moving adult home residents who are not in the most integrated setting appropriate to their needs.

## a. Most Integrated Settings Coordinating Council

The facts about the activities of the Most Integrated Settings Coordinating Council ("MISCC") with respect to adult home residents are not in dispute. As discussed above, the MISCC is obligated by statute to "develop and oversee the implementation of a comprehensive statewide plan for providing services to individuals of all ages with disabilities in the most integrated setting." N.Y. Exec. L. § 703. In their response to Plaintiff's Requests for Admission, Defendants explicitly admitted that "the MISCC is not developing a plan to move residents of adult homes, and deny that there is an obligation to do so."[52] (Def. Obj. & Responses to Pl. First Set of Requests for Admissions ("RFAs") at No. 10 (Raish Decl. Ex. 11).) In addition, Defendants have not provided any evidence contradicting Plaintiff's evidence that the MISCC excluded adult home residents from its data collection. (Pl. 56.1 Statement ¶ 33; see also Wollner Aff. ¶ 65 ("DOH does not consider adult home residents as being 'institutionalized' and therefore did not include them in providing data on this subject to the MISCC.").) Nor have Defendants provided any evidence contradicting Plaintiff's evidence that "MISCC has not done anything to address individuals who reside in adult homes."[53] (Pl. 56.1 Statement ¶ 31.) Furthermore, Defendants have provided no evidence to dispute the testimony of their designated Rule 30(b)(6) witness Kathryn Kuhmerker, who testified on their behalf that "I don't believe there's been anything specific that the MISCC has done to specifically address in any way, shape

---

[52] A matter admitted under Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). No such motion has been made here.

[53] Defendants cite the entire MISCC's final report as their response to paragraph 31 of Plaintiff's 56.1 Statement. That report not only fails to address adult home residents, but contains a statement from six members of the MISCC dated November 20, 2006, noting that:

> [W]e feel that it is our obligation to point out that this report does not quite meet the requirements of the law that established the MISCC. Furthermore, we also feel that this report falls short of the hopes and expectations of the thousands of New Yorkers with disabilities who are currently in need of services being provided in a more integrated setting.

(Wollner Aff. Ex. Wollner-BB at EXEC 0005092.)

or form individuals who happen to reside in adult homes," other than that there were "occasional discussions" regarding adult home residents. (Kuhmerker Dep. 30, 31, 53-54.)

### b. Adult Care Facilities Workgroup

There are disputed issues of fact as to the extent to which Defendants have considered and/or implemented the recommendations of the Adult Care Facilities Workgroup ("Workgroup") to assess adult home residents and move those who are qualified to alternative settings. As noted above, the Workgroup was convened in 2002 by then-Governor Pataki to evaluate the strengths and weaknesses of the State's adult care facility model and to develop recommendations for new approaches, including "Recommendations for Improving Quality of Life and Services for Current Adult Home Residents, Recommendations for Future Restructuring of Housing and Services for Adult Home Residents, and Potential Fiscal Impact of the Recommendations." (Workgroup Report ii-iii (Raish Decl. Ex. 57).) The Workgroup issued a report in October 2002 with numerous recommendations. (Id.) These recommendations included, among other things: (1) assessment of adult home residents; and (2) the development of housing for adult home residents who are able and interested in living elsewhere. (Id. at iii-vi.) In particular, the Workgroup Report proposed a timeline for moving at least 6,000 adult home residents with psychiatric disabilities from adult homes into supported housing by March 2009. (Id. 32 tbl. 1-3.)

Plaintiff has provided evidence that Defendants do not have any formal mechanisms for implementing the recommendations of the Workgroup (Simons Dep. 162), and that the recommendation and timetable were never implemented (Schimke Dep. 179-183). In response, Defendants have provided evidence that they have considered and implemented certain recommendations from the Workgroup, relying on the affidavit of DOH official David Wollner,

who was "active in shaping the Workgroup's mission and agenda" when he worked in the Governor's office.  (See Wollner Aff. ¶¶ 23-59.)  Mr. Wollner attested that State officials in DOH, OMH, and the Governor's office reviewed the recommendations, and implemented the recommendation for assessments by contracting with New York Presbyterian Hospital for the Assessment Project.  (Id. ¶¶ 26, 27-31; see also id. ¶¶ 32-45 (describing DOH efforts to improve quality of life and services in adult homes based on Workgroup's recommendations).)

It is undisputed, however, that Defendants never implemented the Workgroup's recommendation and timetable for moving 6,000 adult home residents to alternative settings. Mr. Wollner attested that "State officials ultimately determined not to implement [that] recommendation, for a number of reasons."  (Id. ¶ 46.)  He stated that first, there are many people with mental illness who need access to OMH-funded housing, and that "it is inappropriate to give all adult home residents a priority right for such housing," and second, New York has taken actions "to increase adult home residents' knowledge of and access to OMH funded and licensed housing," such as the case management and peer support program.  (Id. ¶ 47.)

### c.     Assessment of Adult Home Residents

The parties dispute whether and to what extent Defendants are acting to identify adult home residents who are qualified and unopposed to receiving services in alternative settings. Defendants have admitted that OMH does not perform any ongoing assessment of adult home residents to determine whether they could be served in alternative settings.  (RFAs, at No. 2 (Raish Decl. Ex. 11); see Reilly Dep. 144-45; Tacaronti Dep. 202-203.)  Defendants also admit that DOH does not collect comprehensive data on adult home residents, as it does for nursing home residents. [54]  Defendants assert, however, that while they do not assess or collect data on

---

[54] It is undisputed that DOH collects comprehensive data on nursing home residents' "impairments, needs and progress," and that Defendants do not collect data in a similar manner on adult home residents.  (Pl. 56.1 Statement

adult home residents, the private case managers determine whether adult home residents are able to and/or interested in moving to alternative housing. Defendants have provided evidence that the OMH case management program incorporates data from the Assessment Project and helps identify residents who could be served in alternative settings. A description of the parties' evidence is below.

First, the parties dispute whether Defendants have used data from the Assessment Project, which Defendants include as a component of their Olmstead plan, to determine whether adult home residents are in the most integrated setting appropriate to their needs. Defendants have admitted that they have not used the Assessment Project data "to place Adult Home residents in more integrated settings." (RFAs at No. 15 (Raish Decl. Ex. 11).) Plaintiff has also provided evidence that OMH does not use the Assessment Project data in its strategic planning (Simons Dep. 147-151), and while DOH was initially planning to use the Assessment Project data (Liebman Dep. 106-107), it has not and does not plan to do so (Wickens Dep. 95).[55]

In contrast, Defendants have provided evidence that OMH has used the Assessment Project data to identify adult home residents who might be more appropriately placed in alternative settings through its case management program. According to the contract between DOH and New York Presbyterian Hospital ("NYPH") for the Assessment Project, one of the

¶ 51.) DOH official Lisa Wickens described the process by which DOH assesses the ability and desire of nursing home residents to live elsewhere, including a "comprehensive assessment of the individual, and what needs to be changed in their plan of care"; she testified that "we don't have that mechanism, we don't have that system in place" for adult home residents. (Wickens Dep. 20-24, 15-18.)

Defendants assert that DOH collects information about adult home residents in "other ways," such as inspections. (Hart Aff. ¶¶ 16-46.) In response, Plaintiff has provided testimony from DOH, by and through Catherine Lennon pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, that DOH does not "do [housing] placements"; if an adult home resident expressed to DOH an interest in moving to alternative housing, DOH would not refer that person to a housing placement agency and would instead refer him or her back to his or her social worker or case manager. (Lennon Dep. 198-99.)

[55] Plaintiff has also provided evidence that DOH official Kelly Hansen, who replaced Glenn Liebman as DOH's liaison with the Assessment Project, told Dr. Bruce, the Director of the Assessment Project, not to publish the data or do any further analysis due to this litigation. (Bruce Dep. 54.)

tasks NYPH agreed to undertake for the State was to identify a set of indicators for "scheduled reassessments for residents with potential for relocating to higher or lower levels of care." (Grant Contract at DOH 012807 (Raish Decl. Ex. 59); see also Bruce Dep. 38-39 (discussing that term of the contract).) Mr. Reilly attested that while Assessment Project data was insufficient to make a "final determination" regarding an "individual's suitability for alternative housing . . . OMH analyzed selected portions of this data to identify residents who expressed an interest in alternative housing and who it appeared may have the functional abilities to live in such housing, and identified 375 such individuals."[56] (Reilly Aff. ¶ 31.) He attested that beginning in mid-2006, case managers and treatment providers were instructed to follow up with individual adult home residents and had already obtained consent forms from 134 residents to do so. (Reilly Aff. ¶ 31.)

Defendants have provided evidence that while they do not assess adult home residents, individual case managers do, and OMH reviews this data. Mr. Reilly testified that he is not aware of OMH assembling or collecting that information, but that "OMH's expectation" would be that the case manager or mental health provider working with a particular adult home resident would "work with that individual in finding them an appropriate referral," and OMH reviews

---

[56] The parties dispute whether the Assessment Project data was intended to be used to assess the ability and interest of adult home residents in living in alterative housing. Defendants rely on Dr. Bruce's testimony that the assessments were not intended to make a "final determination" concerning housing placements. (Bruce Dep. 55-56, 132, 201-03.) They also rely on the affidavit of DOH official David Wollner, which states that the "goal of the assessments was to gather information concerning the demographic, clinical, and functional characteristics of the adult home population, identify individuals who might benefit from a further evaluation for a different (higher or lower) level of care, and contribute to individual care planning by, for example, identifying unmet health needs." (Wollner Aff. ¶ 28.)

   In contrast, Plaintiff has provided testimony from Dr. Bruce and DOH's liaison, as well as the planning documents for the Assessment Project, indicating that the intended uses of the data include assessing the ability of individuals to live in more integrated settings and determining whether there were people who wanted to live in other settings. (Bruce Dep. 66-67; Liebman Dep. 23, 25 ("[P]art of the assessment process was to review to see if there were people who wanted to live in other settings."); see also Analytic Plan for Adult Home Assessments (Murray Decl. Ex. 118) ("Question 1. 'How many adult home residents with mental illness would want to and be capable of living independently in the community with reasonable supports?'").)

whether this is happening in its review of case management records, including review during recertification visits and licensing visits.[57]  (Reilly Dep. 145, 176, 179-180; Reilly Aff. ¶¶ 28, 31.)  Mr. Reilly attested that OMH has monthly meetings with supervisors during which it is emphasized that staff should include the resident's interest in alternative housing in developing the individual plan of care.  (Reilly Aff. ¶ 28.)  A project assistant for OMH's Adult Home Team testified that when he reviews case management charts, he has an "expectation that every primary therapist" brings up the topic of housing, and "that the possibilities have been explored." (Abel Dep. 102.)

It is undisputed that OMH does not provide information about alternative housing options to adult home residents "on a routine basis."  (Pl. 56.1 Statement ¶ 68.)  Mr. Reilly attested, however, that OMH's case managers assist residents in moving to alternative settings.  (Reilly Aff. ¶¶ 68, 29-31.)  In particular, Mr. Reilly attested that case managers have taken steps to assist residents who express interest in alternative housing, that OMH has received data from case management agencies, and that the OMH and the Adult Home Team have held meetings with supervisors to review case management records.  (Id. ¶¶ 28-29.)

In sum, it is undisputed that the Defendant agencies do not assess adult home residents, collect comprehensive information as they do for nursing home residents, or use the Assessment Project data to move adult home residents; nor do they provide information about alternative housing options to adult home residents on a routine basis.  Defendants have provided evidence, however, that case managers identify and assist adult home residents who are capable and interested in moving.

---

[57] Defendants also provided testimony that system as a whole works with individuals who want to move to alternative housing.  OMH Senior Deputy Commissioner Robert Myers, whom Defendants designated as one of the officials most knowledgeable about Olmstead planning, testified that if individual expresses a goal, such as moving to alternative housing, there is an "expectation [that] system of care would work with" him or her, and while the state does not do analysis confirming whether the expectation is being met, he "believes" that it is, based on the oversight of the system.  (Myers Dep. 22-24.)

### d. Discharge Planning for Psychiatric Center Patients Discharged to Adult Homes

Defendants also assert that their Olmstead plan includes the development of discharge planning standards and discharge activities for patients of psychiatric centers and inpatient psychiatric units licensed by OMH.  (Def. Letter to DAI, May 5, 2006 (Raish Decl. Ex. 22).)  That component is relevant here to the extent that Defendants or a particular psychiatric facility are made aware in the event that a patient is discharged to an adult home that is inappropriate to his or her needs.

The parties dispute whether OMH or a psychiatric facility is made aware in such a situation.  Both parties rely on Rule 30(b)(6) deposition testimony of OMH by and through Lewis Campbell, the Executive Director for the Capitol District Psychiatric Center at OMH (and former Deputy Director for the Division of State Psychiatric Center Management and Director of Adult Services).  (Am. Notice of Deposition Pursuant to Rule 30(b)(6) (Raish Decl. Ex. 25).)  Plaintiff relies on Mr. Campbell's testimony that there is no "centralized mechanism" for tracking whether an individual was discharged from a psychiatric facility to an appropriate setting.  (Campbell Dep. 49.)

Defendants rely on Mr. Campbell's testimony that there are other mechanisms for determining whether someone was discharged to the appropriate setting.  First, Mr. Campbell testified that there is a "clinical follow-up determination" in which the psychiatric facility is required to contact the provider within thirty days to assure that the individual has made contact with the service provider.  (Id. at 49-50, 116-29.)  He testified that the clinical team working with the individual is responsible for dealing with the individual's service needs and residential options.  (Campbell Dep. 49, 116-129; see also id. at 50 ("My belief is that when we arrange for services, we're arranging for those services. The providers of those services are licensed

professionals and we expect them to do their job.").)  Mr. Campbell also testified that another

mechanism is OMH's licensing, which is "not tracking on an individual basis but tracking on an

operational basis the outcomes of the services provided."  (Id. at 50.)  Finally, he testified that an

additional mechanism for evaluating the effectiveness of discharge policies in psychiatric

facilities is the "governing body process," in which OMH "review[s] the management indicators

and where facilities were outliers within those management indicators."  (See id. at 50-52.)

### e. Amount of Supported Housing Available to Adult Home Residents

It is undisputed that that the State has devoted increasingly large amounts of funding to

supported housing, but the parties dispute the extent to which funding increases for supported

housing have benefited adult home residents.  It is undisputed that from 1995 to 2007, OMH-

funded Housing for Persons with Mental Illness expanded from 18,940 units to more than 29,050

units.  (Newman Aff. ¶ 11.)  In the 2003-2004 budget, OMH received $65 million of capital

funds to develop 600 beds; in the 2004-2005 budget, OMH received $75 million to develop

additional beds.  (Def. 56.1 Statement ¶ 53.)

Defendants' witnesses assert that there is a plan "to develop as much OMH community

housing as possible."  (Newman Dep. 180-81.)   Mr. Newman, the Director of the Housing

Services Unit in OMH's Division of Adult Services, testified that "[w]ithin the resources

available to the Office of Mental Health, we do whatever we can to spend those resources to

develop as much housing as we can."  (Id.)  OMH official Keith Simons similarly attested that

OMH is "committed to maximizing access to Housing Program opportunities" for individuals

moving from adult homes, and maximizing access to community-based services available to

individuals with mental illness.  (Simons Aff. ¶¶ 71-72.)  Defendants have submitted a chart

describing the types of OMH community housing programs, the number of units in operation, and the number of units in development.  (Hathaway Decl. Ex. Hathaway-U.)

Plaintiff has provided the following evidence that Defendants have not created a substantial amount of supported housing for adult home residents.  When OMH develops supported housing, it identifies a target population for the housing as a "priority" that will receive a preference for new housing being constructed.  (Newman Dep. 65-66; OMH RFP, Supported Housing for Adults with Serious and Persistent Mental Illness (Oct. 2000) (Murray Decl. Ex. 128); OMH RFP, SRO Housing for Adults with Serious and Persistent Mental Illness 3 (Sept. 2003) (Murray Decl. Ex. 55); OMH RFP, Supported Housing for Adults with Serious and Persistent Mental Illness 1 (May 2005) (Murray Decl. Ex. 56).)  Those not designated as a target population are effectively excluded from the beds.  (Schwartz Dep. 103-104; Rosenthal Dep. 102-107; Declaration of Geoffrey Lieberman ("Lieberman Decl.") ¶ 4 (Docket Entry #212).)  Adult home residents have not, historically, been a target group for supported housing.  (Supported Housing Implementation Guidelines 5 (Murray Decl. Ex. 80); Newman Dep. 80; OMH RFP, Supported Housing for Adults with Serious and Persistent Mental Illness 2-3 (Murray Decl. Ex. 128).)  In 2005, OMH designated adult home residents as a target group for supported housing, along with five other groups, but only for new supported housing it was in the process of developing.  (OMH RFP, Supported Housing for Adults with Serious and Persistent Mental Illness 1 (Murray Decl. Ex. 56).)[58]

Plaintiff has provided evidence that the designation of adult home residents as a target group has had virtually no effect on adult home residents' ability to gain access to other housing,

---

[58] In addition to that RFP, which developed 318 supported housing beds total, the legislature also funded sixty supported housing beds specifically for adult home residents.  (Id.; OMH January 2007 RFP 3 (Murray Decl. Ex. 81).)

because "[o]ther target groups were given higher priority than adult home residents, and thus received all but a few of the supported housing beds made available by OMH."  (Lieberman Decl. ¶ 6; Lasicki Dep. 172.)  In particular, Plaintiff has provided evidence that 14,105 supported housing beds are not available to adult home residents because the State entered into agreements with New York City in 1990, 1999, and 2006 to create housing specifically targeted for other priority groups, such as homeless individuals with mental illness, people with HIV/AIDS, and people with substance abuse disorder who do not have mental illness.  (Mem. from Chris Madan to Joe Reilly Re: Background Info on NY/NY and OMH Residential Resources 1-2 (June 14, 2002) (Murray Decl. Ex. 82); Handout of NY/NYC Criterion, The New York/New York Agreement to House Homeless Mentally Ill Individuals (Murray Decl. Ex. 83); Newman Aff. Ex. C, at 5 (New York/New York III Supportive Housing Agreement).)  According to Plaintiff's witnesses, very few former adult home residents reside in supported housing.  (Rosenthal Dep. 102-107; Lieberman Decl. ¶ 8.)

<strong>f.        Waiting Lists</strong>

It is undisputed that Defendants do not maintain a waiting list for adult home residents to move to OMH Housing for Persons with Mental Illness, nor do they maintain a comprehensive waiting list for privately operated mental health housing.  (Pl. 56.1 Statement ¶¶ 42, 67.)  In addition, Plaintiff has provided testimony from OMH's Director of Housing Services, Mr. Newman, that he is not aware of any activities OMH has undertaken to ensure that waiting lists for community based services are created.  (Newman Dep. 178-79.)

In response, Defendants have provided evidence that a list of housing program vacancies is maintained by a private agency, the Center for Community Services ("CUCS"), which serves as OMH's Single Point of Access ("SPOA") provider for housing programs in New York City.

(Myers Aff. ¶¶ 89-90.)  As noted above, SPOA refers to a program in which all applications for OMH Housing for Persons with Mental Illness are sent to a centralized source rather than to every housing provider.  (Simons Aff. ¶¶ 75-78.)  Mr. Myers attested that CUCS maintains and publishes online a publicly available vacancy list for Housing for Persons with Mental Illness in New York City, including supported housing slots, and that this list is "available to and regularly consulted by treating professionals and others."  (Myers Aff. ¶ 90.)

In sum, while Defendants have provided evidence that CUCS maintains a <u>vacancy</u> list for Housing Programs, it is undisputed that Defendants do not maintain any <u>waiting</u> list for OMH Housing Programs, let alone one for adult home residents.

### g.    Movement of Adult Home Residents to Alternative Settings

The parties dispute whether and to what extent adult home residents have actually moved out of adult homes.  Defendants have provided evidence that some adult home residents have moved to alternative settings, including OMH-funded and/or licensed housing, private residences, and family members' homes.  (Reilly Aff. ¶ 29; A.M. Dep. 6-7; Hathaway Aff. Ex. Hathaway-R.)  In particular, Mr. Reilly attested that approximately 1,600 residents enrolled in the OMH-funded case management program have been interviewed concerning an interest in alternative housing; 306 of them expressed an interest in alternative housing; and 145 were assessed by their private case managers as being capable of managing an alternative level of housing.  (Reilly Aff. ¶ 29.)  He attested that 17 residents were placed with family, seven in senior housing, 40 in independent housing, 43 into other adult homes, and five into OMH-funded housing programs.  (<u>Id.</u>)  He also attested that, based on "information . . . received from the case management agencies," 194 residents in addition to those residents in the case management program were placed from April 2005 to September 2006 in OMH-funded housing, including

eighty-five individuals who lived in an adult home in Monroe County that converted to an OMH-licensed CR/SRO.  (Id.)  He attested that from April 2002 to December 2006, 708 individuals throughout New York State moved from adult homes to OMH-funded and/or OMH-licensed mental health housing.  (Id.)  Defendants have provided evidence that from January 1, 2000 to January 26, 2006, more than 800 adult home residents have submitted housing applications to HRA (Hathaway Aff. Ex. R), but have provided no evidence concerning the results of these applications.

Plaintiff has provided undisputed evidence that from 2001 to 2005, a total of nineteen adult home residents moved to OMH supported housing in New York City.  (Pl. 56.1 Statement ¶ 71.)  Plaintiff has also provided evidence from OMH that the majority of adult home residents who moved to OMH housing from 2001-2006 were in counties outside of New York City. (OMH Response to FOIA Request Re: Movement of Adult Home to OMH Adult Residential Programs since 2002 (Raish Decl. Ex. 32).)

In sum, the court will consider the parties' evidence regarding relevant components of Defendants' Olmstead plan at trial, in conjunction with evidence about the fiscal impact of the requested relief as well as its potential impact on others with mental disabilities, discussed below.  As a matter of law, the evidence concerning Defendants' Olmstead plan, by itself, is not enough to grant partial summary judgment to Plaintiff.  The court turns to the other components of the fundamental alteration defense below.

### D.    Fiscal Impact of the Requested Relief

As discussed above, Defendants seek summary judgment on their fundamental alteration defense in part on the basis of the costs of the requested relief, contending that the costs would render it a "fundamental alteration."  As the Supreme Court in Olmstead instructed, in

considering a fundamental alteration defense, courts "tak[e] into account the resources available to the state . . . ." 527 U.S. at 597. The parties have provided different calculations of the fiscal impact on the State of the relief Plaintiff seeks – assessing and moving qualified adult home residents to supported housing. This section discusses what is included as the "resources available to the State," provides a brief summary of the costs and funding sources for adult homes and supported housing, and describes the parties' disputed evidence regarding the fiscal impact. Given the disputed facts about the costs of relief, Defendants have not established that the requested relief would cost the State significantly more, let alone demonstrated as a matter of law that the relief would have such an impact on the State's available resources that it would be a "fundamental alteration." In any event, as noted above, the court will consider all of the elements of the fundamental alteration defense together at trial.

### 1. Resources Available to the State

The parties dispute what portion of the State budget should be considered the "resources available to the state" contemplated in Olmstead – the portion of the enacted state's budget allocated to OMH, as Defendants contend; or the "mental health budget," which includes the budgets of OMH, DOH (which includes the Medicaid program), and other State expenditures on individuals with mental illness, as Plaintiff contends.[59] (Def. Mem. 71-72; Pl. Opp. 72-73.) The

---

[59] Plaintiff has provided evidence that Defendants consider the budgets of both OMH and DOH when they conduct fiscal analyses of their services for individuals with mental illness. For example, to increase funding for mental health services, OMH has developed initiatives to maximize federal reimbursements under the Medicaid program for services to people with mental illness that involves shifting state dollars from OMH's budget to DOH's budget, using the state dollars to generate additional federal dollars. (See, e.g., Schaefer-Hayes Aff. ¶¶ 72-78 (describing OMH's "Medicaid maximization" efforts in which "OMH analyzes the programs it funds to see if Medicaid can be brought in to support services provided, thus replacing some State Aid dollars with a Federal contribution" and noting that the ACT program is now half-funded by Medicaid dollars.); Schaefer Hayes Dep. 76; OMH 2003-2004 Exec. Budget 123 (Murray Decl. Ex. 105); OMH 2002-2003 Exec. Budget 145 (Murray Decl. Ex. 106); OMH Aid to Localities 2003-04 Enacted Budget 4 (Murray Decl. Ex. 107).)

Plaintiff has provided testimony from Defendants' witnesses that the DOH budget includes, among other things, the Medicaid program, which is a source of funding for services provided to OMH clients. (Tenenini Dep.

parties also dispute whether the cost analysis should include projected savings to the state. (Def. Mem. 73; Pl. Opp. 72.)

Following <u>Olmstead</u>, courts have limited the scope of the "available resources" inquiry to the state's "mental health budget." The Supreme Court in <u>Olmstead</u> referred to the "mental health budget" six times but did not articulate what that budget included. <u>Frederick L. I</u>, 364 F.3d at 496 n.6 (<u>citing</u> <u>Olmstead</u>, 527 U.S. at 595, 596, 597, 603). Lower courts interpreting <u>Olmstead</u> have considered the "mental health budget" as more than just the budget of a state's mental health department. In <u>Bryson v. Stephen</u>, No. 99-CV-558 (SM), 2006 WL 2805238 (D.N.H. Sept. 29, 2006), the court noted that the "'available resources' test properly focuses on the State's mental health budget, not the overall [Department of Health and Human Services] budget or the State's general budget." <u>Id.</u> at *7. That court considered Medicaid costs as part of the relevant budget. <u>Id.</u> at *7-8. Similarly, in <u>Bruggeman v. Blagojevich</u>, 219 F.R.D. 430 (N.D. Ill. 2004), the court noted that "<u>Olmstead</u> and its progeny limit the scope of available resources to the state's mental health budget," but it permitted an inquiry into the state's efforts to obtain Medicaid funding for the services at issue. <u>Id.</u> at 434-35. Moreover, in <u>Frederick L. I</u>, the Third Circuit considered the relevant budget to be the Department of Public Welfare's spending that had a "nexus" to the "care and treatment of the mentally ill," which excluded the department's "myriad non-mental health responsibilities," such as food stamps. <u>Frederick L. I</u>, 364 F.3d at 496 n.6. This court concludes that the relevant budget is the "mental health budget," which includes any money the State receives, allots for spending, and/or spends on mental health services and programs.

---

40-41 (testifying both that "the state's share of Medicaid comes out of the OMH budget" and also that Medicaid costs were "included in DOH's budget"); Schaefer Hayes Dep. 98.)

On whether to consider projected savings that community placement might entail, the court notes that Olmstead instructed the trial court on remand to conduct an assessment of the state's actual savings from implementing the relief plaintiffs sought, rather than simply comparing the cost of community placement with the cost of institutional care. See 527 U.S. at 604-607. It is thus proper to do so here.

### 2.     Evidence on the Costs of Potential Relief

The parties do not dispute that moving adult home residents to scattered-site supported housing apartments would require the development of additional supported housing units. (Def. 56.1 Statement ¶ 88.) They dispute whether moving residents out of adult homes and into supported housing would ultimately increase the State's costs. This is a factual question that must be resolved at trial.

### a.     Sources of Funding and Types of Costs Incurred

To understand the parties' evidence regarding the fiscal impact of the requested relief, the court briefly describes the sources of funding for and types of costs incurred by adult homes and supported housing. In general, residents of adult homes and supported housing use their Supplemental Security Income ("SSI"), an income supplement for people with disabilities, to pay for the cost of care. The State does not pay operators of the adult homes directly, but it provides a per-resident stipend to supported housing providers. In addition, for both adult homes and supported housing, the State pays a share of residents' Supplemental Security Income ("SSI") benefits and Medicaid costs.[60]

---

[60] While SSI is a federal program administered by the Social Security Administration, the State contributes a share of each individual's SSI benefit. (Affidavit of R. Gregory Kipper ("Kipper Aff.") Ex. Kipper-A at 3-4 (Docket Entry #153).) The State has five categories of living arrangements, and the amount of the State's contribution to the SSI benefit varies with each category. (Id.)

In adult homes, residents use most of their SSI benefit to pay for room, board, three meals per day, housekeeping, personal care, and supervision by staff, keeping a small portion of the benefit as a "Personal Needs Allowance." (Def. 56.1 Statement ¶¶ 75, 78.) For adult home residents in New York City, the State paid $7,692 per person per year in 2007 as its share of the SSI benefits. (Office of Temporary and Disability Assistance, SSI Benefit Levels Chart effective Jan. 1, 2007 ("2007 SSI Benefits Chart") (Murray Decl. Ex. 91); see also (Affidavit of R. Gregory Kipper ("Kipper Aff.") Ex. Kipper-A at 3-5 (Docket Entry #153) (describing levels of State SSI contribution.)

In contrast, scattered-site supported housing is funded by direct funding from OMH and through the individual's income, which often consists only of SSI. (Def. 56.1 Statement ¶ 80.) Individuals with mental illness in supported housing receive the SSI Living Alone rate and are required to pay 30% of this payment toward housing costs. (Id. ¶ 81.) The 2007 annual Living Alone rate is $8,520, of which the State's share is $1,044. (2007 SSI Benefits Chart.) In addition to the State's share of SSI for supported housing residents, it is undisputed that OMH provides a set stipend of $14,197 per resident per year to supported housing providers in New York City. (Myers Aff. ¶ 190.)

Plaintiff's and Defendants' experts agree that the State has paid higher Medicaid costs for individuals with mental illness in adult homes than it has paid for individuals with mental illness residing in supported housing. (D. Jones. Decl. Ex. A at 21; Kipper Aff. Ex. A at 8.) For Medicaid-eligible individuals, the State pays for half the costs of Medicaid-funded services to residents of adult homes and supported housing, including primary care, psychologists, and case management.[61] (Kipper Aff. Ex. A at 7-8.) Plaintiff's and Defendants' experts both cite DOH

---

[61] According to Mr. Kipper, Medicaid is administered by the State but is funded jointly by the State and the Federal government in equal shares; that is, for every dollar in Medicaid costs, the State pays $.50 and the Federal

statistics indicating that in the 2004-2005 fiscal year, the total Medicaid costs – including the State and Federal shares – were $36,169 per Medicaid-eligible individual in the adult homes at issue, and $20,370 per Medicaid-eligible individual with mental illness in supported housing. (See D. Jones. Decl. Ex. A at 21; Kipper Aff. Ex. A at 8; 2004-2005 Medicaid Expenditures by Impacted Adult Home (Murray Decl. Ex. 84); 2004-2005 Medicaid Expenditures by Diagnosis (Murray Decl. Ex. 85).)  The parties dispute whether and to what extent moving adult home residents to supported housing would reduce the amount the State spends on Medicaid costs. (See Kipper Aff. Ex. A at 8; D. Jones Decl. Ex. A at 21.)

### b. Costs of the Requested Relief

Defendants' witnesses asserted that if the State were required to move thousands of adult home residents to scattered-site supported housing, the State's costs would increase.  (See generally Schaefer Hayes Aff. ¶¶ 87-124 (describing overview of program costs and costs of expected relief).)  They have attested that the cost to the State per person is higher for Housing with Persons with Mental Illness – including supported housing – than for adult homes.  (Kipper Aff. Ex. Kipper-A; Schaefer Hayes Aff. ¶¶ 88-100; Myers Aff. ¶¶ 190-206; Newman Aff. ¶¶ 85-89.)  In particular, Defendants have provided testimony from State officials that the increased cost to the State would be $13,500 per person if only OMH's budget is considered – because OMH provides a stipend of approximately that amount for each person in supported housing – and $8,244 if the State's contribution to SSI is considered – because the State pays a different amount of SSI benefits for those in adult homes and those in supported housing.  (Schaefer

---

government pays $.50.  (Kipper Aff. Ex. A at 7).  The court notes that Mr. Tenenini testified that "a Medicaid dollar . . . is fifty cents federal, generally speaking, twenty-five cents state, and twenty-five cents local," but in New York, there is a cap on the local share above which all expenses are the responsibility of the State, so the State's share here is fifty cents.  (Tenenini Dep. 40-41.)

Hayes Aff. ¶ 85; Myers Aff. ¶¶ 190-200.)  According to Defendants' expert, Mr. Kipper, this would be an increase of 231% in cost to the state.  (Ex. Kipper-A.)

In contrast, Plaintiff has provided evidence that moving qualified adult home residents to supported housing would only minimally increase per-person costs to the State, contending that Defendants' analysis overlooks the higher Medicaid costs in adult homes.  Taking into account the higher Medicaid costs incurred in adult homes, Plaintiff has computed the annual cost for an individual with mental illness residing in an adult home as $23,442 (consisting of $15,750 in Medicaid costs and $7,692 in SSI), and the cost of an individual residing in supported housing as $23,475 (consisting of $14,197 from an OMH stipend paid to providers, $8,234 in Medicaid costs, and $1,044 in SSI).[62]  That is, supported housing would add a cost of approximately $33 per person.

Plaintiff's expert, Dennis Jones, based this determination on the higher Medicaid costs for individuals with mental illness who reside in adult homes than for those in supported housing.  As noted above, DOH data indicates that the State has paid significantly more in Medicaid costs for Medicaid-eligible individuals with mental illness in the adult homes at issue than it does for supported housing.  (See D. Jones. Decl. Ex. A at 21; Kipper Aff. Ex. A at 8; 2004-2005 Medicaid Expenditures by Impacted Adult Home (Murray Decl. Ex. 84); 2004-2005 Medicaid Expenditures by Diagnosis (Murray Decl. Ex. 85).)  Because the State pays for half of the Medicaid costs, the DOH data indicates that the State spent approximately $7,900 more in 2004-2005 on Medicaid for each eligible adult home resident than it did for each eligible

---

[62] See Myers Aff. ¶ 190 (describing $14,197 stipend OMH provides to supported housing providers in NYC per resident per year); Murray Decl. Ex. 84 at DOH 0131663-031664 (listing Medicaid costs); NYC Medicaid Expenditure Report for CY 2004 at DOH 0131683-0131684 (Murray Decl. Ex. 129) (listing Medicaid costs); 2007 SSI Benefits Chart.

supported housing resident.[63]  (D. Jones Decl. Ex. A at 21.)  Plaintiff's expert opined that

Defendants' analysis of the projected costs is flawed because Defendants did not properly take

into account what the State would save on Medicaid if adult home residents were moved to

supported housing.  (Id.; D. Jones Decl. Ex. B at 3-5; D. Jones Dep. 290-293; Murray Decl. Exs.

84, 85; see also Kipper Dep. 26, 27, 33-34 (testifying that he did not evaluate the impact of

Medicaid savings).)

Plaintiff has provided evidence that in addition to the costs of Medicaid and SSI, the State

incurs additional costs for adult home residents that it does not incur for residents of supported

housing.  For example, from 2003 to 2007, the State spent approximately $10 million on a

variety of adult home programs, including the Quality Incentive Payment Program, the ACF

Infrastructure Initiative, the case management initiative, and EnAbLE.  (D. Jones Decl. Ex. B at

1-3; Wollner Dep. 102; Wollner Aff. 36-38, 66-67 & Exs. Wollner H-P.)

Finally, Plaintiff asserts two additional defects in Defendants' analysis.  First, Plaintiff

has provided evidence that Defendants' analysis is insufficient to provide an actual estimate of

what it would cost to serve qualified adult home residents in supported housing.  (Schaefer

Hayes Dep. 188 (Chief Financial Officer of OMH testifying that she has not performed any

studies or analysis about the impact that the creation of 2,000 supported housing beds would

have on OMH's budget); Tenenini Dep. 51-52 (testifying that he did not know whether anyone at

---

[63] According to Mr. Jones, higher Medicaid costs are common in highly institutional environments, such as adult homes, which encourage dependency on institutional care.  (D. Jones Decl. B at 5.)  Plaintiff has provided reports from the Commission on Quality of Care and Advocacy for Persons with Disabilities ("CQC") indicating widespread fraud and overuse of Medicaid services in adult homes.  (NYS CQC, Adult Homes Serving Residents with Mental Illness: A Study on Layering of Services ("Layering Report") (Murray Decl. Ex. 79) (showing Medicaid billings of more than $27,000 per resident per year in the 11 largest impacted adult homes in New York City in 2001); NY CQC, Exploiting Not-For-Profit Care in an Adult Home (Murray Decl. Ex. 86); NYS CQC, A Review of Assisted Living Programs in "Impacted" Adult Homes; see also D. Jones Decl. Ex. B, at 4-5 (discussing the Layering Report).)  According to Mr. Jones, "the difference in Medicaid utilization between adult homes and supported housing does not appear to be linked to the severity of individuals' disabilities" because "[t]he State's data show higher Medicaid spending in adult homes whether one looks at only the most seriously mentally ill, the most medically involved, or those in both groups."  (D. Jones Decl. Ex. B at 3; Murray Decl. Exs. 84-85; Asimakopolous Dep. 75-76.)

DOH was evaluating the financial impact of the relief sought); see D. Jones Decl. Ex. A at 21

("New York has not done any detailed fiscal analysis on the relief sought.").)[64]  Second, Plaintiff

contends that Defendants' analysis incorrectly assumes that adult home beds currently occupied

by adults with mental illness would be filled if DAI's constituents moved to supported housing,

resulting in increased overall costs.  Plaintiff has provided evidence that the State could limit

admissions to adult homes, as has been done in similar "deinstitutionalization" contexts (D.

Jones Dep. 15, 318), or terminate operating certificates from adult homes if doing so would be

"in the public interest," which would "conserve resources."  N.Y. Comp. Codes R. & Regs. tit.

18, § 485.5(m)(1)(i).  Plaintiff also notes that even if the vacated beds were filled, whether the

State's overall costs would increase depends on the prior placements of those filling the beds, on

which Defendants have provided no evidence.  (Pl. Opp. 71.)

In sum, the evidence regarding the costs of the requested relief is an issue of disputed fact

to be resolved at trial.

**E.      Potential Effect of the Requested Relief on Others with Mental Disabilities**

In Olmstead, the Supreme Court instructs courts evaluating a fundamental alteration

defense to consider whether "immediate relief for the plaintiffs would be inequitable, given the

responsibility the State has undertaken for the care and treatment of a large and diverse

population of persons with mental disabilities."  527 U.S. at 604.  Defendants' witnesses attested

---

[64] DAI's expert Mr. Jones opined that to estimate the actual costs, the state should, at a minimum:
> (1) identify adult home residents with the ability and interest (with meaningful choice) to live in
> an integrated setting, (2) estimate the service needs of the population, e.g. through sampling
> methodology, (3) evaluate the relative costs for this target population, by comparing current costs
> of the adult home to the costs of a community-integrated setting for similar individuals, (4)
> analyze the results, and (5) formulate an implementation plan and cost out the plan.

(D. Jones Decl. Ex. A at 22.)  Defendants' expert, Mr. Kipper, testified that if he were to consider what the likely
change in Medicaid expenditures, if any, would result if all of the individuals in the adult homes at issue were to
move to alternative settings, he would want to know the clinical and service needs of the population.  (Kipper Dep.
24-25.)  Then, he would determine the cost of the Medicaid services that were necessary to provide the required care
in the alternative setting and look at the difference in cost of those service needs.  (Id.)

that other individuals with disabilities would be adversely affected by the requested relief because the entirety of OMH's budget is allocated to supporting existing programs, and thus OMH could not conduct assessments and develop thousands of additional supported housing beds for the adult home residents at issue. (Myers Aff. ¶¶ 213-23; Simons Aff. ¶¶ 11, 23-24, 65 & Exs. A-F; Schaefer Hayes Aff. ¶¶ 123-138.) They attested that a directive to move the adult home residents at issue to supported housing would force OMH to cut funding for existing services and programs. (Myers Aff. ¶¶ 219-22; Simons Aff. ¶¶ 11, 23-24, 65 & Ex. A-F; Schaefer Hayes Aff. ¶¶ 130-137.) In particular, they assert that other adults with mental illness who want and are eligible for supported housing, including the other five target populations designated by OMH, would have to wait – unfairly – behind adult home residents for supported housing beds. (Myers Aff. ¶¶ 217-218; Schaefer Hayes Aff. ¶¶ 131-132, 137.)

In response, Plaintiff has provided evidence, discussed above, that serving adult home residents in supported housing would result in savings, and thus would not require cuts in programs or prejudice others who seek supported housing. (D. Jones Decl. Ex. A at 21-22; id. at Ex. B at 1-6.) Plaintiff requests that Defendants use funds currently spent on adult home residents to serve adult home residents in supported housing. Plaintiff has provided evidence that redirecting spending, known as "money follows the person," is a nationally accepted approach to promoting community integration that has been used in New York and other states to facilitate movement from segregated to more integrated settings. (See D. Jones Dep. 261-262; Money Follows the Person Federal Rebalancing Demonstration Grant Summary, Mar. 2007 (Murray Decl. Ex. 109).) OMH's Chief Financial Officer Martha Schaefer Hayes testified about OMH's community reinvestment program, noting that OMH has reinvested money from state-operated facilities into community services since the mid-1990s by budgeting census reductions

in state-operated facilities and increasing funding for community services. (Schaefer Hayes Dep. 89-92.)

DAI has provided further evidence that New York is capable of developing sufficient capacity in its existing supported housing program to serve adult home residents. (D. Jones Decl. Ex. A at 31; Rosenberg Aff. ¶ 11; Tsemberis Dep. 238 (testifying that his agency could create 1,000 supported housing beds over the next five years if the State asked); Schwartz Dep. 225-226; Lasicki Dep. 203.) Plaintiff has also provided evidence that New York City supported housing providers have responded in large numbers to OMH's requsts for proposals ("RFPs") for supported housing: when Defendants issued an RFP in 2005 for 318 supported housing beds, forty-four providers responded with plans to develop 1,500 beds. (OMH RFP, Supported Housing for Adults with Serious and Persistent Mental Illness 3 (Murray Decl. Ex. 56.) In addition, Plaintiff has provided evidence that OMH received seven proposals in response to its 2007 RFP for 60 supported housing beds for adult home residents, but it only accepted three proposals. (Murray Decl. Exs. 110, 111, 112, 113, 114, 115, 116.)

### F. Whether the Requested Relief Would Alter the State's Programs and Activities

Defendants argue that the requested relief would alter its program and activities. First, they argue that assessing and placing the adult home residents in supported housing would "create a new program that does not exist, along with an obligation to staff and fund it." (Def. Mem. 76.) Second, they assert that DAI seeks to change the nature of supported housing, because supported housing provides only minimal supports. (Id.) Third, they contend that demanding that DAI's constituents be placed in supported housing creates a new "entitlement" to be placed in a particular setting. (Id.) Finally, they argue that setting aside supported housing beds for adult home residents would be contrary to OMH policies. (Id.)

First, as discussed above in Section VIII.A, the argument that assessing and transferring DAI's constituents would be a "new program," as Defendants' witness attested (see, e.g., Myers Aff. ¶¶ 238-242), is insufficient to establish a fundamental alteration defense where, as here, placement in existing programs is sought.

Second, the court will reach the fundamental alteration defense only if Plaintiff proves that the adult home residents at issue are qualified for supported housing. If DAI's constituents are qualified for supported housing, the requested relief would not "change" the services provided.

Third, contrary to Defendants' assertions, DAI does not seek an "entitlement" for its constituents to receive a particular type of housing. (Myers Aff. ¶¶ 245-50; Simons Aff. ¶ 65.) Rather, should the finder of fact conclude that DAI's constituents are not in the most integrated settings appropriate to their needs, DAI seeks an order requiring its constituents, who already receive housing services from Defendants, to receive those services in the most integrated setting appropriate to their needs.

Fourth, regarding whether a "set-aside" would be contrary to OMH policies, as Defendants' witnesses have attested (Myers Aff. ¶¶ 229-37; Simons Aff. ¶¶ 73-74; Schaefer Hayes Aff. ¶¶ 33-35, 125-28, 131-32), Plaintiff has provided evidence that New York regularly sets aside beds for designated populations, including adult home residents. For example, as described above, OMH designated 9,000 new community housing beds for homeless individuals with mental illness. (See D. Jones Dep. 258, 260; Lasicki Dep. 85.) In addition, OMH has designated "priority populations" for supported housing beds developed since 1990. (See, e.g., Newman Dep. 55-56.) In January 2007, OMH issued a request for proposals for the development of sixty supported housing beds specifically for adult home residents. (Murray

Decl. Ex. 81.)  That Defendants have already issued a set-aside of supported housing beds for adult home residents and other target populations is evidence that doing so is not a "fundamental alteration" of their programs and services.  See Messier, 562 F. Supp. 2d at 344-45 (noting the defendant agency's evidence of its growing community placement program and observing that defendant's "fundamental alteration claim in this case is entirely inconsistent with its public commitment to further enhancing a system of community placement programming . . . .").

In short, having reviewed the parties' evidence on all aspects of the fundamental alteration defense, the court does not grant summary judgment to either party.  At trial, if DAI establishes that the adult home residents at issue are not in the most integrated settings appropriate to their needs, the court will hear evidence on the fundamental alteration defense. This evidence will include components of Defendants' Olmstead plan that relate to identifying and moving adult home residents who are not in the most integrated setting appropriate to their needs, as well as the fiscal impact of the requested relief and its potential impact on others with mental disabilities.  The court will consider all of this evidence together in determining whether the requested relief would be a "reasonable modification" or "fundamental alteration" of Defendants' programs and services.

## IX.    The Governor as Defendant

Pursuant to Rule 21 of the Federal Rules of Civil Procedure, which provides that the court has discretion to drop a party from an action "on such terms as are just," Defendants seek to drop the Governor as a party to this litigation.  (See Def. Mem. 82.)  Defendants contend that the four other named Defendants – the Commissioners of OMH and DOH and the agencies themselves – are able to provide DAI with full relief and that the Governor's presence confers no further advantage on DAI.  (See id. at 83.)  In response, DAI contends that in addition to the

Governor's role as the chief executive of New York, which includes ensuring that the State operates its mental health service systems in compliance with the ADA, the record demonstrates that the Governor is actively involved in addressing adult home issues and plays a key role in shaping the State's mental health policies. [65] (See Pl. Opp. 79-80.) DAI further argues that because the Governor has access to resources unavailable to the other Defendants, such as the Governor's capital budget, dropping him has the potential to limit the relief available to DAI should it prevail at trial. (Id. at 80-81.)

According to DOH official Mr. Wollner, who previously worked in the Governor's office, the Governor's office is involved the following activities: issuing requests for proposals relating to adult home residents; proposing legislation and other initiatives relating to adult homes; determining funding for the OMH's case management and peer support services; working with the interagency Task Force on Housing for People with Special Needs to increase access to existing housing and support service programs; initiating the Adult Care Facilities Workgroup (and reviewing, modifying, and implementing the Workgroup's recommendations); and directing the Governor's capital budget to various housing initiatives relating to special populations. [66] (Wollner Aff. ¶ 2; Wollner Dep. 32-33, 88, 145-146, 49-50.) The Governor also appoints members of and receives reports from the Most Integrated Setting Coordinating Council ("MISCC"). N.Y. Exec. L. §§ 702(1); 703(4).

---

[65] Courts have found that where a governor is responsible for directing, supervising, and controlling the executive departments of state government, "there appears to be no dispute that [he is an] appropriate defendant[] with regard to the ADA." Cellucci, 52 F. Supp. 2d at 243.

[66] Given the court's conclusion in Section VIII.D.1 that the "mental health budget" includes money the state receives, allots for spending, and/or spends on mental health services and programs, if the Governor's expenditure of his capital budget on housing initiatives relating to "special populations" includes those with mental disabilities, such funds should be included as the "available resources of the State" for purposes of the fundamental alteration defense.

Defendants rely on <u>Committee for Public Education and Religious Liberty v. Rockefeller</u>, 322 F. Supp. 678 (S.D.N.Y. 1971), in which the court dropped the Governor as a party because full relief could be afforded by the other named defendants. <u>Id.</u> at 686. In that case, however, the other defendants were charged by the legislature with "sole responsibility" for administration of the statute at issue and were not appointees of the governor or subject to his authority. <u>Id.</u> Here, the Commissioners of DOH and OMH are appointees of the Governor, and New York's Mental Hygiene Law provides that the Mental Health Commissioner "serve[s] at the pleasure of the Governor." N.Y. Pub. Health L. § 204; N.Y. Mental Hyg. L. § 5.03.

The court declines to drop the Governor as a party in the interests of justice. Defendants have identified no prejudice if the Governor remains a party, other than that dropping the Governor would "conserve the limited resources of his important office." (Def. Mem. 83.)

## X. CONCLUSION

The parties' Motions for Summary Judgment are DENIED. The parties are directed to contact chambers no later than February 25, 2009 to arrange for a pre-trial conference to set a date for trial.

SO ORDERED.

                                                                      _/s/ Nicholas G. Garaufis____

Dated: Brooklyn, New York                                    NICHOLAS G. GARAUFIS
          February 19, 2009                                  United States District Judge