UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

  DISABILITY ADVOCATES, INC.,


                           Plaintiff,

                                            **03-CV-3209 (NGG)**

         -against-


  DAVID A. PATERSON, in his official
capacity as Governor of the State of New
York, RICHARD F. DAINES, in his official
capacity as Commissioner of the New York
State Department of Health, MICHAEL F.
HOGAN, in his official capacity as
Commissioner of the New York State Office
of Mental Health, THE NEW YORK STATE
DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

                          Defendants.
------------------------------------------------------------------X



**MEMORANDUM & ORDER SETTING FORTH
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

NICHOLAS G. GARAUFIS, United States District Judge.

The Supreme Court held in Olmstead v. L.C., 527 U.S. 581 (1999), that "[u]njustified isolation . . . is properly regarded as discrimination based on disability," observing that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable of or unworthy of participating in community life." 527 U.S. at 597, 600. The "integration mandate" of Title II of the American with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 791 et seq., as expressed in federal regulations and Olmstead, requires that when a state provides services to individuals with disabilities, it must do so "in the most integrated setting appropriate to their needs." The "most integrated setting," according to the federal regulations, is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35 app. A.

Plaintiff Disability Advocates, Inc. ("DAI"), a protection and advocacy organization authorized by statute to bring suit on behalf of individuals with disabilities, brings this action on behalf of individuals with mental illness residing in, or at risk of entry into, "adult homes" in New York City with more than 120 beds and in which twenty-five residents or 25% of the resident population (whichever is fewer) have a mental illness. Adult homes are for-profit residential adult care facilities licensed by the State of New York (the "State").

Following a five-week bench trial, DAI has proven by a preponderance of the evidence that its constituents, approximately 4,300 individuals with mental illness, are not receiving services in the most integrated setting appropriate to their needs. The adult homes at issue are institutions that segregate residents from the community and impede residents' interactions with

people who do not have disabilities. DAI has proven that virtually all of its constituents are qualified to receive services in "supported housing," a far more integrated setting in which individuals with mental illness live in apartments scattered throughout the community and receive flexible support services as needed. DAI has also proven that its constituents are not opposed to receiving services in more integrated settings. Therefore, DAI has established a violation of the integration mandate of the ADA and the Rehabilitation Act.

Defendants are the New York State Department of Health ("DOH"), the New York State Office of Mental Health ("OMH"), as well as Governor David A. Paterson and the Commissioners of DOH and OMH (collectively, "Defendants").[1] Defendants are required under New York law "to develop a comprehensive, integrated system of treatment and rehabilitative services for the mentally ill." N.Y. Mental Hyg. Law § 7.01; see id. §§ 5.07, 7.07. They administer the State's mental health service system, plan the settings in which mental health services are provided – by both public and private entities – and allocate resources within the mental health service system. See, e.g., N.Y. Mental Hyg. Law §§ 5.07, 7.07, 41.03, 41.42, 41.39; N.Y. Comp. Codes R. & Regs. tit. 18 §§ 485-87. In carrying out these duties, Defendants have denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs. Defendants' actions constitute discrimination in violation of the Americans with Disabilities Act and the Rehabilitation Act. Although Defendants have raised an affirmative defense, they have not satisfied their burden of proof to establish that the relief DAI seeks would constitute a

---

[1] The Governor and the DOH and OMH Commissioners are sued in their official capacities only.

"fundamental alteration" of the State's mental health service system. Accordingly, DAI is entitled to declaratory and injunctive relief.

## I.     BACKGROUND

DAI filed this suit on June 30, 2003, seeking declaratory and injunctive relief. (Compl. ¶ 34 (Docket Entry #1).) Discovery concluded on November 14, 2006. On February 19, 2009, the court denied the parties' motions for summary judgment. Disability Advocates, Inc. v. Paterson ("DAI I"), 598 F. Supp. 2d 289 (E.D.N.Y. 2009). After considering a voluminous factual record of over 13,000 pages and approximately 675 exhibits, this court resolved a host of legal issues raised by the parties. See id. at 293-94. As threshold matters, the court concluded that: (1) DAI has statutory and Article III standing, (2) Title II of the ADA applies to DAI's claims in this case, and (3) the Governor is a proper party. See id. at 307-311, 313-19, 356-57. The court also discussed at length the components of the fundamental alteration defense. See id. at 333-39.

In DAI I, the court identified several issues for trial. To determine whether DAI's constituents are in the "most integrated setting appropriate for their needs," the court would have to determine at trial (1) whether adult homes are the most integrated setting appropriate for DAI's constituents to receive services, and (2) whether DAI's constituents are "qualified" for supported housing. See id. at 319-20 (framing legal inquiry); id. at 331, 333 (concluding that issues of material fact precluded granting summary judgment to Defendants). The court also determined that issues of material fact remained as to the fundamental alteration defense, on which both sides had sought summary judgment. Id. at 349, 356.

The court presided over an eighteen-day bench trial from May 11 to June 16, 2009. The court heard testimony from State officials, mental health and other experts, lay witnesses with

extensive experience in State government, service providers, and current and former adult home residents, two of whom now live in supported housing. Twenty-nine witnesses testified, more than three hundred exhibits were admitted into evidence, and excerpts from the deposition transcripts of twenty-three additional witnesses were entered into the record, along with the 3,500 page trial transcript. The parties submitted proposed findings of fact and conclusions of law on July 13, 2009 and responses on July 22, 2009.[2]

The parties have engaged in numerous settlement discussions over the last six years.[3] After a recent round of settlement conferences before Magistrate Judge Marilyn D. Go, the parties remain unable to settle the case.[4] Accordingly, after considering all of the evidence, this court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[5]

---

[2] See Defendants' Proposed Findings of Fact and Conclusions of Law ("Defs. PFF") (Docket Entries #320, 321); Plaintiff's Proposed Findings of Fact & Conclusions of Law ("Pl. PFF") (Docket Entry #325); Defendants' Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Defs. Resp. PFF") (Docket Entry #329); Plaintiff's Response to Defendants' Proposed Findings of Fact and Conclusions of Law ("Pl. Resp. PFF") (Docket Entry #330).

[3] See, e.g., Minute Entries dated Nov. 14, 2003; Oct. 12, 2005; Nov. 14, 2006; Dec. 19, 2006; Mar. 20, 2009; Apr. 7, 2009; June 8, 16, 22, & 26, 2009; July 2, 2009; see also Docket Entries #25, 26, 35 (parties' settlement status reports).

[4] See Minute Entry for Telephone Settlement Conference Before Magistrate Judge Marilyn D. Go on July 2, 2009 (noting that "[s]ettlement discussions are at an impasse").

[5] Throughout the Findings of Fact, except where noted, the court credits the testimony of the witnesses identified. The court has identified certain instances where it finds particular evidence unpersuasive, irrelevant, or not credible. The court has considered all the evidence in the record but has not included here all of the evidence that it ultimately found unpersuasive or not material to the outcome.

The court provides a list of acronyms appearing in the Findings of Fact in the Appendix to this Memorandum & Order. The court refers to current and former adult home residents by their initials in accordance with Magistrate Judge Go's Protective Order dated May 19, 2004. A.M., P.C., M.B., and J.M. no longer lived in an adult home at the time of their depositions; G.L. and I.K. no longer lived in adult homes at the time of their trial testimony. (Joint Stipulations of Fact ("Joint Stip.") ¶ 35 (Joint Pre-Trial Order, Docket Entry #260).)

The parties have designated portions of depositions admitted into the record at trial, with objections indicated in the margins. Where the court relies on deposition testimony to which a party has objected, it provides a ruling on the objection. Where the court cites to a full page or consecutive pages of a deposition, it has relied only

II.     **THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE
        REHABILITATION ACT**

DAI I explains in detail the court's resolution of numerous legal issues in this case,

including the meaning and application of Title II of the Americans with Disabilities Act

("ADA") and Section 504 of the Rehabilitation Act. See 589 F. Supp. 2d at 311-12, 331, 333-

39. Here, the court provides a brief overview of the relevant legal standards. It then sets forth

the core holdings of DAI I with respect to the applicability of Title II to Plaintiff's claims.

A.      **LEGAL STANDARDS**

The ADA was enacted to "provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

Congress recognized that "historically, society has tended to isolate and segregate individuals

with disabilities, and, despite some improvements, such forms of discrimination against

individuals with disabilities continue to be a serious and pervasive social problem." Id. §

12101(a)(2). Congress found that "individuals with disabilities continually encounter various

forms of discrimination, including . . . segregation." Id. § 12101(a)(5). Title II of the ADA

prohibits discrimination in connection with access to public services, requiring that "no qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity or be subjected

to discrimination by any such entity." 42 U.S.C. § 12132; DAI I, 598 F. Supp. 2d at 311.

To establish a violation of Title II of the ADA, a plaintiff must prove that (1) he or she is

a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3)

---

on the portions admitted into evidence. The court includes line numbers in citations to deposition pages only where
a party has objected to part of a particular page of testimony and the court has not relied on that testimony.

that he or she was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or was discriminated against by defendants, by reason of his or her disability.  See Henrietta D. v. Bloomberg, 331 F. 3d 261, 272 (2d Cir. 2003); DAI I, 598 F. Supp. 2d at 311.

Section 504 of the Rehabilitation Act ("Section 504") similarly prohibits disability-based discrimination: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Claims under the two statutes are treated identically unless – unlike here – one of the "subtle differences" in the two statutes is pertinent to a claim.  Accordingly, in this case the court treats the claims under Section 504 as identical to the ADA claims.  Henrietta D., 331 F.3d at 272; DAI I, 598 F. Supp. 2d at 311 n.25.  It is undisputed that DAI's constituents are individuals with disabilities who are protected by the ADA and Section 504.[6]

One form of discrimination "by reason of . . . disability" is a violation of the "integration mandate" of Title II of the ADA and Section 504.  This mandate – arising out of Congress's explicit findings in the ADA, the regulations of the Attorney General implementing Title II, and the Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581 (1999) – requires that when a state provides services to individuals with disabilities, it must do so "in the most integrated

---

[6] The ADA defines "disability," with respect to an individual, as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  DAI's constituents have one or more major mental illnesses, such as schizophrenia, bipolar disorder, depression and others, which constitute mental impairments that substantially limit one or more major life activities.  (See, e.g., Tr. 837-38, 854, 824-27, 828-35, 839-40, 847 (Duckworth) (testifying that residents of the adult homes at issue and supported housing have severe and persistent mental illness and describing diagnoses and impairments of individual residents); Tr. 52-53 (E. Jones).)

setting appropriate to their needs."  28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); <u>Olmstead</u>, 527 U.S. at 607.

Delineating the scope of the ADA's integration mandate, the Supreme Court in <u>Olmstead</u> explicitly held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability."  <u>Id.</u> at 597.  The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'"  <u>Id.</u> at 600.  The Court recognized that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life . . . and institutional confinement severely diminishes individuals' everyday activities."  <u>Id.</u>  There is no federal requirement, however, "that community-based treatment be imposed on patients who do not desire it."  <u>Id.</u> at 602.

In its analysis of the ADA's integration mandate in <u>Olmstead</u>, the Supreme Court deferred to the Attorney General's interpretation of Title II.  <u>See id.</u> at 598 ("It is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.") (internal quotation marks and citations omitted).  Thus, following <u>Olmstead</u>, courts have looked to the language of the Attorney General's regulations interpreting Title II, as well as the holding in <u>Olmstead</u>, as the standard by which to determine a violation of the ADA's integration mandate.  <u>See</u> <u>DAI I</u>, 598 F. Supp. 2d at 313; <u>Joseph S. v. Hogan</u>, 561 F. Supp. 2d 280, 289-90 (E.D.N.Y. 2009); <u>see also</u> <u>Townsend v. Quasim</u>, 328 F.3d 511, 516, 520 (9th Cir.

2003) ("The plain language of the integration regulation [28 C.F.R. § 35.130(d)], coupled with the reasoning and holding of <u>Olmstead</u>, direct our analysis in this case.").

The Attorney General's regulations implementing Title II provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[7]  28 C.F.R. § 35.130(d); <u>see also</u> 42 U.S.C. § 12134(a) (requiring the Attorney General to issue implementing regulations).  The Appendix to the federal regulations defines the "most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. § 35.130(d), 28 C.F.R. pt. 35 app. A.  As discussed in <u>DAI I</u>, the court defers to these definitions and applies them as the legal standard here.

A state's failure to provide services in the most integrated setting appropriate is excused only when the state can demonstrate that the relief sought would result in a "fundamental alteration" of the state's service system.  See <u>Olmstead</u>, 527 U.S. at 603.  The "fundamental alteration" defense is derived from the "reasonable modifications" regulation, which states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  A plurality of the Supreme Court described the defense as follows:

---

[7] As Congress directed, <u>see</u> 42 U.S.C. § 12134(b), this regulation is consistent with a similar regulation implementing Section 504 of the Rehabilitation Act, which requires recipients of federal funds to administer programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

> Sensibly construed, the fundamental-alteration component of the reasonable
> modifications regulation would allow the State to show that, in the allocation of
> available resources, immediate relief for the plaintiffs would be inequitable, given
> the responsibility the State has undertaken for the care and treatment of a large
> and diverse population of persons with mental disabilities.

Olmstead, 527 U.S. at 604.  As this court noted on summary judgment, evaluating the

fundamental alteration defense involves a specific, fact-based inquiry to determine whether the

requested relief would impose a "fundamental alteration" of the State's programs and services,

taking into account Defendants' efforts to comply with the integration mandate with respect to

the population at issue and the fiscal impact of the requested relief, including the impact on the

State's ability to provide services for other individuals with mental illness.  See DAI I, 598 F.

Supp. 2d at 334.

> **B.      DEFENDANTS ARE SUBJECT TO THE ADA AND THE
>          REHABILITATION ACT**

Title II of the ADA applies to "any State or local government" and "any department,

agency, special purpose district, or other instrumentality of a State or States or local

government."  42 U.S.C. § 12131(1).  Accordingly, all Defendants in this action are subject to

the ADA.  Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209 (1998); see also Innovative

Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 (2d Cir. 1997) (holding that zoning

decisions are subject to the ADA and noting that "programs, services, or activities" is a "catch-

all phrase that prohibits all discrimination by a public entity, regardless of the context."), rev'd

on other grounds by Zervos v. Verizon New York, 252 F.3d 163, 171 n.7 (2d Cir. 2001).

Additionally, Defendants have stipulated that their programs or activities "receiv[e] federal financial assistance."[8]  As such, they are subject to Section 504.  29 U.S.C. § 794(a).

In DAI I, the court held that Title II applies to DAI's claims in this case.  DAI I, 598 F. Supp. 2d at 317; see id. at 319 (holding that DAI's "claim falls squarely under Title II of the ADA").  In doing so, the court rejected Defendants' argument that the State is not liable under the ADA because the adult homes are privately owned, and finding that it is "immaterial that DAI's constituents are receiving mental health services in privately operated facilities."  Id. at 317; see Rolland v. Cellucci, 52 F. Supp. 2d 231, 237 (D. Mass. 1999).  The ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

As the court previously held, Defendants' actions at issue here – including the allocation of State resources among various service settings – involve "administration."  Defendants, as required by New York law, administer the State's system of mental health care, including residential and treatment services provided by both public and private entities.  DAI I, 598 F. Supp. 2d at 317.  They plan how and where services for individuals with mental illness will be provided, and they allocate the State's resources accordingly.  Id.  Defendants are also required under State law to develop a "comprehensive, integrated system of treatment and rehabilitative services for the mentally ill" that assures "the adequacy and appropriateness of residential arrangements" and relies on "institutional care only when necessary and appropriate."  N.Y. Mental Hyg. Law §§ 7.01, 7.07.  As this court previously held, "[t]he State cannot evade its obligation to comply with the ADA by using private entities to deliver services that are planned,

---

[8] Joint Stip. ¶¶ 36, 37.

implemented, and funded as part of a statewide system of mental health care."  DAI I, 598 F. Supp. 2d at 318.

## III.     PLAINTIFF'S CLAIMS UNDER THE ADA AND REHABILITATION ACT

As set forth below, DAI has proven by a preponderance of the evidence that Defendants have discriminated against DAI's constituents by reason of their disability.  DAI has established that the adult homes at issue are not the most integrated setting appropriate to the needs of DAI's constituents: the adult homes do not "enable interactions with nondisabled persons to the fullest extent possible," especially compared to supported housing, a far more integrated setting.  DAI has established that virtually all its constituents are qualified to move to supported housing and are not opposed to receiving services in more integrated settings.

### A.     DAI'S CONSTITUENTS ARE NOT IN THE MOST INTEGRATED SETTING APPROPRIATE TO THEIR NEEDS

#### 1.     Legal Standard

The law requires that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  According to the federal regulations, the "most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35 app. A.  In DAI I, the court resolved the parties' dispute regarding the meaning of the federal regulations and concluded that the proper inquiry is whether the individuals at issue "are in the 'most integrated setting appropriate to their needs,' defined as 'enabl[ing] individuals with disabilities to interact with nondisabled persons to the fullest extent possible.'"  See DAI I, 598 F. Supp. 2d at 321 (citing 28 C.F.R. § 35.130(d), App. A and concluding that "the federal regulations mean what they say").

## 2. Findings of Fact

### a. Background

Adult homes are a type of adult care facility licensed by the State and authorized to provide long-term residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator.[9] Adult homes are privately owned, for-profit facilities.[10] State regulations address many areas of adult home administration and operation, including resident rights, the number and qualifications of staff, physical and environmental standards, and services that must be provided in adult homes.[11]

Defendants administer the State's system of mental health care, including residential and treatment services provided by public and private entities.[12] Defendant OMH licenses, funds, and oversees an array of mental health housing and support service programs statewide, including community support, residential, and family care programs.[13] OMH is also required by law to plan how and where New York's mental health services will be delivered.[14] In particular, OMH is obligated to "develop an effective, integrated, comprehensive system for the delivery of all services to the mentally ill" and to "create financing procedures and mechanisms to support such a system of services"; it relies on both public and private providers of those services.[15] OMH is also responsible for planning and developing programs and services "in the areas of

---

[9] Joint Stip. ¶¶ 2, 17.

[10] Id. ¶ 18; Trial Transcript ("Tr.") 644 (Rosenberg).

[11] See N.Y. Comp. Codes R. & Regs. tit. 18 §§ 485-487; Tr. 2992-93 (Hart) (describing regulations).

[12] N.Y. Mental Hyg. Law §§ 5.07, 7.07.

[13] Id. §§ 41.03, 41.42, 41.39.

[14] Id. § 7.07.

[15] Id.

research, prevention, and care, treatment, rehabilitation, education, and the training of the mentally ill."[16]

The other Defendant agency, DOH, is responsible for, among other things, promoting the "development of sufficient and appropriate residential care programs for dependent adults."[17] DOH issues operating certificates to establish and operate adult homes.[18] The operating certificates must be reissued every four years.[19] DOH also licenses and monitors adult homes and enforces the applicable statutes and regulations[20] through unannounced inspections of each adult home every twelve or eighteen months, depending on the facility's record.[21] It can revoke, suspend, or terminate an operating certificate if an adult home fails to comply with State regulations,[22] or if DOH determines that such an action is in the public interest because it would conserve resources.[23]

In 2002, there were 12,586 recipients of mental health services residing in adult homes statewide.[24] There are currently 380 licensed adult homes in New York State, and 44 adult

---

[16] Id. § 7.07(a); id. § 5.07 (requiring OMH to formulate each year "a statewide comprehensive five-year plan for the provision of all state and local services for the mentally ill" that includes "establish[ing] priorities for resource allocation" and "analyz[ing] current and anticipated utilization of state and local, and public and private facilities and programs.").

[17] N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485.3(a)(1), 487.1(b).

[18] Joint Stip. ¶¶ 4-5.

[19] Id. ¶ 5.

[20] Id. ¶ 2.

[21] N.Y. Soc. Servs. Law § 461-a(2)(a). After each inspection, DOH issues an inspection report, and the facility is required to correct any violations or submit a plan of correction. (N.Y. Comp. Codes R. & Regs. tit. 18 § 486.2(h-j); Tr. 2998-3007 (Hart) (describing inspections).) OMH is also involved in the inspection process. See N.Y. Comp. Codes R. & Regs. tit. 18, § 485.3(b)(1) (stating that OMH may participate in inspections); see infra note 648.

[22] Joint Stip. ¶ 5.

[23] N.Y. Comp. Codes R. & Regs. tit. 18 § 485.5(m)(1)(i).

[24] S-5 (NYS OMH, 2004-2008 Statewide Comprehensive Plan for Mental Health Services) OMH 5999.

homes in New York City.[25]  Adult homes in which at least 25% of the residents or 25 residents

(whichever is fewer) have mental disabilities are referred to as "impacted."[26]  While the term

"mental disabilities" includes both mental illness and developmental disabilities, only a few of

the 12,000 individuals with mental illness who live in adult homes have developmental

disabilities.[27]  The testimony and exhibits concerning "impacted" adult homes refer to those

homes with the requisite number of individuals who have "mental illness," a "mental health

diagnosis," or "history of mental health diagnosis."[28]  Defendants rely on information reported

from the adult homes themselves to identify which homes are impacted.[29]  Impacted adult homes

must enter into a written agreement with a provider of mental health services for assistance with

the assessment of mental health needs, the supervision of mental health care, and the provision of

case management for residents enrolled in mental health programs.[30]

### i.  The Adult Homes at Issue

According to the most recent data, the DOH Adult Care Facility Census Report for 2008

("DOH 2008 Census Report"),[31] there are twenty-eight impacted adult homes in New York City

---

[25] Joint Stip. ¶¶ 20, 21.

[26] See N.Y. Mental Hyg. Law §§ 45.09(a), 45.10(a) (referring to adult homes in which "at least twenty-five percent or twenty-five residents, whichever is less, have at any time received or are receiving services from a mental hygiene provider which is licensed, operated or funded by the office of mental health, or the office of mental retardation and development disabilities").

[27] Tr. 1407-08 (Reilly).

[28] See Tr. 2985, 2996-96, 3042 (Hart); see also P-283 (2004, 2005, and 2006 DOH Census Reports) (listing, inter alia, each adult home's capacity and census, as well as the number and percentage of residents designated as "mental health").

[29] Tr. 2996-97, 3042 (Hart).

[30] N.Y. Comp. Codes R. & Regs. tit. 18 §§ 487.7(b)-(c), 487.4(n).

[31] DAI submitted a motion to admit the DOH 2008 Census Report, marked as P-774, which contains the most recent Adult Home census data.  (Pl. Mot. To Admit Ex. P-774 Into Evidence (Docket Entry #322).)  This data was discussed during trial but was not produced until after the trial.  DOH's 2004, 2005, and 2006 Census Reports were admitted into evidence without objection.  (See Tr. 1219 (admitting P-283 (2004, 2005, and 2006 DOH Census

with more than 120 beds.[32]  These adult homes are: Anna Erika Assisted Living, Bayview Manor Home for Adults, Belle Harbor Manor, Bronxwood, Brooklyn Adult Care Center, Castle Senior Living at Forest Hills, Central Assisted Living LLC (formerly known as New Central Manor), Elm-York LLC, Garden of Eden, Lakeside Manor Home for Adults, Long Island Hebrew Living Center, Mermaid Manor Home for Adults, New Broadview Manor Home for Adults, New Gloria's Manor Home for Adults, New Haven Manor, Oceanview Manor Home for Adults, Park Inn Home for Adults, Parkview Home for Adults, Queens Adult Care Center, Riverdale Manor Home for Adults, Rockaway Manor Home for Adults, Sanford Home, Scharome Manor, Seaview Manor LLC, S.S. Cosmas and Damian Adult Home, Surf Manor Home for Adults, Surfside Manor Home for Adults, and Wavecrest.

---

Reports).)  During the testimony of Defendants' witness Mary Hart, the court asked Defendants to provide the current census data.  (See Tr. 3044.)  Defense counsel stated that "[w]e can . . . I think it would be possible for us to stipulate on the final '08 figures for those homes."  (Id.)  Following trial, Defendants produced P-774, but would not stipulate to its admission.  (See Decl. of Liad Levinson, Exs. A, E, & F (Docket Entry #324).)

The DOH 2008 Census Report is admissible as a business record under Rule 803(6) of the Federal Rules of Evidence, because census reports reflecting the number of residents with mental illness living in adult homes are regularly compiled and maintained by DOH in the course of business, and the data contained in the reports is audited by DOH.  (Tr. 3042-43 (Hart).)  The court rejects the contention that admitting the DOH 2008 Census Report into evidence would prejudice Defendants by effectively permitting DAI to amend its Complaint to include additional adult homes.  (Defs. Opp. (Docket Entry #327).)  Defendants have been on notice for more than six years that the adult homes at issue in this litigation are impacted adult homes in New York City with more than 120 beds. (Compl. ¶ 34.)  It is Defendants – not Plaintiff – that determine whether particular adult homes are "impacted" based on the adult homes' annual reported data.  (Tr. 2996-97 (Hart).)  Whether there are additional adult homes in addition to the "approximately 26 adult homes" listed in the Complaint in 2003 (id. ¶ 35 (emphasis added)) that DOH now identifies as impacted does not materially affect the resolution of Plaintiff's claim.  In any event, Defendants did not object to the admission of the 2004, 2005, and 2006 DOH Census Reports, which also indicate that certain adult homes in New York City not listed in the Complaint are impacted and have more than 120 beds. (See P-283.)  The Complaint does not allege that any particular adult home is itself liable under the ADA and Rehabilitation Act; instead, it challenges Defendants' use of large, impacted adult homes in New York City as a setting in which individuals with mental illness receive services.  Accordingly, Plaintiff's Motion To Admit P-774 in Evidence is GRANTED.

[32] See P-774 (DOH 2008 Census Report).

As of December 31, 2008, each of these adult homes housed more than one hundred residents, and seven housed over two hundred residents.[33]  More than eighty percent of the residents in these twenty-eight adult homes are reported as having mental illness.[34]  In eighteen homes, more than 95% of the residents have mental illness, and in nine homes, 100% of the residents have mental illness.[35]  In only four homes do less than 50% of the residents have mental illness.[36]  According to the DOH 2008 Census Report, more than 4,300 individuals with mental illness were living in these adult homes on December 31, 2008.[37]

Certain details of operation and resident population of the adult homes may vary, but as a factual matter, there are no material differences among these adult homes with respect to the issues in this case.[38]  As used below, "Adult Homes" refers to impacted adult homes in New York City with more than 120 beds.

ii.        The Development of Adult Homes in New York State

---

[33] Id.

[34] Id.

[35] Id.

[36] Id.

[37] Id.

[38] Tr. 70 (E. Jones) (stating that there was "no significant difference between the environments and the characteristics of the adult homes" regarding the twenty-three homes she visited); Tr. 2916 (Kaufman) (testifying that the three homes he visited were a "representative sample" of the adult homes at issue).

Among the adult homes originally at issue in this litigation, DOH closed Ocean House, which had been cited for financial improprieties, and a settlement was reached providing for funds to be used for the benefit of persons with disabilities.  (Tr. 1635-36, 65-69 (Wollner); Tr. 3048-49 (Hart); see also D-49 (Stip. regarding Ocean House (Jul. 18, 2004)); D-50 (Stip. of Settlement (Feb. 14, 2006)); D-51 (Stip. & Order closing Ocean House (Jul. 18, 2004)).)  The administrations of Brooklyn Manor and Leben Home have also changed.  (Tr. 1636-39 (Wollner); see also D-57 (Report & Decision in administrative proceedings reviewing DOH's charges against Brooklyn Manor Home for Adults and appointment of a receiver (Jan. 23, 2006)); D-59 (DOH Operating Certificate for Brooklyn Adult Care Center (Aug. 17, 2006)); see also N.Y. Comp. Codes R. & Regs. tit. 18 § 485.9 (providing that DOH has the authority to seek appointment of a receiver to take over operation of adult homes).) In their Proposed Findings of Fact, both sides cite the testimony of individuals who lived in Ocean House or Brooklyn Manor and provide other evidence concerning programs and expenditures at these two adult homes.  Because both sides rely on evidence about Ocean House and Brooklyn Manor to support their claims, the court considers it in the same manner as it considers evidence about other adult homes and adult home residents at issue.

Adult homes in New York State were originally designed to house the "the frail elderly," not people with psychiatric disabilities.[39] They became a place for people with mental illness to live and receive services when the State began to deinstitutionalize its State psychiatric hospitals in the early 1970s, and State psychiatric hospitals began discharging patients directly into adult homes.[40] As former OMH Commissioner James Stone noted, adult homes developed because "community resources weren't up to speed with state operated bed reductions" resulting from deinstitutionalization.[41] Thirty years ago, New York State and New York City government reports referred to adult homes as "de facto mental institutions" and "satellite mental institutions."[42] According to Linda Rosenberg, a former Senior Deputy Commissioner of OMH who worked in the State's mental health system from the early 1970s to 2004, OMH's approach to the community integration of people with severe mental health issues evolved over the years, and "it became increasingly clear that [adult homes] were neither desirable, nor would they really promote people's recovery and integration and full social inclusion."[43]

### iii. Adult Homes Continue To Be a Discharge Option from Psychiatric Hospitals

Adult homes have long been, and continue to be, a discharge option for individuals leaving psychiatric hospitals.[44] Numerous current and former Adult Home residents testified

---

[39] D-394 (Schimke Dep.) 289.

[40] Tr. 640 (Rosenberg).

[41] P-68 (OMH Comm'r James Stone, Mem. to Members of Mental Health Servs. Council (Nov. 22, 2002) ("Stone Memo")); see Tr. 648 (Rosenberg).

[42] P-142 (Deputy Att'y Gen. Charles J. Hynes, Private Proprietary Homes for Adults: A Second Investigative Report (Mar. 31, 1979)) DAI 2906; P-170 (New York City Council Subcomm. on Adult Homes, The Adult Home Industry: A Preliminary Report) DAI 3589.

[43] Tr. 648-49.

[44] Tr. 2085 (Burstein) ("[M]any of the residents at Park Inn come from state hospitals."); Tr. 658 (Rosenberg) (testifying that an adult home "is a discharge that's often available"); S-151 (E. Jones Report) 3, 9; Tr. 1577

that they were discharged from a psychiatric hospital into an Adult Home.[45] The percentage of

people discharged from psychiatric hospitals into adult homes in New York City declined

significantly from the mid-1990s to 2005,[46] which Ms. Rosenberg testified "speaks to our belief

[at OMH] at that time and I think it continues now that adult homes are not desirable places to

live."[47] Nonetheless, OMH made efforts in 2008 to facilitate discharges from State hospitals in

the New York City area to adult homes in New York City, including a number of the impacted

Adult Homes at issue in this litigation.[48] In particular, OMH's Director of Case Management

Services, Mitchell Dorfman, made recommendations for referrals to adult homes, including the

Adult Homes at issue in this litigation, for psychiatric patients who had been approved for

supported housing.[49] Mr. Dorfman also told adult home operators concerned about the fiscal

impact of a recent legislative initiative to provide 60 beds of supported housing to Adult Home

residents[50] that "in whatever way we can help facilitate referrals to the adult home we would

---

(Campbell) (testifying that OMH psychiatric centers "commonly discharge[d]" to adult homes "for as long as I can remember."); see also N.Y. Mental Hyg. Law § 29.15(i)(2)(II) (providing that adult homes are an option for discharge from State hospitals and other psychiatric facilities licensed by the State).

[45] See, e.g., Tr. 448 (G.L.); Tr. 2685 (I.K.); P-540 (P.B. Dep.) 30-31; P-537 (P.C. Dep.) 46-47.

[46] Tr. 1577-78 (Campbell); S-2 (Discharge Placements for Psychiatric Centers Serving the NYC Metropolitan Area).

[47] Tr. 748.

[48] P-363, P-364, P-365 (e-mails from Mitchell Dorfman, Director of OMH Case Management Services, to State psychiatric center directors and discharge managers regarding facilitation of referrals to adult homes); Tr. 1802, 1808-14, 1824-26 (Dorfman). To the extent Mr. Dorfman asserted that his repeated use of the word "facilitate" in the e-mails did not mean "facilitate" (see Tr. 1810-12), the court finds Mr. Dorfman's testimony not credible.

[49] Tr. 1808-14.

[50] These beds are exclusively for individuals with mental illness living in adult homes in New York City. (S-33 (2007 RFP).) This population includes the Adult Home residents at issue, as well as those in non-impacted adult homes. As shorthand, the court refers to the target population for the 60-bed initiative as "Adult Home residents," because the majority of this population lives in the impacted Adult Homes, and both sides referred at trial to the 60-bed initiative as targeted at the Adult Home residents at issue in this case.

This initiative was imposed on OMH by the Legislature; OMH did not request it. (See Tr. 3354 (Schaefer-Hayes); Tr. 1460-61 (Madan); Tr. 2142 (Newman).)

work with you and do that."[51]  High-level State employees in OMH's central office, including

Robert Myers, OMH's Senior Deputy Commissioner for Adult Services, were aware of these

recent efforts to facilitate discharges from state psychiatric hospitals to impacted Adult Homes,

and did not express any concerns or stop this process.[52]

### b. Adult Homes Are Institutions That Segregate Individuals with Mental Illness from the Community

### i. Adult Homes Are Institutions

The overwhelming evidence in the record compels the court to find, as a factual matter,

that Adult Homes are institutions.[53]  Indeed, in its June 4, 2007 "Guiding Principles for the

Redesign of the Office of Mental Health Housing & Community Support Policies," OMH

characterizes adult homes as institutions:

> as a consequence of poor access to community housing, inadequate levels of
> mental health housing, and clinical programs that do not support people in
> getting/keeping housing successfully, many people with mental illness are poorly
> housed or institutionalized.  Thus, many people with mental illness are "stuck" in
> . . . institutional settings (nursing homes, adult homes, state psychiatric centers).[54]

---

[51] Tr. 1835.

[52] See Tr. 1804-1807 (Dorfman).

[53] See, e.g., S-151 (E. Jones Report) 2; Tr. 75-76 (E. Jones); Tr. 642-43 (Rosenberg) (calling Adult Homes "mini institutions"); Tr. 289-90 (Tsemberis) (testifying that Adult Homes have "absolutely an institutional feel . . . institutional look . . . [and] institutional manner");  Tr. 2241-42 (Bear) (Adult Homes are "much like the psychiatric centers where [Jewish Board's] consumers lived for so long").

[54] P-284 (OMH Guiding Principles for the Redesign of the Office of Mental Health Housing and Community Support Policies (June 4, 2007) ("OMH Guiding Principles")) (emphasis added).   A nearly identical version of the OMH Guiding Principles currently posted on OMH's website and dated May 17, 2007 states that people are "stuck in" adult homes but lists adult homes separately from the other "institutional settings."  (P-59.)

The court uses the term "institution" as defined by Elizabeth Jones, one of DAI's experts, who explained that: "[An] [i]nstitution, in my mind, and in my experience, and in the literature, is a segregated setting for a large number of people that through its restrictive practices and its controls on individualization and independence limits a person's ability to interact with other people who do not have a similar disability."[55]

As set forth more fully below, the evidence demonstrates that Adult Homes have the characteristics Ms. Jones described. Witnesses for both sides testified that Adult Homes share many salient features of State psychiatric hospitals. First, Adult Homes house a large number of people with psychiatric disabilities in a congregate setting.[56] As Defendants' expert Alan Kaufman observed, "significant numbers of residents suffer from serious mental illness . . . . The number of beds in many of the larger Adult Homes, as well as their physical layout, furnishings, and decorations, also give an appearance similar to that in an institutional setting."[57] Second, life in the Adult Homes is highly regimented. Adult Homes, like other types of institutions, "are designed to manage and control large numbers of people . . . by eliminating choice and personal autonomy, establishing inflexible routines for the convenience of staff, restricting access, implementing measures which maximize efficiency, and penalizing residents who break the rules."[58] In particular, there are inflexible schedules for meals, taking medication, receiving public benefits, and other daily activities.[59] Residents are assigned roommates and are

---

[55] Tr. 55.

[56] See, e.g., S-151 (E. Jones Report) 4; S-54 (Kaufman Report) 8.

[57] S-54 (Kaufman Report) 8.

[58] S-151 (E. Jones Report) 4.

[59] S-54 (Kaufman Report) 8-9; Tr. 644-45 (Rosenberg); Tr. 867-68 (Duckworth); Tr. 2895-97, 2911-12 (Kaufman); Tr. 2356-57 (Geller); Tr. 289-90 (Tsemberis); Tr. 54-57, 75-76 (E. Jones); see, e.g., D-391 (D.W. Dep.) 76; Tr. 374, 376-77 (S.K.); P-538 (B.J. Dep.) 60 (describing rigid schedules for meals and medications).

required to sit at a specific seat at a specific table in the cafeteria; they must seek permission to change these assignments.[60] Most Adult Home residents line up to receive their medications at scheduled times.[61] Long lines also form for receiving personal needs allowances, the portion of residents' Supplemental Security Income allocated for the residents' personal use.[62] Witnesses observed that Adult Homes had the look and feel of "back wards" of State hospitals and were "reminiscent of a state psychiatric hospital and its culture."[63]

Adult Homes are not identical in all respects to psychiatric hospitals, however. In some ways, Adult Homes are even more restrictive or "institutional" than psychiatric hospitals. For example, Plaintiff's expert Dr. Kenneth Duckworth testified that in his experience, unlike the Adult Homes, psychiatric hospitals do not have assigned seating for meals and do not necessarily distribute medication at mealtimes.[64] Ms. Jones testified that lines at the Adult Homes, which had "200, 400 people all mingling together and standing in line for medication," were longer than those at psychiatric hospitals, because psychiatric hospitals are divided into wards of approximately twenty people.[65] In certain respects, however, Adult Homes are less restrictive

---

[60] Tr. 2065-66 (Burstein); Tr. 375 (S.K.); Tr. 479-80 (G.L.) (testifying that residents had assigned seats for meals, and that initially residents could not have guests join them, but later on, residents could have a guest if there happened to be an empty seat at the table at mealtime); Tr. 558-59 (S.P.); P-542 (L.G. Dep.) 98; P-543 (R.H. Dep.) 99-100; P-534 (L.H. Dep.) 74; P-544 (C.H. Dep.) 95; P-536 (D.N. Dep.) 91-92; D-391 (D.W. Dep.) 71-72, 74; P-545 (J.M. Dep.) 80; Tr. 2896-96 (Kaufman); Tr. 2685, 2693 (I.K.); see also, e.g., S-165 (Facility Rules, Queens Adult Care Center) (noting that "[d]ining room seating arrangements can only be changed by authorized staff").

[61] Tr. 54-55, 67 (E. Jones); S-151 (E. Jones Report) 5; Tr. 360-61, 376-78 (S.K.); Tr. 2103 (Burstein) ("[I]f there's one or two people helping the residents take their medication and there's 90 that need to get medication, there's going to be congestion."); Tr. 464-65 (G.L.); P-540 (P.B. Dep.) 130-31; P-542 (L.G. Dep.) 122; P-543 (R.H. Dep.) 200-03; P-534 (L.H. Dep.) 103; P-535 (T.M. Dep.) 76; P-545 (J.M. Dep.) 76-77:23; P-546 (A.M. Dep.) 94-95.

[62] Tr. 54-55 (E. Jones).

[63] Tr. 1007 (D. Jones); Tr. 865 (Duckworth); see also P-674 (letter from Alan Siskind, CEO of Jewish Board of Family and Children's Services to OMH Commissioner) (stating that "adult homes are much like the psychiatric centers where our customers lived for so long"); Tr. 2241-42 (Bear) (testifying about P-674, which she drafted).

[64] Tr. 867-68.

[65] Tr. 75; see S-151 (E. Jones Report) 5.

than psychiatric hospitals. For example, Adult Homes do not have a "privilege" system that explicitly limits residents from leaving the grounds, as is common in psychiatric hospitals.[66] In addition, because adult homes are prohibited by law from housing people who are a danger to themselves or others,[67] they do not impose some of the restrictions psychiatric hospitals place on their patients, such as restricting access to mail, limiting smoking at certain times of day, or prohibiting them from carrying matches.[68]

Nonetheless, Adult Homes bear little resemblance to the homes in which people without disabilities normally live.[69] As Defendants' expert Mr. Kaufman observed, medical and mental health staff are a constant presence in Adult Homes.[70] Meals, medication, phone calls, and mail deliveries are announced over a public address system.[71] Privacy is extremely limited. The Adult Homes have large numbers of residents and staff, and there are few or no private spaces in which to receive visitors or talk on the phone.[72]

---

[66] Tr. 156 (E. Jones).

[67] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.4.

[68] Tr. 156-57 (E. Jones). While Adult Homes do not have written policies precluding residents' access to mail under certain circumstances, several current and former Adult Home residents testified that their mail had been opened before they received it. (See D-391 (D.W. Dep.) 114-16; P–541 (S.B. Dep.) 70-74; P-545 (J.M. Dep.) 100; P-542 (L.G. Dep.) 84-86).) J.M. testified that after he complained about the mail tampering to DOH, his mail was no longer opened. (P-545 (J.M. Dep.) 100-01.)

[69] Tr. 289-90 (Tsemberis).

[70] S-54 (Kaufman Report) 8.

[71] P-543 (R.H. Dep.) 97-99 (describing announcements on the loudspeaker "every five, ten minutes"); P-545 (J.M. Dep.) 100; P-536 (D.N. Dep.) 236-38; S-151 (E. Jones Report) 5; S-54 (Kaufman Report) 8; Tr. 865 (Duckworth); Tr. 2912 (Kaufman); Tr. 2356-57 (Geller); Tr. 58 (E. Jones).

[72] Tr. 360-61 (S.K.); Tr. 57-58, 150 (E. Jones) (describing the "congestion, crowding, the noise of the adult home" and the "unrelenting difficulties of living with several hundred people in a very small space"); D-394 (Schimke Dep.) 288; Tr. 863-64 (Duckworth); Tr. 477-78, 489-90 (G.L.); P-545 (J.M. Dep.) 53-54, 80-81, 95-96; P-546 (A.M. Dep.) 207-08; Tr. 563-65 (S.P.); P-540 (P.B. Dep.) 61-62; P-542 (L.G. Dep.) 116-17; P-536 (D.N. Dep.) 110-11, 128-29, 241-43; P-534 (L.H. Dep.) 65-66 (testifying that she has used a pay phone in a laundromat outside the Adult Home because people eavesdrop on her conversations when she uses the pay phone in the Adult Home lobby); D-391 (D.W. Dep.) 173-74. Current and former Adult Home residents also testified that staff would enter their

Residents of Adult Homes are subject to an extensive and significant set of rules.[73]  For example, Adult Homes restrict when and where residents may receive visitors; restrict when residents may be absent; and require visitors to sign in and state the purpose of their visit.[74]  In addition, while some of the Adult Homes do not have curfews,[75] other Adult Homes have evening curfews after which doors are locked and residents must be admitted by staff.[76]  In some Adult Homes, residents are not provided keys to the front doors,[77] and residents sometimes have trouble getting back into their buildings.[78]  Even in Adult Homes without a curfew, residents

---

bedrooms without knocking.  (See, e.g., Tr. 574-75 (S.P.); P-542 (L.G. Dep.) 166; Tr. 474-75 (G.L.); P-544 (C.H. Dep.) 103.)

Many Adult Homes prohibit residents from making outgoing phone calls from their rooms (see, e.g., P-534 (L.H. Dep.) 62; P-535 (T.M. Dep.) 49), and some Adult Homes do not permit residents to install phone lines through the Verizon low-income individuals (Tr. 544, 528 (G.L.)).  I.K. testified that it took "about a year and a half" to convince her Adult Home to allow her to have a Lifeline phone installed.  (Tr. 2720 (I.K.).)  A few residents have cell phones.  (Tr. 528-530 (G.L.).)

[73] Tr. 62-64 (E. Jones); S-151 (E. Jones Report) 4; Tr. 2299-2300, 2356-57 (Geller) (describing "quite extensive" rules in Adult Homes and that Adult Homes imposed rules "to a greater degree than was even necessary"); S-52 (Geller Report) 11 ("There is no doubt that Adult Homes have a significant set of rules."); S-158 (Brooklyn Manor Facility Rules and Conditions); S-159 (Garden of Eden Facility Rules and Policies); S-160 (Rules for Residents of Lakeside Manor Home for Adults, Inc.); S-161 (Facility Rules and Conditions, New Central Manor);  S-165 (Facility Rules, Queens Adult Care Center).

[74] Tr. 64-65 (E. Jones) (describing the procedures for gaining entry to Adult Homes, such as signing the register and producing a driver's license for photocopying, and recounting an episode in which Surfside Manor refused entry and threatened to call the police, despite the fact that Ms. Jones was invited by residents to visit); P-546 (A.M. Dep.) 100-01 (describing visiting hours and restrictions on where residents can receive visitors); Tr. 2103-04 (Burstein) (testifying that Park Inn does not allow overnight visitors); P-744 (complaint in an action by a coalition of Adult Home operators against advocacy groups to enforce restrictive guidelines for visitor access); P-534 (L.H. Dep.) 78 (testifying that the Adult Home does not allow overnight visitors, limits visiting times, and prohibits residents from having members of the opposite sex in their rooms); P-536 (D.N. Dep.) 96-97; D-391 (D.W. Dep.) 75 (testifying that residents had to be present at medication times).

[75] Tr. 527 (G.L.); P-543 (R.H. Dep.) 113, 151; Tr. 2692 (I.K.); Tr. 409 (S.K.) (testifying that "there isn't a curfew but they'd like you to be in by ten o'clock or 10:30 at the latest."); Tr. 591 (S.P.); P-568 (M.B. Dep.) 98-99; P-569 (G.H. Dep.) 164-67; P-546 (A.M. Dep.) 157, 185; P-536 (D.N. Dep.) 96-97.

[76] P-537 (P.C. Dep.) 98; P-541 (S.B. Dep.) 84-85; P-538 (B.J. Dep.) 57, 69-70; P-545 (J.M. Dep.) 159.

[77] Tr. 2103-04 (Burstein) (testifying that residents "don't need their own key" because there is a doorbell); P-541 (S.B. Dep.) 84-85; P-542 (L.G. Dep.) 90-91 (testifying that after the doors are locked, residents have to "bang on the front door" or "hope somebody hears you who is in the smoking lounge to let you in"); P-535 (T.M. Dep.) 54-55, 130, 131.

[78] P-537 (P.C. Dep.) 98-99.

may be required to notify staff each time they leave the facility.[79]  Some Adult Homes prohibit

residents from decorating their rooms, though others do not.[80]  Some residents have expressed

fear that they will be subjected to retaliation if they do not follow the Adult Home's rules or

complain about the Adult Home, and some have been arbitrarily penalized.[81]

The court is persuaded by the opinion of Ms. Jones and DAI's other experts, as well as

lay witnesses who testified based on their personal observations, that the Adult Homes are

institutions: segregated settings that impede residents' community integration.[82]  Ms. Jones, who

---

[79] See, e.g., S-165 (Facility Rules, Queens Adult Care Center) ("Upon leaving the facility, you must notify the attendant on duty [of] the approximate time of your return.").

[80] Tr. 162 (E. Jones); Tr. (G.L.) 500-01; Tr. 549-50 (S.P.); S-160 (Lakeside Manor Rules); Tr. 409 (S.K.); Tr. 2064-65, 2056-57 (Burstein).

[81] S-151 (E. Jones Report) 7; P-534 (L.H. Dep.) 12-13 (expressing fear that the Adult Home administrator would find out about her deposition testimony and kick her out of the Adult Home); Tr. 467-68 (G.L.) (testifying that he personally heard Adult Home staff threaten residents if they did not go to the day program); Tr. 563 (S.P.) (testifying that he had seen a resident refuse to go to the program and that the Adult Home sent that person to the hospital); P-546 (A.M. Dep.) 118-19 (testifying that the Adult Home administrator threatened to send him to a nursing home for allegedly complaining about the food in the Adult Home); P-541 (S.B. Dep.) 70-74 (describing his complaint to the Adult Home administrator about his mail being opened, explaining that "the minute you start [an] argument with them, right away they're ready to send you to the hospital," and that he did not ask the administrator to clarify his statement that "it's the procedure" to open residents' mail, because he "really didn't want to start no trouble"); see also P-536 (D.N. Dep.) 123-124:5 (testifying that she heard announcements over the loudspeaker that residents who do not take their medication will not get their allowance), 134 (expressing fear of being thrown out of the Adult Home if she testified); Tr. 1683-84 (Wollner) (acknowledging that Adult Home residents expressed fear of repercussions from Adult Home staff for participating in the Adult Home Assessment Project).

The court overrules Defendants' Rule 802 objections to pages 118:17-119:23 of A.M.'s deposition and page 123 and the first four lines of page 124 of D.N.'s deposition.  The testimony describes threats, which are not hearsay but "verbal acts."  United States v. Stratton, 779 F.2d 820, 830 (2d Cir. 1985), cert. denied by Stratton v. United States, 476 U.S. 1162 (1986); see also Tr. 961-67 (sidebar concerning admissibility of threats to Adult Home residents during which the court ruled that threats were admissible).  Defendants' Rule 802 objection to page 134 of D.N.'s deposition is also overruled, because D.N.'s testimony that she had previously told an advocate that she feared being thrown out of the home if she testified is admissible to show her then-existing mental state.

[82] Defendants challenge Ms. Jones's credibility.  The court rejects Defendants' contentions and finds Ms. Jones's testimony that Adult Homes are segregated settings credible.

First, the court declines to find that Ms. Jones "established an agenda of proving adult homes were institutions before she had completed half of her research."  (See Defs. PFF ¶ 37.)  Ms. Jones testified that she visited thirteen impacted Adult Homes in New York City when she reached this opinion, approximately nine months after she began her investigation, and subsequently made an additional eighteen visits to Adult Homes.  (Tr. 190-98 (E. Jones).)  By the time she reached this opinion, Ms. Jones had visited more Adult Homes than Defendants' experts combined, and certainly more than the witnesses called by Defendants who had never visited an impacted Adult Home in New York City.  (Tr. 45-48 (E. Jones); Tr. 2377 (Geller); Tr. 2916-17 (Kaufman); Tr. 1499-1500

spent seventy-five hours in twenty-three Adult Homes in both scheduled and unannounced visits explained:

> I can't state strongly enough that these facilities are institutions. These facilities are like the institutions that I worked in when I started my career. These are settings that are caught in time almost. They are not like even the psychiatric settings of today where I've been a director. These are outdated institutional facilities that restrict and constrain people's freedom and their ability to learn and exercise skills. These are the buildings and the places that were here in the '70s when my career started, when the court cases were first entered into. These facilities do not represent current practice in the mental health field.[83]

As Dr. Duckworth testified, "[t]he adult homes have . . . some of the elements of a homeless shelter and some of the elements of a state hospital. The culture is quite institutional in some ways, even more institutional than a state hospital in my opinion."[84] Similarly, former OMH Senior Deputy Commissioner Ms. Rosenberg described Adult Homes as "institutional living at, potentially, its worst."[85] She observed that Adult Homes "impede community integration" and are "little ghettos" with "people sitting out front [of] the adult home, smoking, going back in,

---

(Madan); Tr. 1579 (Campbell).) While Defendants' experts visited Adult Homes only on pre-announced, formal tours attended by attorneys for both sides and DOH officials, Ms. Jones visited Adult Homes informally and unannounced.

Second, the evidence does not support Defendants' contention that "many" of Ms. Jones's conversations were with residents known to MFY Legal Services, counsel to Plaintiff, or that "many" of the residents with whom she spoke were involved in advocacy efforts on behalf of Adult Home residents. (Defs. PFF ¶ 35.) Ms. Jones spoke with a total of 179 residents and spent more than 75 hours in the Adult Homes. (S-151 (E. Jones Report); Tr. 45-48.) She testified that the names provided to her by attorneys were "more sort of a beginning point for some of the visits." (Tr. 47.) Ms. Jones further explained that she spoke to residents who would approach her during both her formal and informal visits, residents would introduce her to other residents, and she would meet people as they were sitting outside the facility. (Id. at 47-48.) She explained that "it kind of evolved. One person led to another, and the longer I spent in a facility, the more chance I had to observe and speak with people." (Id. at 48.) She also testified that there were no significant differences between the residents whose names she had been provided by the attorneys and other residents "in terms of their life experiences or the conditions that they were experiencing in the adult homes or the preferences they had." (Id. at 48.)

[83] Tr. 54-55.

[84] Tr. 809-10.

[85] Tr. 645.

sitting in the lobby, not much going on and not much exposure to the rest of the world."[86]

Residents live in bedrooms with assigned roommates, eat meals only at set times, live

exclusively with other people with serious mental illness, and are completely "defined by their

illness."[87]

### ii. Much of Residents' Daily Lives Takes Place Inside the Adult Homes

Much of Adult Home residents' daily lives takes place inside the Adult Homes. As Ms.

Jones observed, "[t]here is a large number of people who seem to stay in the homes and don't

really go out a whole lot at all."[88] Residents spend most of their days in activities organized for

them by the Adult Homes and/or mental health providers associated with the Adult Homes.

Adult Homes are required to provide a program of activities in the facility as well as in the

community,[89] and DOH has cited Adult Homes for failing to provide a sufficient program of

activities.[90] Activities provided by Adult Homes include games, puzzles, and other child-

appropriate leisure activities.[91] For example, activities provided on-site at Riverdale Manor

through the case management program include computer games suitable "for a three- or four-

year-old,"[92] and a calendar of recreational activities at Surfside Manor lists activities such as

beads, nail painting, and bingo.[93] A former Adult Home resident testified that the activities "had

---

[86] Id. at 645-46.

[87] Id. at 644-45.

[88] Id. at 147-48.

[89] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7.

[90] Joint Stip. ¶ 23; see D-29 (DOH Inspection Report for Sanford Home (Sept. 8, 2003)) DOH 54012-13.

[91] Tr. 69-70 (E. Jones).

[92] Tr. 2560-62 (Waizer) (describing activities).

[93] S-166 (calendar of recreational activities at Surfside Manor).

you coloring, like a little kid; you play Bingo, like a little kid; you play domino, like a little kid;

and you play cards, like a little kid."[94]  When asked at trial about the Adult Home's activities, an

Adult Home resident answered, "[t]hey really don't have too much of anything.  It's like just

maybe playing cards, cribbage, puzzles, stuff like that; but they really don't have anything much

to do."[95]  Adult Homes also arrange for religious services and musical performances inside the

facilities.[96]

Many Adult Home residents also see medical and mental health professionals inside the

facilities.  In general, residents are assigned doctors and psychiatrists, usually on-site in the Adult

Homes, and are told when to see the treatment providers.[97]  For example, Park Inn contracts with

local medical facilities and psychiatric centers that provide on-site doctors, psychiatrists, and

social workers, and the majority of residents of Park Inn attend on-site mental health clinics and

are treated by on-site doctors and mental health professionals.[98]  Because Adult Homes almost

always hold residents' Medicaid cards, residents generally see the providers selected by the

Adult Homes – many of which have a financial interest in controlling who provides medical care

---

[94] P-546 (A.M. Dep.) 34.

[95] Tr. 385 (S.K.).

[96] Tr. 2045 (Burstein); Tr. 150-51 (E. Jones); Tr. 2692 (I.K.); P-541 (S.B. Dep.) 11-13 (testifying that "on special occasions, they would have entertainment from the outside come in, like Christmas parties," but that he could not remember other occasions), 54-55 (testifying that he attended Catholic services each Sunday in the Adult Home but that "not very many" people attended); P-538 (B.J. Dep.) 49 (testifying that Hospital Audiences, Inc. provides concerts inside the Adult Home "once in awhile"); P-568 (M.B. Dep.) 46-48; P-542 (L.G. Dep.) 48-49; P-569 (G.H.) 91; P-546 (A.M. Dep.) 39-40 (testifying that a "small group" of residents attended on-site religious services); P-545 (J.M.) 51-52 (testifying that about twenty-five residents attended services in the Adult Home); D-391 (D.W. Dep.) 150, 152-53 (testifying that a pastor comes to the Adult Home every other Friday).

[97] Tr. 462-63 (G.L.); Tr. 566-67 (S.P.) (testifying that the Adult Home makes appointments for him to see an assigned doctor in Adult Home every three weeks); P-546 (A.M. Dep.) 109-10; P-526 (D.N. Dep.) 125-26; P-535 (T.M. Dep.) 81.

[98] Tr. 2046-49, 2096-97 (Burstein).

to residents[99] – and residents must ask permission to access community-based care.[100] Unless residents are involved in an off-site mental health program, they do not have much interaction with individuals outside of the Adult Home setting.[101] When they do leave the facility to attend mental health programs, they are transported to the programs in ambulettes, buses, or vans, and their time in the programs is spent with other individuals with mental illness.[102]

While Adult Home residents have the right to "leave and return to the facility and grounds at reasonable hours,"[103] in practice they are limited in the times that they can leave the Adult Homes, due to the rigid schedules for meals, medications, and distribution of personal needs allowances.[104] For example, while residents are not precluded from eating outside of the Adult Home, they must be present at times when their medication is dispensed, usually at meal times and at nighttime, or they are penalized.[105] Facility rules for another Adult Home require residents to notify a "staff supervisor" if they will miss a meal.[106] While Adult Home residents

---

[99] Tr. 1407-08 (Reilly) (testifying that Adult Homes often rent space to medical providers at inflated rates which amount to referral fees, and residents are "lined up" to see the medical providers).

[100] P-569 (G.H. Dep.) 170-71 ("Q. Can you choose your own doctors if you want to? A. Ha ha. Good luck. Q. What do you mean by that? A. In other words, we can't change them ourselves. They give them to us . . . . Q. When did you try to pick your own doctor? A. I never have, because they wouldn't let me."); P-542 (L.G. Dep.) 101 (testifying that she had asked and received permission to hold her Medicaid card when she was receiving outside treatment for cancer, but that since then, the Adult Home has kept her Medicaid card "locked up"; although she currently wants to hold her Medicaid card, she has not asked again to hold it). In their Proposed Findings of Fact, Defendants point to only one instance of an Adult Home resident being allowed to hold his Medicaid card. (See Defs. PFF ¶ 41 (citing Tr. 543 (G.L.) (testifying that when he was in the Adult Home, he was allowed to hold his Medicaid card after "insist[ing]" that he do so).))

[101] Tr. 2663 (Lockhart).

[102] S-151 (E. Jones Report) 3, 8; Tr. 151 (E. Jones); P-541 (S.B. Dep.) 25-26 (testifying that he is picked up for the Adult Day Care Program by an ambulette); Tr. 601-02 (S.P.).

[103] N.Y. Comp. Codes R. & Regs. tit. 18, § 487.5(a)(3)(xii).

[104] S-151 (E. Jones Report) 6; Tr. 142 (E. Jones).

[105] Tr. 142 (E. Jones); D-391 (D.W. Dep.) 75-77 ("[I]f you miss medication, they write it up in the charts and they – and then you usually get into some type of trouble."); P-546 (A.M. Dep.) 163.

[106] S-159 (Facility Rules and Polices for the Resident, Garden of Eden).

have the right under State regulations to manage their own medications,[107] there is overwhelming

evidence that the vast majority of Adult Home residents are not permitted to administer their

own medication.[108]  A few residents have successfully reclaimed their right to self-administer

their medication by obtaining their doctor's permission to do so.[109]

### iii.    Residents' Access to Neighborhood Amenities

There is evidence that some Adult Home residents visit, to varying extents, neighborhood

amenities, such as stores, parks and/or beaches, restaurants, libraries, religious institutions, and

entertainment facilities.[110]  The testimony of current and former Adult Home residents

demonstrates, however, that not all residents leave the facilities, and those who go out do not do

so often, nor do they spend significant amounts of time outside of the facility.  For example, one

resident testified that a few residents never leave the Adult Home building, and estimated that

---

[107] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7.

[108] Tr. 1387-88 (Reilly) (acknowledging that medication management is an important skill, but that many Adult Homes do not afford residents the opportunity to demonstrate that skill); see P-546 (A.M. Dep.) 91:16-92:23, 95-96; P-536 (D.N. Dep.) 88-89:20 (testifying that the Adult Home does not allow residents to take their own medication, that she knows how to take her own medication, but has never talked to her doctor about taking her own medications because she "didn't know she could" raise the issue); Tr. 471 (G.L.); P-542 (L.G. Dep.) 70-71; Tr. 553-55 (S.P.) 553-55 (testifying that the Adult Home does not allow any residents to self-administer medication); P-536 (D.N. Dep.) 88-89:19; Tr. 376-77 (S.K.) (testifying that she was not allowed to take her own medication); see also Tr. 66–67 (E. Jones) (describing waiver form from Mermaid Manor authorizing Home to retain Medicaid card and to assist resident with medication, regardless of ability to administer medication); P-166 (waiver form to accept assistance in medication administration).

[109] Tr. 2068 (Burstein); Tr. 164-66 (E. Jones); P-545 (J.M. Dep.) 76-77:23; Tr. 2685-87 (I.K.).  DOH has cited Adult Homes for failure to allow residents who have been approved to self-administer medication to do so.  (Joint Stip. ¶ 23; see also D-28 (DOH Inspection Report for Queens Adult Care (Aug. 6, 2002)) OMH 13147-48; D-29 (DOH Inspection Report for Sanford Home (Sept. 8, 2003)) DOH 53993-99.

[110] See, e.g., Tr. 590-92, 567 (S.P.) (testifying that he walks around the neighborhood "maybe once or twice a month," that he walks to a shopping area about once a week and goes to restaurants "once in awhile," that he does these shopping trips to "try and catch a little air to get away from the home," and that he's seen "maybe about five" other residents at the stores each week); Tr. 511-17, 521-25 (G.L.); Tr. 2689-92 (I.K.); Tr. 405-09, 416 (S.K.); P-540 (P.B. Dep.) 50-53, 57-58, 148; P-567 (M.B. Dep.) 40-50, 103-05, 107-12; P-542 (L.G. Dep.) 14-18, 20-26; P-543 (R.H. Dep.) 33-41, 66, 123-26; P-546 (A.M. Dep.) 56-57, 59, 64, 66-70; P-541 (S.B. Dep.) 11-25; P-534 (L.H. Dep.) 49, 53-53, 117-18; P-537 (P.C. Dep.) 38-39, 97; P-569 (G.H. Dep.) 77-83, 97-99, 115, 130-45; P-544 (C.H. Dep.) 16-18, 20-22, 57-58, 66, 73; P-546 (B.J. Dep.) 53-55; P-545 (J.M. Dep.) 44-49, 50-51, 54, 55-58, 68-70; P-535 (T.M. Dep.) 31, 41, 45-48; P-536 (D.N. Dep.) 14-17, 18-19, 21-23, 32, 33, 36-37; D-391 (D.W. Dep.) 30-32, 156-58; Tr. 2045-46 (Burstein); Tr. 143-44 (E. Jones).

"maybe ten" of the other residents visited the nearby boardwalk.[111]  A former resident testified that he attended church outside the facility, but only on a total of three occasions during the entire time he lived in the Adult Home.[112]  Another former Adult Home resident testified that only eight of the 216 residents went to restaurants in the neighborhood; and that he has only seen a handful of residents leave the facility to go shopping, go to the park, or attend religious services.[113]  Another resident testified that residents walk around the neighborhood and go outside the facility to shop for toiletries and other items roughly ten to fifteen times per year, but no more than three residents go to a park.[114]  He also testified that residents eat out to the extent their monthly funds allow it because the food at the facility is so bad, and that while he goes out of the facility to get food, he does "most of [his] eating in the building up in [his] room."[115]

In addition, while the Adult Homes are located near some neighborhood amenities such as stores, fast-food restaurants, libraries, parks, churches and synagogues, and beaches and/or boardwalks,[116] accessibility depends on how far particular residents can walk.[117]  The Adult Homes are located within several blocks of public transportation,[118] but the familiarity of Adult

---

[111] P-541 (S.B. Dep.) 63-64.

[112] P-546 (A.M. Dep.) 56-57.

[113] P-545 (J.M. Dep.) 50-52, 54-59.

[114] See P-569 (G.H. Dep.) 136-38, 140-41.

[115] Id. at 136-37.

[116] See Tr. 2044-45 (Burstein); Tr. 511, 521-24 (G.L.); Tr. 2690 (I.K.); Tr. 404-07 (S.K.); Tr. 590-91, 593 (S.P.); P-540 (P.B. Dep.) 51-53; P-537 (P.C. Dep.) 96-98; P-542 (L.G. Dep.) 15, 21; P-541 (S.B. Dep.) 130-32; P-543 (R.H. Dep.) 34-41, 79-80; P-569 (G.H. Dep.) 152-53; P-538 (B.J. Dep.) 53; P-535 (T.M. Dep.) 30-32; P-546 (A.M. Dep.) 56-57, 59, 67-70; P-545 (J.M. Dep.) 45-47, 55-57.

[117] S-151 (E. Jones Report), 8; P-541 (S.B. Dep.) 13-14; P-543 (R.H. Dep.) 81-82; Tr. 2688-89 (I.K.).

[118] Tr. 518 (G.L.); Tr. 2688 (I.K.); Tr. 407 (S.K.); Tr. 592 (S.P.); P-541 (S.B. Dep.) 19; P-542 (L.G. Dep.) 171-72; P-534 (L.H. Dep.) 54; P-569 (G.H. Dep.) 152-53;  P-543 (R.H. Dep.) 80-81; P-544 (C.H.) 82-83; P-535 (T.M. Dep.) 32; P-546 (A.M. Dep.) 83:20-84:13; P-545 (J.M. Dep.) 61:9-62; P-536 (D.N. Dep.) 68-69; D-391 (D.W. Dep.) 255; see also Tr. 2045 (Burstein); Tr. 145 (E. Jones).

Home residents with public transportation varies, as does the frequency with which the residents use public transportation.[119] Some Adult Home residents have reduced-fare Metrocards.[120] One Adult Home resident testified that she "do[es]n't really know the buses" in the neighborhood but has taken the bus more than twice, that she is unfamiliar with the subway and has only taken it once since living in the Adult Home, and that she mostly gets around by walking.[121] Others are more familiar with public transportation; for example, when G.L. lived in the Adult Home, he took public transportation with his roommate approximately once per month to stores.[122] There is evidence that a handful of residents have traveled via public transportation to entertainment or cultural events in Manhattan.[123]

When asked whether she had observed residents coming and going from the Adult Homes, Ms. Jones testified that:

> Some residents do; some residents are quite capable. These residents have worked around the routine of the day and make trips to the local resources, may get on a bus and go somewhere. People's ability to go out of the adult home is impacted, of course, by the fact that they have little free money to use for those types of things. But, again, there are many, many people who don't do that, who stay in their room, who stay in the day room, or who sit outside on the perimeter

---

[119] Tr. 518, 527-28 (G.L.); Tr. 2688-89 (I.K.); Tr. 592-93, 612 (S.P.); P-540 (P.B. Dep.) 53-54, 55-57; P-541 (S.B. Dep.) 15, 18-20; P-568 (M.B. Dep.) 35-37; P-537 (P.C. Dep.) 98; P-542 (L.G. Dep.) 16-17, 135-36; P-543 (R.H. Dep.) 81-82; P-569 (G.H. Dep.) 97-99, 142, 154-55; P-534 (L.H. Dep.) 54-55; P-544 (C.H. Dep.) 22-24, 82-83; P-538 (B.J. Dep.) 51-52, 72; P-535 (T.M. Dep.) 32-33, 78-79; P-546 (A.M. Dep.) 84; P-536 (D.N. Dep.) 68-69; D-391 (D.W. Dep.) 25-27; see Tr. 2051 (Burstein); Tr. 145 (E. Jones).

[120] Tr. 518-20 (G.L.); Tr. 2689 (I.K.); Tr. 593 (S.P.); P-568 (M.B. Dep.) 35-36; P-357 (P.C. Dep.) 107; P-542 (L.G. Dep.) 175-76; P-569 (G.H. Dep.) 155; P-544 (C.H. Dep.) 23; P-538 (B.J. Dep.) 71; P-545 (J.M. Dep.) 62; P-536 (D.N. Dep.) 68-69 (naming two residents besides herself who have reduced-fare Metrocards and stating that there might be a few others as well).

[121] P-540 (P.B. Dep.) 53-54, 55-57.

[122] Tr. 517-18 (G.L.).

[123] P-541 (S.B. Dep.) 18-19; P-569 (G.H. Dep.) 97-99, 130-31 (testifying that he took the subway to concerts in Manhattan from time to time from 1997 to 2001); P-535 (T.M. Dep.) 78 (testifying that he has taken the train to Manhattan to see movies); P-544 (C.H. Dep.) 18, 20-22 (testifying that he has gone to sporting events and concerts in Manhattan via public transportation).

of the adult home smoking cigarettes and, you know, being with other adult home residents.[124]

She testified that the fact that some Adult Home residents come and go does not change her conclusion that Adult Homes are segregated settings, because "there is nothing in the adult home that's contributing toward the integration of people in their communities."[125]  She explained that "[t]he people that are going out and doing things in their community, in their neighborhood, are people who have taken that initiative upon themselves.  The people that need support in doing that are not being assisted by the adult home to have those interactions . . . ."[126]

### iv. Organized Trips

The Adult Homes and mental health programs take residents on organized trips,[127] and the regulations require adult homes to arrange for "resident participation in community-based and community-sponsored activities."[128]  Such outings contribute little to residents' integration into the community, however.  The residents generally travel as a group, in a bus or van, and interact mainly with each other.[129]  At Park Inn Home for Adults and numerous other Adult Homes, the number of residents who can go on each trip is limited to the number of persons that

---

[124] Tr. 72; see also id. at 142-43 (expressing reluctance to agree to the statement that "nothing precludes residents from leaving the Adult Homes" because such a statement "paints a very deceptive picture" due to the "impact of living in an adult home with a hundred to four hundred other people and what that does to you in terms of exercising independence and being able to initiate what your day or what your life is like.").

[125] Id. at 72.

[126] Id. at 72-73.

[127] Tr. 2053 (Burstein); Tr. 537, 533-34 (G.L.); Tr. 2546-47, 2578, 2580 (Waizer); P-542 (L.G. Dep.) 46-47, 50-53; P-546 (A.M. Dep.) 34-36, 25; Tr. 151-53, 173 (E. Jones); Tr. 413-14 (S.K.); P-543 (R.H. Dep.) 49-50; Tr. 608-10 (S.P.); P-569 (G.H. Dep.) 41-46; P-544 (C.H. Dep.) 40-47; P-536 (D.N. Dep.) 39, 49-50; P-538 (B.J.) 43-44; P-541 (S.B. Dep.) 29, 38, 53-54.

[128] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7 (h).

[129] Tr. 2061, 2104-05 (Burstein); S-151 (E. Jones Report) 3, 8.

can fit in a van.[130]  Before Park Inn recently acquired a van, it used ambulettes to take groups of residents on monthly outings to restaurants and movies.[131]  Seaview takes between ten and twenty residents each month to Wendy's.[132]  Residents of Riverdale Manor Home for Adults are taken by a mental health provider, the Federation of Employment and Guidance Services ("FEGS"), on "field trips" to museums and libraries, but the visits are after hours when the facilities are closed to the general public.[133]

### v.  The Adult Home Setting Limits Residents' Opportunities To Interact with People Who Do Not Have Disabilities

Overall, Adult Homes provide little support or encouragement for residents to interact with people who do not have disabilities or to become integrated into the community and limit opportunities for social interaction and employment.[134]

As Plaintiff's and Defendants' experts agree, and as Adult Home residents testified, Adult Homes limit the development of relationships with people who do not have disabilities, including social contacts.[135]  While Adult Home residents form friendships and romantic relationships with other Adult Home residents,[136] many residents testified that they lack friends

---

[130] Tr. 2061 (Burstein); see also P-542 (L.G. Dep.) 37 (testifying that outings are limited to thirteen people, the number of persons who can fit in a van).

[131] Tr. 2104-05 (Burstein).

[132] P-541 (S.B. Dep.) 53-54.

[133] Tr. 2560-61, 80 (Waizer).

[134] Tr. 71-73 (E. Jones); S-150 (D. Jones Report) 9.  Adult homes are required to provide case management services that "assist[] each resident to maintain family and community ties and to develop new ones . . . ."  N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7 (g).

[135] Tr. 2916, 2899 (Kaufman) (testifying that by virtue of the nature and characteristics of the Adult Homes, choices in acquaintances and the development of social contacts are limited); S-54 (Kaufman Report) 10-11; Tr. 2374 (Geller); S-151 (E. Jones Report) 3; P-535 (T.M. Dep.) 89-90, 106-07, 110-12; P-538 (B.J. Dep.) 50.

[136] Tr. 517-18, 546 (G.L.) (testifying that he considered his roommate in the Adult Home to be like family, and that they would do activities together such as going to the boardwalk, flying kites, and going shopping); Tr. 593 (S.P.);

outside the Adult Home, and to the extent such friendships exist, they often predate their admission to the Adult Home.[137] While some residents have spoken to or met people on the street,[138] other residents testified that they do not know anyone or have any friends outside of the Adult Home.[139] For example, J.M. testified that when he lived in the Adult Home, he talked to people in the neighborhood and visited a woman in her home, but that he had never seen any other residents of the Adult Home speaking to people in the neighborhood.[140] One resident testified that "I met one person once [in the neighborhood] and when they find where you are from, they avoid you."[141] Another resident testified that "[y]ou're in program, you're in home. All your energy is surrounded with the home, so it's hard to meet different people."[142]

---

Tr. 383 (S.K.) (testifying that she has "a couple of friends" in the Adult Home); P-538 (B.J. Dep.) 28-29, 39-41, 53-54.

[137] Tr. 383 (S.K.) (testifying that she does not have any friends who do not live at the Adult Home because she is "not really involved in anything outside of the home except the [mental health] program"); Tr. 593-98, 603 (S.P.) (testifying that he currently has no friends who do not live at the Adult Home); P-538 (B.J. Dep.) 50; P-540 (P.B. Dep.) 45; P-542 (L.G. Dep.) 78 (testifying that she does not visit anyone or receive visits from anyone who is not a family member); P-543 (R.H. Dep.) 96-97 (testifying that he does not know anyone who lives in the neighborhood and is not in touch with anyone who does not live at the Adult Home); P-534 (L.H. Dep.) 51, 57-58; P-535 (T.M. Dep.) 35 (testifying that he does not know anyone by name who lives outside the Adult Home); P-545 (J.M. Dep.) 54 (testifying that he had no friends outside of the Adult Home when he lived there); P-569 (G.H. Dep.) 120, 123, 126-27.

[138] P-568 (M.B. Dep.) 97-102 (testifying that when he lived in the Adult Home, he had "lots" of "street acquaintances"); P-546 (A.M. Dep.) 79-80; P-545 (J.M. Dep.) 64-66, 54 (testifying that when he lived in the Adult Home, he talked to people on the street "[a]ll the time" and that they were kind to him, but that he had no friends outside of the Adult Home); D-391 (D.W. Dep.) 29-32, 156, 172 (testifying that he speaks to people on the street and that a deli employee knows him by name, but that he lost track of his friends with whom he grew up and does not socialize with anybody who lives outside the Adult Home except for his family); P-546 (A.M. Dep.) 80 (testifying that he met a woman walking her dog and played chess with a man in the neighborhood but had no other friends outside the Adult Home).

[139] P-540 (P.B. Dep.) 45 (testifying that she does not have any friends who are not residents of the Adult Home); P-534 (L.H. Dep.) 57-58, 52 (testifying that she does not know people "on the outside" of the Adult Home and has "like two friends").

[140] P-545 (J.M. Dep.) 64-66, 71.

[141] P-538 (B.J. Dep.) 50.

[142] P-535 (T.M. Dep.) 111-12.

Some residents testified that they feel isolated living in the Adult Homes.[143] For example, one resident testified that "the first seven years I lived at [the Adult Home] I basically gained 135 pounds feeding my loneliness."[144] While it is possible for a person to feel isolated in any setting, including supported housing,[145] Defendants' expert Mr. Kaufman conceded that, by and large, residents of supported housing feel that they are far more integrated than residents of group homes.[146]

Some Adult Home residents have visitors, although as noted above, Adult Homes place significant restrictions on receiving visitors, such as visiting hours and requirements that visitors sign in.[147] For example, a former Adult Home resident testified that his stepfather visited him in the Adult Home, but that his stepfather and others visit him more frequently now that he lives in supported housing, because in the Adult Home there was nowhere to have a private conversation, the visiting areas were small, guests could not join in meals, guests had to sign in, guests were not allowed to stay overnight, and visiting hours ended at 8 p.m.[148] One resident testified that her sister and niece visited her "about twice" since she moved to the Adult Home and that both times, they went out to eat; she testified that she did not want to spend time with them in the Adult Home, because her roommate stays in the room most of the time, and she did not want to

---

[143] Id. at 89-90, 110-12; P-544 (C.H. Dep.) 75-76; cf. D.W. Dep. 172 (testifying that he feels like he is part of the community); P-538 (B.J. Dep.) 56, 50-52. Plaintiff's Rule 611 objection to page 172:11-25 of D.W.'s deposition is overruled.

[144] P-569 (G.H. Dep.) 260.

[145] See Tr. 2353-55 (Geller); Tr. 2899-2900 (Kaufman); Tr. 352-53 (Tsemberis) (testifying that he's seen instances of supporting housing tenants becoming "relatively isolated" but that people would "rather suffer the loneliness than move to a group setting" and would prefer to "try and make it into the community").

[146] Tr. 2915-16 (Kaufman).

[147] See supra note 74.

[148] Tr. 477-79, 481-84 (G.L.).

take her visitors "downstairs" or to the "smoking room."[149]  Another resident testified that she

receives no visitors other than family members, and that they cannot spend time with her at the

Adult Home because the staff gets in the way.[150]  Another resident testified that her sister

sometimes picks her up and takes her to the sister's house, but when asked whether her sister

visits with her inside the Adult Home, she answered only that her sister had "been inside" the

Adult Home before.[151]  A resident testified that he never has visitors at the Adult Home,[152] while

another resident testified that no friends visit her but several relatives do, and that she sees them

in the lobby.[153]

Not many Adult Home residents visit family and friends outside the Home,[154] and the

ones who leave to visit people do so to varying extents.[155]  Hinda Burstein, the administrator of

Park Inn, testified that residents of Park Inn "occasionally" leave the facility to visit their

families.[156]  She estimated that approximately ten percent of the residents have made weekend

visits to their families, and some residents have traveled out of state to visit relatives.[157]  An

Adult Home resident testified that he has visited a friend outside the Home only six times in nine

years, estimated that about 25% of the residents visit their relatives outside the Adult Home (but

---

[149] Tr. 383-85 (S.K.).

[150] P-542 (L.G. Dep.) 78, 164-65.

[151] P-534 (L.H. Dep.) 94.

[152] P-541 (S.B. Dep.) 83.

[153] P-540 (P.B. Dep.) 108-09.

[154] Tr. 2637, 2662-63 (Lockhart) (conceding that "few" Adult Home residents visit their families); Tr. 147 (E. Jones) (testifying that she is aware of "some" residents who visit family).

[155] Tr. 527-28, 530 (G.L.); P-540 (P.B. Dep.) 133-34; P-541 (S.B. Dep.) 56-57; P-568 (M.B. Dep.) 94-95; P-542 (L.G. Dep.) 14-15, 25-26, 135-36; P-569 (G.H. Dep.) 115-20; P-534 (L.H.) 54-55; P-538 (B.J.) 50-52; P-535 (T.M. Dep.) 79; P-546 (A.M. Dep.) 79-80; D-391 (D.W. Dep.) 25-28, 153-54, 181.

[156] Tr. 2069.

[157] Id.

that the most frequently anyone visited a relative outside the home is twice per month), and stated that he knew of one resident who stayed overnight at his mother's house in the neighborhood.[158]  Another resident testified that he does not have any family and friends outside the Adult Home with whom he keeps in touch.[159]

As numerous witnesses testified, the Adult Home setting limits opportunities for residents to pursue employment opportunities.[160]  For example, Dr. Jeffrey Geller, one of Defendants' experts, agreed that living in a place where the phone is answered "Brooklyn Adult Care Center" "diminishes your work options and social contacts."[161]  Very few Adult Home residents are employed or have volunteer positions outside of the Adult Home,[162] and such jobs are often short-lived.  For example, one resident testified that a social worker helped him obtain a previous job as a messenger, but he was fired after seven weeks.[163]  Another resident testified that he kept his previous job at a newsstand once he was admitted to the Adult Home, but the job now occupies only three to four hours per week and no longer involves interacting with customers.[164]

---

[158] P-569 (G.H. Dep.) 117-27.

[159] P-542 (R.H. Dep.) 96.

[160] P-538 (B.J. Dep.) 50; P-535 (T.M. Dep.) 89-90, 106-07, 110-12.

[161] Tr. 2374.

[162] D-364 (NYC Adult Home Case Management Quarterly Program Data Reporting Form) OMH 43715, 43743, 43749 (indicating that on July 15, 2008, 9 residents from Garden of Eden, 7 residents of Riverdale Manor, and 4 residents from Anna Erika were working); Tr. 2064 (Burstein); Tr. 2637 (Lockhart); P-541 (S.B. Dep.) 40-42; P-546 (A.M. Dep.) 144; P-569 (G.H. Dep.) 102-06, 107-10; Tr. 567-70, 602-03, 607-08, 611-12 (S.P.) (testifying that he previously had a "training job" as a porter at the Bronx Psychiatric Center prior to being terminated, that he formerly participated in a job club in Manhattan where he received training, and that he knows only two other residents who have jobs outside of the Adult Home); P-568 (M.B. Dep.) 28-35, 38-40; P-538 (B.J. Dep.) 25-29 (testifying that she volunteers weekly by going to nursing homes and hospitals to share gospel tracts); P-544 (C.H. Dep.) 15-17, 78 (testifying that he shovels snow at his former church and had held a job as a parking attendant).

[163] P-541 (S.B. Dep.) 40-42.

[164] P-569 (G.H. Dep.) 102-03, 106.

Another resident "helped out" at a coffee cart as a volunteer for a year.[165]  A very small number

of residents participate in vocational training; for example, eight to twelve out of the 181

residents at Park Inn participate in vocational training.[166]  There is evidence that one Adult Home

resident obtained a GED since she moved to the Adult Home in 1985.[167]

vi.      **Mental Health Programs and Case Management
Contribute Little to Residents' Integration into the
Community**

Many Adult Home residents with mental illness receive mental health services from a

variety of sources, including clinics, continuing day treatment programs ("CDTs"), and private

practitioners.[168]  Adult homes are also required to provide basic case management services,[169]

and OMH's Case Management Initiative funds independent case managers in eleven of the Adult

Homes.[170]  While some residents leave the facilities to attend CDT or other mental health

programs, attending these programs contributes to residents' isolation and separation from the

mainstream of community life.[171]

---

[165] P-546 (A.M. Dep.) 144.

[166] Tr. 417-17 (S.K.); Tr. 2063-64 (Burstein); id. at 2496-99, 2062-63 (testifying that some mental health programs offer some work opportunities and that case managers help residents use the computer to look for jobs).  Mr. Waizer testified that staff from FEGS "could refer" Riverdale Manor residents to vocational training programs if a resident expresses such an interest, but his testimony does not establish that any resident of Riverdale Manor was referred to or received such training.  (Tr. 2625; see also id. at 2496 (testifying that "[w]e see ourselves as a prevocational agency").)

[167] P-538 (B.J. Dep.) 19-20.

[168] See Tr. 1261-64 (Reilly).

[169] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7 (g).  Impacted adult homes are required to enter into written agreements with a provider of mental health services for "assistance with the assessment of mental health needs, the supervision of general mental health care and the provision of related case management services for those residents enrolled in mental health programs."  N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7 (b).

[170] Tr. 1834–35 (Dorfman) (testifying that OMH case management is in eleven Adult Homes and that Defendants have no plan to expand it).

[171] See supra note 102.

The court heard testimony from service providers from nonprofit agencies that run mental health programs serving Adult Home residents. For example, Susan Bear testified about OMH-licensed CDTs run by the Jewish Board of Family and Children's Services ("Jewish Board"), which have groups that focus on symptom management, spirituality, meditation, relationship building, medication management, cooking, and computers.[172] Licensed CDT programs run by FEGS, serving Adult Home residents both on-site and off-site, are intended to help clients use community resources, learn self-care and self-medication, and prepare for employment.[173]

While CDT programs have laudable goals for participants, the evidence demonstrates that they have little focus on skill development.[174] A December 2006 review by the New York State Commission on the Quality of Care for and Advocacy for Persons with Disabilities ("CQC")[175] of CDT programs noted a "disconnect" between participants' life goals of gaining independent living and job skills and the goals that the programs had set for them.[176] The CQC report found that some day treatment programs are characterized by group television and movie watching and art "programs," which may only involve the provision of crayons, markers, and coloring books.[177] Because Defendants concede that CDT programs are "outdated," they are trying to

---

[172] Tr. 2206-13, 2212.

[173] Tr. 2496-97 (Waizer). Mr. Waizer also described FEGS's intensive psychiatric rehabilitation treatment ("IPRT") programs, but did not testify as to whether Adult Home residents participate in those programs. (See id. at 2501-02.)

[174] Tr. 897-98 (Duckworth); see also, e.g., P-536 (D.N. Dep.) 51 (testifying that her program did not offer training in skills to make her more independent).

[175] The CQC is an independent State agency. (See N.Y. Mental Hyg. Law § 45.07.)

[176] P-93 (NYS CQC, Continuing Day Treatment Review) 13.

[177] Id. at 1, 4-5, 19.

make CDTs and other mental health services "more evidence-based and recovery-oriented,"[178] while also directing funds away from these types of programs.[179]

One Adult Home resident testified that he had been attending a CDT program for fourteen years where he and seventeen or eighteen other residents "go to groups all day" in which providers "try to get us ready for the outside."[180]  He testified that the groups offered "skills training" and that the groups "sometimes" talked about jobs, but he could not remember anything that was said about jobs, and the group leaders never talked about applying for jobs, writing resumes, or looking in classified ads.[181]  Another resident testified that the mental health program he attends, which "gives you something to do during the day," provides arts and crafts, and sometimes movies and Bingo, but that the program does not offer any classes or self-help groups, does not talk about jobs, and has taken participants on only two trips, both to Chinese restaurants.[182]

Case management is also designed to help residents with independent living skills. Defendants' witnesses testified that case managers work with residents to help the residents learn about shopping, accessing community resources, and taking public transportation.[183]  For example, Frances Lockhart testified that case managers from Federation of Organizations

---

[178] Tr. 1489-90 (Madan); Tr. 1273-74 (Reilly).

[179] Tr. 3317-18 (Schaefer-Hayes); Tr. 720, 749-50 (Rosenberg).  Defendants are now promoting "Personal Recovery-Oriented Services ("PROS")" in lieu of CDTs (Tr. 1243-44, 1262-65 (Reilly); Tr. 3392 (Schaefer-Hayes); Tr. 3158-60 (Myers)), but there is no evidence that PROS programs are currently being offered in Adult Homes or that Adult Home residents are participating in such programs.  (See 1242, 1262-65 (Reilly) (testifying that when he left OMH in 2007, "we were looking at even the idea of trying to come up with using a PROS model or PROS site at maybe one of the adult homes to try to look at that as maybe an option on trying to move and change some of the system.").)

[180] See P-544 (C.H. Dep.) 23-26.

[181] Id. at 26, 32-33.

[182] P-541 (S.B. Dep.) 26-30.

[183] Tr. 1746-50 (Dorfman); Tr. 2060-61 (Burstein); Tr. 2626-27 (Lockhart).

("Federation") teach Adult Home residents how to shop for clothes.[184]  An Adult Home resident

testified, however, that while Federation takes residents shopping for clothes twice per year,

"they don't give you the money in your hand and let you buy your own clothes."[185]  Ms. Burstein

testified that at Park Inn, case managers informally assist two or three residents at a time with

using the computer, and that that the "more sophisticated" residents use the internet to look for

jobs, buy clothing, or enter "chat rooms."[186]  As Mr. Jones testified, the OMH Case Management

Initiative primarily "arrange[s] services within the existing setting," it does not "deal frontally

with the issue of where people live."[187]

　　　To the extent that mental health programs or case management aim to teach independent

living skills, such as cooking, budgeting, and grocery shopping, residents have little or no

opportunity to practice these skills in their present living situation.[188]  Experts for both sides

testified that the most effective way for people with mental illness to recover and retain skills is

to practice them in the environment in which they actually live.[189]  For example, residents are

---

[184] Tr. 2626-27 (Lockhart).

[185] D-391 (D.W. Dep.) 135.

[186] Tr. 2062-63.  Ms. Burstein also testified that approximately ten to twelve residents of Park Inn attend psychosocial clubhouses, the purpose of which is to give residents an opportunity to "perform tasks they might not be able to perform in the facility," such as shopping, cooking, and preparing food, although she did not testify as to whether the Park Inn residents actually did those activities at the clubhouse.  (Tr. 2052.)

[187] Tr. 1172.

[188] See, e.g., P-569 (G.H. Dep.) 198 ("Q.  Do you feel you've gained confidence in your abilities while you've lived at [the Adult Home]?  A.  It's tough to say because I've never been able to utilize them.  I don't know.").)

[189] S-152 (Duckworth Report) 6-7 & n.5; Tr. 67-69, 170 (E. Jones) ("These are more artificial activities that have been set up with the idea that you can teach people skills in the adult home that they will then take with them to a community placement if that ever becomes available and actually, that's not the practice in the mental health field. We know that people with serious mental illness have difficulty in generalizing information and that the most successful way to teach people skills and to help them recover skills and retain skills is to have them practice them on an ongoing basis in the place where they live or work."); Tr. 2360-61 (Geller) (testifying that "the system needs to have that person exist in an environment where they can use the skills"); Tr. 1140 (D. Jones) (testifying that teaching independent living skills in congregate settings is a "waste of good public time and money" because "[p]eople don't transfer skills from one setting another").  Dr. Tsemberis, a fact witness, provided similar testimony

unlikely to learn to cook in the Adult Home environment simply because a training kitchen is installed.[190]  Therefore, while it is possible for Adult Home residents to benefit to some extent from these programs,[191] the weight of the evidence shows that they are unlikely to gain a significant benefit from this type of training or develop any lasting skills.[192]  Inspections of the Adult Homes have cited violations related to residents' rights and ability to participate in their surrounding community and to learn independent living skills.[193]

   vii.   **Adult Homes Discourage Residents from Engaging in Activities of Daily Living and Foster "Learned Helplessness"**

   The Adult Homes foster what witnesses for both sides have referred to as "learned helplessness": when individuals are "treated as if they're completely helpless, the helplessness becomes a learned phenomenon."[194]  This is consistent with Defendant OMH Commissioner Hogan's testimony to the Legislature that in institutions in general, "the skills of community living are eroded by the routines of institutional life."[195]  The Adult Homes discourage – and

---

on the basis of his own observations.  (See Tr. 350 (Tsemberis) (testifying that the "research is if you need to learn a skill you have to be in the setting, that's where it's best learned.  If you want to learn how to live in the community, you have to be in the community to do it.").)

[190] S-152 (Duckworth Report) 7-8; Tr. 870 (Duckworth).

[191] See id. at 895; P-544 (C.H. Dep.) 25-26.

[192] S-152 (Duckworth Report) 7-8; Tr. 870 (Duckworth); see also Tr. 412-13 (S.K.) (describing day treatment program in which residents learned to make cakes by being told what ingredients to put in a pan and having staff "do the rest"); P-569 (G.H. Dep.) 198.

[193] Joint Stip. ¶ 22; see D-29 (DOH Inspection Report for Sanford Home (Sept. 8, 2003)) DOH 54012-13 (citing Adult Home that did not have planned community activities on its activity schedule).

[194] Tr. 257-59 (Tsemberis) (describing a "certain passivity and helplessness and demoralization that sets in"); Tr. 2358 (Geller) (describing "learned helplessness" and testifying that Adult Homes "absolutely" foster learned helplessness); S-152 (Duckworth Report) 9, 13, 15; see also Tr. 3425, 3486 (D. Jones) (describing dependency-based model of care in Adult Homes and testifying that some Adult Home residents have "learned the dependency that has been part of that setting").

[195] D-182 (OMH 2009-2010 Mental Health Update & Exec. Budget Testimony) OMH 43461.

some outright prohibit – residents from cooking,[196] cleaning,[197] doing their own laundry,[198] and administering their own medication.[199]  The Adult Homes also generally manage residents' personal needs allowances, distributing cash to residents on specified dates and times.[200]  The result is that Adult Home residents lose skills that they had prior to living in the Adult Home – such as medication management – because they are forbidden from practicing those skills in the Adult Home.[201]  As one former Adult Home resident testified, "[W]hen you go to an adult home, number one, you're treated like a little kid.  And if you stay there long enough, you're going to act like a little kid and you ain't going to want to leave because you being taken care of . . . it's

---

[196] See, e.g., P-552 (Kerr Dep.) 190:2-5 (explaining that DOH prohibits Adult Home residents from cooking their own meals); S-159 (Garden of Eden Facility Rules & Policies) (prohibiting residents from cooking and having refrigerators in their rooms and prohibiting residents from entering the facility's kitchen "at any time"); Tr. 481 (G.L.) (testifying that there was no way to cook for oneself or prepare a meal for a guest); Tr. 559-60 (S.P.) (testifying that he used to cook his own meals before moving to the Adult Home but that the Adult Home does not allow residents to cook any of their own meals); (S.B. Dep.) 81 (testifying that he wants to cook but cannot, because he's not "in that type of setting" and "there's no cooking facility"); P-545 (J.M. Dep.) 102:4-103:5; cf. Tr. 2060-61 (Burstein) (testifying that Park Inn has a "breakfast group" in which participants can prepare their own breakfast). Defendants' Rule 602 objection to pages 102:24-103:5 of J.M.'s deposition is overruled.

[197] See, e.g., P-541 (S.B. Dep.) 82 (testifying that he wants to mop for himself but does not do his own cleaning because there is a housekeeper); Tr. 381-82 (S.K.) (testifying that she is "of course" capable of cleaning her room but does not do anything besides make the bed, because "they don't allow you to do anything" and "that's the way it's done); see also S-54 (Kaufman Report) 8-9; Tr. 862-63 (Duckworth).

[198] See, e.g., S-160 (Lakeside Manor Rules) (prohibiting residents from entering the laundry room); Tr. 381-82 (S.K.) (testifying that she is capable of doing her own laundry but that she does not do it in the Adult Home because residents are not allowed to); P-534 (L.H. Dep.) 59; P-545 (J.M. Dep.) 101:02:3; Tr. 496-98, 538-39 (G.L.) (testifying that his former Adult Home, unlike other Adult Homes, allowed residents to do their own laundry and that he did his own laundry, but his roommate did not do his own laundry because the aide "kind of made him feel guilty that he was doing something that she could do for him"); P-546 (A.M. Dep.) 103-04; P-541 (S.B. Dep.) 82; see also S-54 (Kaufman Report) 8-9.

[199] See supra note 108.

[200] S-151 (E. Jones Report) 6.  G.L. testified that when he lived in the Adult Home, he was not allowed to receive his personal needs allowance on a monthly basis.  (Tr. 496-97 (G.L.).)  Some residents receive their personal needs allowance on a monthly basis.  (See, e.g., Tr. 167 (E. Jones); Tr. 379 (S.K.) (testifying that residents she receives her allowance weekly but that some residents receive their allowance daily or monthly); Tr. 572 (S.P.) (testifying that he and about fifty other residents receive their allowances at the same time at the beginning of every month).)  Park Inn allows residents to choose whether they will receive their personal needs allowance on a daily, weekly, or monthly basis.  (Tr. 2066 (Burstein).)

[201] Tr. 862-63 (Duckworth) (describing the "atrophying" of medication management skills during residents' stay in the Adult Homes).

like an institution to me."[202]  Similarly, another former resident testified, "the adult home fosters

complete dependency upon them to do everything for you, discourages independence . . . ."[203]

Plaintiff's expert Dennis Jones – who had been the Commissioner of Department of Mental

Health in two states and a transitional receiver for the District of Columbia's public mental

health system – testified that Adult Homes are a "residency based model which means the goal

there is not really to promote independence, it's to promote dependence and sustain

dependency."[204]

     That the Adult Homes are a setting that fosters learned helplessness, however, does not

mean that the individuals who live in the Adult Homes are helpless, or that they cannot and do

not manage their activities of daily living.  To the contrary, the evidence set forth below

demonstrates that Adult Home residents are not materially different from individuals with mental

illness who live and receive services in the community.[205]  As Plaintiff's expert Elizabeth Jones

observed, the high degree of independence exhibited by many Adult Home residents is

particularly striking given the tendency of individuals to appear more dependent and disabled

when they are observed in institutional settings such as Adult Homes.[206]  In addition, some of the

current and former Adult Home residents who testified in this case engage in advocacy on behalf

---

[202] P-546 (A.M. Dep.) 153-55; see also id. at 211:13-19, 212:11-213:5.  Defendants' objection to pages 153:17-154:14 as non-responsive is overruled.

[203] Tr. 2734-35 (I.K.).

[204] Tr. 3425; see also S-150 (D. Jones Report) Ex. 1 (resume).

[205] See infra Part III.B.2.h.

[206] Tr. 122.

of Adult Home residents – they lobby State government, participate in rallies, and attend meetings of advocacy organizations for individuals with mental illness.[207]

> ### viii. Defendants' Experts Did Not Rebut the Overwhelming Evidence That Adult Homes Are Institutions, Segregated Settings That Impede Community Integration

Defendants presented two experts, Alan Kaufman and Dr. Jeffery Geller, to rebut the evidence that Adult Homes are segregated settings that impede community integration. Defendants' experts highlighted, for example, that the Adult Homes are in urban settings and that because residents are not locked in the facilities, they have opportunities to come and go.[208] But even if the Adult Homes are not as restrictive as psychiatric hospitals in some respects, they nonetheless are segregated, institutional settings that impede integration in the community and foster learned helplessness. As described below in Part III.A.2.c, the State's supported housing program provides far more opportunities for community integration than do Adult Homes. As explained by Michael Newman, the Director of OMH's Bureau of Housing Development and Support, 120 people living in a congregate setting in which everyone is seriously mentally ill is a "segregated setting," while scattered-site supported housing provides "maximum opportunities" for integration.[209]

---

[207] Tr. 530-33 (G.L.); P-542 (L.G. Dep.), 158-59; P-543 (R.H. Dep.) 16-18, 27-33 (testifying that he attends advocacy group meetings, is on the Residents' Council, and has traveled to Albany); P-569 (G.H. Dep.) 11-16, 22-29; P-545 (J.M. Dep.) 21:21-24:5; P-535 (T.M. Dep.) 70-71 (testifying that he went to Albany once); D-391 (D.W. Dep.) 134 (testifying that he went to Albany five times to lobby for an "[i]ncrease of spending allowance, clothing allowance, better medical and mental conditions, air conditioners in the room and housing."); Tr. 2724-27 (I.K.).

[208] See, e.g., S-54 (Kaufman Report) 9.

[209] Tr. 2162, 2169-70.

Defendants' experts opined that the setting in which a person with disabilities lives is irrelevant to the question of integration because it is possible for a person to feel isolated in any kind of setting.[210] The court accords these opinions little weight. Mr. Kaufman conceded that, by and large, residents of supported housing feel that they are far more integrated into the community than residents of group homes.[211] Dr. Geller explicitly rejected the applicable legal standard for integration. He testified that he believes the Supreme Court's finding in Olmstead that "confinement in an institution severely diminishes the everyday life activities of individuals" was "wrong," and that the setting in which a person lives and receives services does not determine whether he or she is "integrated."[212]

With respect to the institutional and segregated nature of Adult Homes, Defendants' experts and other witnesses were largely in agreement with DAI's experts, current and former Adult Home residents, and other witnesses.[213] Defendants' experts acknowledged the

_____

[210] Tr. 2899-2900 (Kaufman); Tr. 2292 (Geller).

[211] Tr. 2915-16.

[212] Tr. 2373 ("Q. In your opinion, Dr. Geller, the Supreme Court was wrong when it stated that 'confinement in an institution severely diminishes the everyday life activities of individuals including family relations, social contact, work options, economic independence, educational advancement and cultural enrichments,' correct? A. Based on my own experience and evaluating scores and scores of state hospitals across the United States, yes, they were wrong."); S-52 (Geller Report) 2 (opining that, because integration is "simply not a function" of the setting where a person lives, "[t]he questions faced in this case … are not whether or not adult homes are institutions with all the connotations thereto; or whether or not adult homes are 'segregated settings,' whatever that might mean; or whether or not those who reside in adult homes could reside in apartments with varying degrees of support; or whether or not supported housing per se has a more positive effect on rehabilitation and recovery; or whether or not New York State had negative experiences with impacted adult homes; or whether or not New York State, pursuant to the Americans with Disabilities Act, the Olmstead decision and all other considerations has created a panoply of residential types throughout New York State."). Put another way, Dr. Geller's view is that "there should be no debate as to whether Mr. A or Ms. B can be serviced 'in the community.' The answer to that question is clearly, 'yes,' he or she can. That's a separate question from the wisdom of doing so . . . ." (Id.)

[213] See, e.g., Tr. 2162 (Newman) (agreeing that "a housing situation in which 120 people with serious mental illness live in that housing situation in a congregate setting and there are no residents who do not have serious mental illness" is a "segregated setting").

47

institutional characteristics of the Adult Homes.[214]  Mr. Kaufman noted that there is generally no

expectation that individuals in Adult Homes will move to another setting.[215]  Defendants'

experts also acknowledged that characteristics of Adult Homes themselves impede the

development of social contacts and work opportunities.[216]  Given the extensive testimony from

Defendants' experts that Adult Homes have "institutional qualities," "share[] characteristics with

inpatient psychiatric facilities," and impede residents' development of social contacts and

employment opportunities, the court rejects the fallacy that Adult Homes are not

"institutions."[217]  Indeed, while Mr. Kaufman tried to draw a semantic distinction between a

---

[214] Tr. 2356 (Geller) ("Q. Dr. Geller, did you find that adult homes share some characteristics with institutions? A. Absolutely."); id. at 2374 ("Q.  So you would agree that living in a place where the phone is answered 'Brooklyn Adult Care Center' diminishes your work options and social contacts?  A. Yes.  Q. And you would agree then that having visiting hours diminishes opportunities to cultivate social or family relationships, right?  A. Right."); id. at 2425 ("Q. Do you agree that there are many people with mental illness stuck in adult homes? A. Absolutely."); id. at 2427 ("Q. Do you agree that there is an overuse of adult homes? A. Absolutely."); id. at 2370-71 (agreeing that Adult Homes have an institutional feel and institution-like characteristics, and are in some respects segregated settings); id. at 2356-57 (providing examples of Adult Homes "being institution-like": "lining up to get your medication, having medication delivered while you were eating a meal, being required to sit in the same seat repeatedly, having to negotiate, potentially extensively, if you wanted to change a roommate, not having a choice when you first moved in who your roommate might be, having congregate toilet facilities."); see also S-54 (Kaufman Report) 8-9 (noting that the size, physical layout, furnishings and decorations of large adult homes give them a similar appearance to institutional settings; adult homes also share certain routines with mental health institutions, including inflexible schedules for meals and other daily activities, assigned dining hall seating, routinized program activities, public address announcements, and constant presence of medical and mental health staff); Tr. 2895-96 (Kaufman) (testifying that Adult Homes shared characteristics of "large psychiatric hospitals and institutions," including the regimented food service schedule, dispensing of  medication, provision of housekeeping and laundry services without allowing residents to do these activities themselves, and not allowing "full freedom" as to roommates).

[215] Tr. 2910-11.

[216] Id. at 2899 (Kaufman); S-54 (Kaufman Report) 10 ("Understandably, a large Adult Home setting coupled with a high proportion of residents with mental illness can artificially limit the interactions of residents and constrict the diversity of friends and acquaintances."); Tr. 2374 (Geller).

[217] Tr. 2897 (Kaufman) ("So on balance, while I thought that they shared characteristics with inpatient psychiatric facilities, I did not think that they were actually mental health institutional settings per se."); see Tr. 2357 (Geller).

setting with institutional characteristics and "institutional settings per se," he testified on direct examination that Adult Homes "were large institutions."[218]

Defendants themselves have acknowledged that Adult Homes are institutional.[219]  In addition, their witness, Susan Bear, the Assistant Executive Director of a large New York City mental health provider, described the Adult Homes located in Coney Island as "community-based psychiatric ghettos in which smaller groups of individuals were located in a community, but never helped to become part of it."[220]

In sum, the court finds that the overwhelming weight of the evidence demonstrates that Adult Homes are institutions that impede residents' interaction with individuals in the community who do not have disabilities.

### c.    Supported Housing Is a More Integrated Setting Than an Adult Home

As relief in this case, DAI seeks an order requiring Defendants to enable DAI's constituents to receive services in supported housing instead of Adult Homes.  Supported housing, a type of OMH-funded "Housing for Persons with Mental Illness,"[221] is a setting in

---

[218] Tr. 2899 (testifying that in talking to Adult Home residents, "it was clear to me that facilities of this nature had certain artificial limitations or artificially limited who you could interact with in many cases.  They were large institutions.") (emphasis added).

[219] P-284 (OMH Guiding Principles).

[220] P-673 (Letter from Susan Bear to OMH official Joseph Reilly (Jan. 9, 2004)) JBFCS 354; Tr. 2236-2238 (Bear) (testifying about P-673).

[221] Other types of OMH Housing for Persons with Mental Illness (also referred to as "OMH community housing") are: (1) congregate treatment, commonly referred to as group homes or supervised community residences; (2) apartment treatment; and (3) community residence-single room occupancy ("CR-SRO").  (Tr. 1436-40.)  According to Christine Madan, OMH's Director of Housing and Adult Services, congregate treatment is the "most highly structured and supervised program[]" that OMH licenses, in which 10-40 residents live in a single-site facility that provide meals, on-site services, and 24/7 staff coverage.  (Id. at 1436-37.)  Apartment treatment programs provide housing in shared apartments that usually house three to five people and are often scattered-site; residents staff services as needed.  (Id. at 1437-39.)  CR-SRO programs provide extended-stay housing in a single-site facility where 40-60 residents have their own rooms designed as studio apartments or as suites with single bedrooms around shared living spaces, with 24/7 staff on site.  (Id. at 1439-40.)

49

which individuals live in their own apartment and receive services to support their success as tenants and their integration into the community. OMH develops supported housing by issuing Requests for Proposals ("RFPs") and awarding contracts to community providers who will deliver the services.[222] The providers select existing apartments in the community for their programs.[223] Most supported housing in New York is "scattered site" – that is, it is in the form of rental apartments scattered among various buildings throughout the community.[224] As used throughout, "supported housing" refers to the scattered-site supported housing that DAI seeks for its constituents.

The State is currently focusing on supported housing more than other forms of OMH housing because it is cost-effective, a best practice, and what consumers want.[225] Ms. Jones explained that the modern practice in the mental health field is to start with housing and "add and subtract the supports as that person needs them."[226] Likewise, Ms. Rosenberg testified that supported housing reflects the most current thinking and practice in the field.[227] Consistent with that view, OMH began to implement a supported housing program in 1990.[228] Mr. Newman, the Director of OMH's Bureau of Housing Development and Support, testified that supported housing is the current focus of OMH's housing development because it is a "successful," "cost-

---

[222] Tr. 1927-29 (Newman) (describing RFP process for OMH-funded housing).

[223] Tr. 3483 (D. Jones) (testifying that supported housing providers "are using already existing housing," so they do not have to buy or build new buildings).

[224] Tr. 236 (Tsemberis); see also Joint Stip. ¶ 11 ("Scattered site supported housing consists of apartments scattered among various buildings.").

[225] Tr. 2159 (Newman).

[226] Tr. 139; see also S-150 (D. Jones Report) 25.

[227] Tr. 650-51.

[228] S-11 (OMH, Supported Housing Implementation Guidelines (Apr. 1990) ("1990 Supported Housing Implementation Guidelines")); see also S-150 (D. Jones Report) 26.

effective" program that gives residents "the same privacy rights as any other tenant in a landlord-tenant relationship."[229]  As set forth below, the evidence demonstrates that supported housing is a far more integrated setting than an Adult Home.

In supported housing, people with mental illness live much like their peers who do not have disabilities.  Scattered site supported housing is a "normalized" residential setting.[230]  In other words, it is a setting much like where individuals without disabilities live.[231]  It is a person's home.[232]  Residents of supported housing sometimes live alone and sometimes share their apartment with one or more roommates.[233]  They choose their own roommates.[234]  Sometimes they lease the apartment directly from the landlord, and sometimes they lease the apartment from the provider.[235]

One of the key principles of the State's supported housing program is to "separat[e] housing from support services by assisting the resident to remain in the housing of his choice while the type and intensity of services vary to meet the changing needs of the individual."[236]  Supported housing providers and other community mental health providers offer support services that vary depending upon the needs of the resident.[237]  Supported housing providers offer basic

---

[229] Tr. 2159-60; see also Tr. 3172-73 (Myers) (testifying that OMH's development efforts are centered on supported housing and SROs, and noting that supported housing is "less expensive" than other housing models).

[230] Tr. 654-55 (Rosenberg).

[231] Tr. 654-55 (Rosenberg).

[232] S-150 (D. Jones Report) 25; Tr. 252 (Tsemberis) ("It is their home. . . . The person makes a home[,] it's not like they're moving into a housing program that's a room in some place that they are sort of guests in that place.  It's their lease, it's their apartment . . . ."); Tr. 851 (Duckworth).

[233] Tr. 290 (Tsemberis).

[234] Id. at 290.

[235] Id. at 316-17.

[236] S-11 (1990 Supported Housing Implementation Guidelines) OMH 37269.

[237] S-33 (2007 RFP) OMH 42726.

case management services.[238]  The number of visits from case managers can vary widely

depending on the needs of the resident, from once a month to as often as twice per day.[239]

In addition to the services of the supported housing provider, residents can receive

additional support services, such as Assertive Community Treatment ("ACT") or additional case

management services, sometimes called "intensive" or "blended" case management.[240]  Sam

Tsemberis, the Executive Director of the Pathways to Housing ("Pathways") supported housing

program, testified that it is "common" for supported housing residents to have case management

services in addition to those supplied by the provider.[241]  As OMH's Director of Case

Management Services Mr. Dorfman testified, "[a]ll residents in [OMH] mental health housing, if

appropriate, are eligible and can access all the mental health community support services."[242]

High-level OMH officials similarly testified that ACT and case management services, including

blended and intensive case management, are currently available to supported housing

residents.[243]

According to OMH, ACT "delivers comprehensive and flexible treatment, support, and

rehabilitation services to individuals in their natural living settings."[244]  An ACT team is multi-

---

[238] Tr. 237 (Tsemberis); Tr. 1252-53 (Reilly) (testifying that supported housing includes "some amount of case management").

[239] 1443-44 (Madan); Tr. 2172-73 (Newman); Tr. 2642-43, 2672-73 (Lockhart) (testifying that she is aware of individuals who were seen by the supported housing case manager twice per day, twice per week, and every other day).

[240] Tr. 1830, 1832 (Dorfman); Tr. 1414-16 (Reilly); Tr. 3170-71 (Myers).

[241] Tr. 237.

[242] Tr. 1832.

[243] Tr. 1414-15 (Reilly) (supported housing residents can receive ACT or case management services); Tr. 3170-71 (Myers) (testifying that some people in supported housing receive ACT or have an intensive case manager).

[244] S-97 (OMH website description of ACT); see also Tr. 855-57 (Duckworth) (testifying about S-97 and that OMH's description of ACT in New York is consistent with his experience).

disciplinary – it typically includes members from the fields of psychiatry, nursing, psychology, and social work, with increasing involvement of substance abuse and vocational rehabilitation specialists.[245] ACT teams provide services tailored to meet a client's specific needs.[246] According to OMH's ACT Program Guidelines, to be eligible for ACT services in New York State, individuals must have "a severe and persistent mental illness . . . that seriously impairs their functioning in the community," with a "priority" given to individuals with "continuous high service needs that are not being met in more traditional service settings."[247]

ACT teams can assist recipients with a wide range of service needs, including teaching medication management.[248] They can also assist with daily activities such as personal care and safety, grocery shopping and cooking, purchasing and caring for clothing, household chores, using transportation and other community resources, and managing finances.[249] ACT teams see

[245] S-97 (OMH website description of ACT).

[246] Id.

[247] P-372 (OMH ACT Program Guidelines 2007) 4.

Defendants have provided a document from the Center for Urban Community Services ("CUCS"), a third party contracted to run New York City's Single Point of Access (SPOA) for supported housing. (D-279 (CUCS, Quick Reference Guide to ACT & Case Management Servs ("CUCS Guide").) That document indicates that to receive ACT services in New York City, a person must either be under a court's Assisted Outpatient order, demonstrate a high use of inpatient hospitalizations or emergency room services (three or more times over the last year), or have an inpatient hospitalization during the last year that lasted ninety days or longer. (See id.) Ms. Madan testified that these eligibility requirements do not reflect OMH's statewide ACT policy guidelines, but instead represented "more specific" guidelines for New York City agreed upon by OMH and the "local government unit," i.e., New York City. (Tr. 1477-78, 1537 (Madan).) As DAI's expert Mr. Jones testified, some Adult Home residents who would need ACT to live in supported housing would meet the CUCS guidelines. (Tr. 1125.) Mr. Jones also testified that OMH could apply the statewide guidelines in New York City, rather than the local guidelines, in order to ensure that Adult Home residents transitioning into supported housing receive the services necessary to succeed. (Id. at 1125-26.)

[248] Tr. 938 (Duckworth) (testifying that "[a]ll ACT Teams expect to teach people how to manage their medicines as part of the process of care."); Tr. 1535-38 (Madan); P-372 (OMH ACT Program Guidelines 2007) 3-4 (listing independent living skills taught by ACT team).

[249] P-372 (OMH ACT Program Guidelines 2007) 3-4; Tr. 279, 243-46 (Tsemberis). The court does not credit the testimony of OMH employees who testified, contrary to OMH's ACT Program Guidelines and service providers themselves, that ACT teams do not provide routine support in helping residents with personal care, taking their medications, and housekeeping. (See Tr. 3194-96 (Myers); 1478-79 (Madan).)

clients on average about twice per week but can see individuals as often as twice per day if necessary.[250] An ACT team assigned to a person with mental illness recently discharged from the hospital would typically see that person once or twice a day.[251] Individuals in supported housing who receive ACT services are required to be visited at least six times per month by members of the ACT team.[252]

For example, the Pathways program uses ACT with roughly 80% of its incoming clients; the remaining 20% receive less intensive case management.[253] Pathways routinely and successfully helps people overcome difficulties with activities of daily living such as laundry, cooking, or using public transportation, and does not regard such challenges as "difficult issues" to deal with.[254]

Residents of supported housing have the same freedoms that other apartment tenants do.[255] They can control their own schedules and daily lives.[256] They are free to come and go when they like. They can live with a significant other, marry and live with a spouse, live with their children, invite guests for meals, decorate their own apartment, and have overnight

_____

[250] Tr. 228-29 (Tsemberis) (describing ACT services in Pathways to Housing).

[251] Id.

[252] P-372 (OMH ACT Program Guidelines 2007) 5.

[253] Tr. 230 (Tsemberis).

[254] Id. at 243-46.

[255] Tr. 501-02 (G.L.); Tr. 2751 (I.K.); P-546 (A.M. Dep.) 204-05 (testifying that he prefers to live in supported housing than in the Adult Home because "I get more independent, I take my own medication, I do my own blood tests, I set up my own schedule, I eat when I want to, I cook – I get an opportunity to cook. Like Thanksgiving, I made a Thanksgiving dinner, me and my girlfriend . . . ." and that at the adult home, "you got to eat at certain times" or "[y]ou don't eat," unless the Adult Home has leftovers or the resident calls in advance to let them know he or she will be missing the meal).

[256] Tr. 475-77, 483-88 (G.L.) (describing his life in supported housing, including that he sets his own schedule for meals, receiving visitors, and other activities); Tr. 290-91 (Tsemberis).

guests.[257]  They have the same privacy rights and freedoms as any other tenant in a landlord-tenant relationship,[258] including the keys to their own apartment.[259]  I.K., who recently moved to supported housing after spending sixteen years in an Adult Home, testified that she loves living in her apartment.[260]  She explained:

> I can limit what I eat or I can expand my choices.  I can have as much salad as I like.  I can have as little grease as I like.  I can eat foods that were not permitted in the home . . . . I do my own shopping.  I do my own food selection.  It's free.  It's freedom for me.  It's freedom.  It's being able to actually live like a human being again.[261]

When asked whether he had a preference between the Adult Home, where he lived for five years, and supported housing, where he has been living for the last two years, G.L. explained:

> A. Definitely where I am now.
> Q. Why is that?
> A. I have much more freedom.
> Q. To do what?
> A. Anything, everything.
> Q. Would you ever –
> A. I can have people stay overnight.  I can entertain.  I couldn't do that in the adult home.
> Q. Anything else?
> A. Visitors can come anytime.
> Q. And that means something to you?
> A. Yes.
> Q. Would you ever voluntarily come back to an adult home?
> A. No.[262]

---

[257] Tr. 251 (Tsemberis).  While Defendants have provided evidence that one supported housing provider, Federation of Organizations, imposes stricter rules in its 25-bed supported housing program, such as not permitting residents to live with their families (Tr. 2643-47 (Lockhart)), this evidence does not rebut the weight of the evidence that supported housing imposes far fewer restrictions and provides far greater freedoms than Adult Homes, and that residents of supported housing have the same freedoms as other apartment tenants.

[258] Tr. 2160 (Newman).

[259] Tr. 251 (Tsemberis).

[260] Tr. 2750.

[261] Id. at 2751.

[262] Tr. 501-02.

Dr. Tsemberis explained that it is the very ordinariness of supported housing that residents appreciate:

> When people first move into an apartment that is so much the thing they appreciate the most, because many of the people that we're housing out of shelters and hospitals, especially, have been for years told when to wake up, what to eat, when to eat, what TV channels to watch, which are selected for them, what they watch, and when they watch it, when they can make phone calls. Every tiny aspect of their life is decided by someone else and what people appreciate immediately are the ordinary day to day freedoms of things, like when you can choose to wake up or go to sleep or watch a TV channel or eat when you are hungry as opposed to when it's time to eat. They seem ordinary and mundane and are profoundly important to build a sense of well being for the person.[263]

Residents of supported housing live and receive services in integrated settings.[264] Compared to Adult Home residents, residents of supported housing have far greater opportunities to interact with people who do not have disabilities and to be integrated into the larger community.[265] In the words of Mr. Newman, the Director of OMH's Bureau of Housing Development and Support, supported housing provides "maximum opportunities" for community integration.[266]

### 3.    Conclusions of Law

As noted above, the law requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The appropriate inquiry to determine

---

[263] Tr. 290-91.

[264] Tr. 654-55 (Rosenberg); Tr. 2915-16 (Kaufman) (testifying that in general, residents of supported housing feel more integrated than residents of group homes).

[265] Tr. 653-55 (Rosenberg); Tr. 482-487 (G.L.) (describing the guests and family members who have visited him at his apartment, as well as the barbecues and holiday dinners he has prepared for guests).

[266] Tr. 2162.

whether a particular setting is the "most integrated setting" is whether it "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." <u>DAI I</u>, 598 F. Supp. 2d at 321 (<u>citing</u> 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35 app. A). The court concludes that the large, impacted Adult Homes at issue in this case do not enable interactions with nondisabled persons to the fullest extent possible, and that the State's supported housing programs offer a setting that enables interactions with nondisabled persons to a far greater extent.

Under the applicable standard set forth in the regulations for what constitutes the "most integrated setting," a plaintiff need not prove that the setting at issue is an "institution" to establish a violation of the integration mandate. <u>See</u> <u>Fisher v. Okla. Health Care Auth.</u>, 335 F.3d 1175, 1181 (10th Cir. 2003) (noting that "there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized" and "while it is true that the plaintiffs in <u>Olmstead</u> were institutionalized at the time they brought their claim, nothing in the <u>Olmstead</u> decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements."). Rather, a plaintiff must show that the setting does not "enable interactions with nondisabled persons to the fullest extent possible." <u>DAI I</u>, 598 F. Supp. 2d at 321; <u>see also</u> <u>Joseph S.</u>, 561 F. Supp. 2d at 289-290 ("A failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate.") (internal quotation marks and citation omitted).

Whether a particular setting is an institution is nonetheless a relevant consideration in determining whether it enables interactions with nondisabled persons to the fullest extent possible. It is clear that, "where appropriate for the patient, both the ADA and the RA favor

integrated, community-based treatment over institutionalization." <u>Frederick L. v. Dep't of Pub.</u> <u>Welfare</u> ("<u>Frederick L. I</u>"), 364 F.3d 487, 491-92 (3d Cir. 2004). This echoes <u>Olmstead</u>'s recognition that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life . . . and institutional confinement severely diminishes individuals' everyday activities." 527 U.S. at 600.

The court's factual finding that the Adult Homes are institutions is compelling evidence supporting the conclusion that such a setting does not enable interactions with nondisabled people to the fullest extent possible. Adult Homes are institutions that house well over 100 people, all of whom have disabilities and most of whom have mental illness. Adult Homes are designed to manage and control large numbers of people and do so by establishing inflexible routines, restricting access, and limiting personal choice and autonomy. Residents line up to receive meals, medication, and money at inflexibly scheduled times during the day. They are assigned seats in the cafeteria, roommates, and treatment providers. They have next to no privacy or autonomy in their own daily lives, and they are discouraged, and most often prohibited, from managing their own activities of daily living, such as cooking, taking medication, cleaning, and budgeting.

These institutional qualities of the Adult Homes are relevant to the issue of integration because they influence the extent to which residents can interact with individuals who do not have disabilities. The large population of the Adult Homes is relevant because many people with mental illness living together in one setting with few or no nondisabled persons contributes to the segregation of Adult Home residents from the community. As the Director of OMH's Bureau of

Housing Development and Support testified, a housing setting shared by 120 people, all of whom have serious mental illness, is a "segregated" setting.[267] The rules and routines of the Adult Homes place many practical limits on when residents can come and go from the facility. Given the lack of privacy and the restrictions on when and where visitors can be received, the residents' ability to develop and maintain relationships with people outside the Adult Home is limited.

The lack of autonomy and isolation fostered by the Adult Home setting also influences residents' opportunities to interact with people who do not have disabilities. Contrary to Defendants' assertion that autonomy and isolation are not functions of where a person lives,[268] the Adult Home setting impedes the opportunity for contacts with nondisabled persons. As one resident testified, "[y]ou're in program, you're in home. All your energy is surrounded with the home, so it's hard to meet different people."[269] Given the very nature of the Adult Homes, the opportunities to develop social and employment contacts are extremely limited. As Defendants' experts conceded, living in a place where the phone is answered "Brooklyn Adult Care Center" diminishes work options and social contacts, and being subject to visiting hours diminishes opportunities to cultivate social or family relationships.

Regardless of whether the Adult Homes at issue are "institutions" per se or merely a setting with "institutional characteristics," as Defendants contend, the overwhelming evidence demonstrates that the institutional characteristics of Adult Homes impede residents' ability to

---

[267] Tr. 2162.

[268] Defs. PFF ¶¶ 180, 182.

[269] P-535 (T.M. Dep.) 111-12.

develop relationships with nondisabled persons. Thus, the Adult Homes do not enable interactions with nondisabled persons "to the fullest extent possible."[270]

Defendants nonetheless contend that the Adult Homes enable interactions with nondisabled persons to the fullest extent possible because: (1) Adult Homes are located in "residential areas" close to neighborhood amenities such as stores, restaurants, libraries, beaches, and/or parks, (2) Adult Home residents come and go from the facilities, (3) OMH-funded case managers and other mental health providers available to Adult Home residents "facilitate integration," and (4) Adult Homes organize outings and on-site entertainment and activities.[271] These factors do not render Adult Homes integrated settings or settings that enable interaction with nondisabled persons to the fullest extent possible, either on their own or as compared to supported housing.

First, the argument that Adult Homes are the "most integrated setting" because they are close to neighborhood amenities is unpersuasive. By that measure, any large psychiatric facility located in an urban setting would be an integrated setting, no matter how institutional. As described by Defendants' witness Susan Bear, the Assistant Executive Director of the Jewish Board, Adult Homes are "community-based psychiatric ghettos in which smaller groups of individuals were located in a community, but never helped to become part of it."[272] The urban locations of the Adult Homes do not render them the "most integrated setting" for DAI's constituents to receive services.

___

[270] Even if the court were merely to consider whether the Adult Homes are an integrated setting, the evidence at trial clearly demonstrates that the Adult Homes at issue are not an integrated setting, let alone the "most integrated setting" appropriate to the needs of DAI's constituents.

[271] Id. ¶¶ 168-72.

[272] See supra note 220.

Second, that some Adult Home residents come and go from the facilities to varying extents does not persuade the court that Adult Homes are the "most" integrated setting.  Viewed in its entirety, the record evidence establishes that Adult Homes impede the ability of Adult Home residents to participate in their communities outside the Homes.  The inflexible schedules for medications and meals limit the times when residents can be absent from the Adult Homes. The large numbers of residents, lack of privacy, and restrictions on visitors also limit the development of relationships with individuals outside the Adult Homes.

While Defendants assert that the Adult Home setting is not <u>as</u> segregated as the hospital at issue in <u>Olmstead</u> because Adult Home residents are not locked in the facilities,[273] that does not demonstrate that Adult Home residents are in the <u>most</u> integrated setting, as the law requires. The existence of a less integrated setting does not demonstrate that the Adult Homes are the most integrated setting.  <u>See</u> <u>DAI I</u>, 598 F. Supp. 2d at 331 n.42.  As the court previously noted, even the plaintiff L.C. in <u>Olmstead</u> left the institution on a regular basis:

> [L.C.] [r]eceive[d] a wide variety of community-care services . . .  leaving during the day . . .  via public transportation for persons with disabilities, to attend a daily community-based program that included social activities, vocational opportunities and field trips; L.C. returned on the bus each evening to the institution.

<u>DAI I</u>, 598 F. Supp. 2d 321 n.36 (<u>quoting</u> Pet. Reply Br., <u>Olmstead v. L.C.</u>, No. 98-536, 1999 WL 220130, at *17–18 (S. Ct. Apr. 14, 1999)).

Third, the argument that mental health providers "facilitate integration" of Adult Home residents is without persuasive factual support in the record.  The weight of the evidence is to the contrary.  Experts for both sides agreed that teaching skills in a setting in which they cannot be applied or practiced is ineffective and does not foster independent living skills or integration.

---

[273] Defs. PFF ¶¶ 175-76.

Even if the mental health providers did facilitate integration to some extent, that would not render the Adult Homes the "most" integrated setting, especially compared to supported housing, where residents can learn and practice skills in their own homes.  Similarly, OMH's Case Management Initiative, which places OMH-funded case managers in less than half of the Adult Homes at issue in this litigation, does not alter the segregated nature of the setting in which DAI's constituents receive services; the case managers simply arrange services within the existing setting.

Fourth, Defendants' assertion that Adult Homes enable integration because residents are occasionally taken on trips outside the Adult Homes and provided with on-site recreational activities and entertainment fails to alter the court's conclusion.  The evidence at trial shows that outings outside the Homes contribute little to residents' integration into the community, because the residents generally travel as a group – sometimes in ambulettes – and interact mainly with each other.  To cite just one example, that FEGS takes residents on "field trips" to museums and libraries after hours, when the facilities are closed to the general public, does not enable interactions with people who do not have disabilities.  Nor do the activities and entertainment provided inside the Adult Homes.

Defendants additionally contend that the residents' degree of interaction with individuals who do not have disabilities is a matter of choice, or at most, a function of the quality and effectiveness of the services offered by particular mental health providers, which are outside of the scope of the enforcement provisions of the ADA and Rehabilitation Act.[274]  See Olmstead, 527 U.S. at 603 n.14 ("We do not . . . hold that the ADA imposes on the States a 'standard of

---

[274] Defs. PFF ¶¶ 182-85.

care' for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities.'"); Doe v. Pfrommer, 148 F.3d 73, 84 (2d Cir. 1998) (rejecting challenge to the substance of services provided by a nonprofit organization, where plaintiff's "challenge is not illegal discrimination against the disabled, but the substance of the services provided to him through [the nonprofit organization]"); P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990) ("The [Rehabilitation] Act does not require all handicapped persons to be provided with identical benefits."). Defendants assert that while they monitor compliance with State regulations, they cannot be held responsible under the ADA or Rehabilitation Act for ineffective or low-quality services, or a particular provider's failure to facilitate and encourage community involvement.[275]

This argument is inapposite. DAI does not seek a particular standard of care for its constituents. Nor does DAI seek increased enforcement of State regulations applicable to Adult Homes.[276] Rather, DAI seeks to have Defendants administer their services to DAI's constituents in the most integrated setting appropriate to their needs. While Olmstead does not impose a "'standard of care' for whatever medical services [states] render," it requires states to adhere to the ADA's nondiscrimination mandate and administer their services to individuals in the most integrated setting appropriate to their needs. 527 U.S. at 603 n.14 ("We do hold . . . that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."). As large, highly regimented facilities that house many people with mental illness in a

---

[275] Id. ¶ 184.

[276] Plaintiff withdrew its claims alleging that Defendants failed to take adequate measures to redress continued poor conditions in Adult Homes. (Compl. ¶¶ 137-42, 158-65; Pl. Mem. Opp. Defs. Mot. for Summ. J. 79 (Docket Entry #202) (dropping such claims because "[d]iscovery has shown that since the filing of this case defendants have increased their efforts to redress poor conditions in impacted adult homes.").)

congregate setting, Adult Homes have inherent institutional qualities that – regardless of the quality of services provided to their residents– impede opportunities for Adult Home residents to interact with nondisabled people.

The existence of supported housing – a more integrated setting – further proves that the Adult Home setting does not enable DAI's constituents to interact with nondisabled persons to the fullest extent possible. Supported housing is an integrated, community-based setting that enables interaction with nondisabled persons to the fullest extent possible. People who live in supported housing have the autonomy to live and participate in their communities in essentially the same ways as people without disabilities. Simply put, residents of supported housing are not defined by the setting in which they receive services. Residents of supported housing have far greater opportunities to interact with nondisabled persons and be integrated into the larger community. As the Director of OMH's Bureau of Housing Development and Support testified, supported housing provides "maximum opportunities" for integration into the community.[277]

In sum, DAI has established that Defendants are not serving DAI's constituents in the most integrated setting appropriate to their needs. As set forth below, virtually all of DAI's constituents could be appropriately served in supported housing.

### B. VIRTUALLY ALL OF DAI'S CONSTITUENTS ARE QUALIFIED FOR SUPPORTED HOUSING

#### 1. Legal Standard

The ADA and Rehabilitation Act provide that individuals with disabilities are entitled to receive services in the most integrated setting that is "appropriate" to their needs. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(a). In Olmstead, the Supreme Court held that a setting is

---

[277] Tr. 2162 (Newman).

"appropriate" for individuals if those individuals meet the "essential eligibility requirements for habilitation in a community based program." 527 U.S. at 603; see also DAI I, 598 F. Supp. 2d at 331. As this court previously noted, "[n]ot every eligibility requirement is an 'essential eligibility requirement.'" DAI I, 598 F. Supp. 2d at 333 (citing PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001)).

## 2. Findings of Fact

### a. Supported Housing Targets Individuals with Mental Illness Who Have Significant Needs

As OMH's Supported Housing Implementation Guidelines provide, supported housing provides individuals with mental illness with a permanent place to live coupled with flexible support services customized to each individual's specific needs.[278] The State's supported housing program already targets individuals with mental illness who have significant needs.[279] In particular, OMH has characterized supported housing as an "approach" designed to ensure that individuals with "serious and persistent mental illness"[280] can choose where they want to live.[281] In their existing supported housing program, Defendants have imposed no requirement

---

[278] See S-101 (OMH, Supported Housing Implementation Guidelines (reformatted May 2005) ("2005 Supported Housing Implementation Guidelines")) OMH 37514; S-33 (2007 RFP) OMH 42726-28 (describing supported housing).

[279] Tr. 1505 (Madan) (testifying that supported housing is for individuals with severe and persistent mental illness); S-101 (2005 Supported Housing Implementation Guidelines) OMH 37515 (providing that supported housing is an "approach" designed to ensure that individuals with serious and persistent mental illness can choose where they want to live); S-17 (2005 RFP) OMH 37306-07 (requesting supported housing proposals targeting "high-need individuals").

[280] To be categorized as having a severe and persistent mental illness ("SPMI"), an individual must (a) be 18 years of age or older, (b) have a designated mental illness, and (c) either (1) receive SSI or SSDI due to a designated mental illness, (2) currently have certain functional limitations due to a designated mental illness, or (3) have had certain functional limitations prior to receiving psychiatric rehabilitation and supports and/or medication. (S-17 (2005 RFP) App. A OMH 37314.) SSI, Supplemental Security Income, and SSDI, Social Security Disability Income, are income supplements for people with disabilities.

[281] S-101 (2005 Supported Housing Implementation Guidelines) OMH 37515.

that individuals have "minimal" support needs in order to live in supported housing.[282]  To the contrary, in recent years, OMH's Requests for Proposals ("RFPs") for supported housing have specifically targeted those with significant needs.  For example, in 2005, OMH issued an RFP targeting individuals who, according to them, are "high need," defined as "a person who, as a result of psychiatric disability, presents some degree of enduring danger to self or others or has historically used a disproportionate amount of the most intensive level of mental health services."[283]  Similarly, OMH issued RFPs for supported housing in 2007 and 2008 for a target population that may need ACT or Blended Case Management, and may have a co-occurring substance problem.[284]  Robert Myers, OMH's Senior Deputy Commissioner, testified that there are people living in supported housing who have "extensive psychiatric needs."[285]

As Dr. Tsemberis pointed out, "you can put someone with severe mental illness in supported housing and it doesn't matter the degree of severity of illness as long as you match the supports to what they need."[286]  Supported housing offers flexible supports; as Ms. Jones testified, "you start with a place for the person to live and you add and subtract the supports as

---

[282] See, e.g., S-101 (2005 Supported Housing Implementation Guidelines) OMH 37515-16 (explaining that supported housing is directed at people with serious and persistent mental illness and that supported housing provides varying levels of support);  S-17 (2005 RFP) OMH 37307; S-33 (2007 RFP) OMH 42726-27; S-67 (2008 RFP) OMH 43109; see also Tr. 1506-07 (Madan) (agreeing that description of supported housing in S-33 is accurate); Tr. 3170-71 (Myers).

[283] S-17 (2005 RFP) OMH 37307.

[284] S-33 (2007 RFP) 42726 (explaining that target population may need ACT or Blended Case Management, and may have a co-occurring substance problem); S-67 (2008 RFP) OMH 43109.

[285] Tr. 3170-71.

[286] Tr. 266; see also id. at 265-66 (Tsemberis) (pointing out that most people with severe mental illness in the United States live at home with family).

that person needs them."[287]  Even Defendants' expert, Dr. Geller, conceded that "those who

reside in adult homes could reside in apartments with varying degrees of support."[288]

<blockquote>
<strong>b.   Supported Housing Can Serve Adult Home Residents Who Need Varying Levels of Support</strong>
</blockquote>

New York's supported housing programs are flexible and are more than capable of

serving virtually all Adult Home residents, including those who might have relatively high

needs.[289]  OMH officials testified that ACT and case management services, including blended

and intensive case management, are available to supported housing residents.[290]  As noted above,

such services are flexible; case managers can visit supported housing residents as often as once

or even twice a day as necessary.[291]  The evidence shows that while individuals from more

institutional settings sometimes require many visits from the service provider when first moving

into supported housing, those visits usually decrease in frequency as the resident becomes

adjusted to more independent living.[292]  Supported housing providers routinely do assessments

---

[287] Tr. 139; see also Tr. 812 (Duckworth) (testifying that of people with serious mental illness, "my experience has taught me that just about everybody can make it in Supported Housing with the appropriate level of flexible supports").

[288] Tr. 2370.  Mr. Geller also conceded that "virtually anyone who has a chronic debilitating psychiatric disorder can be provided care and treatment outside of an institutional setting with sufficient services provided."  (Id.)

[289] Tr. 851-62 (Duckworth); see also Tr. 288-89 (Tsemberis) (testifying that if the State issued an RFP to provide supported housing to adult home residents with mental illness, many agencies could serve those individuals); D-399 (Lasicki Dep.) 203 (executive director of an association of non-profit mental health residential program providers testifying that she has "no doubt" that member organizations could serve Adult Home residents).

[290] See supra notes 240, 242, & 243.

[291] Tr. 2172-73 (Newman); D-399 (Lasicki Dep.) 94-97 (supported housing provides "fluid" case management services); Tr. 2672 (Lockhart) (agreeing that case managers in Federation of Organizations supported housing visited at least one resident as often as twice a day).

[292] Tr. 229 (Tsemberis) (testifying that the frequency of visits to someone discharged from the hospital would "reduce over time"); Tr. 2672-73 (Lockhart) (testifying that services to new residents of Federation supported housing were able to be decreased over time); Tr. 715 (Rosenberg) (testifying that individuals from adult homes who moved to supported housing "would ultimately need little support, they might go to a clinic, get some treatment. They might have a case manager who checked in with them once or twice a month or telephone called them."); S-33 (2007 RFP) OMH 42727 ("It is expected that the need for services provided by the sponsoring agency

as part of their work to identify the specific supports and services that their clients will require.[293]

OMH's own RFPs demonstrate the flexible nature of supported housing. The RFPs describe whom OMH expects supported housing providers to serve, and they make clear that supported housing is not limited to those with minimal support needs. For example, OMH's 2007 RFP for supported housing for Adult Home residents states:

> Recipients of Supported Housing may be able to live in the community with a minimum of staff intervention from the sponsoring agency. Others may need the provision of additional supports such as Assertive Community Treatment (ACT) team or Blended Case Management (BCM) services. Many recipients will be coping with co-occurring substance abuse disorders and be at various stages of recovery.[294]

That RFP goes on to note that "[s]ervices provided by the sponsoring agency will vary, depending upon the needs of the recipient."[295] Other OMH RFPs for supported housing contain identical or substantially similar language.[296]

The responses by providers to OMH's supported housing RFPs further demonstrate the flexible nature of the supports available to residents of supported housing.[297] In these responses, the supported housing providers make clear that they are willing and able to serve individuals in

---

will decrease over time as the recipient is more fully integrated in the community."); Tr. 3193-94 (Myers) (testifying about providers working with individuals in supported housing to "restore functioning").

[293] See P-748 at 4 (2009 RFP) (requiring supported housing providers to "provide in-reach, develop coordinated discharge/admission plans with PC [psychiatric center] staff, and identify/provide services and supports to ensure successful transition to the community"); see also Tr. 1486-87 (Madan) (testifying that applicants for supported housing must interview with the supported housing provider).

[294] S-33 at OMH 42726-27.

[295] Id.

[296] See S-67 (2008 RFP) OMH 43109; S-17 (2005 RFP) OMH 37307.

[297] Defendants contend that the court should not rely on these RFP responses, because DAI presented no testimony from the providers themselves. (See Defs. Resp. PFF 14-16.) The court need not conduct a detailed inquiry into the nature of each provider's program to reach its finding that there are supported housing providers who seek to serve and are capable of serving individuals with mental illness who have relatively high support needs.

supported housing who require very high levels of support.[298]  For example, one response noted

that the target population "will need some assistance in developing or redeveloping activities of

daily living.  Some will require assistance in developing or redeveloping skills in self care."[299]

Another response seeks to serve a target population that is "institutionalized" and may require a

range of services, including medication management, assistance with budgeting and

socialization, and substance abuse treatment.[300]  Like the RFPs themselves, several of these

supported housing providers specifically indicate in their RFP responses that supported housing

residents with especially high service needs may need ACT while living in supported housing.[301]

A response notes that the "service needs of these populations are varied" and may require ACT

---

[298] See, e.g., P-286 (Transitional Servs. for N.Y., Inc. Response to OMH RFP (Mar. 28, 2007)) OMH 42961 ("A significant range of functional limitations characterize the SPMI [serious and persistent mental illness] population that directly impact their ability to engage in activities associated with normal daily living . . . ."); P-394 (The Bridge, Inc. Response to OMH RFP (Apr. 1, 2008)) 2 (noting that one of the target populations "ha[s] been traditionally non-compliant with treatment while in the community (including medication regimes, seeking appropriate follow-up services, etc.)"); P-395 (Baltic Street AEH, Inc. Response to OMH RFP (Mar. 26, 2008)) 2 (targeting individuals "who have the highest service needs and the least likelihood of succeeding in other housing programs" and stating that its program "is designed specifically to assist individuals with high service needs and to help them along their own recovery paths toward becoming people with low or no service needs"); P-400 (FACES NY Response to OMH RFP (Mar. 30, 2008)) 5-6 (noting that the service needs of clients include "how to navigate public transportation, how to shop for and prepare food, and how to access emergency services"; while the program requires residents to be "capable of self-medication," ACT teams are available);  P-439 (Assoc. for Rehabilitative Case Management & Housing Response to OMH RFP (Mar. 31, 2008)) 3; P-440 (Center for Behavioral Health Servs. Response to OMH RFP (Mar. 31, 2008) 2; P-442 (Postgraduate Center for Mental Health Response to OMH RFP (Mar. 31, 2008)) 2; P-445 (Transitional Servs. for New York, Inc. Response to OMH RFP (Mar. 31, 2008)) 2 (noting that "the functional limitations of this population are often varied in regard to type and severity and are often a complex mix of issues"); P-530 (Comunilife Response to OMH RFP (Mar. 29, 2007)) OMH 42990 (noting that the target population may need assistance with "daily living skills," may have "historically used a disproportionate amount of the most intense level of mental health services" and may "have some enduring degree of danger to self or others"); P-532 (Center for Behavior Health Servs. Response to OMH RFP (Mar. 29, 2007)) OMH 43075.

[299] P-439 at 3.

[300] P-532 at OMH 43075.

[301] See, e.g., P-395 at 7; P-439 at 3; P-440 at 2; P-442 at 2.  Similarly, Linda Rosenberg confirmed that supported housing providers know how to utilize ACT services to serve individuals with intensive support needs.  (Tr. 655-56.)  She testified that OMH in or around 2004 issued RFPs for supported housing and ACT that provided incentives to providers to combine the two services.  (Id.) OMH received "lots of responses" to these RFPs.  (Id.) According to Ms. Rosenberg, providers "know how to do" supported housing plus ACT, it is something in which they have "developed expertise," and it is "consistent with their missions."  (Id.)

or intensive case management services.[302]  Another response noted that the target population

may need ACT services and may need service planning regarding "medication compliance,

symptom awareness and management, and appropriate community integration."[303]

The availability of ACT services means that even the Adult Home residents who have the

highest needs could successfully be served in supported housing.[304]  As the responses to the

RFPs demonstrate, a significant number of supported housing providers are committed to and

capable of serving individuals with such needs.

> ### c.    Supported Housing Is Not Only for Individuals Who Need "Minimal" Supports

The evidence contradicts Defendants' contention that to live in supported housing,

individuals must be capable of seeking assistance and taking their medication independently,

must demonstrate "a significant period of psychiatric stability," must be able to "meet their own

daily needs" and must "maintain their apartment" with "minimal assistance."[305]  While several

supported housing providers impose such requirements for admission to their programs, the

evidence shows that other supported housing providers in New York successfully serve people

who have difficulties with each of these issues.  For example, Ms. Jones and Dr. Tsemberis

testified about the availability and options for support services to assist supported housing

---

[302] P-440 at 2.

[303] P-442 at 2.

[304] See, e.g., D-399 (Lasicki Dep.) 102 (explaining that ACT teams can help someone with medication compliance); P-395, P-439, P-440, P-442 (responses to RFPs).

[305] See Defs. PFF ¶ 54 (citing S-70 (CUCS, Supportive Housing Options NYC (2009 ed.)) OMH 43225; S-76 (description of Jewish Board's programs) JBFCS 431; D-90 (description of Federation's supported housing program); S-61 (description of FEGS's supported apartment program); Tr. 1445 (Madan); Tr. 1983-84 (Newman); Tr. 2220, 2223-24 (Bear); Tr. 2640-42 (Lockhart); Tr. 3169-71, 3193 (Myers)).

residents with medication.[306]  OMH's Supported Housing Guidelines target newly-discharged psychiatric hospital patients for supported housing.[307]  Providers' responses to RFPs seek to serve individuals who need assistance with medication compliance and self-care skills.[308]  In addition, while Defendants contend that for "many providers" of supported housing, individuals must maintain their sobriety,[309] recent OMH RFPs have barred providers from screening out applicants on the basis of substance-abuse issues.[310]

Nor does the evidence support Defendants' contention that supported housing is only for those with "minimal" support needs.[311]  First, the court does not credit the testimony of OMH employees that supported housing is only for those who need "minimal" supports,[312] as that testimony is contradicted by OMH's RFPs and numerous other OMH documents.  Second, while Defendants rely on OMH's 1990 Supported Housing Implementation Guidelines to support their

---

[306] Tr. 82-83 (E. Jones) (testifying that, although some Adult Home residents would need medication management or health-related services in supported housing, those supports "are nothing unfamiliar to what's commonly found in a mental health system today"); Tr. 316-17 (Tsemberis) (explaining the "whole range of options" to assist supported housing residents with medication).

[307] S-101 (1990 Supported Housing Implementation Guidelines) OMH 37516.

[308] P-394 at 2 (RFP response seeking to serve individuals who have been "non-compliant with treatment," including medication regimes); P-439 at 3 (RFP response seeking to serve individuals needing assistance "developing or re-developing activities of daily living" and self-care skills); P-442 at 2 (RFP response seeking to serve individuals who need service planning regarding "medication compliance and symptom awareness and management").)

[309] Defs. PFF ¶ 54.

[310] P-748 (2009 RFP) 8 ("Agencies cannot reject someone for housing based solely on the past history or current substance use of potential residents"); S-33 (2007 RFP) OMH 42730 (providing that "no exclusionary admission criteria related to past or current substance use may be imposed" and noting that "[c]urrent treatment modalities and research indicate that length of sobriety is a poor indicator of an individual's suitability for, or success in, residential programs"); Tr. 1528 (Madan).

[311] See Defs. PFF ¶¶ 53-54.

[312] Tr. 1252-53, 1386 (Reilly); Tr. 1441-42, 1445, 1487 (Madan); Tr. 1933, 1983-84 (Newman); Tr. 3169-71, 3194 (Myers).

assertion, the Guidelines do not state anywhere that supported housing is only for – or even targeted to – those with minimal needs.[313]

In addition, while several supported housing providers, such as FEGS[314] and Federation,[315] provide more limited supports in their supported housing programs, such evidence does not rebut the weight of the evidence that there are numerous other supported housing providers in New York City who are willing and able to serve individuals with much higher needs.[316] Nor is it significant that one agency, the Jewish Board, has considered particular Adult Home residents inappropriate for its supported housing.[317] That some supported housing providers provide more limited services does not demonstrate that supported housing is "only" for those who need minimal support, and as discussed below, supported housing providers can and do serve former Adult Home residents.[318]

The only document cited by Defendants that actually uses the terms "minimal support" in reference to supported housing is a document prepared by a third party, Center for Urban

---

[313] See S-11 (1990 Supported Housing Implementation Guidelines). The Guidelines identify as a target population for supported housing "individuals discharged from psychiatric centers." (Id. at OMH 37270.) Such individuals are a "highly institutionalized" population with significant needs. (See Tr. 310-11 (Tsemberis); Tr. 2559 (Waizer) (describing newly discharged patients from psychiatric hospitals as "our most disabled population").)

[314] See S-19 (describing FEGS's residential programs); S-61.

[315] See Tr. 2639-42 (Lockhart). Ms. Lockhart testified that, despite her view that supported housing is only for individuals who are "substantially independent," Federation has previously accepted Adult Home residents and even individuals from state psychiatric centers directly into its supported housing program, that some Adult Home residents could live in supported housing, and that she was aware of at least one new supported housing resident whose case managers visited the apartment twice-daily to assist with the transition to supported housing. (Tr. 2639-40, 2670-72.)

[316] See, e.g., P-286, P-394, P-395, P-439, P-440, P-442, P-445, P-530, P-532 (responses to OMH RFPs for supported housing); see also Tr. 129:1-20 (E. Jones) (noting that while some supported housing providers provided "more limited supports," most of the providers responding to the RFPs "work with people that are among the most challenging to provide supports to and supported apartments").

[317] Tr. 2226-27 (Bear) (testifying that, to her knowledge, no individuals have moved from Adult Homes into Jewish Board's supported housing program and that "it's not something that we would encourage").

[318] See infra Part III.B.2.i.

Community Services ("CUCS"), which purports to describe various "supportive housing models for people with mental illness and other special needs," though it acknowledges that "in practice and over time, variations with [each housing] model have developed."[319] As DAI's expert Dennis Jones explained at trial, the CUCS document describes supported housing in terms that are inconsistent with OMH's stated approach to supported housing in other documents.[320] In any event, New York City's Human Resources Administration ("HRA"), the local agency that approves individuals' applications for supported housing in New York City, does not rely on the eligibility criteria set forth by CUCS in approving individuals for supported housing.[321]

### d. The Court Finds Credible and Persuasive the Conclusions of DAI's Experts That Virtually All Adult Home Residents Could Move to Supported Housing

At trial, DAI presented three expert witnesses, Dr. Kenneth Duckworth, Dennis Jones, and Elizabeth Jones, all of whom testified that virtually all Adult Home residents could be appropriately served in supported housing. The court finds the conclusions of these experts to be credible and persuasive.[322]

---

[319] See S-40 (CUCS, Supportive Housing Options NYC: A Guide to Supportive Housing Models for People with Mental Illness and Other Special Needs) JG 250, 244; S-70 (CUCS, Supportive Housing Options NYC (2009 ed.) OMH 43225, 43219 (updated version of S-40).

[320] Tr. 1154.

[321] See Tr. 1893 (Kelly) ("Q. Does HRA rely on the eligibility criteria set forth by CUCS? A. No.")

[322] The court rejects Defendants' contention that, because DAI's experts did not perform formal in-person clinical assessments of each of DAI's constituents to determine whether each person was qualified for supported housing, they did not use "reliable scientific principles or methods" in reaching their opinion. (Defs. PFF ¶ 79; id. ¶¶ 85, 89, 91 (stating that each expert did not conduct clinical evaluations or housing assessments of individual residents).) The court credits the opinion of DAI's experts that such assessments are only necessary to determine the specific supports that each resident would need once placed in supported housing. (Tr. 53-54 (E. Jones) (testifying that a clinical assessment was unnecessary "because, at this point, I'm not making individual determinations as to the exact array of supports that people will need when they live in the community setting."); Tr. 811–12 (Duckworth) (testifying that formal clinical assessments were unnecessary because expert could "screen people looking for specific contraindications to why they might not be able to live in the community").) The court previously held that the opinions of DAI's experts were admissible because they were based on reliable methodologies. Disability Advocates, Inc. v. Paterson ("DAI Evidentiary Order"), No. 03-CV-3209 (NGG), 2008 WL 5378365, at *3 (Dec.

### i.     Dr. Duckworth

Dr. Kenneth Duckworth is a licensed psychiatrist with twenty years of experience serving people with serious mental illness.  He is triple board certified by the American Board of Psychiatry and Neurology in Adult Forensics, and Child and Adolescent Psychiatry.  He has worked in numerous different treatment settings, including hospital inpatient, outpatient, supported housing, day treatment, emergency triage and homeless outreach.  Dr. Duckworth has interviewed, directly treated, supervised, and consulted about the treatment of thousands of individuals with schizophrenia, bipolar illness, schizoaffective disorder, and depression, among other serious psychiatric disorders.  Dr. Duckworth has also served as the Medical Director and Acting Commissioner for the Massachusetts Department of Mental Health, where he was involved with, among other things, placement of hospital patients in more integrated settings and the design and implementation of Programs of Assertive Community Treatment ("PACT") – Massachusetts's version of New York's ACT program – throughout Massachusetts.[323]  In short, Dr. Duckworth is an experienced medical professional with substantial professional experience directly relevant to assessing whether individuals with mental illness are capable of living in supported housing.

In this case, Dr. Duckworth undertook an extensive analysis of whether Adult Home residents could be served in supported housing.  Dr. Duckworth's analysis included a review of

---

22, 2008).  The evidence at trial demonstrates that DAI's experts' methodologies are not only reliable, but produced credible and persuasive results to which the court affords significant weight.

The court notes that HRA, New York City's agency that evaluates applications for supported housing, does not conduct clinical assessments of individuals and relies instead on the electronic application form.  (Tr. 1907-08 (Kelly).)  Also, Defendants' expert Dr. Geller did not perform clinical evaluations of Adult Home residents to assess them for supported housing.  (Tr. 2379-80.)

[323] S-152 (Duckworth Report) 1-4 & S-155 (Duckworth Resume).

the mental health records of between 260 and 270 Adult Home residents, visits to five Adult

Homes, interviews with approximately 38 Adult Home residents, a visit to the Pathways to

Housing supported housing program, and the review of numerous documents relating to the case,

including deposition transcripts of Adult Home residents, materials concerning New York's

supported housing programs, and responses to RFPs issued by OMH for supported housing.[324]

Based on his analysis of these voluminous materials, his visits with Adult Home residents

and supported housing residents, and his extensive experience, Dr. Duckworth concluded that

"there are no material clinical differences between adult home residents and supported housing

clients."[325]  He further concluded that "virtually all of the [Adult Home residents] I looked at I

felt would make it in Supported Housing.  I looked for things that would contraindicate a person

living in Supported Housing and I found relatively few of them."[326]  Dr. Duckworth specifically

considered the extent to which such contraindications – which he identified as severe cognitive

vulnerabilities or dementia, extreme nursing needs, and a history of active arson – were present

in the Adult Home population.[327]  While Dr. Duckworth testified that his "approach" is that

---

[324] S-152 (Duckworth Report) 4–5 & Ex. 2 (list of documents considered); Tr. 932 (Duckworth) (testifying that he also read some RFP responses since drafting this report); Tr. 880-83 (describing his visits with residents); Tr. 813, 817, 819 (testifying about the volume of records reviewed); Tr. 813-14 (testifying about his review of deposition transcripts).  The court rejects Defendants' contention that Dr. Duckworth's initial report is flawed or otherwise unreliable because Dr. Duckworth visited "only" five Adult Homes and spoke to 38 residents, some of whom were selected by MFY Legal Services.  (Defs. PFF ¶ 81.)  Defendants' two experts visited three and eight homes respectively, on formal group tours.  (Tr. 2916-17 (Kaufman); Tr. 2295-96 (Geller).)

[325] S-152 (Duckworth Report) 5; see also Tr. 854 ("Q. And how, if at all, did the clients you visited at Pathways compare to the adult home residents you visited in this case? A. Again, these populations are identical. . . . They all want something for themselves, it seems to me, frequently to live more independently would be the most common theme but the populations don't differ in any impressive way that stood out to me.").

[326] Tr. 809; see also S-152 (Duckworth Report) 18-19 ("[I]t is clear to me that existing supported housing programs in New York could appropriately serve virtually every adult home resident that I encountered."); S-80 (Duckworth Reply Report) 2; S-149 (Duckworth Corrected Reply Report) 1.

[327] Tr. 812-13, 900-01, 907-10.

"most anybody can make it in independent living,"[328] which is consistent with his experience placing hospital patients in more integrated settings, Dr. Duckworth did not simply "presume" that Adult Home residents could move to supported housing.[329] Dr. Duckworth consistently and credibly testified that he reached his conclusions on the basis of his extensive research and experience.

Dr. Duckworth testified on cross-examination that for a very small number of the Adult Home residents whose records he reviewed, he would need more information to determine whether they were appropriate for supported housing.[330] He also testified that two individuals lacked the requisite mental health diagnosis to make them eligible for OMH housing,[331] that some residents were discharged to a nursing home,[332] and that several residents had personal care needs that might make them inappropriate for supported housing or require extensive supports.[333] Such testimony, when weighed against Dr. Duckworth's detailed testimony regarding other residents who were well qualified for supported housing,[334] does not make Dr. Duckworth's conclusion that "virtually all" Adult Home residents could be served in supported housing less credible or persuasive.[335]

---

[328] Tr. 820.

[329] Defs. PFF ¶ 82 (citing Tr. 820).

[330] Tr. 908-09, 910-11, 916-17, 906; see also D-324, D-327, D-331, D-249 (records of Adult Home residents).

[331] Tr. 907-08, 914 (testifying that the records of two individuals indicated that they were categorically ineligible for OMH housing because they lacked the requisite mental health diagnosis); see also D-252, D-336 (records of Adult Home residents).

[332] Tr. 904.

[333] Tr. 908, 913; D-252, D-330.

[334] See, e.g., Tr. 826-27, 832-33 (testifying about particular Adult Home residents whose records indicate that they could be served in supported housing immediately).

[335] The court rejects Defendants' contention that Dr. Duckworth is biased because he works part-time at the National Alliance for the Mentally Ill, an advocacy organization dedicated to "improving the lives of individuals and families affected by mental illness" (Tr. 880), and because he expressed support for DAI's decision to bring this lawsuit.

###     ii.     Elizabeth Jones

DAI's expert Elizabeth Jones has more than thirty years of experience in the field of mental disability, including positions as the superintendent/director of three institutions and the court-appointed receiver of a psychiatric institution.  Ms. Jones has focused a substantial part of her work on the management of institutions and the planning, development, and management of community services for people with mental illness and developmental disabilities.   She has also managed the day-to-day operations of two community mental health systems, in which she had a leadership role in planning, developing, and implementing services in integrated settings as an alternative to institutional care.  Ms. Jones has served as an expert consultant regarding institutional conditions and the development of alternative community-based programs in Massachusetts, Texas, North Dakota, Iowa, Michigan, Romania, Bulgaria, and Paraguay.[336]

In forming her expert opinions in this case, Ms. Jones visited twenty-three impacted Adult Homes for a total of approximately seventy-five hours.  These visits included six announced, "formal" tours of Adult Homes – in which Defendants' experts also participated – and seventeen unannounced, "informal" visits to various Adult Homes.[337]  During her visits, Ms. Jones personally interviewed 179 residents, some for as long as two hours.[338]  She also spoke to clinicians, nurses, social workers, and a psychiatrist at some of the Adult Homes she visited, and

---

(Defs. PFF ¶ 80, citing D-222 (e-mail from Dr. Duckworth to Plaintiff's counsel).)  As Dr. Duckworth's testimony at trial demonstrates, he expressed support for DAI not because he had prejudged the question of whether Adult Home residents are qualified to live in supported housing, but because of his reaction to articles he had read about the Adult Homes in The New York Times.  (Tr. 947-48.)

[336] S-151 (E. Jones Report) 1; S-154 (E. Jones Resume).

[337] Tr. 45-46 (E. Jones); cf. Tr. 2295-96 (Geller) (describing a total of eight visits to Adult Homes, each with a "rather large group" that included attorneys and experts for both sides and staff and owners of the Adult Homes).

[338] S-151 (E. Jones Report) 1-2.

also had some conversations with social workers about particular residents.[339]   In addition, Ms. Jones employed three social workers who observed conditions and interviewed an additional 62 residents in Seaview Manor, Riverdale Manor and Garden of Eden and prepared summaries of their observations for her review.  Ms. Jones also considered deposition transcripts and numerous other documents relating to the issues in this case in forming her expert opinion.[340]

The social workers employed by Ms. Jones also reviewed a number of resident records from three of the Adult Homes.[341]  Ms. Jones then reviewed the social workers' notes on those records, and also reviewed roughly twenty to twenty-five of those records herself.  In responding to the expert report of Defendants' expert Dr. Geller, Ms. Jones reviewed over one hundred additional records of Adult Home residents.[342]

On the basis of her research and experience, Ms. Jones concluded that "virtually all" Adult Home residents could be served in a more integrated setting, including supported housing.[343]  She found that "there was no reason that [Adult Home residents] couldn't live in supported housing if the appropriate supports were provided to them," and that she "saw nothing in [her] visits to the adult homes that would lead [her] to believe that people required more than

---

[339] Tr. 102-03.

[340] S-151 (E. Jones Report) 1-2 & Ex. 3 (list of documents reviewed).

[341] Tr. 50.

[342] Id.

[343] Tr. 100; S-157 (E. Jones Reply Report).  For the same reasons listed in note 82, the court rejects Defendants' assertion that Ms. Jones "supported Plaintiff's position in this case before she completed her research," which refers to a "workplan" prepared nine months after she began her investigation in which Ms. Jones states some of the conclusions that appear in her final report.  (Defs. PFF ¶ 86 (citing Tr. 190-98).)  Ms. Jones testified that by the time she prepared that document, she had already visited 13 Adult Homes—already more than any of Defendants' witnesses in their entire investigations – and had spoken to "numerous residents."  (Tr. 198.)  Ms. Jones explained that, based on those visits and conversations, she had "formed the clear conviction that [Adult Home residents] could live in supported housing with supports."  (Id.)  Ms. Jones explained that the "workplan" simply reflected her then-current thinking on how her report would be structured, and that she would have revised her conclusions if the remaining ten Adult Homes she subsequently visited had been different than the first thirteen.  (Tr. 192.)  They were not.  (Tr. 192-93.)

is available already in the community in New York or that they presented any particular challenge other than what we work with every day in the field of mental health."[344]  According to Ms. Jones, while some Adult Home residents would need help with medication management, or various health related services, the "array of supports [that would be needed] are nothing unfamiliar to what's commonly found in a mental health system today."[345]  Ms. Jones further concluded that there are "many" Adult Home residents who could live in their own apartment "with little or no support."[346]

Ms. Jones also found that Adult Homes themselves do not provide intensive support or supervision for people with high needs.  To the contrary, Adult Homes "do not provide intensive supervision to people . . . they have restrictive rules and practices, but they do not provide individualized attention to people.  So, many people have a place to stay and they have their meals and their medicine, but not a whole lot more than that."[347]

---

[344] Tr. 113; see id. at 80-81.

[345] Tr. 82.  Defendants contend that Ms. Jones did not provide "any credible evidence that ACT services are commonly used in New York to provide services to individuals in supported housing."  (Defs. PFF ¶ 90.)  The court finds that Ms. Jones's testimony demonstrates familiarity with supported housing in New York sufficient to form her opinion.  To the extent that Ms. Jones's conclusions are based on an assumption about the availability of ACT services in particular, the court notes that the evidence demonstrates that supported housing residents can and do receive ACT services.  See supra note 240.

[346] Tr. 83-84 (E. Jones); see also id. 143-44 (testifying that the Adult Home residents who come and go from the Adult Homes can live in apartments and require little support).

[347] Tr. 80 (E. Jones); see also id. at 142 (testifying that Adult Homes provide "minimal" supervision); S-157 (E. Jones Reply Report) 1 (noting that she "do[es] not think that the adult home setting provides supports to the extent cited as necessary in Dr. Geller's report").

Defendants dispute Ms. Jones's conclusion that Adult Homes provide only minimal supervision, citing regulations requiring adult homes to provide supervision, N.Y. Comp. Codes R. & Regs. tit. 18 § 487.7(d)(1), and the testimony of Ms. Burstein describing the provision of supervision and services at Park Inn.  (Defs. Resp. PFF 19-20 (citing Tr. 2046-51).)  First, citing regulations requiring supervision is not evidence that the Adult Homes in fact provide such supervision.  Second, Ms. Burstein's testimony is insufficient to rebut Ms. Jones's conclusion.  Ms. Burstein testified that (1) Park Inn has 38 staff members, including dieticians, housekeepers, maintenance workers, and bookkeepers; (2) Park Inn contracts with other entities to provide psychiatrists, medical doctors, and social workers who come to the Adult Home on a regular basis; and (3) residents attend on-site psychiatric clinics.  (See Tr. 2046-48.)  That there is such staff does not establish that the staff supervises the residents, nor does the existence

Ms. Jones testified that these two observations – that (1) Adult Homes do not provide intensive support and (2) Adult Home residents in supported housing would not require more support than is already available in the community in New York – provide the basis for her conclusion that virtually all Adult Home residents could move to supported housing.[348]  While Ms. Jones had previously testified at deposition that her "starting point is that everyone could live in community housing . . .  virtually everyone could live in supported housing . . . if the appropriate supports are provided,"[349] the evidence demonstrates that Ms. Jones did not simply assume in this case that Adult Home residents could be served in supported housing in reaching her opinion.  Rather, she credibly and consistently testified about her extensive factual observations that formed the basis for her conclusions.

### iii.        Dennis Jones

DAI's expert Dennis Jones served as the top mental health official for the state of Indiana from 1981 to 1988 and the top mental health official for the state of Texas from 1988 to 1994. He was also appointed by a federal district court as the transitional receiver for the District of

---

of psychiatric clinics establish that the residents receive supervision.  Ms. Burstein also testified that Park Inn, which has 181 residents, has "one personal care attendant on every shift," and that the Visiting Nurse Service provides home health attendants for "individuals who require more than the adult home is required to or equipped to provide," estimating that about sixty residents have home health attendants.  (Id. at 2048-49.)  That some Adult Home residents receive assistance from home health attendants through a service separate from the Adult Home does not rebut Ms. Jones's conclusion, based on her extensive observations and research in this case, that Adult Homes themselves do not provide intensive support.

In addition, Ms. Jones's conclusion is consistent with other testimony at trial.  (See Tr. 709 (Rosenberg) (testifying that Adult Home residents have "less support in many cases" than supported housing residents; they are "left [to] their own devices[] a lot of the time").)  Consistent with the finding that Adult Homes do not provide extensive support is the testimony of former OMH and DOH official David Wollner that Adult Homes are appropriate for an individual "who has a mental illness who is able to live independently or with some supportive services."  (Tr. 1730).

[348] Tr. 80-81.

[349] Defs. PFF ¶ 89 (citing Tr. 115-16).  To the extent that Ms. Jones's testimony indicates an approach that "virtually everyone" could live in the community, such an approach is consistent with Ms. Jones's many years of experience planning, developing and implementing services in integrated settings as an alternative to institutional care.

Columbia's mental health system from 2000 to 2002 and later became a federal court monitor in the same action, a position he still holds today. As part of his role as transitional receiver, Mr. Jones developed a plan to completely restructure the public mental health system in the District of Columbia. Mr. Jones also served from 1994 to 2003 as the Administrator/CEO of the largest community mental health center in Indiana.[350]

Mr. Jones's analysis and investigation in this case included review of documents,[351] visits to four Adult Homes, and conversations with Adult Home residents and visits to community mental health providers, including supported housing providers.[352] As part of his research in this case, Mr. Jones analyzed data from the Assessment Project, a study from New York Presbyterian Hospital that Defendants commissioned to collect data regarding residents of nineteen adult homes, including fifteen of the Adult Homes at issue here.[353] Mr. Jones worked with Dr. Ivor Groves, an expert in data analysis, to devise an algorithm to assess whether the Adult Home residents in the fifteen Adult Homes were not opposed to moving, and also whether those residents would need a high or low level of support.[354] That algorithm determined that of the

---

[350] S-150 (D. Jones Report) 1-2 & Ex. 1 (Resume of Dennis Jones); see also Tr. 984 (D. Jones) (describing his experience).

[351] Defendants criticize Mr. Jones's supposed "reliance" on the report of the Adult Care Facilities Workgroup ("Workgroup Report"), discussed in Part III.B.2.f infra, which concluded that 6,000 people with mental illness in adult homes could and should be served in more integrated settings. (Defs. PFF ¶ 92.) At trial, Mr. Jones explained that while he found it significant and worth considering in his report that a "very serious and diligent group of many high level people across the departments" concluded that 6,000 people could be served in more integrated settings, "I didn't conclude that 6,000 people could be moved." (Tr. 1127; see also id. at 1128 ("I feel like I'm repeating myself. I did not conclude that 6,000 people could move. I had no basis around which to make that determination. I was simply citing a work group that had met very diligently over a period of time, made a number of recommendations; and that was one.").) The evidence demonstrates that Mr. Jones considered the Workgroup Report as "worth considering" and "significant" – that it was probative, but not dispositive, to his conclusion that virtually all Adult Home residents could be served in supported housing.

[352] See S-150 (D. Jones Report) 3-5 & Ex. 2 (listing materials considered).

[353] The court discusses the findings of the Assessment Project in Parts III.B.2.g and III.C.2.c, infra.

[354] Tr. 1048-50.

2,080 residents in the sample, 1,769 would be able to live in supported housing with relatively little support, and 311 would need greater support.[355] The algorithm also determined that 1,536 would not be opposed to moving to supported housing and 544 would be resistant.[356] Of those who were non-resistant, only 199 would need a high level of support.[357] Mr. Jones testified that the Assessment Project data showed "a large majority of people who, given the right situation, would choose to [move to supported housing]" and "the amount of supports that people are going to need out there are within what I would consider the range of what the New York system can accommodate."[358] On the basis of his extensive experience and his investigation in this case, Mr. Jones concluded that "virtually all mentally ill adult home residents are able to live in integrated community settings such as supported housing."[359]

> **e.** **OMH's Former Senior Deputy Commissioner Believes That Virtually All Adult Home Residents Could Move to Supported Housing**

Former OMH Senior Deputy Commissioner Linda Rosenberg testified credibly and persuasively that, based on her firsthand observations from working in New York's mental health system until 2004, virtually all Adult Home residents are qualified for supported housing. Ms. Rosenberg served from 1997 to 2004 as the Senior Deputy Commissioner for OMH, where

---

[355] Id.

[356] Id.

[357] Id.

[358] Tr. 1051. The court rejects Defendants' contention that Mr. Jones's conclusion is flawed because he relied on the data from the State's own Assessment Project. (Defs. PFF ¶ 94 (contending that the Assessment Project was not meant to be a housing assessment).) As explained more fully below, one of the purposes of the Assessment Project was to assess residents' needs and desires concerning housing, and the data is relevant to determining whether Adult Home residents are qualified to move to supported housing. (See infra note 388.) In addition, while Dr. Groves, with whom Mr. Jones worked, identified some inconsistencies in the Assessment Project data, both Dr. Groves and Mr. Jones considered the data to be reliable overall. (See infra notes 407, 408.)

[359] S-150 (D. Jones Report) 10; see also Tr. 995 (D. Jones).

she oversaw the "community system of care for people with serious mental illnesses," including OMH's housing services as well as, at one point, all of New York's state hospitals.[360] Ms. Rosenberg has had extensive experience dating back to the 1970s with adult homes and adult home residents, including the ones at issue in this case, having met "probably literally thousands" of adult home residents as a result of her OMH position as well as previous positions with community mental health clinics and State psychiatric hospitals.[361] According to Ms. Rosenberg, Adult Home residents "by and large have similar characteristics" to residents of supported housing, and are placed in Adult Homes by "luck of the draw for the most part" rather than by any clinical determination that it is an appropriate setting.[362] Ms. Rosenberg further testified that Adult Homes offer "less support in many cases" than supported housing, "because you are left on your own devices . . . the home has meals but doesn't have much more than that going on anyway. It isn't as if you are tak[en] care of in an intensive way, unless the home brings in a home health care agency . . . ."[363] Ms. Rosenberg did not do a "housing assessment" for particular Adult Home residents or review their treatment records.[364] Her opinion that Adult Home residents as a group have "similar characteristics" to residents of supported housing and other types of OMH community housing is based on her experience managing OMH community housing, in which she had an opportunity to become familiar with Adult Homes, meet thousands of adult home residents, including ones at issue in this case, and form an opinion about Adult

---

[360] Tr. 636.

[361] Id. at 640-42.

[362] Id. at 709.

[363] Id. at 709.

[364] Id. at 772-76.

Home residents' qualifications to move to supported housing.[365]  The court finds that, based on her years of experience as a high-ranking OMH official until 2004, including extensive experience with Adult Homes and Adult Home residents, the testimony of Ms. Rosenberg that virtually all Adult Home residents could be served in supported housing is credible and persuasive.

> **f.      Defendants' Own Adult Care Facilities Workgroup Concluded That Large Numbers of Adult Home Residents Could and Should Receive Services in More Integrated Settings**

In response to a series of articles in 2002 about Adult Homes by Clifford Levy in The New York Times, Governor George Pataki convened the Adult Care Facilities Workgroup to conduct a comprehensive review of adult home policies, programs, and financing.[366]  The Workgroup focused on 12,000 individuals with mental illness who live in adult homes, most of which are in or near New York City.[367]  Joseph Reilly, who formerly held high positions at OMH and DOH and was a staff member of the Workgroup, testified that the Workgroup was convened in a "crisis atmosphere."[368]  The Workgroup was comprised of a "blue ribbon panel" of various stakeholders in the mental health system, including clinicians, mental health

---

[365] Id. at 708-10, 773.  While the court struck portions of Ms. Rosenberg's affidavit as inadmissible lay opinion testimony prior to resolving the parties' summary judgment motions, it determined at trial that Ms. Rosenberg would be allowed to testify as a lay witness as to the qualifications of Adult Home residents to move, provided that Plaintiff laid an adequate foundation.  (Tr. 703-08 (sidebar addressing scope of Ms. Rosenberg's testimony).)  The court finds that Plaintiff laid an adequate foundation, because Ms. Rosenberg's conclusions are rooted in her own personal perceptions formed over time during her work at OMH and in New York's mental health system.  Fed. R. Evid. 701; see United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007); Bank of China v. NBM LLC, 359 F.3d 171, 181-82 (2d Cir. 2004).

[366] Tr. 1369 (Reilly); 1672-73 (Wollner).  The court excluded the articles as hearsay but noted that evidence that the Workgroup was created in response to the articles is admissible.  DAI Evidentiary Order, 2008 WL 5378365, at * 21 & n.10.

[367] S-103 (Report of the Adult Care Facilities Workgroup (Oct. 2002) ("Workgroup Report")) DOH 86158.

[368] Tr. 1369.

providers, and Adult Home operators.[369]  The Workgroup members were selected by the

Governor's office and included well-known New York State experts on mental health.[370]  The

Governor's office was active in shaping the Workgroup's agenda.[371]  The Workgroup was

staffed by thirty-eight employees of OMH and/or DOH.[372]  These employees did not merely

provide ministerial assistance to the Workgroup; they made editorial and conceptual

contributions to the Workgroup and put together the final Workgroup report.[373]  The Co-Chair of

the New Models Sub-workgroup, Karen Schimke, viewed the final Workgroup report as a

document "submitted by the Health Department to the Health Department."[374]

   In 2002, the Adult Care Facilities Workgroup proposed that 6,000 of the 12,000

individuals with mental illness living in adult homes be helped to move to more integrated

settings, and proposed a timeline to move them to supported housing by March 2009.[375]  The

12,000 individuals on whom the Workgroup focused includes the Adult Home residents at issue

in this case – the Workgroup Report noted that "most" of these 12,000 individuals with mental

illness live in adult homes in or near New York City, and "a substantial proportion live in

facilities with the largest capacity."[376]  The Workgroup's proposal was based on the

Workgroup's findings that these residents had similar characteristics to individuals living more

independently, a finding that was made after substantial study, deliberation, and research that

[369] Tr. 1616-19, 1673 (Wollner).

[370] Id. at 1674, 1688-89.

[371] Id. at 1673.

[372] Id. at 1674-75; S-103 (Workgroup Report) DOH 86210-14 (listing staff).

[373] D-394 (Schimke Dep.) 153-54.

[374] Id.

[375] Joint Stip. ¶ 13 (stating that the Workgroup Report "proposed a timeline for moving at least 6,000 adult home residents with psychiatric disabilities into supported housing by March 2009").

[376] S-103 (Workgroup Report) DOH 86158.

included presentations from a variety of experts and field visits to various types of housing.[377] As there was "little reliable and current clinical data on these 12,000 residents," the Workgroup members, who were selected by Defendants for their expertise and experience, developed working assumptions about the residents' needs.[378]  The Workgroup Report noted that "[t]he operational construct for [adult home residents with mental illness] was predicated on the belief that all needed congregate level care and are too fragile to live more independently."[379]  It rejected this premise, finding that "[a] great many people with many of the same issues and needs live every day in integrated, community settings across New York State."[380]

    Upon its completion, the Workgroup Report was presented to the then-Commissioner of DOH, Antonia Novello, who "applauded" the Report.[381]  No member of the Workgroup objected to or dissented from the Workgroup's finding that large numbers of adult home residents with mental illness – a population that includes the Adult Home residents at issue in this case – should be served in more independent settings.[382]

---

[377] D-394 (Schimke Dep.) 123; S-103 (Workgroup Report) DOH 86217-23 (listing presentations to and site visits by the New Models Subworkgroup); Tr. 1370-76 (Reilly) (describing research activities of the New Models Subworkgroup and agreeing that the Workgroup "relied on a broad array of information that it gathered [after] diligent effort").

[378] S-103 at DOH 86156 (noting the lack of clinical data, which it stated "would be remedied through implementation of the recommendations in this report").  The Workgroup developed a working assumption that the functioning of the adult home residents would follow a normal bell curve distribution along an "independence, dependence line."  (See D-394 (Schimke Dep.) 106, 110-11, 122-23; S-103 at DOH 86157 tbl. 1-2.)

[379] S-103 at DOH 86141.

[380] Id.; see also D-394 (Schimke Dep.) 300 (agreeing that the Workgroup developed a consensus to reject the "existing paradigm that most of the residents with mental illness who are in adult homes are at a very low end of independence or ability for independence").

[381] D-394 (Schimke Dep.) 181.

[382] See Tr. 1376 (Reilly) ("Q. Was there a dissenting report appended to the Workgroup's report? A. There was only one report.").

### g. New York Presbyterian Hospital's Assessment Project, Commissioned by Defendants, Establishes That Adult Home Residents Could Be Served in Supported Housing

In December 2002, Defendants commissioned a study from New York Presbyterian Hospital (the "Assessment Project") that collected data regarding adult home residents, including many of the residents at issue in this litigation. Defendants paid a total of $1.3 million to New York Presbyterian Hospital for the survey.[383] Ms. Rosenberg testified that in her view, the Assessment Project was part of a mission to "deflect[] . . . what had become a crisis for the Governor's office."[384] The Assessment Project was conducted by Dr. Martha Bruce, an expert in population-based survey design and sampling procedures who had previously been involved in designing between fifteen and twenty such surveys.[385] In addition, Defendants themselves had "a great deal of input" into the design of the survey.[386] The Assessment Project assessed 2,611 residents in nineteen adult homes, including fifteen of the Adult Homes at issue here.[387]

One of the purposes of the Assessment Project was to assess adult home residents' housing needs and desires.[388] Dr. Bruce testified at her deposition that one of the intended uses for the Assessment Project data was to "screen for residents who might benefit from changing

---

[383] Joint Stip. ¶ 7; Tr. 1678 (Wollner); P-583 (Bruce Dep.) 123-24.

[384] Tr. 739-40.

[385] P-583 (Bruce Dep.) 16.

[386] Id.

[387] Joint Stip. ¶ 8.

[388] P-583 (Bruce Dep.) 66-67:7; P-555 (Liebman Dep.) 25, 134-35; see also Tr. 1676-78 (Wollner) (testifying that one of the purposes was to determine who would benefit from a higher or lower level of care). The court notes that while Dr. Bruce testified that "I didn't do an assessment for people's housing" and that the Assessment could not be used to make a "final determination" regarding housing placements and was a "screening process" (P-583 (Bruce Dep.) 201-02, 55-56, 132, 203), the weight of the evidence demonstrates that a purpose of the Assessment Project was to assess Adult Home residents' housing needs and desires.

housing to a more supportive or more independent" setting,[389] and that, to the best of her understanding, DOH officials such as Glenn Liebman and Lisa Wickens understood this purpose.[390] Lisa Wickens testified that the Assessment Project survey questions dealt so much with housing options that she was actually concerned that residents would believe they would be offered alternative housing if they participated in the survey.[391] Adult Home administrator Ms. Burstein testified that when the assessors from the Assessment Project came to her Adult Home, they informed the residents that "they would be interviewing them to see who would possibly qualify in the future for independent housing, and they did let them know that there would be independent housing available to them at some point."[392]

The Assessment Project data demonstrates that the vast majority of adult home residents are not seriously impaired and could be served in supported housing.[393] 74.1% of residents participated in the survey, a very high response rate.[394] Although the vast majority of adult home residents had mental illness, only 7% of residents had "severe cognitive impairments"; 66.4% had no cognitive impairments.[395] The statistics regarding cognitive impairments were not self-reported; rather, they were the results of mental status examinations administered by the surveyors.[396] Only a small percentage of residents reported needing assistance with activities of

---

[389] P-583 (Bruce Dep.) 66-67:7.

[390] Id. at 67-68. Defendants' Rule 402 and 602 objections to pages 67:14-68:13 of Dr. Bruce's deposition is overruled. The court finds the testimony relevant and based sufficiently on personal knowledge.

[391] P-566 (Wickens Dep.) 74-75.

[392] Tr. 2107-08.

[393] Tr. 1051 (D. Jones).

[394] P-583 (Bruce Dep.) 73.

[395] Id. at 103, 104; P-586 (Adult Home Assessment Project Powerpoint Presentation (May 13, 2004)) NYPH 1494.

[396] Tr. 893-94 (Duckworth).

daily living.[397]   As Mr. Jones testified, 68.4% of those surveyed had done some meaningful work in the previous two years.[398]   67% of those surveyed had one or no hospitalizations in the last three years.[399]

Dr. Ivor Groves, who worked with Plaintiff's expert Mr. Jones to perform an analysis of the Assessment Project data pertaining to residents of the Adult Homes at issue in this litigation, testified that virtually all Adult Home residents could live in supported housing.[400]  Dr. Groves has more than thirty-five years of experience working in mental health and related areas of human services.  Dr. Groves worked in a large state hospital for nine years and managed publicly operated human services programs for fifteen years, including five years in the highest mental health position in the state of Florida.  Dr. Groves has served both as a project director of program evaluations and assessments and as a consumer of evaluations and assessments of adult mental health consumers and programs.  He is currently a consultant developing and evaluating mental health and related human services programs for children and adults.[401]

Based on his review of the Assessment Project data, Dr. Groves found that Adult Home residents "are not a seriously impaired population in the vast majority; meaning, they don't have severe cognitive deficits and they don't have real significant problems in daily living skills."[402]  Dr. Groves testified that, in his view, "the vast majority" of Adult Home residents "could live in

---

[397] P-583 (Bruce Dep.) 101-02.

[398] Tr. 1028-29.

[399] Id. at 1029-30.

[400] Plaintiff retained Dr. Groves as an expert, and Dr. Groves worked with Plaintiff's other experts in this litigation. Plaintiff did not call Dr. Groves as a witness at trial; Defendants subsequently called Dr. Groves as their trial witness.

[401] S-156 (Groves Report) 1.

[402] Tr. 3072.

supported housing with appropriate supports."[403]  That his analysis of the Assessment Project

data was for Adult Home residents in the "aggregate" – meaning that he did not evaluate

individual medical or mental health records or perform in-person clinical assessments[404] – does

not undermine the credibility or persuasiveness of his conclusion that the vast majority of Adult

Home residents, according to the Assessment Project data, are qualified for supported

housing.[405]

     The court is persuaded by the testimony of Dr. Groves and Mr. Jones that the Assessment

Project data is reliable.  While Dr. Groves noted that there were some inconsistencies in

participant responses and that some of the data was self-reported by participants,[406] Dr. Groves

confirmed that overall, he considered the survey data reliable:

> At one point, I sat down and said: What are all of the possible issues around the
> Columbia Presbyterian data? And I made a list. And those, those were the items
> that I thought about. In terms of the analysis we did and the data we used, <u>do I
> think that that, those limitations significantly affected that analysis in the data?
> The answer is no</u>.[407]

Mr. Jones similarly found the Assessment Project data reliable, testifying that "this was a

very rich set of data, frankly better than you get in most decision-making projects, where

---

[403] Tr. 3074; <u>see also</u> S-156 (Groves Report) 4 (opining that "most, if not all, of the residents of Adult Homes could live in the community with appropriate levels of support").

[404] <u>See</u> Defs. PFF ¶ 95 (<u>citing</u> Tr. 3079-82, 3073-75 (Groves)).

[405] In addition, while Dr. Groves revised his algorithm based on concerns raised by Plaintiff's other experts and Plaintiff's counsel that the original algorithm he designed was undercounting individuals who were both qualified and unopposed to living in supported housing, the court finds Dr. Groves's explanations for the revision credible. (Defs. PFF ¶ 96 (<u>citing</u> Tr. 3088-3094 (Groves); 1097-1100 (Jones)).)  As Dr. Groves explained, after running the original analysis, DAI's experts determined that the results were "under-representative" of the persons in the Homes who could live in supported housing.  (Tr. 3091 (Groves).)  Dr. Groves explained that he revised the algorithm so that it filtered out individuals with "severe cognitive impairments or real problems in adaptive living," as well as those who had expressed that they "definitely don't want to leave" the Adult Home, as opposed to all residents who did not express an affirmative desire to leave.  (<u>Id.</u>)

[406] Defs. PFF ¶ 95 n.109 (<u>citing</u> Tr. 3094-96 (Groves)).

[407] Tr. 3095-96 (emphasis added).

you really knew something about the psychiatric history, you knew something about the level of impairment and you knew something about the physical history, the degree of cooperation, all those sorts of things."[408]  While Dr. Geller suggested that the residents who did not respond to the survey were, on average, more disabled than the responding residents, he acknowledged that some of those whom the Assessment Project missed were probably "on their own going places" and would therefore likely be less disabled that the individuals who participated in the Assessment.[409]

The generally high cognitive and ability levels of Adult Home residents reflected in the Assessment Project data demonstrates "a huge mismatch" between Adult Home residents and the custodial setting in which they reside.[410]  Mr. Jones – who, as noted above, has run the mental health systems of two states and the District of Columbia – credibly testified that OMH should have regarded this data as indicating "a big problem" requiring "a very serious multi-year initiative."[411]

> **h.    There Are No Material Differences Between Adult Home Residents and Supported Housing Residents**

Adult Home residents do not have more severe disabilities than individuals already served by Defendants in supported housing.  As noted above, DAI's constituents have one or more major mental illnesses, such as schizophrenia, bipolar disorder, and/or depression.[412]

---

[408] Tr. 1036.

[409] Tr. 2333.

[410] Tr. 1037 (D. Jones).

[411] Id. at 1037-38.

[412] See supra note 6.

There is generally little distinction between the psychiatric characteristics of Adult Home residents and supported housing residents.[413]

People with mental illness are often placed in Adult Homes not for clinical reasons, but because the Adult Home is the only housing available when they are discharged from the psychiatric hospital.[414] For example, Adult Home resident S.K. testified at trial that when she was discharged from the psychiatric hospital, although she "wanted to really get an apartment of my own," the only option offered to her was an Adult Home.[415] Prior to being placed in the Adult Home, S.K. lived with clinical depression successfully in the community for almost twenty years.[416] S.K. raised a family of four children living in her own home on Long Island, where she cooked, cleaned, shopped, and did the yard work.[417] After her husband died, she moved to an apartment in Astoria and worked for five years as a nurse's aide, where she took care of patients and administered their medications.[418] S.K. then moved to Georgia to live with her daughter, and worked there for five years at a supermarket deli.[419] She moved back to New York to live with her sister, but was then voluntarily hospitalized due to an episode of severe depression.[420] After her hospitalization, S.K.'s sister refused to allow her to move back in with her because the

---

[413] Tr. 287 (Tsemberis); Tr. 854 (Duckworth); Tr. 52-53 (E. Jones); Tr. 709 (Rosenberg); D-394 (Schimke Dep.) 50-52; S-103 (Workgroup Report) DOH 86141. The court does not find persuasive the testimony of Jonas Waizer, the CEO of FEGS, that Adult Home residents are "very disabled" (Tr. 2560), because Mr. Waizer's view of Adult Home residents results from cursory observations made while visiting Riverdale Manor to negotiate and implement FEGS's case management program there. (Tr. 2558, 2577-78.)

[414] Tr. 646, 709 (Rosenberg); D-394 (Schimke Dep.) 10-11; P-68 (Stone Memo).

[415] Tr. 372.

[416] Id. at 361.

[417] Id. at 361-64.

[418] Id. at 364-66.

[419] Id. at 367-69.

[420] Id. at 370-71, 397.

sister "couldn't cope with" S.K.'s depression.[421]  Although S.K. wanted to live in an apartment,

the psychiatric hospital instead discharged her to an Adult Home.[422]  S.K. also testified about her

ability to live independently.  She testified that she is "well able to take care of a place on my

own" and that she is able to manage her own money and do her own cleaning.[423]  She testified

that she would be "well able to manage [her] own medication" in a supported apartment.[424]  She

testified that the only support she would need in her own apartment would be "somebody to call

in on me once in a while just to see how things are doing.  I'd like to have somebody there that I

could call."[425]  Nevertheless, S.K. was placed in an Adult Home upon her discharge from the

hospital.  The other current and former Adult Home residents who testified at trial, including

Defendants' witness, I.K., similarly testified that they were given little or no choice about being

placed in an Adult Home.[426]

      Nor are Adult Homes designed to provide individuals with mental illness with the

intensive levels of care and supervision that Defendants claim Adult Home residents require.[427]

To the contrary, because supervision in Adult Homes is minimal, individuals in Adult Homes

must be able to live with some degree of independence.[428]  Adult Homes are actually prohibited

---

[421] Id. at 371.

[422] Id. at 371-72.

[423] Id. at 372, 380, 382.

[424] Tr. 377-78; see also D-394 (S.K.'s application prior to discharge from psychiatric hospital to HRA for "New York Supportive Housing") SM1441, 1448 (psychosocial summary indicating that S.K. has been "medication compliant" and "is able to manage her medication independently").

[425] Tr. 390; see also D-394 at SM1437, 1440-44, 1448.

[426] Tr. 448 (G.L.) (testifying that his choices were a long-term psychiatric facility or an Adult Home); Tr. 551-52 (S.P.) (that the only choice offered was the Adult Home); Tr. 2685 (I.K.) (testifying that the Adult Home "was the only thing offered" to her upon discharge from the hospital).

[427] See supra notes 39, 40, 41.

[428] See supra note 347.

by State regulations from admitting people who, for example, need "continual medical or nursing care or supervision," pose danger to themselves or others, have an "unstable" medical condition requiring "continual skilled observations," chronically require the physical assistance of another person to walk, or have chronic unmanaged incontinence.[429]

> **i.** **Supported Housing Providers Can and Do Serve Adult Home Residents**

The evidence at trial also showed that numerous New York supported housing providers do not view Adult Home residents as having needs incompatible with supported housing; indeed, several of them already successfully serve former Adult Home residents. Dr. Tsemberis of the Pathways to Housing supported housing program testified that Pathways has served five former Adult Home residents, all of whom "did very well" in supported housing.[430] Another supported housing provider, Transitional Services for New York, Inc., in a response to an RFP by OMH, described its experience transitioning three Adult Home residents into supported housing as very similar to transitioning other individuals:

> TSI . . . successfully transitioned three individuals into Supported Housing from local Adult homes. All three of these individuals have remained successfully housed and their transition into independent living was similar to the non-adult home referrals. These three tenants required assistance at a level typical of a referral coming from a long term resident of an apartment treatment program; adjusting their budgeting to meet their monthly financial obligations, developing resources in the community to meet their treatment needs, developing a new daily routine, accessing recreational resources in their new neighborhood and developing vocational supports to return to work.[431]

---

[429] N.Y. Comp. Codes R. & Regs. tit. 18 § 487.4 (listing categories of people whom Adult Homes may not admit).

[430] Tr. 281-82.

[431] P-286 (RFP Response) OMH 42975.

In 2007, seven different supported housing providers submitted proposals in response to OMH's RFP to implement the legislative initiative for 60 supported housing beds for Adult Home residents.[432]  Each of these providers sought to serve Adult Home residents in its supported housing programs.[433]  OMH awarded contracts to three of these seven providers.[434]  Those supported housing beds were subsequently developed, and all sixty of those beds are either filled or are in the process of being filled by Adult Home residents.[435]

The court also heard testimony from two former Adult Home residents who are now successfully living in supported housing: G.L. and I.K.  After living in an Adult Home for five years, G.L. moved to a supported housing apartment run by Pathways to Housing in 2006.[436]  Prior to living in an Adult Home, G.L. did his own cooking and cleaning, managed his own medications, made and kept medical and mental health appointments, and handled his own money.[437]  Now that he is in supported housing, he currently manages his own medication and finances and does his own cleaning, shopping, cooking, and laundry.[438]  G.L. has been successful in supported housing without using ACT services.[439]  I.K. moved to supported housing in April 2009 after sixteen years in an Adult Home.  She now does her own laundry and shopping, and cooks her own meals.[440]  I.K. testified that she is extremely happy living in supported housing.[441]

---

[432] Tr. 1509-1511 (Madan); P-293 (OMH's responses to agency proposals); see also supra note 50.

[433] P-293 (OMH responses to agency proposals).

[434] Tr. 1782 (Dorfman); Tr. 1511 (Madan).

[435] Tr. 1794 (Dorfman).

[436] Tr. 441, 443 (G.L.).

[437] Id. at 446-47, 492.

[438] Id. at 463-64, 485-86, 495, 496, 498.

[439] Id. at. 459.

[440] Tr. 2685, 2751.

###### j. Defendants' Witnesses Conceded That Significant Numbers of Residents Could Be Served in Supported Housing

A number of Defendants' own witnesses do not dispute that there are many Adult Home residents who could be served in supported housing with appropriate supports. Defendants' expert, Dr. Geller, testified that "[a]bout 50 percent of the individuals who would otherwise be eligible could go to some form of supported housing either immediately, after transitional residence, with ACT, or with intensive ACT."[442] High-level State employees testified that there are "undisputedly" Adult Home residents who could be served successfully in supported housing.[443] They also testified that Adult Home residents have been served successfully in supported housing.[444] Adult Home administrator Ms. Burstein testified that "often the [Adult Home] residents have the ability to live independently."[445] Ms. Lockhart, who worked at Federation, which has a small supported housing program, testified that some Adult Home residents could live in supported housing.[446] Dr. Bruce, who oversaw the Assessment Project,

---

[441] Tr. 2750-51 ("I love it . . . . It's freedom.  It's being able to live like a human being again.").

[442] Tr. 2409; see also id. at 2370 ("Q. And you agree that those who reside in adult homes could reside in apartments with varying degrees of support, correct? A. Correct."); id. at 2333 ("But there are certainly some percentage who are, you know, about on their own going places who were just never there when they did the assessment.  We would think those people might be highly likely to be able to go to supported housing."); id. at 2384 ("Q.  And I think you also testified earlier that residents who get out and about are highly likely to be able to live in supported housing. Was that your testimony? A. Yes.") (Geller).

[443] Tr. 1304 (Reilly); see also P-564 (Tacoranti Dep.) 225-26 (agreeing, based on her experience of moving Adult Home residents to supported housing following Adult Home closures, that there are current Adult Home residents who could live in supported housing).

[444] Tr. 1521 (Madan).

[445] Tr. 2084.

[446] Tr. 2636 (Lockhart).

testified that there are individuals in adult homes who are qualified and willing to move to supported housing.[447]

> **k.    The Court Is Not Persuaded by Dr. Geller's Claim That Only Half of Adult Home Residents Could Ever Be Served in Supported Housing**

The court is not persuaded by the opinion of Defendants' expert Dr. Geller that only about half of Adult Home residents could eventually be served in supported housing, with or without ACT services.[448]  Dr. Geller's conclusions ignore important evidence about supported housing in New York.  They are also based on Dr. Geller's mistaken belief that Adult Home residents may constitute an immediate danger to themselves or others.

Dr. Geller is a board-certified psychiatrist, the Director of Public Sector Psychiatry at the University of Massachusetts Medical School, and the Vice President of the American Psychiatric Association.[449]  He has extensive experience teaching, working in psychiatric hospitals and community mental health settings, and treating patients.[450]  For his initial report, Dr. Geller visited eight Adult Homes and several types of mental housing and reviewed numerous documents, including the medical and mental health records of 188 Adult Home residents from an initial list of residents Plaintiff claimed were qualified to be served in supported housing.[451]  For his second report, Dr. Geller reviewed additional records as a sample from Plaintiff's list of

---

[447] P-583 (Bruce Dep.) 111.  Defendants' objections pursuant to Rules 402, 602, and 701 are overruled.  The evidence is relevant and based on Dr. Bruce's personal knowledge as a result of the Assessment Project and observations she had made.  Nor is this testimony inadmissible under Rule 701.  In any event, even if the court were not to consider this portion of Dr. Bruce's testimony, the record is replete with testimony from both sides, from fact witnesses and experts alike, that there are Adult Home residents who could be served in supported housing.

[448] Tr. 2409, 2370.

[449] See id. at 2285-90.

[450] See id.

[451] See id. at 2322-23; see generally S-52 (Geller Report).

residents from the Assessment Project data and determined what supports would be necessary in order for those residents to live in supported housing, though he disagreed with Plaintiff's view that all of those residents could be served in supported housing.[452]

In his first report, Dr. Geller concluded that only 63 of the 188 residents whose records he reviewed (33.5%) were "in the residential setting most appropriate to their needs, i.e., they should remain in Adult Homes."[453] He concluded that 16% of the sample could appropriately live in supported housing, and 21% could live in other types of mental health housing.[454] He did not consider the residents' preferences.[455] He testified that because the sample was taken from those whom Plaintiff claimed were qualified to move, if a sample were taken of all Adult Home residents, the percentage would be lower.[456] In his second report, Dr. Geller concluded that approximately 25% of the residents could live in supported housing without additional services.[457] As noted above, however, Dr. Geller testified at trial that 50% of the Adult Home residents whose records he reviewed could eventually be appropriately served in supported housing with or without ACT services, and that every single current Adult Home resident could live in apartments with varying degrees of support.[458]

Dr. Geller reached his conclusions without adequately investigating the ability and willingness of New York's supported housing providers to serve Adult Home residents. In forming his opinion about the capabilities of New York's supported housing providers, Dr.

---

[452] Tr. 2325-26.

[453] S-52 (Geller Report) 36.

[454] Id. at 37-38; Tr. 2310-11, 2318-19.

[455] Id. at 2318-19.

[456] Id. at 2322-23.

[457] S-53 (Geller Second Report) 10; Tr. 2329-31.

[458] See id. at 2409, 2370.

Geller reviewed only two responses to OMH's supported housing RFPs, both of which were seeking exclusively to serve homeless individuals and <u>categorically excluded</u> Adult Home residents from applying for beds developed under those RFPs.[459] Dr. Geller conceded that he was unaware of, and did not review a single response to, OMH's 2007 RFP to create 60 supported housing beds specifically for Adult Home referrals.[460]  In concluding from the two inapplicable RFP responses that New York's supported housing providers could not provide the level of services that Adult Home residents purportedly would require, Dr. Geller also did not consider that supported housing residents can obtain services such as ACT or intensive case management to assist them with support needs that are beyond the capabilities of the supported housing provider.[461]

Dr. Geller's conclusion that many Adult Home residents are not appropriate candidates for supported housing is also flawed because it is based on the mistaken belief that some Adult Home residents pose an immediate danger to themselves or others.[462]  For example, he testified that DAI's expert failed to take into account whether Adult Home residents placed in supported housing might "jump off a roof" or "set fires,"[463] but acknowledged on cross-examination that Adult Homes are not permitted to admit such individuals.[464]

Dr. Geller's analysis of the service needs of certain Adult Home residents likely overestimates the amount of services they would require in supported housing.  Dr. Geller

---

[459] <u>Id.</u> at 2412, 2414.

[460] <u>Id.</u> at 2415-16.

[461] <u>Id.</u> at 2412-14.

[462] <u>Id.</u> at 2368.

[463] <u>Id.</u> at 2328-30.

[464] <u>Id.</u> at 2368-69; <u>see also</u> <u>supra</u> note 429.

estimated the number of hours of services various Adult Home residents would require if they moved to supported housing without considering the extent to which the residents currently receive these services in the Adult Home.[465] DAI's experts provided several examples of residents whom Dr. Geller had deemed unfit for supported housing but who in fact appeared to have fairly limited support needs. Ms. Jones testified that although Dr. Geller classified one Adult Home resident as needing "24/7 support," the individual actually lived fairly independently at the Adult Home.[466] Dr. Duckworth discussed three instances in which he disagreed with Dr. Geller that particular Adult Home residents could not live in supported housing.[467] In light of the evidence that Adult Homes provide very minimal assistance with activities of daily living,[468] Dr. Geller's conclusion likely substantially overstates the amount of services Adult Home residents would require in supported housing.[469]

Dr. Geller's testimony that it would be "inhumane" and "possibly dangerous" to place all Adult Home residents in supported housing because, for example, individuals might "set[] a fire while learning to cook," and that Adult Home residents should therefore be taught independent living skills in the Adult Home before moving to more independent settings,[470] is contradicted by the weight of the evidence. Witnesses for both sides testified that independent living skills cannot effectively be taught in institutional or congregate settings, because the individuals are

---

[465] Tr. 2403-04.

[466] See Tr. 122-23.

[467] Tr. 842-50; see also P-571, P-572, P-573 (records of Adult Home residents).

[468] See supra note 347.

[469] See Tr. 88-89 (E. Jones) (testifying that Dr. Geller's analysis was flawed because Dr. Geller claimed that residents would need services in supported housing that those residents were not receiving in the Adult Homes).

[470] S-52 (Geller Report) 2, 17; Tr. 2341.

unable to practice the skills that are taught.[471]  Dr. Geller himself testified that "the system needs to have that person exist in an environment where they can use the skills."[472]  In any event, ACT teams can assist individuals with learning independent living skills in their own homes.[473]  In addition, the Pathways supported housing program, which specifically seeks out and successfully serves some of the hardest-to-serve individuals in the mental health system, is just one example of a supported housing provider that can safely serve individuals with a very wide range of support needs.[474]

> **l.**  **In Practice, OMH Does Not Require Individuals Leaving Institutional Settings To Proceed Through a "Linear Continuum"**

Several OMH officials testified that individuals with mental illness coming from institutional settings must move through a "linear continuum" of gradually less restrictive service settings over a period of years before they may "graduate" to fully integrated housing.[475]  The weight of the evidence – including Defendant OMH Commissioner Michael Hogan's testimony to the Legislature – contradicts this self-serving and inaccurate testimony.  While OMH continues to license and/or fund different types of Housing for Persons with Mental Illness,[476] individuals in OMH housing are not required to move from setting to setting.   While remnants

---

[471]  See supra notes 189, 190, 191, 192.

[472] Tr. 2360-61.

[473] See supra notes 248, 249.

[474] Tr. 247 (Tsemberis) ("Q. So, would it be fair to say you wouldn't shy away from difficult-to-serve clients? A. I think we seek them out and sometimes you actually have to fight the system to get them.").

[475]  See Tr. 1248-53 (Reilly) (describing so-called "linear continuum"); Tr. 2176-79 (Myers); see also Tr. 1436-44 (Madan) (describing "hierarchical" types of OMH housing).

[476] See supra note 221; Tr. 3176-77 (Myers) (testifying that while the focus of OMH's housing development is supported housing, OMH does not plan to eliminate other types of housing).

of the continuum approach may still persist in the programs of some community providers,[477] the

linear continuum model is inconsistent with OMH's own current practices and principles.[478]

Commissioner Hogan disavowed the "linear continuum" model in his recent testimony to

the Legislature. He stated that while "many staff and advocates have come to believe" in the

linear continuum model, that model is "inherently problematic" because "moving is especially

stressful for people with psychiatric disabilities and can contribute to problems and re-

hospitalization."[479] According to Commissioner Hogan, New York has now shifted its focus to

creating "safe, decent and affordable housing that is available long term, linked to flexible

services that can be increased or decreased as needed."[480]

As early as 1990, when OMH created its Supported Housing Implementation Guidelines,

it acknowledged the limitations of the continuum model:

> Although many individuals have received beneficial rehabilitation from the
> community residence program, which has helped them to live successfully in the
> community, the limitations of this approach have become apparent. People do not
> want to move each time they make progress in their rehabilitation; often
> affordable housing is not available for people to "transition" into; and many
> people do not want or may not require the structure of a residential program.[481]

---

[477] See, e.g., S-70 (CUCS Supportive Housing Options in NYC (2009 ed.)); Tr. 2215-18 (Bear) (testifying about the Jewish Board's programs); S-76 (description of the Jewish Board's programs); Tr. 2509-13 (Waizer) (describing FEGS's programs); S-58, S-59, S-60, S-61, S-62 (describing each level of FEGS's programs and their eligibility criteria); see also Tr. 299-300 (Tsemberis) (acknowledging the existence of mental health professionals who support the linear continuum model, but "[c]ertainly not the ones that I know," given the "real sea change" in the last ten years away from the continuum model ); Defs. Resp. PFF 15 (noting that two supported housing providers cited by Plaintiff as examples of supported housing providers who serve high-need target populations also operate a continuum of housing options, citing P-394, P-442).

[478] See, e.g., P-590 (2008–2009 Executive Budget Recommendation Highlights Testimony (Jan. 29, 2008) (Comm'r Hogan Testimony)) 4; S-67 (2008 RFP) OMH 43108 (targeting long-stay residents of psychiatric hospitals for supported housing).

[479] P-590 (Comm'r Hogan Testimony) 4.

[480] Id.

[481] S-11 (1990 Supported Housing Implementation Guidelines) OMH 37268; accord S-101 (2005 Supported Housing Implementation Guidelines) OMH 37514; see also P-59 (OMH Guiding Principles) 2 (noting that "[m]ost people want permanent, integrated housing that is not bundled with support services (housing as housing)").

Ms. Rosenberg testified that by the time she left OMH in 2004, the linear continuum "was really being abandoned by both New York and most places."[482] According to Ms. Rosenberg:

> [t]he whole issue of a continuum is also an old idea. It used to be thought that people had to move from . . . large congregate settings, to smaller congregate settings, to having a few roommates to eventually graduating to their own apartment. Nobody really thinks that much anymore. First of all, it would be like asking me to move every few months or every year or so just because I have to. So, it's quite disruptive, and also there is no evidence to show that people do better in the long run with you going through the continuum and, in fact, [people] could be placed directly in their own apartments with the right supports [and] can be quite successful.[483]

Ms. Rosenberg also made clear that OMH did not develop different types of service settings as part of any deliberate effort to create a "linear continuum" through which individuals needing housing would transition; rather, OMH over time began creating more integrated forms of housing as its thinking evolved about the best way to promote recovery.[484]

There is additional evidence that OMH no longer follows the continuum model. OMH's supported housing RFPs further demonstrate that individuals leaving institutional settings need not transition through gradually less restrictive service settings before "graduating" to supported housing. In recent years, OMH has issued several RFPs for supported housing that specifically target individuals leaving institutions such as psychiatric centers, hospitals, prisons, and Adult Homes.[485] These RFPs received numerous responses from supported housing providers eager to

---

[482] Tr. 755.

[483] Id. at 653.

[484] Id. at 755-56.

[485] See, e.g., P-748 (2009 RFP) 4 (targeting current residents of OMH psychiatric centers who have resided there for one year or longer); S-67 (2008 RFP) OMH 43108 (targeting psychiatric center patients, prison inmates, individuals with Assisted Outpatient Treatment ("AOT") orders); S-17 (2005 RFP) OMH 37306 (targeting psychiatric center patients, prison inmates, acute psychiatric unit patients, and individuals with AOT orders); S-33 (2007 RFP) OMH

serve those populations.[486]

DAI's experts, all of whom have worked in the mental health field for decades, testified that the "linear continuum" approach is no longer widely accepted. Dr. Duckworth testified that "the idea that people need to go through transitional housing, another move, another step, I think has been debunked pretty definitively in our field."[487] Ms. Jones testified that the continuum approach is "outdated," and the accepted approach in the states where she has worked is to provide individuals with permanent housing and add or subtract supports based on their specific needs.[488] Mr. Jones testified that the continuum model is "archaic" and that New York's views on it have "changed pretty significantly" in the last five to ten years.[489] Frances Lockhart – a former Federation of Organizations employee called by Defendants to testify that Federation still followed the "continuum" approach in operating its programs – acknowledged that even Federation sometimes accepts individuals into their supported housing programs directly from psychiatric centers without requiring those individuals to move through a continuum.[490]

Finally, to the extent the linear continuum of care model has ever been OMH policy, Adult Homes are simply not a part of that continuum.[491] The evidence shows that Adult Homes

---

42726 (targeting Adult Home residents); see also Tr. 1530-31 (Madan) (testifying that in some of its RFPs, OMH has required supported housing providers to accept referrals from psychiatric centers and prisons).

[486] Tr. 3478-79 (D. Jones) (testifying that 30 to 40 providers responding to the 2005 RFP proposed a total of roughly 1,500 beds); see also Tr. 1060-65 (D. Jones) (identifying numerous RFP responses).

[487] Tr. 846.

[488] Tr. 136-38.

[489] Tr. 1140-41; id. at 1143 (testifying that the continuum model was considered standard practice in the 1970s and 1980s).

[490] Tr. 2670-71. Ms. Lockhart also acknowledged that Federation has previously accepted Adult Home residents into its supported housing program. (Id. at 2640.)

[491] D-394 (Schimke Dep.) 48-49; Tr. 872: (Duckworth) (testifying that adult homes are "not part of a continuum of care").

are not transitional residences designed to prepare residents for more independent living; rather, they are permanent "destinations."[492] Even Defendants' expert, Mr. Kaufman, agrees that OMH views Adult Homes as "permanent" placements and "does not view adult homes as rehabilitation settings designed to transition consumers from supervised to independent settings."[493]

> m.  **Failure To File a Formal Application for Supported Housing Does Not Preclude Adult Home Residents from Being Qualified To Receive Services in Supported Housing**

OMH currently requires individuals seeking to live in any OMH-funded housing in New York City to submit an application to New York City's Human Resources Administration ("HRA").[494] Defendants contend that Adult Home residents are not "qualified" for supported housing unless they have applied and have been approved for supported housing by HRA.[495] The court rejects this contention. The evidence shows that HRA is merely a bureaucratic "clearinghouse" for OMH-funded housing whose determinations of individuals' suitability for a particular type of housing are often subject to change. In any event, many Adult Home residents lack a meaningful opportunity to submit an application to HRA for the housing of their choice.

Christine Madan, OMH's Director of Housing and Adult Services, described HRA as a "clearinghouse for receiving applications for housing for persons with mental illness in the city."[496] Based on this application – called an "HRA 2010(e)"[497] – HRA decides the types of

---

[492] Tr. 75-76 (E. Jones) (testifying that Adult Homes are "permanent placements" not designed for transition; people stay "20 or 30 years with no hope of moving to a community setting"); Tr. 872 (Duckworth) (testifying that Adult Homes are "destinations"); see also Tr. 690-91 (Rosenberg) (testifying that "certainly no one seems to leave unless they get rehospitalized or get ill and go to the hospital for a physical reason").

[493] Tr. 2910-11; S-54 (Kaufman Report) 5.

[494] Tr. 1276-77 (Reilly); Tr. 2628 (Lockhart); Tr. 1463 (Madan).

[495] See Defs. PFF ¶¶ 64–67.

[496] Tr. 1461-62.

housing for which an applicant may apply.[498]  In New York City, a Single Point of Access ("SPOA") system links housing applicants who have been approved by HRA to providers who administer the type of housing for which the applicant was approved.[499]  Using SPOA to apply for housing is optional; an individual can also apply directly to housing providers after receiving HRA approval.[500]  If an individual uses the SPOA process, he or she is guaranteed interviews with three housing providers.[501]  Individual housing providers make the final determination as to whether to accept an applicant into their residential programs.[502]

The evidence at trial made clear that an HRA determination of eligibility for a particular level of housing is not a reliable indication of the type of housing in which an individual could successfully be served.[503]  Kathleen Kelly of HRA also testified that HRA determinations are "not written in stone." [504]  To the contrary, it is a "flexible process," in which a service provider can "call the reviewer" or "transmit additional information" if the service provider disagrees with

---

[497] D-271 (New York City Supportive Housing Referral Application (HRA 2010(e)).  The previous version of the HRA application was the "HRA 2000," which was substantially similar to the HRA 2010(e), except that the HRA 2010(e) is electronic, includes questions about domestic violence, and has a separate application form for families. (Tr. 1895-96.)

[498] Tr. 1463 (Madan); Tr. 1913 (Kelly).

[499] See Tr. 1464-70 (Madan) (describing SPOA process and testifying that SPOA was designed to improve access to different types of housing, particularly for those who have had difficulty finding a placement).  OMH has contracted with CUCS to operate the SPOA in New York City.  (Id. at 1464-65.)  CUCS maintains a "vacancy report" on their website for various types of housing.  (Id. at 1465.)

[500] Tr. 1464 (Madan).

[501] Id. at 1468-70 (Madan).  If an applicant is unsuccessful after these interviews, he or she can request a case conference in which OMH, the housing provider, the applicant, and the applicant's treatment provider participate, to determine whether there are steps that could be taken to approve the applicant's placement.  (See id.)

[502] See, e.g., S-21, S-60.

[503] Tr. 346-47 (Tsemberis).

[504] Tr. 1908.

HRA's determination.[505]  Ms. Kelly further acknowledged that the experience level of the reviewer may impact the type of housing for which an applicant is approved.[506]

Approved HRA applications are an inappropriate measure of how many Adult Home residents are qualified for supported housing because of the inability of many residents to meaningfully utilize the HRA process.[507]  It is undisputed that Adult Home residents must rely on others to complete the application and submit it to HRA.[508]  The application is a complicated electronic form that is designed to be completed by a "referring agency," not the individual seeking housing.[509]  It requires detailed assessments of the applicant from both a psychiatrist and a social worker.[510]

Many Adult Home residents may not have anyone to assist them in completing an application.  Case managers and other mental health providers are not always willing to assist residents in completing the application or in applying for the type of housing that the resident desires.[511]  The record is replete with testimony from residents explaining that, when they

---

[505] Id.

[506] Id. at 1910.

[507] While 807 applications were submitted on behalf of Adult Home residents from January 2000 to January 2006, there is no indication as to the results of these applications.  (Tr. 1914 (Kelly).)  Only 21 Adult Home residents moved to supported housing in New York City from January 2002 through January 2006, and 65 moved to other forms of OMH Housing during that same time period.  (P-149.)

[508] See Defs. PFF ¶ 64 (stating that an HRA application is "usually filled out by the referring agency or provider, and . . . must include a professional clinical assessment, and a recommendation as to what type of housing and services the client requires.").

[509] Tr. 1462 (Madan) (testifying that HRA application is filed electronically and that a resident wishing to complete the application process would speak with a mental health provider); Tr. 1894 (Kelly) (testifying that the "referring agency" is supposed to complete the HRA application).

[510] Tr. 1894-95, 1897-98 (Kelly); Tr. 2106-07 (Burstein).

[511] See Tr. 1501-02 (Madan) (treatment provider completing the application, not resident, ultimately determines what kind of housing to apply for); see also, e.g., Tr. 390-91 (S.K.) (testifying that she spoke with her case manager about moving to more integrated housing about a year ago, but has not heard anything further from the case manager); P-546 (A.M. Dep.) 140-42, 128-32, 169 (had to "fight" to get HRA application filled out by case manager, who then failed to complete it properly); Tr. 614-16 (S.P.) (describing how his former psychologist

expressed an interest to case managers or other mental health providers in moving to more independent housing, they received no help – and often outright discouragement – in exploring and securing alternative housing options.[512]  For example, D.N. testified that when she asked a social worker to help her obtain an HRA application, the social worker responded "we don't do that here," and told her that she should apply on her own; she testified that another social worker told her it would be "better if you stay here."[513]  Staff or social workers employed by the Adult Home also have a motive to be unhelpful to residents seeking to move: the Adult Homes are for-profit enterprises that lose revenue with each resident who secures alternative housing.  Dr. Duckworth testified that case managers and other staff he observed working in the Adult Homes seemed to have "lost their professional autonomy" and "basically showed up to work and saw whoever the operator directed them to see."[514]  DOH has cited some Adult Homes for failing to follow up on residents' expressed desire to move.[515]

In sum, the evidence demonstrates that New York's supported housing program can and does serve individuals with a wide range of support needs and that the support needs of Adult Home residents could, in virtually every case, be easily addressed in supported housing.  The court therefore finds that virtually all of DAI's constituents are qualified for supported housing.

---

referred him to a case manager at a mental health program who started but did not finish his HRA application, but also that his current social worker helped him apply to a particular housing program, for which he recently had an interview); P-542 (L.G. Dep.) 105-06 (testifying that her therapist encouraged her to move out of the Adult Home but did not mention supported housing or any other type of OMH housing and never discussed the application process); Tr. 452-54 (G.L.).

[512] See supra note 511.

[513] P-536 (D.N. Dep.) 150-56.  Defendants' Rule 802 objection to the social workers' statements is overruled; the statements are admissible to show D.N.'s mental state.

[514] Tr. 870.

[515] Joint Stip. ¶ 23; see D-28 (DOH Inspection Report for Queens Adult Care (Aug. 6, 2002)) OMH 13147-48.

### 3. Conclusions of Law

#### a. Virtually All of DAI's Constituents Meet the Essential Eligibility Requirements of Supported Housing

Part of the inquiry as to whether supported housing is "appropriate to the needs" of DAI's constituents is whether DAI's constituents are qualified to be served in supported housing. In Olmstead, the Supreme Court held that states have an obligation to provide services and programs in community-based settings only if the individual with disabilities "meets the 'essential eligibility requirements' for habilitation in a community-based program," referring to the "most integrated setting appropriate" language in the regulations. 527 U.S. at 602 (citing 28 C.F.R. § 35.130(d)). "Not every eligibility requirement is an 'essential eligibility requirement.'" DAI I, 598 F. Supp. 2d at 333 (citing PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001)).

Applying the law to the facts, the court concludes that DAI has proven that virtually all of its constituents meet the essential eligibility requirements of supported housing. For virtually all of DAI's constituents, nothing about their disabilities necessitates living in the Adult Homes as opposed to supported housing, nor would they require services that are not already provided to people living in supported housing. The evidence at trial demonstrates that Defendants expect New York's supported housing programs to serve individuals with serious mental illness who have a wide range of support needs – including individuals transitioning directly from psychiatric hospitals and inpatient psychiatric centers, whom OMH terms "high need." The evidence at trial further demonstrates that the supports that would be needed by Adult Home residents to live independently are well within the capabilities of New York's supported housing providers to accommodate. Indeed, many of DAI's constituents would need only minimal supports.

Voluminous evidence supports the court's conclusion. After extensive investigations that included interviews with hundreds of residents and review of hundreds of mental health records, DAI's experts credibly and persuasively concluded that virtually all Adult Home residents could be served in supported housing. OMH's own former Senior Deputy Commissioner agrees with the conclusions of these experts that virtually all Adult Home residents could be appropriately served in supported housing.

In addition, OMH has issued supported housing RFPs <u>targeting</u> institutionalized individuals, including Adult Home residents themselves. Numerous responses to these RFPs by supported housing providers indicate that these providers are willing and able to serve individuals needing a wide variety of supports relating to managing their illness and learning independent living skills. Dr. Tsemberis testified that the Pathways program routinely and successfully serves individuals needing all manner of supports, and that Pathways does not regard many of the independent living issues cited by Defendants as absolute barriers to independent living to be "difficult issues" to resolve. In fact, in implementing the Legislature's 60-bed initiative, OMH has successfully transitioned residents of Adult Homes into supported housing.

Defendants' argument that DAI is seeking to "change the nature of supported housing" is without merit.[516] As the court found above, supported housing is not only for those who need "minimal" supports. Rather, it is targeted at individuals with mental illness who need varying levels of support. Nor does OMH require individuals to proceed through a "linear continuum" of care. Defendant OMH Commissioner Hogan testified to the Legislature, and Ms. Rosenberg

---

[516] Defs. PFF ¶¶ 191-92.

testified at trial, that OMH has abandoned that model and does not require institutionalized individuals to transition gradually through less restrictive forms of housing before moving to supported housing.

Defendants' own studies demonstrate that many Adult Home residents are qualified to move to supported housing. The Assessment Project, which Defendants commissioned, demonstrates that Adult Home residents are not a particularly disabled population. In addition, the Adult Care Facilities Workgroup, in a 2002 report significantly shaped by Defendants, recommended that 6,000 individuals with mental illness in adult homes be moved to supported housing. While Defendants contend that the Workgroup's recommendation of moving 6,000 adult home residents is "not based on sufficient data" to be reliable,[517] no one contends that the 6,000 figure is derived from quantitative data, because the State had not collected such data. Rather, the Workgroup Report is probative because it shows that a group of accomplished New York experts on mental health, chosen by Defendants, unanimously concluded that large numbers of individuals with mental illness in adult homes in or near New York City – a population that includes the Adult Home residents at issue in this case – could more appropriately be served in more integrated settings.

While Defendants contend that "it is impossible to know whether an individual can live safely in a particular type of housing without knowing what supports the person would need,"[518] they do not explain the basis for this assertion. Individuals residing in supported housing receive varying levels of support depending on their particular needs. While DAI must show – and has successfully shown – that its constituents meet the essential eligibility requirements for

---

[517] Defs. PFF ¶ 204.

[518] Id. ¶ 196.

supported housing, it is not DAI's burden to assess what specific supports each of its approximately 4,300 constituents would need once he or she is placed in supported housing. Supported housing providers routinely do assessments as part of their work to determine the specific supports their clients require.

Finally, the court concludes that failure to apply and obtain approval for supported housing is not an "essential eligibility" requirement for receiving services in supported housing. See PGA Tour, Inc., 532 U.S. at 688. The HRA process is a bureaucratic hurdle to placement in supported housing that requires detailed evaluations from psychiatrists and social workers. The evidence demonstrates that many Adult Home residents do not have anyone to assist them in filling out the form. In any event, this procedural requirement has nothing to do with the personal characteristics and capabilities of the individuals at issue. Whether an individual has completed an HRA application is unrelated to the question posed by the law of whether supported housing would be a setting appropriate to his or her needs.

> **b.** **DAI Is Not Required To Show That Each of Its Constituents Has Been Deemed Eligible for Supported Housing by a Treatment Provider**

Defendants contend that DAI has failed to show that its constituents are qualified for supported housing because DAI did not show that each of its constituents has been deemed eligible for supported housing by a treatment provider.[519] The court concludes that the law does not require DAI to do so in order to prove that its constituents are qualified.

Olmstead holds that a state "generally may rely on the reasonable assessments of its own professionals" in determining whether an individual is qualified to be served in a more integrated

---

[519] See Defs. PFF ¶¶ 194-95, 201-02.

setting. 527 U.S. at 602. In <u>Olmstead</u>, there was "no genuine dispute" as to whether the individuals at issue were "qualified" to be served in a more integrated setting, because the state's own professionals determined that community-based treatment would be appropriate. <u>Id</u>. at 602-03. The court does not read <u>Olmstead</u> as creating a requirement that a plaintiff alleging discrimination under the ADA must present evidence that he or she has been assessed by a "treatment provider" and found eligible to be served in a more integrated setting.

In <u>Joseph S. v. Hogan</u>, 561 F. Supp. 2d 280 (E.D.N.Y. 2008), the district court found that no eligibility determination from the "state's mental health professionals" is required, noting that "it is not clear whether <u>Olmstead</u> even requires a specific determination by any medical professional that an individual with mental illness may receive services in a less restrictive setting, or whether that just happened to be what occurred in <u>Olmstead</u>." <u>Id</u>. at 291. In <u>Frederick L. v. Department of Public Welfare</u>, 157 F. Supp. 2d 509 (E.D. Pa. 2001), the district court declined to read <u>Olmstead</u> as requiring "a formal 'recommendation' for community placement, as that term may be used in the mental health field," noting that "<u>Olmstead</u> does not allow States to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities." <u>Id</u>. at 540; <u>see also</u> <u>Long v. Benson</u>, No. 08-cv-26 (RH/WCS), 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008) (noting that the State "cannot deny the right [to an integrated setting] simply by refusing to acknowledge that the individual could receive appropriate care in the community. Otherwise the right would, or at least could, become wholly illusory."); <u>cf.</u> <u>Fisher</u>, 335 F.3d at 1181 & n.7 (when there was no dispute as to whether community placement was appropriate, citing the standard as "when treatment professionals have determined that community placement is

appropriate for disabled individuals"); but see Martin v. Taft, 222 F. Supp. 2d 940, 972 & n.25 (S.D. Ohio 2002) (requiring plaintiffs to plead "that the state's professionals have determined the plaintiffs are qualified for community-based care, or . . . facts from which it may be inferred that the determinations of the state's professionals are manifestly unreasonable.").

DAI has presented persuasive evidence from a variety of sources, including the Defendants' Assessment Project, that its constituents are qualified to receive services in the community. It need not prove "qualification" in the form of determinations from the Adult Home residents' "treatment professionals." To find otherwise would render the ADA's integration mandate effectively unenforceable as to Adult Homes. The evidence demonstrates that OMH considers Adult Homes to be permanent placements. Defendants have admitted that they do not perform any ongoing assessments of Adult Home residents to determine whether they could be served in alternative settings.[520] The evidence does not demonstrate that Adult Home residents are routinely assessed by their own treatment providers as to their "qualifications" to receive services in the community. The for-profit Adult Homes (and the treatment providers employed by them) have no incentive to assist them in moving to alternative housing. Individual case managers and providers are "expected" to bring up the topic of housing with Adult Home residents and follow up with assisting residents who want to move, but there is evidence that case managers and other providers have actually discouraged Adult Home residents who seek to move.

Given the facts of this case, to require determinations from treatment providers would indefinitely forestall Adult Home residents who are actually qualified to receive services in the

_____

[520] S-133 (Defs. Obj. & Responses to Pl. First Set of Requests for Admissions) Nos. 12, 14.

community from access to the most integrated setting appropriate to their needs, simply because their own treatment providers have not bothered to assess them. Such a result would eviscerate the integration mandate as applied to this case. It would condemn the placements of DAI's constituents to the virtually unreviewable discretion of the various entities on whom the State relies to deliver services to Adult Home residents. This is not what Olmstead contemplates. See Frederick L., 157 F. Supp. 2d at 540 ("Olmstead does not allow States to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities."); Long, 2008 WL 4571904, at *2. Accordingly, the court finds as a matter of law that DAI is not required to provide determinations from its constituents' treatment providers in order to show that its constituents are qualified to move.

### C. DAI'S CONSTITUENTS ARE NOT OPPOSED TO RECEIVING SERVICES IN MORE INTEGRATED SETTINGS

#### 1. Legal Standard

As the Supreme Court explained in Olmstead, the ADA does not impose accommodations on individuals who do not want them, and accordingly it does not force individuals who oppose moving to a more integrated setting to do so. See Olmstead, 527 U.S. at 602 ("Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it.") (citing 28 C.F.R. § 35.130(e)(1), 28 C.F.R. pt. 35 app. A, at 450 ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.")).

## 2.  Findings of Fact

The court finds that DAI's constituents, as a whole, are not opposed to living in more integrated settings.  Adult Home residents have expressed preferences for living in more integrated settings, and there is convincing evidence that many would choose to live in an independent setting such as supported housing if given an informed choice.

### a.  Most Adult Home Residents Had Little or No Choice in Moving to an Adult Home

By and large, people with mental illness come to live in Adult Homes not by choice, or because a mental health professional determines that an Adult Home is the most appropriate setting to serve their needs.  Rather, most of DAI's constituents entered Adult Homes because they had nowhere else to go.  Ms. Rosenberg testified that, when thousands of patients were discharged from the State's psychiatric centers, "housing was scarce" and "beds were available" in the Adult Homes.[521]  As Defendants' witness Karen Schimke testified, "[r]esidents in adult homes, particularly residents with psychiatric disabilities, often were placed there simply because it was . . . four o'clock on a Friday afternoon and they had no other options, not because it was necessarily the place of choice."[522]  DAI's expert Elizabeth Jones reported that she "met very few residents who were offered options other than an adult home."[523]  Many residents had previously been "confined to a state or community psychiatric hospital and were eager to leave that setting," or had been "homeless and were desperate for an alternative to a shelter."[524]

---

[521] Tr. 646.

[522] D-394 (Schimke Dep.) 10-11.

[523] S-151 (E. Jones Report) 3.

[524] Id.

Numerous current and former Adult Home residents testified that they had little or no choice regarding whether to move in to an Adult Home. Former Adult Home resident I.K. explained that when she was discharged from the hospital, an Adult Home was "the only thing offered" to her as a housing option.[525] The only alternative she was offered to the Adult Home was another Adult Home.[526] Similarly, G.L. testified that he was given "two choices" when he was discharged from the hospital: a "long term psychiatric facility" or an Adult Home.[527] Because he had "already been in a psychiatric facility" and "had no desire to go back into one," he "decided to take [his] chance[s] with the adult home," although he had "absolutely no idea" what it would be like.[528] Other current and former residents provided similar testimony.[529]

> **b.** **Most Adult Home Residents Are Uninformed About Alternative Housing Options**

Most Adult Home residents are not adequately informed about housing alternatives to the Adult Homes. In general, residents are unaware of other housing options and the wide range of

---

[525] Tr. 2685.

[526] Id. at 2685-86.

[527] Tr. 448.

[528] Id. at 449.

[529] P-537 (P.C. Dep.) 46-47 (testifying that upon discharge from hospital, social worker told him that he could either move to an adult home or go to a shelter), 187-88 (testifying that he knows that many residents at the Adult Home "want to move into different housing," but believes "[t]here are not that many programs for disabled people with mental disabilities in the city"); P-536 (D.N. Dep.) 192:15-201 (upon discharge from hospital, was told if she did not take adult home placement, she would not be allowed in that hospital again); P-541 (S.B. Dep.) 137-38 (resident was discharged from the hospital to a nursing home because he had "nowhere else to go," and social worker at the nursing home arranged for him to move to an adult home when his "insurance ran out"); P-540 (P.B. Dep.) 29-32 (testifying that when she was discharged from hospital, she was sent to the Adult Home because her social worker "picked it for [her]," and she was not accepted anywhere else). Defendants' Rule 802 objection to pages 192:23-193 of D.W's deposition is overruled; the testimony is admissible as a threat, which is not hearsay. Defendants' objection to pages 194:24-195:4 of D.N.'s deposition is overruled; the testimony is admissible not for the truth of the matter asserted, but the mental state of D.N., the listener.

assistance that would be available to them in supported housing and other settings.[530] Ms. Rosenberg testified that during her tenure at OMH, residents had only the "vaguest" information about housing alternatives.[531] Defendants' expert Dr. Geller agreed that residents are not adequately informed of housing options.[532] Ms. Burstein, the administrator of Park Inn, testified that the "path wasn't clear" to Adult Home residents seeking alternative housing.[533] I.K. testified that the Adult Home "does not provide information about services to help you get out of the home."[534] The responsibilities of OMH-funded case managers include informing residents about other housing options,[535] and Defendants' witnesses repeatedly testified that they "expected" Adult Home case managers, social workers, and other mental health professionals to fulfill their responsibilities.[536] Defendants have not analyzed, however, whether the OMH-funded case management is effective.[537] In addition, residents who do not participate in a case management program may not receive any information about alternative housing options.[538] For

---

[530] See, e.g., S-151 (E. Jones Report) 11 (residents "have not been informed about the array of housing options provided by the state of New York, the benefits available to them, or the complement of providers experienced in supporting adults with mental illness").

[531] Tr. 663.

[532] Tr. 2416.

[533] Tr. 2083-84.

[534] Tr. 2734-35; see also id. at 2732, 2736-37 (describing her previous difficulties in obtaining alternative housing, such as missing an interview for housing because Access-a-Ride did not show up, and explaining that she turned down a placement in an SRO because she did not want to live in an SRO and the neighborhood was unsafe).

[535] Tr. 2628-2629, 2630-32 (Lockhart); Tr. 2525, 2549-51, 2555 (Waizer).

[536] Tr. 1500-02 (Madan); Tr. 1364-66 (Reilly).

[537] See Tr. 1703-04 (Wollner) (testifying that he does not know of any analysis as to whether any Adult Home residents have moved to supported housing as a result of the OMH Case Management Initiative); see also Tr. 2918-19 (Kaufman) (testifying that he did not reach an opinion as to whether the OMH Case Management Initiative was successful because it was just starting at the time of his investigation in this case).

[538] Tr. 2663-64 (Lockhart) (testifying that residents who have not participated in a case management program would likely not be familiar with alternative housing opportunities); Tr. 1835 (Dorfman) (testifying that he is unaware of what information about housing opinions is provided to residents in Adult Homes without OMH case management); see also Tr. 2917-18 (Kaufman) (testifying about his observations that Adult Home staff and on-site treatment

example, G.L.'s medical records from when he lived in the Adult Home indicate that his therapist spoke to him about supported housing several times,[539] but G.L. testified that he received "very, very little" information about housing from his social worker and that conversations with her were "very discouraging."[540] Another resident testified that her therapist encouraged her to move out of the Adult Home but did not mention supported housing or any other type of OMH housing.[541]

### c. The Majority of Adult Home Residents Evaluated in the Assessment Project Expressed an Interest in Living Elsewhere

The Assessment Project found that, of the approximately 2,000 adult home residents with mental illness assessed, more than 56% expressed an interest in leaving the adult home, with 35.5% desiring to move to their own apartment and another 21.2% wanting to move in with family.[542] A total of approximately 75% of the residents assessed either expressed an explicit interest in living elsewhere, or at the least, did not express a preference for living in the adult home.[543] Ms. Wickens, a Deputy Director at DOH, testified that when she conducted town hall meetings with adult home residents about the Assessment Project in 2002, residents asked, "When I do the assessment, when can I leave?"[544]

---

providers were not "up-to-date" and "could benefit from education as to what is going on in the field," what expectations are possible, and "what services could be provided").

[539] See D-417 (G.L. Mental Health Records) GL-MHP 71, 95, 139, 142, 143, 150.

[540] Tr. 452-54.

[541] P-542 (L.G. Dep.) 105-06.

[542] P-583 (Bruce Dep.) 94-95.

[543] Tr. 1050-51 (D. Jones) (noting that an analysis of the Columbia Presbyterian Assessment data showed that 75% of adult home residents assessed were not opposed to moving).

[544] P-566 (Wickens Dep.) 74.

Plaintiff's witnesses credibly testified that the Assessment Project's data underestimate the numbers of adult home residents who would express a preference for moving if given a meaningful choice. As noted above, Adult Home residents are uninformed about alternative housing.[545] The surveyors conducting the assessments did not educate adult home residents about supported housing or other housing options prior to asking whether the residents would like to move out of the adult home, nor did they inquire as to whether the residents had any understanding of these options.[546] As Ms. Rosenberg testified, "for many people in adult homes," the Assessment Project "may have been the first time they heard the words 'Supported Housing,' and I'm sure most of the people had no idea in the world [what] Supported Housing was . . . ."[547] Ms. Rosenberg testified that, based on her observations during her long tenure working in the State's mental health system, if adult home residents were educated about what supported housing is, a "majority" would choose to live in their own apartments rather than an adult home.[548]

Similarly, as Dr. Kenneth Duckworth explained, because the residents evaluated in the Assessment Project were not presented with a "legitimate alternative that was concrete and believable," the 56% of residents who reported a preference to move out of their adult home is merely "a floor" with regard to who would truly be willing to move if given the proper "encouragement."[549] Dr. Duckworth estimates that "probably four out of five" residents would

---

[545] See supra Part III.C.2.b.

[546] P-583 (Bruce Dep.) 97-98.

[547] Tr. 663.

[548] Id. at 712-13.

[549] Tr. 810, 872-73, 874, 876-77.

be willing to move to more independent settings if provided with a meaningful option.[550] According to Dr. Duckworth, "the only way we can know the actual choice individuals would make is if we support them in a true choice, including by making options available."[551]

DAI's other experts reached similar conclusions. Ms. Jones opined that, of the 179 residents with whom she spoke during her visits to Adult Homes, "[t]he great majority – 91% . . . wants to live somewhere else," and would choose to do so if given the opportunity to make an informed choice.[552] Mr. Jones reached the same conclusion. In his experience, "[i]ndividuals with mental illness routinely choose to live in integrated community settings when they understand their options and are assured that appropriate, reliable supports will be available during the transition and beyond."[553] Accordingly, Mr. Jones concluded that, if provided with information about the nature of supported housing along with the programmatic and financial supports that would be available, "the great majority of adult home residents will very likely choose to move to integrated settings."[554]

Defendants unequivocally acknowledge the importance to mental health consumers of "informed choice" with respect to the settings in which they receive services. According to OMH's website, "[r]esearch suggests that when people have adequate information regarding their options and are supported in their decision making, they are likely to make healthier and

---

[550] Tr. 874-75.

[551] S-80 (Duckworth Reply Report) 6.

[552] S-151 (E. Jones Report) 9; see also Tr. 44 (E. Jones) (testifying that "virtually all of the Adult Home residents [she] spoke with would choose independent living or supported housing if they were given a choice of that . . . .").

[553] S-150 (D. Jones Report) 11.

[554] Id.; see also Tr. 1020-1022 (testifying that the percentage of residents expressing a preference to live in supported housing as opposed to an Adult Home would be "much higher" than the Assessment Project data reflects if they were adequately informed).

more positive choices.  The person who advocates for his/her choices in regards to services and/or course of treatment is likely to recover[] more quickly."[555]  Studies conducted by OMH have revealed that "[p]eople who reported the most satisfaction with their housing choices also reported significantly higher overall quality of life."[556]

### d. Adult Home Residents Have Continually Expressed a Preference for Supported Housing

The enthusiastic responses of Adult Home residents to the housing forums OMH conducted in late 2008 and early 2009 in eleven Adult Homes support the conclusions of DAI's experts.[557]  These forums were conducted to educate residents about supported housing in order to fill the 60 beds set aside by the Legislature.[558]  Ms. Burstein testified that after two housing forums were held at Park Inn, residents were "very excited" to learn "that there's something out there for them."[559]  She explained that the path to independent housing for Adult Home residents has historically been "unclear," with "very long waiting lists" and bureaucratic hurdles.[560]  She testified that "having an informational setting where the residents can get all the information they

---

[555] S-97 (OMH website description of ACT) 3 (describing ACT) (internal citations omitted).

[556] P-527 (OMH, Progress Report on New York State's Public Mental Health System (Jan. 2001)) 20 (citation omitted).

[557] The eleven Adult Homes that had these forums are the ones with OMH-funded case management.   In addition to the forums in the eleven Adult Homes, OMH held another housing forum in a public library for those who live in Adult Homes that do not have OMH-funded case management, which Mr. Dorfman estimates was attended by 30 residents.  (Tr. 1785-91 (Dorfman).)

[558] See Tr. 1783-91 (Dorfman) (describing meetings with housing providers, advocacy groups, adult home operators, State employees; development of planning committees for each home; and housing forums).

[559] Tr. 2083.

[560] Id.

would need to move on was just very, very informative, and it was very encouraging, and it gave residents a lot of hope."[561]

Documents in the record reflect similarly enthusiastic responses to the other forums. An e-mail from an OMH employee describing a forum at Anna Erika states that when the administrator of the Adult Home asked the residents to indicate, by a show of hands, who wanted to move out of the facility, "all of the residents raised their hands," and "[s]ome of the residents comment[ed] . . . that they feel 'trapped' living in the adult home and have no money to move out on their own."[562] DAI's expert Mr. Jones noted that the residents' responses, in light of the "intimidating" circumstances, were an indication that the residents are "pretty highly motivated" to leave the Adult Home.[563] At forums held in other Adult Homes, residents similarly expressed interest in supported housing.[564]

Numerous Adult Home residents offered testimony about how living independently was important to them. For example, P.B. testified that she would prefer an apartment where it

---

[561] Id. at 2084; see also id. ("[O]ften the residents have the ability to live independently . . . and here were real-life people saying . . . 'you can come live independently,' and . . . that made them very encouraged."). Ms. Burstein also testified that Park Inn encouraged all of its residents to attend the first forum, and approximately 100 residents attended; about 30 to 40 residents attended the second forum at Park Inn. (Id. at 2082-83.)

[562] P-357 (Dorfman e-mail re: Anna Erika housing forum, June 19, 2008).

[563] Tr. 1074-75.

[564] P-354 (Dorfman e-mail re: Brooklyn Adult Care Center housing forum, June 3, 2008) ("Overall, the residents that were in the forum expressed much interest in obtaining supportive housing."); P-355 (Dorfman e-mail re: Sanford Home housing forum, June 6, 2008) (noting that five residents in attendance "expressed a lot of interest in living independently" and asked the housing providers "a lot of on point questions"); P-356 (Dorfman e-mail re: Riverdale Manor housing forum, June 12, 2008) (describing the forum as a "success judging by the number of residents that expressed interest in housing and the numerous questions asked at the end of the forum"); P-358 (Dorfman e-mail re: Rockaway Manor housing forum, June 26, 2008) (residents "asked a lot of good questions at the end of this forum and agreed to participate in the groups that will help them move to independent living").

Defendants assert that the enthusiastic responses to the forums overstates the number of Adult Home residents who are interested in supported housing because the residents invited to the first round of housing forums were already "on the cusp of being ready" to move. (Defs. Resp. PFF 12.) Yet evidence in the record indicates that not all of the forums were selective; Ms. Burstein testified that "Park Inn encouraged all of its residents to attend the first forum, and approximately 100 residents attended." (Defs. PFF ¶ 110 (citing Tr. 2082-83 (Burstein).)

would be "much cleaner and you [could] be on your own and you could do what you want to do, and you don't have to be in at a certain time," and where she "wouldn't have to depend" on others to prepare her meals.[565]  S.B. testified that he would like to have his own apartment with his girlfriend.[566]  L.G testified that she does not like living in the Adult Home and has wanted to move to her own apartment for a long time.[567]  Former Adult Home resident A.M. testified that he had wanted to move out so that he could "grow" and become "more independent."[568]  I.K. provided compelling testimony about the effect that moving from an Adult Home to supported housing had on her.[569]

As OMH has acknowledged, however, one of the harms of long-term institutionalization is that it instills "learned helplessness," making it difficult for some who have been institutionalized to move to more independent settings.[570]  Several of DAI's witnesses explained that people with mental illness who have spent much of their lives in an institutional setting tend to be highly reluctant to move on, even if they are capable of living independently.[571]  As a result, some residents may be reluctant or ambivalent about leaving the Adult Home.[572]  For

---

[565] P-540 (P.B. Dep.) 168-170:2.  Defendants' Rule 402 objection to the cited portion is overruled.

[566] P-541 (S.B. Dep.) 89-90.

[567] P-542 (L.G. Dep.) 102-03.

[568] P-546 (A.M. Dep.) 203-04.

[569] See supra notes 260, 261.

[570] D-182 (OMH 2009-2010 Mental Health Update & Exec. Budget Testimony) OMH 43461-63.

[571] See, e.g., Tr. 810, 874 (Duckworth) (explaining that people with mental illness who have suffered a "history of broken promises" at the hands of the mental health system "tend to be conservative" with respect to change); Tr. 91 (E. Jones) (testifying that reluctance "isn't uncommon when people come out of institutional settings where they've been dependent for so many years"); S-151 (E. Jones Report) 11; see also supra notes 194, 204 (describing learned helplessness and culture of dependency in Adult Homes).

[572] See S-151 (E. Jones Report) 10 ("Although the great majority of residents desire to live elsewhere, I did speak with some residents who prefer at this time to remain in the Adult Homes."); P-569 (G.H. Dep.) 183 (testifying that "I want to [move], but I'm not mentally ready for it. . . .  [Y]ou're there 19 years, you learn hopelessness by being there so long and being in the mental health system so long."). One resident testified that he did not want to move to

example, while the testimony of former Adult Home resident G.L. demonstrates that G.L. is currently flourishing in supported housing,[573] his medical records from when he lived in the Adult Home demonstrate that he formerly expressed ambivalence about moving to supported housing or a more independent setting.[574] Former Adult Home resident I.K. acknowledged that she had formerly felt ambivalent about leaving the Adult Home, "because the adult home fosters complete dependency upon them to do everything for you, discourages independence, does not provide information about services to help you get out of the home. Anything that I know about getting out of the home I learned from outside sources."[575] A current Adult Home resident who had been living in the Adult Home for twenty years at the time of her deposition testified that there was not any place she would rather live "right now," that she was "not ready to move yet," and that she liked living in the Adult Home because she had not been hospitalized while living there, although she was "thinking about [supported housing] for [the] long-term."[576]

---

"supportive housing" because it was "almost the same" as the Adult Home. (P-543 (R.H. Dep.) 149-50.) He testified that he liked being on the Residents' Council at the Adult Home: "I like working with the residents, advocating for them, doing what I can for them. And I've seen a lot of residents and it's sad. It's real sad to see a person 24 hours a day in a smoking room, for example, smoking all day long. It's sad to see that, not going out much, getting clothing from – getting clothing from donations, dependent upon it, and pass away. . . . [S]ome lives, if you really want to know, are left there, forgotten, smoke all day, and it's sick, pass away, and that's some of them." (Id.)

The observations of Defendants' experts that their "overall impressions" from speaking with Adult Home residents was that the residents were "satisfied" with living in the Adult Home does not rebut the evidence that Adult Home residents, on the whole, are not opposed to moving. (Defs. Resp. PFF 10-11; Tr. 2298-99 (Geller) (testifying that residents were satisfied and that food was the "most common concern"); S-52 (Geller Report); Tr. 2885-86, 2894 (Kaufman) (testifying that the 20-25 residents with whom he spoke were "generally satisfied" with their living situation).)

[573] See Tr. 463-64, 485-86, 495, 496, 498.

[574] See D-417 (G.L.'s Mental Health Records) GL-MHP 37, 71, 95, 99, 139, 142-43.

[575] Tr. 2734-35; see also id. at 2732, 2736-37 (describing her previous difficulties in obtaining alternative housing, such as missing an interview for housing because Access-a-Ride did not show up, and explaining that she turned down a placement in an SRO because she did not want to live in an SRO and the neighborhood was unsafe).

[576] P-538 (B.J. Dep.) 31:20-34, 42-43, 89, 92:8-93:10. B.J. testified that adult homes are the "[b]est thing that can ever happen to mental patients." (Id. at 92-93.)

Fear and reluctance to move is hardly unique to Adult Home residents. The State has long encountered this issue in its psychiatric facilities and has developed effective methods for combating it. Lewis Campbell, who testified regarding the administration of the State's psychiatric centers, conceded that individuals who have spent long periods of time in a psychiatric facility often become "institutionalized" – that is, they become fearful of and resistant to leaving the hospital, even if they are quite capable of living in an integrated community setting.[577] Mr. Campbell explained that it is becoming increasingly common for hospitals to incorporate into their discharge policies efforts to assist patients who are "resistive to discussion and/or involvement with the discharge plan."[578] The discharge policy for Manhattan Psychiatric Center, for example, includes a program called "Bridger Services," which designates a staff person to "accompany patients on formal interviews and trial visits," "network with community providers so as to provide a smooth transition for their patients," and "provide follow up during the [post-discharge transition] period to ensure a continuum of care."[579] The "Bridgers" "maintain services as necessary until a Community Intensive Case Manager and/or Supportive Case Manager has connected with their patient."[580] Bridger Services have been implemented in the hospital Mr. Campbell administers and are "very effective" in assisting patients with the transition to the community.[581]

As numerous witnesses testified, having a stable, safe, and permanent place to call home is a universal desire, and people with mental illness are no different from anyone else in this

---

[577] Tr. 1582-83.

[578] Id. at 1583-84.

[579] D-11 (Manhattan Psychiatric Center, Discharge Planning Policies) OMH 703.

[580] Id.

[581] Tr. 1584-85 (Campbell).

regard.[582]  Indeed, according to OMH's "Guiding Principles," "[h]ousing is a basic need and [is] necessary for recovery.  Most people want permanent integrated housing that is not bundled with support services (housing as housing)."[583]

### 3.        Conclusions of Law

As Olmstead provides, "[t]here is no federal requirement that community-based treatment be imposed on patients who do not desire it," 527 U.S. at 602.  Olmstead cited the regulation providing that "persons with disabilities must be provided the option of declining to accept a particular accommodation."  Id., citing 28 C.F.R. § 35.130(e)(1), app. A.  Applying the legal standard to the facts, the court concludes that DAI's constituents, as a whole, are not opposed to moving to more integrated settings.

Analyses conducted by both DAI's experts and Defendants' Assessment Project demonstrate that large numbers of Adult Home residents are not opposed to moving and would choose to live in settings other than the Adult Homes.  These findings are confirmed by the enthusiastic responses of residents to the recent housing forums held by OMH in connection with the Legislature's allocation of 60 supported housing beds for Adult Home residents.  The court concludes that, with accurate information and a meaningful choice, many Adult Home residents

---

[582] See Tr. 294 (Tsemberis) (testifying that a "home," and not merely "housing," provides a "sense of ontological security," and is an essential "foundation" without which a person will not "be able to consider their treatment needs, or their higher order needs"); Tr. 851 (Duckworth) ("Most people have the dream of having their own place whether they've been saddled with schizophrenia or not.  It's an American phenomen[on] to want to have your own place . . . ."); Tr. 1010-11 (D. Jones) (testifying that when people have a safe and permanent home, they can "meaningfully go to work on the other aspects of their lives, including . . . treatment engagement").

[583] P-59 (OMH Guiding Principles) 2; see also P-527 (OMH, Progress Report on New York State's Public Mental Health System) 19 ("For most of us, achieving a sense of community belonging hinges on having a decent place to call home."); Tr. 2159 (Newman) (agreeing with the proposition that, "by and large, supported housing is what mental health consumers are telling the Office of Mental Health they want today").

would choose to live and receive services in a more integrated setting, such as supported housing.

In sum, DAI has proven by a preponderance of the evidence that its constituents are not in the most integrated setting appropriate to their needs and are not opposed to moving to a more integrated setting. Accordingly, it has shown that Defendants are in violation of the integration mandate of the ADA and the Rehabilitation Act.

## IV. FUNDAMENTAL ALTERATION DEFENSE

The court turns now to the fundamental alteration defense, on which Defendants have the burden of proof. See Olmstead, 527 U.S. at 604; Frederick L. I, 364 F.3d at 493-94 (noting that once plaintiffs have established a prima facie case, the burden shifts to defendants to establish the fundamental alteration defense); Messier v. Southbury Training Sch., 562 F. Supp. 2d 294, 323 (D. Conn. 2008) (noting that the fundamental alteration defense is used to rebut a prima facie case of discrimination under the ADA).

DAI seeks an injunction directing Defendants to take such steps as are necessary to enable DAI's constituents to receive services in the most integrated setting appropriate to their needs.[584] DAI specifically seeks, among other things, an increase in supported housing beds to accommodate DAI's constituents who desire to live in supported housing.[585] The court has conducted a specific, fact-based analysis to determine whether this relief constitutes a "fundamental alteration" of the State's programs and services, taking into account both Defendants' efforts to comply with the integration mandate with respect to Adult Home residents and the fiscal impact of the requested relief, including any potential impact on the State's ability

---

[584] Pl. PFF ¶ 295.

[585] See id. ¶ 298.

to provide services for other individuals with mental illness.  See DAI I, 598 F. Supp. 2d at 334

(framing inquiry).  After considering all of the evidence on the defense, the court concludes that

Defendants have not met their burden to demonstrate that the relief DAI seeks would be a

fundamental alteration.  Defendants do not have an effective or comprehensive plan to enable

DAI's constituents to receive services in the most integrated setting appropriate to their needs,

nor have they shown that the relief DAI seeks would increase the State's costs.

### A.      LEGAL STANDARD

The court fully analyzed the law regarding the fundamental alteration defense in DAI I,

and will not repeat that analysis here.  See DAI I, 598 F. Supp. 2d at 333-56.  In short, the

"fundamental alteration" defense is derived from the "reasonable modifications regulation,"

which states that [a] public entity shall make reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of

disability, unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 32.130(b)(7).  In

Olmstead, a plurality of the Court explained:

> Sensibly construed, the fundamental-alteration component of the reasonable
> modifications regulation would allow the State to show that, in the allocation of
> available resources, immediate relief for the plaintiffs would be inequitable, given
> the responsibility the State has undertaken for the care and treatment of a large
> and diverse population of persons with mental disabilities.

Olmstead, 527 U.S. at 604.

The Supreme Court also explained in Olmstead that a state might show that a proposed

modification was a fundamental alteration if it demonstrated that it already had a

"comprehensive, effectively working plan" for placement of persons with mental illness in "less

restrictive settings" (which subsequent cases term an "Olmstead plan") and a "waiting list that moved at a reasonable pace." Id. at 605-06. Therefore, before ordering relief, a court must consider the range of services that a state already provides to persons with mental disabilities, and it may not "order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions." Id. at 597, 606.

This court concluded on summary judgment that an Olmstead plan is not a requirement in order for the state to mount a fundamental alteration defense, but that "[a] state's efforts to comply with the integration mandate with respect to the population at issue are nonetheless an important consideration in determining the extent to which the request relief would be a permissible 'reasonable accommodation' or an impermissible 'fundamental alteration.'" DAI I, 598 F. Supp. 2d at 339 (citing Martin v. Taft, 222 F. Supp. 2d 940, 985-86 & n.42 (S.D. Ohio 2002)). The court also agreed with the Third Circuit's view that a state must make efforts to comply with the integration mandate in order to show that the specific relief requested would be too costly. DAI I, 598 F. Supp. 2d at 339 ("If a state does not make a genuine attempt to comply with the integration mandate in the first instance, it cannot establish that compliance would be a fundamental alteration of its programs and services . . . ."); see Pennsylvania Protection & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 381 (3d Cir. 2005).

With respect to what constitutes a fundamental alteration, this court concluded on summary judgment that "[w]here individuals with disabilities seek to receive services in a more integrated setting – and the state already provides services to others with disabilities in that setting – assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'" DAI I, 598 F. Supp. 2d at 335 (citing Messier, 562 F. Supp. 2d at 345

(holding that where community placement can be accommodated through existing programs, it would not be a fundamental alteration to require the state to assess class members for determination whether they were appropriate for those programs)).

In considering the resources available to the State, the relevant budget is the "mental health budget," which includes any money the State receives, allots for spending, and/or spends on services and programs for individuals with mental illness. DAI I, 598 F. Supp. 2d at 350. Under that standard, for purposes of this case, the resources available to the State include funds that OMH, DOH, the Governor, or the Legislature spends on persons with mental illness. The analysis includes not only current spending on mental health services and programs, but also savings that will result if the requested relief is implemented. Id. (citing Olmstead, 527 U.S. at 604-07). Courts have required states to provide a "specific factual analysis" to demonstrate that the requested relief would constitute a "fundamental alteration." DAI I, 598 F. Supp. 2d at 335 (citing Fisher, 335 F.3d at 1183 (refusing to accept fundamental alteration defense absent specific evidence that the costs of providing the requested relief would "in fact, compel cutbacks in services to other Medicaid recipients" or be inequitable to others with disabilities); Townsend, 328 F.3d at 520).

### B. FINDINGS OF FACT

#### 1. Defendants Have No Comprehensive or Effective Plan To Enable Adult Home Residents To Receive Services in More Integrated Settings

Defendants have provided evidence concerning their efforts to comply with the Supreme Court's decision in Olmstead to ensure that people with mental illness in New York State receive services in the most integrated setting appropriate to their needs. Defendants have asserted that

no Olmstead plan is needed for Adult Home residents, because they contend that Adult Homes are already in the community.[586]  Defendants have no single document constituting an "Olmstead plan,"[587] and no witness at trial testified to the existence of a plan, either written or unwritten, to enable Adult Home residents to move to more integrated settings.  Nonetheless, the court finds it relevant to consider the steps Defendants have taken and plan to take to enable Adult Home residents to receive services in more integrated settings.

Defendants have pointed to a number of activities, programs, and services that they contend constitute their Olmstead plan for individuals with mental illness in New York State, including Adult Home residents.  According to Defendants' counsel, Defendants' Olmstead plan includes: (1) "an array of community-based activities, programs, and services" intended to assist all persons with mental disabilities to live and receive services in the community rather than in State-operated psychiatric hospitals; (2) OMH's planning, program implementation, and oversight of the mental health system; (3) DOH's inspection and oversight of Adult Homes; and (4) initiatives targeted at Adult Home residents designed to assist them to gain independent living skills and participate in the community, as well as enhancing access to mental health housing.[588]  Defendants also assert that the legislatively mandated Most Integrated Setting Coordinating Council is part of their Olmstead plan.[589]

---

[586]  S-87 (Defs. Amended Obj. & Resp. to Pl. First Set of Requests for Admissions) No. 6 ("[D]efendants state that there is no need for an Olmstead plan for adult home residents because adult homes are in the community, and because adult home residents are not services that are operated or provided by the State of New York abut rather are privately owned residences.").

[587]  P-553 (Kuhmerker Dep.) 29-30 (explaining that "there is no one specific document that one could point to").

[588]  Defs. PFF ¶ 122.  No witness at trial identified the activities in Defendants' asserted Olmstead plan as part of a plan to enable Adult Home residents to move to more integrated settings.

[589]  Id. ¶ 133.

Some of the activities Defendants cite as part of their <u>Olmstead</u> plan, while important aspects of Defendants' overall administration of the State's mental health system, do not relate to enabling Adult Home residents to receive services in the most integrated setting appropriate to their needs.[590]  For example, the court heard testimony about OMH's activities relating to OMH's Children's and Forensic Divisions, research on suicide prevention, and the development of new treatments and medications for people with mental illness.[591]  Such evidence is irrelevant to what Defendants plan or do to enable Adult Home residents to receive services in integrated settings.[592]

As set forth below, the evidence – which includes evidence of significant expenditures to Adult Homes for infrastructure and other improvements and of the facilitation of referrals of patients from State psychiatric hospitals to Adult Homes – establishes that Defendants do not have a comprehensive or effective plan to enable Adult Home residents to receive services in more integrated settings, but are instead committed to maintaining the status quo.  Although Defendants have taken steps intended to improve living conditions and the quality of services <u>in</u>

---

[590] <u>See, e.g.</u>, <u>id.</u> ¶¶ 118-20 (<u>citing</u> Tr. 3148-53, 3179-80 (Myers) (describing activities of the Children's Division, Division of Forensic Services, and OMH's research into mental health issues)); <u>id.</u> ¶ 130 (<u>citing</u> Tr. 1428-31 (Madan) (describing OMH's oversight of the mental health system through its licensing processes and oversight of programs and services and asserting that OMH monitors and improves the quality of the 2,500 providers whose services it licenses through inspections during licensure, recertification reviews, and technical assistance and training)).

   Defendants also list various "[a]dditional components" of their <u>Olmstead</u> plan, including "OMH's basic and applied research in the mental health field" and "OMH's strategic planning to promote general public health as it relates to mental health, wellness, suicide prevention, and the forensic system," but they cite to <u>no</u> evidence to support their assertions.  (<u>Id.</u> ¶ 132.)  In any event, the activities listed in Paragraph 132 are not relevant to what Defendants plan and do to enable Adult Home residents to receive services in integrated settings.

[591] Tr. 3148-51 (Myers).

[592] To the extent such evidence is relevant to whether the requested relief would unfairly impact others with mental illness, the court considers it below in Part IV.B.3.

the Adult Homes, such steps do not enable Adult Home residents to receive services in more integrated settings.

### a. The Most Integrated Setting Coordinating Council Does Not Include Adult Home Residents

Defendants list the Most Integrated Setting Coordinating Council ("MISCC") as part of their Olmstead plan.[593] The MISCC was established by the Legislature in 2002. Its statutorily mandated purpose is, among other things, to "develop and implement a plan to reasonably accommodate the desire of people of all ages with disabilities to avoid institutionalization and be appropriately placed in the most integrated settings possible."[594] The Legislature mandated that the MISCC "develop and oversee the implementation of a comprehensive statewide plan for providing services to individuals of all ages with disabilities in the most integrated setting."[595] The MISCC statute requires the MISCC to put together a plan for how the State will ensure that people are able to reside in the most integrated settings.[596]

To date, however, MISCC has not developed, and is not developing, a plan to move residents of Adult Homes to more integrated settings.[597] In fact, the MISCC has not done anything specific with regard to assisting Adult Home residents to move to more integrated

---

[593] Defs. PFF ¶ 133. In addition to the MISCC, Paragraph 133 of Defendants' Proposed Findings of Fact also asserts – with no citation to any testimony or exhibit – that the Olmstead plan also includes a "Coalition to Promote Community Based Care," with no description of this coalition. (Id.) There was no reference to any such coalition at trial.

[594] S-133 at No. 10, citing N.Y. Exec. Law § 700.

[595] Id., citing N.Y. Exec. Law § 703.

[596] P-553 (Kuhmerker Dep.) 27.

[597] S-133 at No. 10 ("Defendants admit that the MISCC is not developing a plan to move residents of adult homes, and deny that there is an obligation to do so"); see Defs. PFF ¶ 133 ("[T]he MISCC did not develop a plan to move adult home residents").

settings.[598]  The MISCC has no plan "for placing adult home residents who otherwise meet the criteria for living in supported housing or OMH community housing into any of [those] types of residential programs."[599]  And nothing in the MISCC's 2006 annual plan or the MISCC 2008 Annual Report shows any effort to address integration of Adult Home residents.[600]  Indeed, Defendants deny that MISCC has any obligation to do so.[601]

> **b.  OMH's Annual "Comprehensive Plans for Mental Health Services" Do Not Contain any Plan To Enable Adult Home Residents To Receive Services in More Integrated Settings**

Defendants assert that "much" of their Olmstead planning is reflected in OMH's statewide Comprehensive Plans for Mental Health Services, referred to as "5.07 plans."[602]  None of Defendants' witnesses at trial, however, testified about the 5.07 plans or their connection to any purported Olmstead plan for Adult Home residents.  The court has reviewed the 5.07 plans cited by Defendants and finds that they contain no reference to any plan to enable Adult Home residents to move to more integrated settings.  Defendants cite to an appendix in the January 2004 5.07 plan titled "Interagency Adult Home Initiative."[603]  The appendix does not appear in any of the other 5.07 plans cited by Defendants.[604]  The activities enumerated in the appendix

---

[598] P-553 (Kuhmerker Dep.) 31; id. at 53-54.

[599] Id. at 33; see also id. at 31 (providing testimony pursuant to Rule 30(b)(6) that "I don't believe there's been anything specific that the MISCC has done to specifically address in any way, shape or form individuals who happen to reside in adult homes," other than that there were "occasional discussions" regarding adult home residents).  In their Proposed Findings of Fact, Defendants assert – without citation to any evidence – that the MISCC "address[ed] the adequacy of and access to community services for all individuals with disabilities, including adult home residents."  (Defs' PFF ¶ 133.)  Ms. Kuhmerker's Rule 30(b)(6) testimony directly rebuts this unsupported assertion.

[600] Tr. 1083-87 (D. Jones); see generally P-589 (MISCC 2008 Annual Report).

[601] S-133 at No. 10.

[602] Defs. PFF ¶ 123 (citing various 5.07 plans: S-5, S-6, S-8, S-38, S-39).

[603] Id. (citing S-5 (2004 Plan) OMH 6136-38).

[604] See S-6 (2005 Plan); S-8 (2006 Plan); S-38 (2002 Plan); S-30 (2001 Plan).

focus on improving the quality of life and care for residents in Adult Homes – for example, "clarifying current regulatory authority for medication assistance" and "development of enrichment activities, both within adult homes and in the community" – rather than taking steps to enable residents of Adult Homes to move to more integrated settings.[605]  To the extent the document mentions housing, it describes "assisting residents in homes that are closing."[606] While the document references "[i]ncreas[ing] access to 31,000 community residential beds," it does not describe how such access is to be improved.[607]

        **c.**    **Deinstitutionalization from State-Operated Psychiatric Hospitals Is Not Relevant to Whether the State Enables Adult Home Residents To Receive Services in More Integrated Settings**

New York has been recognized as a leader in providing services to people with mental illness in the community rather than in psychiatric hospitals.[608]  The State has downsized and closed many State-operated inpatient psychiatric centers and reinvested funds toward community-based services.[609]  There are currently around 3,600 individuals in New York's State psychiatric centers, down from 93,197 in 1955, approximately 10,000 in 1994, and just over 5,000 in 1999.[610]  This evidence is not relevant, however, to the issue of whether Defendants have a plan to enable Adult Home residents to be served in more integrated settings.  Indeed, witnesses on both sides testified that the reduction in the census of State psychiatric hospitals

---

[605] S-5 at OMH 6136-38.

[606] Id. at OMH 6137-38.

[607] Id. at OMH 61367.

[608] Tr. 752 (Rosenberg).

[609] S-5 (2004 Plan) OMH 5972; Tr. 1613 (Wollner); Tr. 3261-64 (Schaefer-Hayes); D-167 (OMH 2007-2008 Exec. Budget Testimony) OMH 42771.

[610] S-5 (2004 Plan) OMH 5972; Tr. 1559 (Madan).

over the past several decades was made possible in significant part because the State used Adult

Homes as discharge placements for patients in the State's psychiatric institutions.[611]

        **d.**        **Defendants' Statewide Expansion of Community-Based Programs Is Not a Plan To Move Adult Home Residents to More Integrated Settings**

Defendants have developed and continue to invest in community-based programs for

individuals with mental illness, including case management, residential programs, CDTs, IPRTs,

PROS, ACT, peer bridger programs, and psychosocial clubhouses.[612]  The number of individuals

participating in these programs has increased in recent years.  For example, the number receiving

case management has grown from approximately 14,000 in the late 1990s to 31,000 today, and

the number receiving ACT services has grown from approximately 3,000 in 2004 to 5,000 today,

3,000 in New York City.[613]  Defendants have not provided evidence as to how the general

expansion of the scope of these programs relates to moving Adult Home residents to more

integrated settings.

        **e.**        **Defendants Expanded Supported Housing and Added Adult Home Residents as a Target Population, but Few Adult Home Residents Have Gained Access**

Between 1995 and 2009, OMH increased the number of beds in operation in its

community housing program from 18,940 to 32,633, including 13,557 supported housing

beds.[614]  They have also allocated funds to develop 1,763 additional supported housing beds.[615]

In addition, Defendants added Adult Home residents to the "target populations" for supported

---

[611] See supra notes 40, 41, 44.

[612] See Tr. 3155-61 (Myers).

[613] Id. at 3162; S-6 (2005 Plan) OMH 37140-41, OMH 37145.

[614]  Tr. 1936-41 (Newman); D-350 (OMH Community-Based Bed Chart (Mar. 31, 2009)).

[615] D-350 (OMH Community-Based Bed Chart (Mar. 31, 2009)) 4; see also Tr. 1939-45 (Newman).

housing in 2005. The evidence demonstrates, however, that because of the way Defendants administer the system, Adult Home residents have gained access to very few supported housing beds, even after being added as a target population.

The State develops new supported housing beds through an RFP process.[616] When OMH develops supported housing, it identifies a target population for the housing as a "priority" that will receive a preference for new housing beds.[617] As State officials testified, the system is administered to effectuate the target or priority populations, and it is very unlikely that somebody who is not a member of a priority population will receive a supported housing bed.[618] For example, Ms. Madan, OMH's Director of Housing and Adult Services, testified that "[w]e expect that the providers who are awarded beds under this particular – under any one particular RFP adhere to the priority populations listed in that RFP. . . . [A]ny opening would be filled by someone who belongs to one of the priority categories."[619] Former OMH official Joseph Reilly similarly explained that residential providers are expected to accept referrals from priority populations.[620]

Adult Home residents have not, historically, been a target group for supported housing.[621] The Supported Housing Implementation Guidelines developed in April 1990 set forth three target populations to be served in supported housing: "individuals ready to leave certified

---

[616] Tr. 1927-29 (Newman) (explaining that RFPs "are the State of New York's way to allocate resources").

[617] See, e.g., S-17 (2005 RFP) OMH 37306.

[618] Tr. 2189 (Newman); Tr. 1532-33 (Madan); Tr. 1312-16 (Reilly).

[619] Tr. 1532-33.

[620] Tr. 1312-16 ("So there are priority populations that when a referral is being made to a residential provider that the residential provider is expected to have – to accept a referral from these priority populations . . . .").

[621] See S-11 (1990 Supported Housing Implementation Guidelines) OMH 37270; S-101 (2005 Supported Housing Implementation Guidelines) OMH 37516; Tr. 2176 (Newman).

community residences; individuals discharged from psychiatric centers; and individuals who are currently homeless, living in shelters, depots or on the streets."[622]  The target populations did not include Adult Home residents.[623]

Adult home residents were not designated as one of the target populations until 2005, along with five other groups.[624]  Thus, prior to 2005, Adult Home residents were effectively excluded from supported housing beds developed by OMH.[625]  The designation in the 2005 RFP was only effective for new supported housing that OMH was in the process of developing; it did not grant Adult Home residents access to older supported housing already developed by OMH. As Defendants' witnesses explained, when beds developed under a particular RFP are vacated, they must be filled with members of the priority populations enumerated in the RFP that initially created the beds.[626]

As witnesses for both sides testified, even after Adult Home residents became a priority population for newly developed supported housing, they continued, for the most part, to be denied access to supported housing because members of other priority populations received higher priority.[627]  Indeed, Ms. Rosenberg testified that neither OMH's Single Point of Access ("SPOA") program nor the designation of Adult Home residents as a priority population in RFPs had any impact on Adult Home residents' access to supported housing beds.[628]

---

[622] S-11 at OMH 37270.

[623] Id.

[624] Tr. 1534 (Madan); S-17 (2005 RFP) (including adult home residents among target populations).

[625] Tr. 1532-34 (Madan).

[626] Tr. 2193-95 (Newman); Tr. 1532-34 (Madan).

[627] Tr. 660, 662 (Rosenberg); Tr. 1089-91 (D. Jones); Tr. 2165-66, 2198-99 (Newman).

[628] Tr. 662 ("[They] didn't have access before and they continued not to have access for the most part."); Tr. 3500-01 (D. Jones) ("The state has demonstrated that it has the will and the ability to create additional supported housing

As noted above, in 2007, the Legislature allocated funds for 60 supported housing beds for Adult Home residents.[629]  As of May 22, 2009, 45 of those beds had been filled and 15 Adult Home residents were in the process of acquiring the remaining slots.[630]  OMH did not propose or advance this initiative, and Defendants' witnesses testified that there is no plan to undertake a similar initiative in the future.[631]  In fact, a recent RFP for supported housing targets individuals who are currently "long-stay" residents of OMH Psychiatric Centers and OMH-operated residential programs but does not list adult home residents as a target population.[632]

As noted above, the number of Adult Home residents who have actually moved to supported housing or other types of OMH community housing is negligible.  From January 2002 through January 2006, only twenty-one Adult Home residents moved to supported housing in New York City.[633]  Only sixty-five Adult Home residents moved to other forms of OMH community housing during the same time period.[634]  According to Mr. Dorfman, OMH began "really collecting data" beginning in early 2008 as to whether Adult Home residents move to supported or other types of housing, and since that time, out of the approximately 2,100 individuals in the Adult Homes with OMH-funded case management, eleven moved to

---

slots . . . . The sad reality is that in doing that, it left behind a whole group of people over in adult homes who have not had access to that.").

[629] Tr. 1460-61 (Madan).

[630] Tr. 1974 (Dorfman).

[631] Id.; see Tr. 1510 (Madan).

[632] P-748 (2009 RFP).

[633] P-149.  According to OMH, the majority of adult home residents who moved to OMH housing from 2001 to 2006 were in counties outside of New York City.

[634] Id.

"supportive" housing, nine moved to their own apartments, and fourteen moved in with families.[635]

Even with respect to the relatively few supported housing beds for which Adult Home residents have been designated as a target population, Adult Home residents are still largely denied access because supported housing resources are scarce. The current vacancy rate is less than 2%,[636] residential mental health service providers have "exorbitant waiting lists,"[637] and members of other priority populations receive higher priority.[638] The negligible rate at which Adult Home residents have accessed supported housing beds compared to the success of filling the 60-bed legislative set-aside[639] demonstrates that without a specific allocation of beds for Adult Home residents, Adult Home residents will not have access to supported housing as a practical matter. Once the 60 supported housing beds from the set-aside are filled, the pipeline of supported housing beds for Adult Home residents will be closed.

---

[635] Tr. 1797-99. Mr. Dorfman used the term "supportive housing"; Defendants' other witnesses used that term to refer to apartment treatment programs, which are different from supported housing. (See, e.g. Tr. 1459-60 (Madan) (testifying that "supportive housing" is a CR-SRO and requires "construction and siting," which supported housing does not).) The case management data reporting forms on which Mr. Dorfman's testimony relies also refer to "supportive" rather than "supported housing." (See D-364 (OMH's NYC Adult Home Case Management Quarterly Program Data Reporting Forms).) The HRA 2010(e) application also refers to "supportive housing" as an umbrella term for OMH community housing. (D-271.) In any event, whether eleven Adult Home residents moved to supportive or supported housing since early 2008 does not change the court's finding that very few Adult Home residents have moved to supported housing.

[636] Tr. 1503-04 (Madan).

[637] Tr. 1874 (Dorfman); Tr. 2983-84 (Burstein).

[638] See supra note 627.

[639] See Tr. 1461 (Madan).

f.   **Defendants Do Not Maintain a Waiting List for Adult Home Residents Who Express a Desire To Move to Supported Housing**

It is difficult to measure the number of Adult Home residents who have attempted and failed to receive supported housing, because Defendants do not maintain a waiting list for residents of Adult Homes who have expressed a desire to move to more integrated housing.[640] Although CUCS maintains a list of housing program vacancies in New York City, Defendants do not maintain a waiting list for any OMH community housing programs, let alone one for Adult Home residents.[641]  Ms. Kelly, Defendants' witness from HRA, testified that while HRA received 807 applications for OMH housing on behalf of Adult Home residents between the years 2000 and 2006, HRA does not know the outcome of these applications because it does not keep track of placements, acceptances into, or rejections from OMH community housing.[642]   In 2005, the State Legislature passed legislation that would have required OMH to establish a community housing waiting list for adults "who have been referred to or applied for but have not yet received supported, supportive, supervised or congregate housing services."[643]  Governor Pataki vetoed that bill "based on objections raised by OMH."[644]

---

[640] S-133 at Nos. 8, 9; S-130 (Defs. Resp. to Pl. Statement Pursuant to Local R. 56.1) ¶ 42; P-555 (Liebman Dep.) 19 (testifying that a "housing waiting list was not discussed").

[641] S-130 ¶ 67 ("Defendants admit that OMH does not maintain a comprehensive waiting list for all privately operated mental health housing . . . ."); see Tr. 1464-65 (Madan) (describing CUCS's "vacancy list").

[642] Tr. 1911 (testifying that after HRA makes a determination about whether a person is approved for a certain level of housing, "[t]he determination letter goes back to the referring agency, and then that basically ends our involvement with it"); see also id. at 1913-14.

[643] S-23 (Veto of Assembly Bill No. 2895-A (Aug. 16, 2005)) EXEC 4910.

[644] Id.

g.   **Defendants Have Taken Steps Designed To Improve the
Conditions and Quality of Services in the Adult Homes, but
Such Steps Do Not Enable Adult Home Residents To Move to
More Integrated Settings**

Defendants have taken steps designed to improve the conditions and quality of services in

the Adult Homes, but such steps do not enable Adult Home residents to move to more integrated

settings.  Defendants assert that DOH's licensure and enforcement of regulations governing

Adult Homes are part of their Olmstead plan,[645] but they cite no evidentiary support for this

assertion nor do they explain how these activities enable Adult Home residents to move to more

integrated settings.  Defendants also point to "various statutory and regulatory changes" enacted

to strengthen oversight and improve conditions in adult homes statewide, such as a regulation

that allows DOH to immediately assess fines for violations that endanger residents and a statute

that requires adult homes to have at least one common room that is air conditioned.[646]

Defendants also cite to the Inter-Agency Committee on Adult Homes, formed in 2001 by DOH,

OMH, and the New York State Commission for Quality of Care ("CQC"), to improve

coordination and communication among the agencies.  This Committee created mechanisms for

conducting joint inspections and sharing information and took steps to strengthen the "Do Not

Refer" list, which precludes various entities from referring individuals to adult homes statewide

that fail to meet applicable standards.[647]  Defendants also refer to the Adult Home Monitoring

Team, which OMH formed in 2000 to address issues of quality of care in adult homes.  The

---

[645] Defs. PFF ¶ 131.

[646] Id. ¶ 142 (citing N.Y. Soc. Servs. Law §§ 460-d, 460-f(1); N.Y. Mental Hyg. Law § 29.15; N.Y. Corr. Law § 72-b; N.Y. Comp. Codes R. & Regs. tit. 18 § 486.5(a)(4)).

[647] Defs. PFF ¶ 135 (citing Tr. 1286-88 (Reilly); Tr. 3014-17 (Hart); S-31 (Memorandum of Understanding by and Between DOH, OMH, and CQC Regarding Monitoring and Oversight of Adult Care Facilities Serving a Significant Number of Persons Who Are Mentally Ill)).

Adult Home Monitoring Team participates in joint inspections of adult homes with DOH, investigates complaints, works with DOH to oversee the closure of adult homes, and enhances the oversight of mental health programs serving adult home residents.[648]

These strengthened monitoring and enforcement activities are commendable, but they do not constitute a plan or commitment to enable individuals in Adult Homes to receive services in more integrated settings. Indeed, one of the witnesses whose testimony Defendants cite for the proposition that the Adult Home Monitoring Team is part of their <u>Olmstead</u> plan testified that OMH does not do anything to investigate whether there are residents of Adult Homes who would be more appropriately placed in supported housing.[649] She testified that, to her knowledge, no one is assessing whether residents of Adult Homes would be more appropriately situated in supported housing.[650]

> **h.**      **There Is No Evidence That the EnAbLE Program Has Assisted any Adult Home Resident in Moving to a More Integrated Setting**

Defendants list the "EnAbLE" program – Enhancing Abilities and Life Experiences – as part of their <u>Olmstead</u> plan.[651] Mr. Wollner, who formerly held high positions at OMH and DOH, testified that the EnAbLE Program was "in essence" created by adult home residents who had "quality of life concerns," and that the budget proposal for the program sent to the

---

[648] <u>Id.</u> ¶ 136 (<u>citing</u> Tr. 1265-1274 (Reilly); P-564 (Tacoronti Dep.) 18-19). The court notes that, according to Mr. Reilly, the Adult Home Monitoring Team was assigned to New York City but had "statewide responsibilities." (Tr. 1265.)

[649] P-564 (Tacoronti Dep.) 202-03.

[650] <u>Id.</u>

[651] Defs. PFF ¶ 141.

Legislature was for "adult home residents to improve the quality of life."[652]  Through this

program, DOH has provided grants of up to $100,000 to adult homes to provide certain activities

and services within the facilities.[653]  Several Adult Homes have used the grant to create teaching

kitchens or laundry areas,[654] one Adult Home created a "garden area," and another Adult Home

purchased a van to take residents on trips.[655]  Eight of the Adult Homes at issue in this litigation

have received EnAbLE Grants.[656]  While Defendants contend that this program helps teach

independent living skills, Defendants have not determined whether the EnAbLE Program has

resulted in any Adult Home residents moving to more integrated settings.[657]  Accordingly,

Defendants have not shown that the EnAbLE Program is part of a plan to assist Adult Home

residents in moving to more integrated settings.

  i. **OMH's Case Management and Peer Support Program in Eleven Adult Homes Is Not a Comprehensive or Effective Plan To Enable Adult Home Residents to Receive Services in More Integrated Settings**

  Defendants include OMH's case management and peer support program as part of their

Olmstead plan.[658]  In 2002, OMH created the Case Management Initiative, which was designed

to provide independent case managers to work with Adult Home residents to identify goals,

---

[652] Tr. 1608, 1647-49, 1660-61; see also Tr. 2084-85 (Burstein) (explaining her understanding that the EnAbLE Program is "an opportunity for adult homes to receive funding from the Department of Health to do projects or programs for the enhancement of the residents").

[653] S-69 (Request for Applications – EnAbLE (2008)); S-88 (Request for Applications – EnAbLE (2005)); D-131 ("Dear colleague" letter enclosing EnAbLe Request for Applications (2005)).

[654] Tr. 2902-03 (Kaufman).

[655] Tr. 1647-51 (Wollner); see also S-69, S-88 (DOH Request for Applications – EnAbLE).

[656] P-244 (DOH EnAbLE Program Grant Awards); see also D-132, D-133, D-135, D-136, D-137, D-138, D-139 (Letters from David Wollner to Adult Home operators awarding EnAbLE grants).

[657] Tr. 1715-16 (Wollner).  To the extent that EnAbLE grants are used to teach independent living skills to Adult Home residents, the evidence demonstrated that skills cannot effectively be taught unless people have an opportunity to practice them in the settings where they live.  See supra note 189.

[658] Defs. PFF ¶¶ 138-40.

coordinate services, and put together a service plan.[659] The program also assigned a mental health peer to work with each case manager.[660] The State initially implemented the program for 690 residents in Brooklyn Adult Care Center, Riverdale Manor and Queens Adult Care Center.[661] The initial RFP for the program does not mention, as part of the services to be provided, assistance with locating alternative housing for Adult Home residents interested in moving.[662] As Mr. Reilly testified, OMH was concerned when implementing the Case Management Initiative that Adult Homes would be resistant to permitting the program to operate inside the Homes.[663] OMH issued two subsequent RFPs, in 2004 and 2006, and the program was eventually implemented in eight additional Adult Homes.[664] As of 2007, the program provided services for 2,100 Adult Home residents.[665] OMH has no plan to expand the program into additional Adult Homes.[666] Thus, OMH case management reaches less than half of the 4,300 Adult Home residents at issue in this case.

While the responsibilities of OMH's case managers include assisting residents who are interested in moving to more integrated settings,[667] the evidence demonstrates that only a few

---

[659] Tr. 1307-08 (Reilly).

[660] Id. at 1308-09.

[661] Id. at 1321, 1325.

[662] Id. at 1384-85; S-12 (Letter from Joseph Reilly to providers enclosing RFP (Aug. 8, 2003)).

[663] Tr. 1384-85.

[664] See S-16 (OMH Case Management RFP (2004)); S-32 (OMH Case Management RFP (2006)); Tr. 1330-38 (Reilly).

[665] Tr. 1338-39 (Reilly).

[666] Tr. 1834-35 (Dorfman).

[667] Id. at 1772-73, 1734, 1738, 1760-65, 1777-78 (testifying that case managers assist residents in filling out HRA 2010(e) forms, file HRA determination with CUCS, assist with interviews, and work with housing providers to secure apartment access, advocate for residents if HRA does not approve the appropriate level of housing, and assist residents with finding non-mental health housing or reconnecting with families); Tr. 2628-29, 2630-32 (Lockhart) (testifying that case managers from Federation inform Adult Home residents about the four levels of housing offered by Federation); Tr. 2525, 2549-51, 2555 (Waizer) (testifying that housing options "are a constant refrain and that's

residents in Adult Homes with OMH-funded case managers have actually moved to supported

housing, apart from the one-time 60-bed legislative initiative.  Ms. Lockhart testified that, in her

eight years working for Federation, which provides case management services in four Adult

Homes, she recalled only two residents who moved to supported housing whom Federation had

assisted with filling out the HRA form and going on interviews.[668]  Mr. Waizer, the chief

operating officer of FEGS, which provides case management at Riverdale Manor, testified that

he is "really not aware" of any residents of Riverdale Manor who have been placed into FEGS's

supported housing program.[669]  Ms. Burstein testified that since the OMH Case Management

Initiative began at Park Inn three years ago, not one resident has been discharged to supported

housing.[670]  In addition, Defendants' witnesses testified that residents who live in one of the

Adult Homes without OMH-funded case management are unlikely ever to be informed about, or

receive assistance with, securing alternative housing.[671]  Defendants' witnesses simply testified

that they "expected" Adult Home case managers to follow up on residents' expressed desires to

move to more integrated housing.[672]  Defendants have never analyzed whether the program is

---

an interest of ours to see if, in fact, they would be willing to begin talking about outside housing opportunities" and that FEGS's staff at Riverdale Manor conduct a housing training group at least weekly).

[668] Tr. 2630-32.  According to Ms. Lockhart, Federation also assisted an Adult Home resident in moving to his own apartment.  (Id. at 2631.)

[669] Tr. 2551-52.  Mr. Waizer testified that eight residents of Riverdale Manor moved to FEGS's other supervised residences, primarily CR-SROs.  (Id. at 2525, 2551-52.)

[670] Tr. 2079-80 ("I don't think we discharged any to supported [housing].").  Ms. Burstein testified that prior to the OMH-funded case management at Park Inn, ten residents moved to more independent settings, though not supported housing.  (Id. at 2071; see also D-190 (Park Inn "Patient's Register" listing discharges).)  Since the OMH-funded case management began at Park Inn, she estimates that between seven and ten residents moved to "more independent settings," but not supported housing.  (Tr. at 2079.)  Ms. Bear also testified that she thinks that 13 residents of Adult Homes where the Jewish Board operates programs moved to other settings, but not supported housing.  (Tr. 2226.)

[671] See supra note 538.

[672] See supra note 536.

effective at assisting residents in moving to more integrated settings.[673]  The evidence presented at trial also demonstrates that little movement from Adult Homes to supported housing actually occurs.[674]

OMH's Case Management Initiative is a step toward assisting some Adult Home residents, although the number of residents who have actually obtained supported housing – with or without OMH case management – is negligible.[675]  OMH case management is limited to less than half of the Adult Home residents at issue in this litigation, and is further limited by the lack of supported housing beds available to Adult Home residents.[676]  As DAI's expert Mr. Jones testified, "if case management – primarily what it does is to arrange services within the existing setting and not really deal – not deal frontally with the issue of where people live, then it is not accomplishing very much."[677]  He further testified:

> [U]nless you have a systemic initiative here that moves to create significant numbers of supported housing slots into which people can go and there is a clear organizational commitment to make that happen up and down the line, no individual case manager is going to do anything more than what I think they have been doing, which is doing the best they can, without any commitment. And that translates into the status quo.[678]

Defendants themselves characterize the Case Management Initiative as "assist[ing] adult home residents in developing and achieving individualized treatment plans."[679]  It is not a comprehensive or effective plan to move Adult Home residents to more integrated settings.

---

[673] Tr. 1704-05 (Wollner) (testifying that he does not know of any analysis).

[674] See supra notes 633, 635.

[675] See supra Part IV.B.1.e.

[676] See supra notes 170; supra Part IV.B.1.e.

[677] Tr. 1172.

[678] Id. at 1172-73.

[679] Defs. PFF ¶ 236 n.143.

### j.      Defendants Have Not Used the Assessment Project Data To Identify and Assist Adult Home Residents To Move to More Integrated Settings

Defendants assert that the Assessment Project is part of their <u>Olmstead</u> plan.[680]  As mentioned above, one of the original purposes of the Assessment Project was to assess adult home residents' needs and desires regarding the settings where they received services.[681]  Dr. Bruce, who directed the Assessment Project, testified that the data collected in the Assessment Project could have been useful in identifying and assisting adult home residents with mental illness in moving to more integrated settings.[682]  As Mr. Jones explained:

> [T]his was a very rich set of data, frankly better than you get in most decision-making projects, where you really knew something about the psychiatric history, you knew something about the level of impairment and you knew something about the physical history, the degree of cooperation, all those sorts of things.  So when I looked at this, I guess several things jumped out at me.  One is that, yes, we do have a group of people who are in the main, have an identifiable diagnosable mental illness.  No question about that we're dealing with.  And – but, secondly, that when you get down to the question of, is that psychiatric impairment or the concomitant physical impairment such that people need to be in a 24-hour setting?  I would say the answer was a very clear no, they do not.  That our technology allows us to care for people in integrated settings and provide both the mental health supports that they need, the life supports that they need and whatever physical supports that they need in an integrated setting.[683]

When asked whether he would have considered the Assessment Project data to be relevant and important when he was a state mental health commissioner, Mr. Jones responded, "[a]bsolutely," explaining that the Assessment Project is "an in-your-face sort of report.  And I mean what it says, which, you know . . . we had this huge mismatch between people who ended up in these

---

[680] Defs. PFF ¶ 138.

[681] <u>See</u> <u>supra</u> notes 388, 389, 390, 391, & 392; <u>see also</u> Tr. 1676-78 (Wollner) (testifying that one of the purposes was to determine who would benefit from a higher or lower level of care); Tr. 2108 (Burstein).

[682] P-583 (Bruce Dep.) 52-53, 55.

[683] Tr. 1036-37.

settings and the settings themselves and what they can and should be able to do.  So you've got a huge, a huge mismatch."[684]  He further testified, "so if I were commissioner looking at this, I would say, [w]ow, we've got a big problem here and we're going to have to put together a very serious multi-year initiative to deal with this."[685]  Despite the validity of the Assessment Project data, the State never used the Assessment Project data to determine how many adult home residents with mental illness could live in integrated settings.[686]  In fact, the State ordered Dr. Bruce, the director of the Assessment Project, not to do any analysis of the data for her own research due to this litigation.[687]

Defendants admit that they have not used the Assessment Project data "to place Adult Home residents in more integrated settings."[688]  Mr. Reilly testified that several years after the data was collected, OMH provided some of the individual assessments to case managers or mental health treatment providers for "follow-up" in instances where the residents had provided consent to disclose their assessments.[689]  Mr. Wollner testified that where specific medical needs were identified, residents were referred to the Adult Home staff for care and follow-up.[690] Defendants presented no evidence that the data sent to case managers or providers has actually been used to enable Adult Home residents to move to more integrated settings, or in connection

---

[684] Id. at 1037.

[685] Id. at 1038.

[686] P-583 (Bruce Dep.) 43; P-566 (Wickens Dep.) 90 (stating that New York Presbyterian had not analyzed Assessment data to determine how many adult home residents could live in integrated settings).

[687] P-583 (Bruce Dep.) 54.

[688] S-133 at No. 15.

[689] Tr. 1348, 1394-95; cf. P-543 (R.H. Dep.) 28-29 (testifying that after the assessments were done, Adult Home residents never heard anything back).

[690] Tr. 1619-23.

with Defendants' strategic planning.[691]  Nor have Defendants shared the Assessment Project data

with the MISCC or the Adult Care Facilities Workgroup so that it might be used in their

planning.[692]  Indeed, because Defendants claim that "the [Assessment Project] was never

intended to be used as an assessment tool for determining what type of housing individuals were

qualified for and able to reside in,"[693] they have essentially admitted that the Assessment Project

is not part of any plan to move Adult Home residents to more integrated settings.

> **k.** **Defendants Never Implemented the Recommendation of the Adult Care Facilities Workgroup To Move Adult Home Residents to Supported Housing**

Defendants rely on the 2002 report of the Adult Care Facilities Workgroup ("Workgroup

Report") as part of their <u>Olmstead</u> plan.[694]  Defendants rejected the Workgroup's

recommendation that proposed a timeline for moving 6,000 people with mental illness from adult

homes into supported housing.[695]  Most of the recommendations Defendants implemented from

the Workgroup Report concerned curbing the abuses that had been occurring in the Adult

Homes, as opposed to taking steps to enable Adult Home residents to move to more integrated

settings.   For example, Mr. Wollner testified that Defendants implemented the following

changes statewide: (1) medication training for adult home staff, not adult home residents; (2)

changes in the ability of DOH to fine homes that were endangering residents; and (3) expanding

the "Do Not Refer" list to prohibit the Department of Corrections and Parole from referring

---

[691] <u>Id.</u> at 1623.  Mr. Wollner testified that the Assessments were used to collect baseline demographic data about Adult Home residents and that there was a "tracking mechanism" to follow up on individual residents' unmet health care needs, such as cardiac problems or diabetes.  (<u>Id.</u> at 1620-21.)

[692] P-566 (Wickens Dep.) 93, 94-95.

[693] Defs. PFF ¶ 94.

[694] <u>Id.</u> ¶ 137.

[695] Tr. 1640-45 (Wollner).

individuals to adult homes with serious deficiencies.[696]  Defendants implemented the

Workgroup's recommendations relating to assessments and case management by commissioning

the Assessment Project and implementing OMH-funded case management.[697]  As discussed

above, however, those activities have had no meaningful effect on the ability of Adult Home

residents to access more integrated housing.

### 2.     The Requested Relief Would Not Increase Costs to the State

The parties do not dispute that moving Adult Home residents to supported housing would

require the development of additional supported housing beds.  The evidence demonstrates that

serving DAI's constituents in supported housing rather than Adult Homes would not increase

costs to the State.[698]

### a.     Funding Sources and Types of Costs Incurred

In general, residents of Adult Homes and residents of supported housing pay for all or

part of the cost of their housing with Supplemental Security Income ("SSI"), an income

supplement for low income people with disabilities.[699]  The SSI program is managed by the

federal Social Security Administration and is partially federally funded.  The State's share of an

---

[696] Tr. 1623-39.

[697] Id. at 1617-19, 1295-97; cf. S-103 (Workgroup Report) DOH 86143 (recommending, among other things, an immediate ongoing assessment of all adult home residents and the implementation of an independent service coordinator initiative in adult homes).

[698] Defendants have also provided evidence about the per-bed costs of Supportive SROs and CR-SROs, other types of OMH Housing for Persons with Mental Illness.  (See Defs. PFF ¶¶ 151, 152, 159, 161.)  Because Plaintiff does not seek placement of its constituents in these other types of community housing, the court does not consider such analysis relevant to determining whether the relief Plaintiff seeks would increase the costs to the State.

[699] See Joint Stip. ¶¶ 9, 28.

individual's SSI benefit depends on the individual's residential setting and the location of the residence within the State.[700]

Adult Homes are classified as Congregate Care Level III housing for the purpose of determining the SSI benefit that Adult Home residents receive.[701] Currently, Adult Home residents in New York City receive $16,416 per year in SSI; of that amount, the federal government pays $8,088 and the State pays $8,328.[702] The Adult Home resident uses most of the SSI benefit to pay the Adult Home for room, board, three meals a day, housekeeping, personal care and supervision.[703] Residents keep a small portion of the SSI benefit as a Personal Needs Allowance ("PNA").[704] In 2009, in New York City, the PNA for adult home residents is $2,136 per year, or $178 per month.[705]

Scattered-site supported housing consists of apartments scattered among various buildings.[706] Scattered-site rental apartments are funded directly by OMH in the form of a rental stipend, and through the individual residents' income, which often consists only of SSI.[707] The State pays a per-bed stipend directly to supported housing providers. The current per-bed stipend paid by OMH for supported housing is $14,654.[708] Individuals residing in supported

---

[700] See D-347 (SSI Benefit Levels Chart effective Jan. 1, 2009) (indicating five categories of living arrangements with varying amounts of SSI benefits).

[701] Joint Stip. ¶ 14.

[702] Id. ¶ 27.

[703] Id. ¶ 28.

[704] Id.

[705] Id.

[706] Id. ¶ 11.

[707] Id. ¶ 29.

[708] Id. ¶ 33.

The rental stipend the State currently pays for supported housing is not reimbursed by Medicaid. (Tr. 3268 (Schaefer-Hayes).) As OMH CFO Martha Schaefer-Hayes testified, the portion of the amount of the rental stipend

housing receive the SSI Living Alone Rate and are required to pay 30% of this payment, i.e., 30% of their income, toward housing costs to the not-for-profit provider.[709] The 2009 Living Alone rate was $9,132 per year ($761 per month), of which the State's share is $1,044 per year, or $87 per month.[710]

Residents of Adult Homes and supported housing receive services funded by Medicaid, paid for jointly by the State and federal government.[711] For Medicaid-eligible individuals, the State pays for half the costs of Medicaid-funded services, including primary care, hospital care, psychiatric care, prescriptions, psychologists, Medicaid transportation, case management, and various other medical services.[712] As described below, the State pays significantly higher Medicaid costs for individuals with mental illness living in Adult Homes than it pays for individuals with mental illness in supported housing.

While OMH does not provide stipends to Adult Home operators as it does for supported housing providers, the State incurs additional costs for Adult Home residents that it does not

---

that goes to provide case management services is potentially eligible for Medicaid reimbursement. (Id. at 3268-69.) DAI has pointed out that if the State were to seek to make that expense coverable by Medicaid, the State could share the cost of those services with the federal government. (Pl. PFF ¶ 200 n. 12.) OMH has declined, however, to seek Medicaid reimbursement for that portion, asserting that the potential recovery "is not substantial enough to invest or require providers to invest in Medicaid billing systems to try to go after that." (Tr. 3276-77 (Schaefer-Hayes).) Ms. Schaefer-Hayes testified that 10-15% of the rental stipend funds go to case management. (Id. at 3276.)

DAI points out that the amount of Medicaid recovery to the State from the federal government if those funds were sought could be $9.9 million. (Pl. PFF ¶ 200 n. 12.) This number derives from multiplying ten percent of the $14,654 per-bed rental stipend by the approximately 13,500 supported beds that Defendants currently fund (see supra note 614), divided by two, because the State pays half of Medicaid costs (see infra notes 711, 712).

[709] Joint Stip. ¶¶ 9, 30.

[710] D-347 (SSI Benefit Levels Chart effective Jan. 1, 2009).

[711] S-55 (Kipper Report) 7-8 & n.4 ("[F]or $1.00 of Medicaid service cost, the State pays $0.50 and the Federal government pays $0.50.").

[712] See generally P-63 (DOH Analysis of Medicaid Expenditures in Impacted Adult Homes ("State Analysis")).

incur for residents of supported housing, described below. The State funds a variety of grant programs and other subsidies for adult homes statewide, including the Adult Homes at issue.

**b.      Defendants Have Not Done any Analysis To Determine the Financial Impact of the Requested Relief**

Martha Schaefer-Hayes, the Chief Fiscal Officer of OMH, testified that OMH has not done any analysis to determine the financial impact of creating supported housing beds specifically for Adult Home residents.[713] Ms. Schaefer-Hayes acknowledged on cross-examination that she was not familiar with the "financing mechanisms for adult homes," and agreed that, to her knowledge, "OMH has not performed an analysis of the financial impact" of the relief DAI seeks.[714] She also conceded that she had "not performed any studies or any analysis about the impact which the creation of 2,000 supported housing beds for adult home residents would have on the OMH budget."[715]

Defendants' cost expert, R. Gregory Kipper, testified on direct examination that he lacked information about the exact number of residents DAI contends could be served in supported housing and the exact mix of supports each individual would need for that to occur.[716] He stated that the lack of such information "certainly made it more difficult" to reach conclusions about the effect on the State's cost for moving individuals from Adult Homes to supported housing.[717] Mr. Kipper conceded on cross-examination, however, that there were several ways that an estimate could have been done to arrive at approximate figures to determine

---

[713] Tr. 3367-69 (Schaefer-Hayes).

[714] Id. at 3368.

[715] Id. at 3369.

[716] Tr. 2783-84.

[717] Id..

the effect on the State's costs.[718] For example, the State identifies its programs by unique "program codes."[719] The State could have used its own Medicaid database to compare services for former Adult Home residents before and after they moved to supported housing using those codes.[720] As DAI's expert Mr. Jones testified, because the Medicaid data is categorized by codes for various programs, the State could have looked at what it was "spending for those people while they were in adult homes and what it is now spending for them subsequently in supported housing."[721] The State never performed such an analysis.

### c. Defendants' Cost Analysis Ignores Relevant Costs

Defendants' evidence on costs is based on the premise that the only relevant costs are the OMH rental stipend provided to supported housing providers and SSI. Defendants' cost expert, Mr. Kipper, testified that the annual cost of serving a person in supported housing is $15,698, which is the $14,654 OMH stipend plus the State SSI contribution of $1,044.[722] He testified that the annual cost of serving a person in an Adult Home is only $8,328, which is the State SSI contribution.[723] Therefore, according to Defendants, it costs the State an additional $7,370 each year for an Adult Home resident to live in supported housing.[724] This comparison ignores Medicaid costs, however.[725]

---

[718] Id. at 2834-36; see Tr. 3464 (D. Jones).

[719] Tr. 3241 (Schaefer-Hayes).

[720] Tr. 2834-35 (Kipper); Tr. 3464 (D. Jones).

[721] Tr. 3465.

[722] Tr. 2780; see D-441 (Schaefer-Hayes Chart); D-398 (Kipper Chart).

[723] Tr. 2780; see D-441 (Schaefer-Hayes Chart); D-398 (Kipper Chart).

[724] Tr. 2780 (Kipper); see D-441 (Schaefer-Hayes Chart); D-398 (Kipper Chart).

[725] Tr. 2788, 2789 (Kipper); Tr. 3383-84 (Schaefer-Hayes); Tr. 3438-39 (D. Jones).

As set forth in detail below, the court finds that Medicaid costs are relevant to the analysis and should be considered in evaluating the costs of the proposed relief. Once Medicaid costs are taken into account, it would <u>not</u> be more expensive to serve DAI's constituents in supported housing rather than Adult Homes: it would actually <u>save</u> the State of New York $146 per year to serve an individual in supported housing instead of an Adult Home.

i.      **Defendants' Own Analysis Demonstrates That Medicaid Costs in Supported Housing Are Significantly Lower Than Medicaid Costs in Adult Homes**

At DAI's request, the State undertook a comparison of the Medicaid costs for residents of Adult Homes and residents of supported housing for the fiscal year 2004-2005 ("State Analysis").[726] In that analysis, the overall <u>annual</u> Medicaid costs for an individual residing in an Adult Home were, on average, roughly $15,000 higher than the average Medicaid costs for an individual with mental illness in supported housing.[727] As demonstrated in Table 1 below, the total average Medicaid expenditures, including the State and federal shares, were $31,530 per Medicaid-eligible individual in the Adult Homes at issue, and $16,467 per Medicaid-eligible individual with mental illness in supported housing.[728] In fact, the State pays far more for

---

[726] Tr. 3421 (D. Jones); <u>see generally</u> P-63 (State Analysis). The 2004-2005 data is the latest data available. (<u>See</u> Tr. 3440-41 (D. Jones).)

[727] P-63 (State Analysis) DOH 131663-64; P-773 (D. Jones Summary of Cost Evidence) 1; Tr. 3424 (D. Jones); S-55 (Kipper Report) 8; <u>see also</u> P-228 (NYS CQC, Adult Homes Serving Residents with Mental Illness: A Study on Layering of Services (Aug. 2002) ("Layering Report")) CQC 114 (finding that adult home residents receive services that are "costly," "sometimes unnecessary," and that appear in many instances to be "revenue-driven"); S-103 (Workgroup Report) DOH 86205-09 (discussing potential Medicaid savings from reforming services to adult home residents); P-94 (NYS CQC, A Review of Assisted Living Programs in "Impacted" Adult Homes (June 2007) ("2007 ALP Report")) at i (finding that assisted living services provided to residents of impacted adult homes "were not commensurate with the increased charges to Medicaid").

[728] P-63 (State Analysis) DOH 131663-64; <u>see also</u> S-150 (D. Jones Report) 21; S-55 (Kipper Report) 8.

services to Adult Home residents than for services to residents of supported housing across a "spectrum of services," including inpatient hospitalization costs and pharmacy costs.[729]

**Table 1: Summary Comparison of Medicaid Expenditures in FY 2004-2005[730]**

| Population Cuts | Average Per-Person Cost | |
|---|---|---|
| | Supported Housing | Adult Homes |
| Resident Populations in State Fiscal Year 2004-2005 | $16,467 | $31,530 |
| Severely and Persistently Mentally Ill ("SPMI") | $20,370 | $36,109 |
| (a) SPMI and Medically Involved | $28,108 | $46,772 |
| (b) SPMI and Not Medically Involved | $18,664 | $32,163 |
| Not SPMI | $11,882 | $25,289 |
| (a) Not SPMI and Medically Involved | $27,006 | $39,677 |
| (b) Not SPMI and Not Medically Involved | $9,628 | $19,711 |

**Source**: P-63 (State Analysis) DOH 131663-64.

Defendants further parsed the Medicaid data to compare persons with higher or lower medical needs and higher or lower psychiatric needs in both residential settings.[731] No matter which sub-category was analyzed, there were significant savings – between $10,000 and $18,700, depending on the category – for residents of supported housing.[732]

---

[729] Tr. 2789 (Kipper).

[730] Pl. PFF ¶ 204; P-773. The court has verified that this table accurately reflects the data at pages OMH 131663-64 in the State Analysis (P-63).

[731] See P-63 (State Analysis) DOH 131663-64; see Tr. 3471-72 (D. Jones).

[732] P-63 (State Analysis) DOH 131663-64.

ii.       **Serving Adult Home Residents in Supported Housing Would Reduce State Medicaid Costs**

While the parties do not dispute that the State spends more on Medicaid for residents currently living in Adult Homes than for residents currently living in supported housing, the parties dispute whether moving Adult Home residents to supported housing would reduce State Medicaid costs.[733] The dispute centers around the question of whether the higher Medicaid costs for Adult Home residents are due to the setting in which a person with mental illness is served or the characteristics of a person living in that setting.  Defendants' cost expert, Mr. Kipper, concluded that Medicaid costs "wouldn't necessarily change due to a change in your address, a change in your housing situation," and that it was "highly speculative" that moving an individual from one setting to another would cause an immediate change in the individual's Medicaid service needs and the State's share of associated Medicaid costs.[734] DAI's expert, Mr. Jones, testified that it is the <u>nature of the provision of services</u> in Adult Homes that causes the disparity, not the residents themselves.[735] The evidence below demonstrates that the higher cost is due to the Adult Home system of care rather than the characteristics of the individuals receiving services.

a)       **Adult Homes Over-Utilize Medicaid Services**

A significant reason why Medicaid expenses are higher in Adult Homes is that Adult Homes over-utilize Medicaid services; there is a great deal of "layering of services" in Adult Homes that does not occur in supported housing.[736] In August 2002, the New York Commission

---

[733] <u>See, e.g.</u>, S-55 (Kipper Report) 8; S-150 (D. Jones Report) 21-22.

[734] Tr. 2789-90, 2796, 2798-2800.

[735] Tr. 3424-26.

[736] Tr. 712 (Rosenberg); 3425-26 (D. Jones).

on Quality of Care ("CQC"), an independent State agency, issued the report "Adult Homes Serving Residents with Mental Illness: A Study on Layering of Services" (the "Layering Report").[737] The Layering Report was one of several studies that were highly critical of the Adult Home system of care.[738] It concluded that financial abuses existed in at least "the 11 largest adult homes in the greater New York City area," which together "cared for about one-fifth of the total population of 'impacted adult homes.'"[739] The Layering Report found it "not uncommon to see multiple practitioners and providers . . . located on-site in adult homes and acting independently of each other" in serving a "captive adult home population."[740] The report concluded that "many residents received multiple layers of services from different providers that were costly, fragmented, sometimes unnecessary, and often appeared to be revenue-driven, rather than based on medical necessity."[741] The report called the entire Adult Home service system "fundamentally flawed" and in need of "reform."[742] It cited ingrained "structural problems" that had been ongoing for "more than 25 years."[743] The report described a system:

> in which services are often not sought by the recipient, but initiated by the practitioner; in which providers fail to communicate with one another on treatments and medications, even on such matters as the need for surgery; and, in which the primary care physician plays no role in assuring that services are coordinated effectively.[744]

---

[737] P-228.

[738] Id.

[739] Id. at CQC 99.

[740] Id. at CQC 96.

[741] Id. at CQC 96.

[742] Id. at CQC 114-15.

[743] Id. at CQC 97.

[744] Id. at CQC 96.

The Layering Report, which used then-current figures, found that it cost the State $37,000 per year for a person to live in the adult homes it analyzed when Medicaid billing was added to room and board charges.[745]

The findings in the Layering Report are consistent with findings reached in several other State reports. A May 2006 report by the CQC, "Health Care in Impacted Adult Homes: A Survey," found that because primary care physicians and specialists provided services on-site at impacted adult homes, "this sometimes meant that individuals were seen monthly by their primary care physician even when they had no complaints and had made no request to see him/her."[746] It also found that "individuals were screened by specialists when they had no documented need for such [care]"; in one home, for example, a dermatologist screened all residents.[747] The report provided, for example, that in one home a dermatologist screened all residents. The CQC's June 2007 report, "A Review of Assisted Living Programs in 'Impacted' Adult Homes," found that assisted living services, which are provided to some Adult Home residents, "were not commensurate with the increased charges to Medicaid."[748] In addition, the Workgroup Report discussed potential Medicaid savings from reforming services to adult home residents.[749]

Several witnesses also identified the over-utilization problems highlighted in the Layering Report. Ms. Rosenberg explained that there is a fiscal relationship between Adult

---

[745] Id. at CQC 101.

[746] D-385 (NYS CQC, Health Care in Impacted Adult Homes: A Survey (May 2006) ("Health Care Report")) 8. This report focused on 13 impacted adult homes, four of which are at issue in this litigation. (See id. at 2.)

[747] Id. at 8.

[748] P-94 (2007 ALP Report) i.

[749] S-103 (Workgroup Report) DOH 86205-09.

Home operators and providers that rent space in the homes to provide Medicaid-billable services to adult home residents.[750]  She testified that some Adult Home residents at times had home health aides billed to Medicaid who worked for agencies owned by the Adult Home operators, and that the residents were unaware they had a home health aide.[751]  She described layering of "all of the medical services, all of the support services that could be billed through Medicaid that the adult home operator [ ] brought into the home," with the most egregious instances involving unnecessary cataract surgery.[752]  Similarly, Mr. Jones identified Medicaid over-utilization as a problem in Adult Homes – but not in supported housing – and described the finding of the Workgroup's Payment Subworkgroup that adult homes over-utilized nursing services and home health aides.[753]  As Mr. Jones explained, "[y]ou've got very aggressive private for-profit providers who are operating in largely a fee for service Medicaid world who are highly [incentivized] to bill as much Medicaid as they can bill."[754]  Accordingly, "you end up here with an exceedingly high cost for Medicaid."[755]  Ms. Rosenberg put it this way: "because they're for-profits[,] [i]t's institutional living at, potentially, its worst."[756]

---

[750] Tr. 712.  For example, on a site visit to an Adult Home, she observed that the Adult Home had arrangements with providers "where they could come into the home and would treat everybody in the home; and it was unclear, you know, how much the residents had a say in whether that's who they wanted to treat them or would they have preferred to go see somebody else."  (Id. at 645.)

[751] Tr. 709-10.

[752] Tr. 710-11.

[753] Tr. 3491-92, 3431-32.

[754] Tr. 3425.

[755] Id.; see also Tr. 566-67 (S.P.) (testifying that the Adult Home administrator makes appointments for him every three weeks to see the doctor assigned to him by the home in an office connected to the Adult Home, and that Medicaid pays for those appointments).

[756] Tr. 645.

Defendants assert that "there is no evidence that the financial abuses that occurred in some homes are widespread and still occurring,"[757] contending that "many of the homes where abuses took place" are closed or under different management. Defendants' expert, Mr. Kipper, testified that he "thought the problem would have been addressed."[758] Defendants have done no analysis to prove these assertions, which are not supported by the evidence.

First, the facts contradict Mr. Kipper's assumption that the Medicaid over-utilization problem "had been addressed" prior to his analysis in this case. The Layering Report found that the average Medicaid costs in the adult homes it analyzed exceeded $27,000 per resident, a figure it termed "expensive" and indicative of "uncoordinated" and "unnecessary" services.[759] When the State analyzed the Medicaid data for this litigation for the fiscal year 2004-2005, two years after the Layering Report was issued, the average costs in all the Adult Homes analyzed totaled $31,830 per resident – nearly $5,000 more per resident on average than the $27,000 figure found in only the eleven largest adult homes in 2002.[760] The State Analysis found that twenty Adult Homes still had expenditures in excess of $27,000 per resident, and seven Adult Homes had costs exceeding $35,000 per resident – a 30% increase in costs since the release of the Layering Report.[761] Looking at these numbers in connection with the longstanding "structural" problems identified in the Layering Report and other evidence of Medicaid over-

---

[757] Defs. PFF ¶ 155; id. (citing D-440 at 162-63 (deposition of Walter Saureck, a former CQC official who worked on the Layering Report, who did not disagree with the observation of Ms. Schimke, a member of the Workgroup's Payment Subcommittee, that the Layering Report may not be representative of all homes)).

[758] Tr. 2833.

[759] P-228 at CQC 96.

[760] P-63 (State Analysis) DOH 131637.

[761] Id.

utilization, it is impossible to reconcile the facts with the assumption that these problems have been fixed.

The evidence also belies the assertion that the financial abuses are limited to a few isolated Adult Homes.  As noted above, the Layering Report found that financial abuses existed in at least "the 11 largest adult homes in the greater New York City area," Adult Homes that together "cared for about one-fifth of the total population of 'impacted adult homes.'"[762]  Most of those Adult Homes continue to serve Adult Home residents to this day.[763]

> **b)** **The Dependency-Based Model of Adult Homes Contributes to Increased Medicaid Expenditures**

Another reason Mr. Jones identified for the increased Medicaid expenditures in Adult Homes is the "dependency-based model" of care in Adult Homes, as compared to the "recovery-based model" of supported housing.[764]  He testified that the dependency-based model says "I'll do it for you, I'll bill Medicaid for it."[765]  In contrast, the recovery-based model looks at people's strengths: what they are capable of doing and how best to promote those strengths,[766] maximizing an individual's potential to become increasingly independent over time, reducing the amount of Medicaid-billable services.  Mr. Jones illustrated the concept this way:

> If you want somebody to learn how to ride the bus, you don't pull up with a van every day and say, Hop in, we're going, and bill Medicaid.  That's an old-style model.  You go out and you help people to learn how to ride public transportation. You do that in stages, teaching and training.[767]

---

[762] See supra note 739.

[763] See P-774 (2008 Census Report).

[764] Tr. 1010-11, 3425-26, 3475-76.

[765] Id. at 3476.

[766] Id. at 3475.

[767] Id. at 3476.

According to Mr. Jones, "[i]t's the difference between doing for and doing with."[768] He testified that in a dependency-based model, the same services recur and do not taper off over time: "[Y]our people are doing the same things for folks this year as they are doing next year."[769] For these reasons, the dependency-based model is another cause of the high Medicaid costs found in Adult Homes.

**c)**      **Increased Medicaid Costs in Adult Homes Are Not Attributable to the Characteristics of Adult Home Residents**

The evidence demonstrates that the difference in Medicaid costs between Adult Homes and supported housing is not attributable to the characteristics of the persons living in the Adult Homes. The Layering Report, for example, shows that the problem is with the Adult Home system of care, not with the residents subject to the system. The Layering Report does not discuss any characteristics of Adult Home <u>residents</u> that would lead to high Medicaid costs. Rather, it details at length the "multiple layers of services from different providers that [are] costly, fragmented, sometimes unnecessary, and often appear[] to be revenue-driven, rather than based on medical necessity."[770] According to the Layering Report, rather than being driven by the needs of Adult Home residents, services were "characterized by their lack of individualization," and that the "breadth" and "volume" of services is instead "attributed to easy accessibility and the absence of a gatekeeper or service coordinator."[771]

---

[768] <u>Id.</u>

[769] <u>Id.</u>

[770] P-228 (Layering Report) CQC 100.

[771] <u>Id.</u>

The State Analysis of the 2004-2005 comparative Medicaid data – a comparison of Adult Home residents with similarly-diagnosed residents of supported housing – also demonstrates that the increased costs are linked to the system of care, not the residents.[772] Defendants' expert, Mr. Kipper, agreed that the State Analysis "divide[d] [the two] populations into subgroups that had similar characteristics," and that this was done "based on diagnosis codes in the Medicaid database."[773] Mr. Kipper also agreed that, on an average per-person basis, "no matter how you cut the data you get the same kind of result, it's considerably higher in the adult home than in supported housing."[774] As noted above, the data shows plainly that for every category, the savings in supported housing were significant, ranging from $10,000 to $18,700 per person.[775] That is, for persons with a given diagnosis, the State was likely to pay many thousands of dollars more per year for that person if he or she lived in an Adult Home than if he or she lived in supported housing.[776]

Mr. Kipper pointed to the CQC's Health Care Report as one source of his view that Adult Home residents had higher needs than residents of supported housing.[777] The reference to that report, however, is misleading. The report compared the medical needs of Adult Home residents with the medical needs of the general population, not residents of supported housing.[778] In fact, the report explained that its findings were not surprising, because people with serious psychiatric

---

[772] See generally P-63 (State Analysis).

[773] Tr. 2827-28.

[774] Id. at 2830.

[775] P-63 (State Analysis) DOH 131663-64.

[776] See id.

[777] Tr. 2789-92.

[778] See D-385 (Health Care Report) 2-3 (noting that residents of impacted adult homes had higher incidences of certain disorders than "the general American population").

disorders "may [be] predispose[d] . . . to certain health risks" because of lifestyle choices, the psychotropic medications they take, and their limited incomes.[779] These factors are not unique to Adult Home residents; they are generally applicable to persons with mental illness regardless of whether they are served in Adult Homes or supported housing. Nothing in the report indicates that Adult Home residents are a needier population than residents of supported housing.

In any event, as the court discussed at length above, the evidence demonstrates that there are no material differences between residents of Adult Homes and residents of supported housing, and whether a person with mental illness is placed in an Adult Home rather than in supported housing is not based on that person's functional abilities or medical needs.[780]

> **d)** **When the Cost of Medicaid Is Properly Included, It Costs the State Less To Serve an Individual in Supported Housing than in an Adult Home**

When Medicaid is properly included, it costs the State less to serve an individual in supported housing than in an Adult Home. After adding (1) the average Medicaid cost for a person in supported housing ($16,467) to (2) the amount of the supported housing stipend ($14,654) and (3) the amount of SSI paid for a resident of supported housing ($9,132), the total paid by the State and federal governments for a person in supported housing is $40,253 per year.[781] The State's share of the cost for a person in supported housing is 100% of the stipend ($14,654), half of the Medicaid ($8,234), and a portion of the SSI ($1,044), for a total State cost of $23,932.[782] By contrast, after adding the Medicaid cost for a person in an Adult Home

---

[779] Id. at 2-3.

[780] See supra Part III.B.2.h; supra notes 362, 522.

[781] P-773 (D. Jones Summary of Cost Evidence) 2; Tr. 3437-38 (D. Jones).

[782] P-773 at 2.

($31,350) to the cost of SSI for a person in an Adult Home ($16,416), the total paid for a person

served in an Adult Home is $47,946 per year.[783]  The State's share of the cost is half of the

Medicaid ($15,750) and a portion of the SSI ($8,328), for a total State cost of $24,078.[784]  This

data is summarized in Table 2:

**Table 2: Supported Housing ("SH") Average Per-Person Annual Costs Compared to Baseline Adult Home ("AH") Average Annual Costs[785]**

|  | Supported Housing | |  | Adult Homes | |
|---|---|---|---|---|---|
|  | State | Total |  | State | Total |
| SH Stipend | $14,654 | $14,654 |  | N/A | N/A |
| Medicaid | $8,234 | $16,467 |  | $15,750 | $31,530 |
| SSI | $1,044 | $9,132 |  | $8,328 | $16,416 |
| **TOTAL** | **$23,932** | **$40,253** | **TOTAL** | **$24,078** | **$47,946** |

**Source:** P-773 at 2.

When the cost of Medicaid is included, it saves the State of New York $146 per year to

serve an individual in supported housing instead of an Adult Home.[786]  The overall cost is $7,693

less for the combined expenses of the State and federal governments.[787]

### iii.        Defendants Ignore Other Relevant Costs of Adult Homes

In addition to Medicaid costs, the State also incurs millions of dollars in additional

expenses for Adult Home residents that it does not incur for residents of supported housing.[788]

---

[783] Id.

[784] Id.

[785] Pl. PFF ¶ 212; P-773. The court has verified that P-773 accurately reflects the Medicaid data in P-63, the stipulated SSI costs for residents of supported housing and Adult Homes, and the stipulated amount of the supported housing stipend.

[786] Id.; see also Tr. 3439 (D. Jones).

[787] P-773 at 2.

[788] Tr. 3439-40, 3459-60 (D. Jones); see generally P-773 at 3-12.

Defendants have not included any of these costs in their analysis. The court finds such costs relevant to the comparative cost analysis in this case.

First, Defendants did not consider the cost of the Quality Incentive Payment ("QuIP") program.[789] The State has spent at least $28 million on QuIP since the program's inception,[790] $26.4 million of which has been spent since this lawsuit was filed.[791] QuIP money is allocated as a funding subsidy to adult home operators statewide who "maintain compliance with DOH regulations."[792] QuIP funds are allocated to those adult homes that apply for and are awarded grants based on the number of SSI-eligible residents living in the home.[793] Adult homes receiving grants under the QuIP program are authorized to use funds for capital improvements, such as new roofs or new furniture, and for training and education of adult home staff.[794] QuIP money goes to adult home owners and operators, not to adult home residents.[795] QuIP money is not designed to assist Adult Home residents in moving to more integrated settings; according to Mr. Wollner, who formerly held high positions at OMH and DOH, that "was not the intent of the legislation."[796]

---

[789] Tr. 2786-87 (Kipper); S-148 (D. Jones Rebuttal Report) 2-3; S-55 (Kipper Report) 9 n.6 ("Costs related to the QUIP program have not been included"); S-144 (Kipper Reply Report) 2-3; D-441 (Schaefer-Hayes Chart); Tr. 3381-82 (Schaefer-Hayes).

[790] Tr. 16710, 1710 (Wollner); P-773 at 3-12.

[791] P-773 at 3-12.

[792] S-55 (Kipper Report) 5; see also S-148 (D. Jones Rebuttal Report) 2-3.

[793] S-148 (D. Jones Rebuttal Report) 2.

[794] Tr. 1708-09 (Wollner). Mr. Wollner acknowledged that there have been allegations that QuIP funds have not been put to their intended use, but instead have been used by some Adult Homes to subsidize operating expenses like workers' compensation. (Id. at 1710.)

[795] Tr. 1708-09 (Wollner).

[796] Id. at 1608, 1709-10.

Since this litigation began, DOH has distributed millions of dollars to the operators of the Adult Homes at issue in this litigation.[797] DOH spent $4 million on QuIP in 2002-2003, of which $972,742 was distributed to Adult Homes at issue in this litigation.[798] DOH allocated $6 million to QuIP in 2003-2004, of which $1,982,129 was spent in Adult Homes at issue in this litigation.[799] DOH allocated $2.75 million to QuIP in 2005-2006,[800] $2.75 million in 2006-2007,[801] $5.5 million in 2007-2008,[802] and $5.46 million in 2008-2009.[803]

Second, Defendants did not consider[804] the substantial funds they have allocated for capital improvements and air conditioning in Adult Homes.[805] In 2004-2005, the Legislature appropriated $1.5 million for an Infrastructure Capital Program.[806] Six of the Adult Homes at issue in this litigation received Infrastructure grants.[807] In 2006-2007, the State spent $2.8 million on air conditioning for adult homes.[808] Nine of the Adult Homes at issue in this litigation received funds for air conditioning.[809]

---

[797] P-773 at 3-12.

[798] P-773 at 3; P-264 (QuIP Final Payment List 2002-2003).

[799] P-773 at 4; P-263 (QuIP Final Payment List 2003-2004).

[800] P-773 at 8.

[801] Id. at 9; Tr. 1708 (Wollner).

[802] P-773 at 11.

[803] Id. at 12.

[804] S-144 (Kipper Reply Report) 3; Tr. 2786-87 (Kipper); S-148 (D. Jones Rebuttal Report) 3; D-441 (Schaefer-Hayes Chart); Tr. 3381-82 (Schaefer-Hayes); Tr. 3460 (D. Jones).

[805] P-773 at 3-12.

[806] P-773 at 6; Tr. 1706-07 (Wollner); P-659 ("Dear Colleague" letter from David Wollner announcing the availability of funding under the ACF/Infrastructure Improvement Initiative).

[807] P-773 at 6; see P-245 (DOH, ACF Infrastructure Improvements, List of Approved Applications).

[808] P-773 at 9; see also Tr. 1709 (Wollner) (testifying that the State had spent $2 million).

[809] P-773 at 9-10; P-722 (DOH Press Release, "51 Adult Care Facilities Share $2.8 Million in Grants to Increase Air Conditioning in Resident Rooms" (Apr. 25, 2007)).

Third, Defendants did not consider[810] the millions of dollars the State has spent on the EnAbLE program.[811]  The State spent $2 million on EnAbLE in 2004-2005, and three Adult Homes at issue in this litigation received grants.[812]  The State spent $2.75 million in 2005-2006,[813] and $2.2 million in 2006-2007,[814] of which $491,908 was allocated to Adult Homes at issue in this litigation.[815]  Additional funds were allocated for EnAbLE as part of a $6.55 million budget package in 2007-2008,[816] and $3 million was allocated to the program in 2008-2009.[817]

Fourth, Defendants did not consider funds the State has invested in Adult Homes through OMH's Case Management Initiative.[818]  This initiative was originally funded with $1.2 million in 2003-2004 to provide case management in three Adult Homes at issue in this litigation.[819]  The State allocated $1.275 million to case management in 2004-2005.[820]  In 2005-2006, the State allocated $5.25 million to case management.[821]  Mr. Wollner testified that the State has spent at

---

[810] S-144 (Kipper Reply Report) 3; Tr. 2786-87 (Kipper); Tr. 3460 (D. Jones); S-148 (D. Jones Rebuttal Report) 3; D-441 (Schaefer-Hayes Chart); Tr. 3381 (Schaefer-Hayes).

[811] See P-773 at 3-12; see supra Part IV.B.1.h (describing EnAbLE program).

[812] P-773 at 6; see also P-244 (DOH, EnAbLE Program Grant Awards) (listing awards to Queens Adult Care Center, Park Inn, Rockaway Manor, and Ocean House).  The award to Ocean House was made shortly before Ocean House was closed because of "very serious concerns as it relates to . . . care that was not provided to the residents" and "allegations of fraud and misuse of governmental funding that had been provided to the owners and operators."  (Tr. 1728 (Wollner).)

[813] See P-773 at 8 (discussing allocation for "general adult home initiatives"); Tr. 1713 (Wollner).

[814] P-773 at 9; see also Tr. 1713 (Wollner) (stating that $2.75 million was allocated).

[815] P-773 at 9; D-135, D-136, D-137, D-138, D-139 (DOH letters notifying Adult Homes that EnAbLE grants have been approved).

[816] P-773 at 11.

[817] Id. at 12.

[818] S-144 (Kipper Reply Report) 2; Tr. 2786-87 (Kipper); Tr. 3460 (D. Jones); S-148 (D. Jones Rebuttal Report) 2.

[819] P-773 at 4-5.

[820] Id. at 7.

[821] Id. at 8; P-756 (Excerpt from 2005-2006 Enacted Appropriations Bill, S554-E/A554-C) 277 (appropriating $5.25 million for case management in Adult Homes); see also S-127 (OMH Aid to Localities 2005-2006 Enacted Budget –

least $5.25 million per year since 2005 on the Case Management Initiative.[822]  On a per-resident

basis, the State spends approximately $1,514 annually in direct State aid for each Adult Home

resident that receives services through the Case Management Initiative.[823]

Finally, Defendants did not consider[824] an additional $2 million the State budget

allocated to various adult home initiatives in addition to the specific programs described

above.[825]  In 2005-2006, the State allocated $350,000 "for services and expenses to promote

programs to improve the quality of care for residents in adult homes."[826]  For example, the State

spent "a couple hundred thousand dollars" on medication management training for adult home

staff.[827]  As Mr. Wollner testified, this program was not designed to help adult home residents to

learn how to self-administer medication; rather, it was necessary because of the nature of

concerns about medication handling and storage by the staff.[828]

> ### d.    Defendants Contend That the Relief Would Impose Additional Costs but Provide Limited Factual Support for This Contention

Defendants contend that the relief would impose additional costs.  They assert that DAI's

constituents would need additional support services in supported housing.[829]  They also assert

that administrative costs of assessing Adult Home residents and overseeing increased supported

---

Summary of Legislative changes) 1 (listing "no change" as to the Executive Budget Recommendation for case management in Adult Homes).

[822] Tr. 1702-03\.

[823] D-348 (2008-2009 Case Management Funding Models) (listing the cost to the state of a case manager serving 30 Adult Home residents as $47,744).

[824] See generally D-398 (Kipper Chart); D-441 (Schaefer-Hayes Chart); S-55 (Kipper Report) 8-9.

[825] P-773 at 4.

[826] Id. at 8; P-756 (Excerpt from 2005-2006 Enacted Appropriations Bill, S554-E/A554-C) 76.

[827] Tr. 1717 (Wollner).

[828] Id. at 1718-19.

[829] Defs. PFF ¶ 160.

housing should be considered.[830]  Defendants further contend that, if DAI's constituents moved to supported housing, the newly vacated Adult Home beds would be "backfilled" with other individuals with mental illness.[831]  As set forth below, Defendants have not provided sufficient evidence that these costs would be incurred or how much such costs would be.

### i.    Additional Support Services

Defendants assert that DAI's experts "conceded that many, if not all, of plaintiff's constituents will need additional services to live in scatter-site supported housing."[832]  Based on that assertion – despite ample testimony to the contrary[833] – Defendants contend that "it is likely that many [Adult Home residents] would need the services of an ACT team."[834]  Defendants also hypothesize that it is "very possible" that some Adult Home residents would need an "Intensive Case Manager" or "additional services that cannot be provided by an ACT team or a case manager, such as a home health aide."[835]  Defendants assert that a "new ACT team" costs $8,508 and an Intensive Case Manager costs $4,414, presumably per person per year.[836]  These assertions ignore the fact that there are current supported housing residents who already receive

---

[830] Id. ¶ 222.

[831] Id. ¶¶ 224-225.

[832] Id. ¶ 160.

[833] See, e.g., Tr. 83:24–84 (E. Jones) (concluding that "many people" in Adult Homes could move to supported housing with "little or no support"); Tr. 3072 (Groves) (testifying that Adult Home residents are "not a seriously impaired population in the vast majority").

[834] Defs. PFF ¶ 160.

[835] Id.

[836] Id. ¶ 160 (citing Tr. 3346; D-441 (Schaefer-Hayes Chart)).

such services,[837] the cost of which is <u>already</u> included in the Medicaid comparison between Adult Home residents and supported housing residents.[838]

In any event, while Defendants assert that it is "possible" that Adult Home residents might need additional services in supported housing, the evidence demonstrates that many Adult Home residents would not require extensive support services to live in supported housing. While ACT services are available to residents of supported housing, as noted above, there are no material differences between residents of Adult Homes and residents of supported housing.[839] Even Defendants' expert Dr. Geller conceded that 29% of current Adult Home residents in his sample could go to supported housing "without ancillary services."[840] There is no basis to assume that a higher percentage of Adult Home residents will require ACT services compared to the individuals who currently live in supported housing.

In addition, Defendants have not provided any analysis comparing the cost of ACT with the cost of the various mental health services those Adult Home residents currently receive, or the cost of services that supported housing residents without ACT teams receive. As Mr. Jones testified, "ACT is a bundled set of services, so that if you're in an ACT team, that . . . ACT team really provides the full gamut of what you're going to need in terms of mental health services."[841] Thus, the evidence shows that residents with an ACT team will not be incurring the expense of other programs offered by the State. As OMH's website explains, ACT services are

---

[837] Tr. 223, 224, 237 (Tsemberis) (testifying that some Pathways tenants receive ACT, blended case management, and supportive case management); Tr. 2413–14 (Geller); P-286 (TSI RFP Response) OMH 42968.

[838] <u>See</u> D-441 (Schaefer-Hayes Chart) (showing the Medicaid percentages the State pays)).

[839] <u>See</u> <u>supra</u> Part III.B.2.h.

[840] Tr. 2406.

[841] Tr. 3462-63.

carried out "at the locations where problems occur and support is needed rather than in hospital or clinic settings."[842] That shift in the locus of services means that costs formerly borne by the State are avoided. As OMH itself has reported, "[s]tudies have shown that recipients who receive ACT services experience greater reductions in psychiatric hospitalization rates and a higher level of housing stability. Research has also shown that ACT . . . is no more expensive than other types of community-based care."[843] Thus, even if many of DAI's constituents would need ACT services, Defendants have not provided evidence demonstrating that such services would be more costly.

### ii. Cost of Potential Assessments and Administrative Costs

Defendants assert that the cost of assessments of Adult Home residents should be included in the cost analysis. They contend – without citation to evidence – that they will need an outside contractor to conduct assessments and that the the cost will "undoubtedly" be more than the $1.3 million the State spent on the Assessment Project.[844] Supported housing providers, however, routinely do assessments as part of their work to identify the supports and services residents will require.[845] Case managers in Adult Homes are already "expected" to assist Adult Home residents to move to more integrated settings.[846] There is no evidence in the record that the State would need to hire an outside contractor to conduct assessments.

---

[842] S-97 (OMH website description of ACT) 1.

[843] Id. (citation omitted); see also Tr. 3428-29 (D. Jones); P-725 (Substance Abuse & Mental Health Servs. Admin ("SAMHSA") National Registry of Evidence-Based Programs & Practices (Nov. 2007)) 1, 5-6 (finding that supported housing with ACT services cost less than supported housing coupled with traditional community services, and that residents who received ACT spent less time in psychiatric hospitals than persons receiving traditional community services).

[844] Defs. PFF ¶ 222.

[845] See supra note 293.

[846] See, e.g., Tr. 1500-02 (Madan); Tr. 1365-66 (Reilly).

Defendants additionally contend that "increased administrative and staff costs for OMH of overseeing additional supported housing should also be considered."[847]  There is no evidence concerning whether such costs would be incurred or how much they might be.

### iii.     There Is No Evidence That Potential "Backfill" Would Increase the State's Costs

While Defendants assert that the State's costs would increase if beds vacated by Adult Home residents were "backfilled" by other individuals with mental illness,[848] Mr. Kipper, Defendants' cost expert, testified that he had no opinion as to whether backfill would occur, and he did not include the potential for backfill in his analysis.[849]  Defendants did not offer any evidence that backfill, if it were to occur, would result in increased costs to the State.  Instead, the evidence is to the contrary.

Defendants' witnesses testified that the persons most likely to fill vacant Adult Home beds are homeless persons and persons being discharged from State psychiatric hospitals.[850] The evidence shows that if Adult Home beds were backfilled with persons in those populations, those individuals would likely be served less expensively in an Adult Home than in the settings from which they were coming.  Dr. Tsemberis testified that such "high users" of the mental health system are "in and out of psychiatric hospitals or detoxes" and in and out of shelters."[851]  He testified that, for example, that it costs the State an average of $40,000 per year in Medicaid expenses alone to provide services to homeless persons with mental illness, and costs can be as

---

[847] Defs. PFF ¶ 222.

[848] Id. ¶ 224.

[849] Tr. 2784-86.

[850] See, e.g., Tr. 2156-57 (Newman); Tr. 3198-3200 (Myers); see also Tr. 2905 (Kaufman).

[851] Tr. 292.

high as $100,000 per year.[852]  This cost is higher than the average $31,530 in Medicaid expenditures for Adult Home residents.[853]  Similarly, a person that has come from an inpatient psychiatric setting, such as a State hospital, will have come from a much higher cost setting than an Adult Home.[854]

In any event, New York State has no obligation to insure that vacated Adult Home beds are backfilled.  To the contrary, State law permits the State to regulate admissions to Adult Homes,[855] and also permits the State to downsize or close Adult Homes for which there is no public need.[856]

### e. The State Has Demonstrated Its Ability To Redirect Funds as Individuals Move from One Setting to Another

There is ample evidence in the record demonstrating the State's ability to redirect funds as individuals with mental illness move from one service setting to another.  When State hospitals have closed hospital beds, the New York State Community Reinvestment Act of 1993 has enabled the State to transfer money from the budget for State hospitals to the budget for OMH community services.[857]  In total, the State was able to redirect more than $210 million in savings from the closure of psychiatric hospital beds into community programs.[858]  In 2005,

---

[852] Id.

[853] See P-773 at 1-2.

[854] Tr. 3372 (Schaefer-Hayes) (estimating that in 2007, the State saved $73,000 for each psychiatric center bed it closed); Tr. 3428-29 (D. Jones) (stating that "when you darken the door of an inpatient psychiatric unit, that is not only the most intensive part of treatment, but it's also the most expensive and so, to the degree to which you can maintain people avoiding that is a major factor in keeping costs down").

[855] N.Y. Soc. Servs. Law §§ 461(1), 461(2); N.Y. Comp. Codes R. & Regs. tit. 18 § 485.5(m)(1)(i).

[856] N.Y. Soc. Servs. Law § 461-b; N.Y. Comp. Codes R. & Regs. tit. 18 § 485.5(m)(1)(i); see also Joint Stip. ¶ 5; Tr. 3047-48 (Hart).

[857] Tr. 3261-63 (Schaefer-Hayes); S-150 (D. Jones Report) 22-23; Tr. 1947 (Newman); Tr.1613 (Wollner).

[858] Tr. 1613 (Wollner); Tr. 3262-65, 3316 (Schaefer-Hayes); S-25 (Excerpt from New York State 2004-2005 Executive Budget, Appendix I: Agency Presentations re: OMH) EXEC 63-64 (describing reinvestment); accord S-

OMH closed 100 beds in psychiatric centers and used the savings to fund 600 supported housing beds.[859] OMH's Chief Fiscal Officer, Ms. Schaefer-Hayes, testified that OMH has internally reallocated items in its budget in order to shift resources away from outdated programs to more effective programs,[860] and has taken steps to maximize other funding sources, such as Medicaid.[861] Both Ms. Schaefer-Hayes and Ms. Rosenberg testified that money can be transferred from one State agency to another when the need arises.[862]

Mr. Jones testified that New York can extricate itself from reliance on Adult Homes to serve persons with mental illness if it chooses to do so.[863] While witnesses essentially agreed that no state has been able to provide subsidized housing for all its residents with mental illness,[864] the relief sought here concerns individuals for whose housing and services the State already incurs significant costs. Ms. Rosenberg testified that sufficient supported housing could be created in New York for other needy groups as well as Adult Home residents, "because if

---

26 (Excerpt from New York State 2005-2006 Executive Budget, Appendix I: Agency Presentations re: OMH) EXEC 4823-24.

[859] Tr. 3373; see also id. at 3370-71 (describing that reinvestment has been used to create supported housing).

[860] Id. at 3315-18; see also S-150 (D. Jones Report) 27-28 (describing $10 million savings by OMH through implementation of the PROS program).

[861] Tr. 3266 (Schaefer-Hayes).

[862] Tr. 3370, 3395 (Schaefer-Hayes) (testifying that State money can be moved from DOH to OMH with the approval of the Legislature and the Governor); Tr. 731-32 (Rosenberg) (testifying that with proper coordination, money could be moved from the DOH budget to the OMH budget).

[863] See Tr. 3477-78.

[864] Tr. 1181 (D. Jones) ("I don't know of any states that have reached where they want to be and where they would like to be"); Tr. 946 (Duckworth) (testifying that more resources could be put into community housing in Massachusetts); see also Tr. 3174-75 (Myers) (speculating that if OMH were to provide housing for the more than 350,000 individuals with serious and persistent mental illness in New York State, it would take more than OMH's total budget).

there was the will to close Adult Homes, and I think it will take political will, that money could be shifted and used for the services people in supported apartments would need."[865]

> ### f. Defendants Have Not Provided Sufficient Evidence That "Fiscal Difficulties" Have Limited OMH's Ability To Develop Supported Housing

There is insufficient evidence to support Defendants' contention that current fiscal difficulties have impacted OMH's ability to develop supported housing.[866] Defendants have provided testimony that OMH has suffered budget cuts of just under $100 million, that further cuts are "expected by October," and that the demand for mental health services has increased.[867] Ms. Schaefer-Hayes also testified that OMH has been given authority by the Division of the Budget to spend only twenty percent of appropriations for 2009 as of May.[868] Defendants also point to the fact that some capital expenditures for the development of community housing have been "frozen" in the current budget cycle – that is, OMH was told to stop further development efforts for "capital projects where a site had not yet been identified."[869] DAI's requested relief, however, is the provision of supported housing beds, and it is undisputed that creation of new supported housing beds does not require an outlay of capital, because supported housing consists of existing housing in the community.[870]

---

[865] Tr. 772-73.

[866] Defs. PFF ¶ 158.

[867] Tr. 3245-47 (Schaefer-Hayes); Tr. 3156-57 (Myers).

[868] Tr. 3303.

[869] Defs. PFF ¶¶ 219-20; Tr. 1965-66 (Newman). No supported housing beds in the development pipeline have been frozen. (D-350 (OMH Community-Based Bed Chart (Mar. 31, 2009)) 4.

[870] See, e.g., Tr. 2159-60 (Newman); see also Tr. 3483 (Jones) (testifying that supported housing providers are "using already existing housing.").

The record is devoid of evidence showing that the current fiscal difficulties have limited OMH's ability to develop supported housing. OMH Commissioner Hogan testified on January 29, 2009 that "[r]esources appropriated in the 08-09 budget to develop supported housing will be used in part to expand the array of supported housing and in part to create a new and more flexible housing subsidy program during 2010-2011."[871] In fact, while this trial was ongoing, the State issued an RFP for 230 beds of new supported housing, with conditional awards to be made in July 2009.[872]

### 3. The Relief Would Not Adversely Impact Other Individuals with Mental Illness

The court heard extensive testimony about the wide range of services the State provides through its public mental health system, serving 600,000 New Yorkers with mental illness through approximately 2,500 licensed mental health programs.[873] The court heard testimony and reviewed the documentary evidence about State-operated psychiatric hospitals, including forensic hospitals; the development of Secure Treatment facilities for sex offenders; OMH's research and public education; and services to approximately 150,000 children with "emotional disturbance."[874] OMH Senior Deputy Commissioner Robert Myers testified that recent "financial pressures and loss of jobs" have resulted in an increased demand on mental health services funded by the State, and that "when there's that kind of pressure on the mental health

---

[871] D-182 (2009-2010 Mental Health Update & Exec. Budget Testimony) OMH 43467.

[872] See P-748 (2009 RFP). As noted above, this RFP does not include Adult Home residents in the target populations.

[873] Tr. 3164 (Myers); 3259 (Schaefer-Hayes).

[874] See generally Tr. 3148-64 (Myers).

system, there [are] also usually not additional resources to meet that demand because government doesn't have the resources to expand services."[875]

Defendants have not provided evidence sufficient to demonstrate, however, that the relief DAI requests would force them to cut back on services to other needy populations. As noted above, Mr. Kipper, who opined that serving Adult Home residents in supported housing would increase State costs, did not consider all relevant costs.[876] In contrast, Mr. Jones showed convincingly based on his detailed analysis that serving Adult Home residents in supported housing instead of Adult Homes would not increase the State's costs.[877] Accordingly, the court finds that the evidence does not show that, if the requested relief were imposed, the State would have to cut programs or prejudice others who seek supported housing.[878]

> **4.      DAI Provided Convincing Evidence That the State Is Capable of Expanding Its Supported Housing Program To Meet the Needs of Adult Home Residents**

DAI provided convincing evidence that New York is capable of expanding its supported housing program to meet the needs of Adult Home residents. Mr. Jones concluded that "the community provider system has the demonstrated ability to expand services (housing, clinical, and support) to serve persons with mental illness now living in adult homes."[879] Dr. Tsemberis testified that Pathways to Housing has served people who have come from Adult Homes, that

---

[875] See id. at 3156-57 (testifying that "it's well known that as the economy worsens the demand for mental services increases").

[876] See supra Part IV.B.2.c.

[877] See supra Part IV.B.2.c.ii.d.

[878] See S-150 (D. Jones Report) 21-22; S-148 (D. Jones Rebuttal Report) 1-6.

[879] See S-150 (D. Jones Report) 20-21; see also Tr. 656 (Rosenberg) (testifying that supported housing providers "know how to do it"); D-399 (Lasicki Dep.) 203 (executive director of an association of non-profit mental health residential program providers testifying that she has "no doubt" that member organizations could serve Adult Home residents).

they have done well in supported housing, and that Adult Home residents in general would do "very well" in supported housing.[880]  He also testified that if the State issued an RFP to provide supported housing to Adult Home residents with mental illness, many agencies would apply to serve them.[881]

As Mr. Jones described, the "very clear and consistent message" he got in conversations with providers was:

> We know how to do this, we believe in the philosophy around community integration, we have a strong track record of doing it, and what we need from the state here, as a part of all of this, is to come up with a clear plan, which would presumably be a multi-year plan, be very clear about how it's going to get funded so there's no question about commitment, do it in an incremental way, and support it.  And if you can do those things at a state leadership level, we can and will deliver . . . . The local providers were not in the least bit hesitant about expressing . . . their ability to serve folks who are today in adult homes, not in the least.[882]

Mr. Jones testified that New York is capable of developing supported housing beds for Adult Home residents at a rate of approximately 1,500 per year for several years.[883]  In particular, he testified that in response to the 2005 supported housing RFP for the 60-bed initiative, OMH received responses proposing to develop a total of 1,500 beds.[884]  He also testified that many supported housing providers have established working relationships with landlords.[885]  He noted OMH's history of taking on "big projects" such as the New York/New York Initiative to provide supported housing for homeless individuals – that initiative planned for the development of

---

[880] Tr. 282-83, 287.

[881] Tr. 288-89.

[882] Tr. 3477-78.

[883] See id. at 3478-79, 3482-87.

[884] Id. at 3478.

[885] Id. at 3483.

9,000 beds in its third phase alone.[886]  Mr. Jones, who is familiar with the real estate market in New York City, indicated that it would be possible to identify a sufficient number of units of appropriate housing to achieve this goal.[887]

### C.    CONCLUSIONS OF LAW

The court assumes familiarity with the analysis set forth in DAI I describing the components of the fundamental alteration defense.  While the court noted on summary judgment that a comprehensive, effective Olmstead plan was not a necessary component of the defense or a prerequisite to considering the fiscal impact of the relief, it agreed with the Third Circuit's approach that a state must make efforts to comply with the integration mandate to establish that the requested relief would be too costly.  See DAI I, 598 F. Supp. 2d at 339.  On summary judgment, the court made clear that at trial, it would consider evidence about the State's efforts to comply with the integration mandate with respect to the Adult Home residents at issue together with evidence on the costs of prospective relief.

Defendants argue that their "Olmstead plan is sufficient," contending that they have established the defense on that basis alone.[888]  Plaintiff argues that Defendants have not shown a genuine attempt to comply with the integration mandate with regard to Adult Home residents, let alone a comprehensive and effective Olmstead plan, so the defense must fail on that basis alone.[889]  The parties dispute whether the requested relief would increase costs to the State or adversely affect others with mental illness.

---

[886] Id. at 3487.

[887] Id. at 3482-83.

[888] Defs. PFF ¶¶ 235-40.

[889] Pl. PFF ¶ 283.

183

The court has considered all of the evidence concerning Defendants' Olmstead plan and the fiscal impact of the requested relief, including its potential impact on other individuals with mental illness. As set forth below, the court concludes that Defendants have not demonstrated a comprehensive or effective plan to enable Adult Home residents to receive services in more integrated settings. Defendants' efforts to comply with the integration mandate with respect to the Adult Home residents at issue do not meet any of the standards that other courts have articulated for Olmstead plans. Given the cost evidence in this case, however, the court need not render a conclusion as to whether the insufficiency of the plan is fatal to the defense. Defendants have not proven by a preponderance of the evidence that the requested relief would increase costs to the State; the weight of the evidence shows that it would actually cost less to serve DAI's constituents in supported housing than in Adult Homes. Nor have Defendants proven that the requested relief would adversely affect other individuals with mental illness. Therefore, the court concludes that the relief Plaintiff seeks – expansion of the State's existing supported housing program to accommodate Adult Home residents who desire to move to more integrated settings – does not constitute a "fundamental alteration" of the State's programs and services.

> **1.** **Defendants Have Not Made a Genuine Commitment To Comply with the Integration Mandate with Respect to Adult Home Residents, Let Alone Implemented a Comprehensive and Effective Plan To Enable Adult Home Residents To Receive Services in More Integrated Settings**

In Olmstead, the Supreme Court proposed that one way for a state to prevail on the fundamental alteration defense is to demonstrate that it already has a "comprehensive, effectively working plan" for placement in "less restrictive settings" and a "waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated."

Olmstead, 527 U.S. at 605-06.[890]  Following Olmstead, courts have held that an Olmstead plan

must communicate a commitment to integration "for which [the state] can be held accountable

by the courts."  Frederick L. I, 364 F.3d at 500.  "General assurances" and expressions of "good

faith intentions" are not enough.  Frederick L. v. Dep't of Pub. Welfare ("Frederick L. II"), 422

F.3d 151, 158 (3d Cir. 2005).

     In determining what constitutes a "comprehensive, effectively working plan"

contemplated by the Supreme Court in Olmstead, the Third Circuit has held that a plan must

have "reasonably specific and measurable targets for community placement."  Frederick L. II,

422 F.3d at 157.  It must, "at a bare minimum," specify four things: "(1) the time-frame or target

date for placement in a more integrated setting; (2) the approximate number of patients to be

placed each time period; (3) the eligibility for placement; and (4) a general description of the

collaboration required between the local authorities and the housing, transportation, care, and

education agencies to effectuate integration into the community."  Id. at 160.  The Third Circuit

has held that an Olmstead plan is a necessary element of the fundamental alteration defense.

Frederick L. II, 422 F.3d at 157 (holding that, even where the relief would "constrain the state's

---

[890] In explaining the fundamental alteration defense, the district court in Martin v. Taft noted that the example in Olmstead was "not actually an illustration of a fundamental alteration at all.  Rather, it is a way the State may show that it has already provided a reasonable accommodation.  If the state makes this showing, then there is simply no need to further modify the program."  222 F. Supp. 2d at 985.  Defendants cite Martin to support their contention that they may "prevail if they have already provided a reasonable accommodation, without the need to prove a fundamental alteration."  (Defs. PFF ¶ 207.)

     To the extent that Defendants suggest that a "reasonable accommodation" defense is distinct from the fundamental alteration defense, they misread Olmstead.  Olmstead requires public entities to make reasonable modifications to their service systems to enable individuals with disabilities to receive services in integrated, community-based settings, unless doing so would constitute a fundamental alteration.  Olmstead states that such an analysis requires "taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 607.  Olmstead makes clear that in order to demonstrate "reasonable accommodation," a state must show either compliance with the integration mandate or that the relief requested would require unreasonable modifications to the state's programs, i.e., a fundamental alteration.  The court therefore considers Defendants' evidence as to their "reasonable accommodation" as part of its analysis of the fundamental alteration defense.

ability to satisfy the needs of other institutionalized patients," the state could not avail itself of the defense without an Olmstead plan); Pennsylvania Protection & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 381 (3d Cir. 2005) (holding that Olmstead "allows for a fundamental alteration defense only if the accused agency has developed and implemented a plan to come into compliance with the ADA and RA").

The Ninth Circuit has interpreted the fundamental alteration defense more flexibly. It has allowed a state to prevail on the fundamental alteration defense by showing that it already has in place a comprehensive, effective plan – which includes the plaintiffs at issue – to move individuals from institutional facilities to community settings. Sanchez v. Johnson, 416 F.3d 1051, 1067-68 (9th Cir. 2005) ("[W]hen there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary restraints and the competing demands of other services that the State provides, including the maintenance of institutional care facilities, . . . is 'effectively working,' . . . the courts will not tinker with that scheme.") (internal citations omitted); ARC of Wash., Inc. v. Braddock, 427 F.3d 615, 620 (9th Cir. 2005) ("So long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons 'with an even hand,' we will not interfere.") (citations omitted).

It is clear that Defendants have not demonstrated a comprehensive or effective plan to enable Adult Home residents to receive services in more integrated settings. To the contrary, Defendants have routinely and systematically excluded Adult Home residents from their efforts to comply with Olmstead and the integration mandate of the ADA and the Rehabilitation Act. Ample evidence supports the court's conclusion.

No witness testified about any plan, written or unwritten, to enable Adult Home residents to move to more integrated settings. Defendants' witnesses testified that Adult Homes are considered permanent placements for individuals with mental illness. Defendants presented testimony from various State officials describing activities conducted by their respective agencies and divisions, many of which had no apparent connection to Adult Home residents, let alone any connection to enabling DAI's constituents to receive services in the most integrated setting appropriate to their needs. Defendants' lawyers assert that an Olmstead plan is not necessary for Adult Home residents. They nonetheless assert that Defendants' programs and activities should be construed as a sufficient Olmstead plan for all people with disabilities, including Adult Home residents.[891]

While Defendants presented evidence that the State engages in Olmstead planning in a broad sense, such planning excludes Adult Home residents. The Most Integrated Setting Coordinating Council, a state entity whose statutorily mandated purpose is "to develop and implement a plan to reasonably accommodate people of all ages with disabilities . . . to be appropriately placed in the most integrated settings possible," has no plan that covers Adult Home residents. OMH engages in comprehensive strategic planning with its annual "5.07 plans," but those plans do not discuss or address enabling Adult Home residents to receive services in the most integrated setting appropriate to their needs.

In recent years, Defendants have increased the overall amount of community housing beds, including supported housing beds. The evidence demonstrates, however, that Adult Home residents have been systematically excluded from the vast majority of those beds. Despite their

---

[891] Defs. PFF ¶ 236.

inclusion as a target population for supported housing for the first time in 2005, Adult Home residents have continued to be denied access to the program because other populations of persons with mental illness have received higher priority. The State's most recent supported housing RFP does not include Adult Home residents among the target groups. Beyond the 60 supported housing units allocated to Adult Home residents by the Legislature, a one-time initiative imposed on OMH, only about 30 of the approximately 4,300 residents of the Adult Homes at issue have obtained supported housing, and only about 65 residents have moved to other forms of OMH community housing. In addition, because of objections raised by OMH, the Governor vetoed a bill that would have required OMH to maintain a waiting list for community housing. Thus, while the State has developed a number of supported housing beds in recent years, because Adult Home residents have not been afforded meaningful access to those beds, those efforts cannot realistically be considered part of a commitment to enable Adult Home residents to receive services in the most integrated setting appropriate to their needs.

Defendants license and/or fund certain programs targeting Adult Homes, such as the EnAbLE program and the OMH Case Management Initiative. The evidence shows, however, that these programs have not meaningfully aided Adult Home residents to move to more integrated settings. There is no evidence that any Adult Home resident has moved to supported housing as a result of the EnAbLE program. The OMH Case Management Initiative is limited in scope to less than half of the Adult Homes at issue, and the evidence demonstrates that only a few residents in Adult Homes with OMH-funded case managers have actually moved to supported housing. While the Case Management Initiative has helped some Adult Home residents apply for supported housing, it cannot, alone or in combination with the other elements

of Defendants' asserted plan, constitute a comprehensive or effective plan to enable Adult Home residents to receive services in more integrated settings.

Finally, to the extent that Defendants have data about the housing needs and desires of Adult Home residents, they do not use it to identify or move Adult Home residents to more integrated settings. Defendants have not used the Assessment Project data to move Adult Home residents, and to the extent that Defendants sent the assessments of some Adult Home residents to case managers or providers for "follow up," there is no evidence that the data has actually been used to enable Adult Home residents to move to more integrated settings, or in connection with Defendants' strategic planning. Similarly, Defendants simply ignored the recommendation of the Adult Care Facilities Workgroup that 6,000 adult home residents statewide be moved to more integrated settings.

Defendants contend that they should prevail on the fundamental alteration defense because their "'Olmstead plan' is sufficient," citing <u>Sanchez</u> and <u>ARC of Washington</u>.[892] The evidence Defendants put on at trial does not demonstrate any such "working plan." The plaintiffs in <u>Sanchez</u> and <u>ARC of Washington</u> were individuals with developmental disabilities. In <u>Sanchez</u>, the plaintiffs resided in institutional facilities called "developmental centers." <u>Sanchez</u>, 416 F.3d at 1066. In <u>Sanchez</u>, the defendants had developed individualized community placement plans to move individuals residing in developmental centers to community residential settings. <u>Id</u>. at 1064-66. The plans included the identification of supports required by residents to live in the community. <u>Id.</u> at 1065. Additionally, the defendants had reduced the percentage of people with developmental disabilities living in developmental centers from 6% of the

---

[892] Defs. PFF ¶¶ 235-40.

population with developmental disabilities to 2% of that population.  Id. at 1066.  The court

concluded that the "requested relief would require us to disrupt this working plan," and thus

constituted a fundamental alteration.  Id. at 1068.

Here, in contrast to Sanchez, Defendants have not developed a plan to move DAI's

constituents to community-based settings, and there has been no reduction in the percentage of

people with mental illness receiving services in Adult Homes.  Unlike in Sanchez, Defendants

have not developed individualized community placement plans that, among other things, identify

the supports necessary to enable residents to live successfully in the community.  Defendants

concede that they do not assess Adult Home residents, and argue that requiring them to do so

would be a "fundamental alteration."[893]  They have not shown anything comparable to what the

defendants in Sanchez demonstrated to prevail on the defense.

Similarly, in ARC of Washington, which challenged the size of the state's Medicaid

waiver program to provide non-institutional care for people with disabilities, the defendants had

implemented a plan to enable persons with developmental disabilities to move to the community.

This plan included the maintenance of a waiting list, which ensured that "all Medicaid-eligible

disabled persons will have an opportunity to participate in the program once space becomes

available, based solely on their mental-health needs and position on the waiting list."  427 F.3d at

621.  Defendants have no such plan here.

Thus, while the Ninth Circuit has noted that federal courts should be "sympathetic" to

fundamental alteration defenses, Sanchez, 416 F.3d at 1067,  it upheld existing plans that were

comprehensive, detailed, and most importantly, "effectively working."  Here, unlike in Sanchez

---

[893] Defs. PFF ¶ 230.

and ARC of Washington, where the defendants' efforts to enable individuals to receive services in more integrated settings applied to the people whose rights were at issue in those cases, Defendants have no plan that includes moving Adult Home residents.

Defendants' activities, initiatives, and programs, viewed alone or as a whole, do not amount to an Olmstead plan for Adult Home residents. While the court need not determine whether an Olmstead plan must have the specific elements that the Third Circuit listed in Frederick L. II, such as a time frame for discharge and the approximate number of individuals to be discharged during each period, at the very least, an Olmstead plan requires a "reasonably specific and measurable commitment to deinstitutionalization" for which the State "may be held accountable." Frederick L. II, 422 F.3d at 157. Even if the State's actions are viewed as some effort to comply with the integration mandate, Defendants have not come close to demonstrating such a commitment. They have certainly not shown a "comprehensive, effectively working plan" with a waiting list to move people to "less restrictive settings," as the Supreme Court proposed in Olmstead. 527 U.S. at 605-06.

Defendants do not even assert that they are addressing the segregation of DAI's constituents in Adult Homes at any systemic level. They have excluded Adult Home residents from the Most Integrated Setting Coordinating Council's Olmstead planning. They contend, contrary to the overwhelming weight of the evidence, that the large, institutional Adult Homes are "the most integrated settings" for DAI's constituents. This court has found otherwise. Whatever limited steps the State has taken to enable Adult Home residents to receive services in community housing have not been effective: very few Adult Home residents have actually moved to supported housing or any other form of OMH community housing. It is clear that

Defendants have no comprehensive or effective plan to enable Adult Home residents to receive services in more integrated settings.[894]

Defendants have violated the integration mandate of the ADA and Rehabilitation Act, and have failed to show a genuine commitment to compliance for which they can be held accountable. The court need not determine whether the fundamental alteration defense fails solely on this basis. As discussed below, Defendants fail to excuse their failures to comply with the integration mandate by showing that compliance would be prohibitively expensive. In fact, they have not proven that serving DAI's constituents in supported housing would increase the State's costs or limit the State's ability to provide services for other individuals with mental illness.

> ## 2. Defendants Failed To Prove That the Requested Relief Would Increase the State's Costs or Limit the State's Ability To Provide Services to Other Individuals with Mental Illness

The fundamental alteration standard set forth under <u>Olmstead</u> permits a state to demonstrate that, "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." <u>Olmstead</u>, 527 U.S. at 604. In considering the resources available to the State, the relevant budget is the "mental health budget," which includes any money the State receives, allots for spending, and/or spends on services and programs for individuals with mental illness. <u>DAI I</u>, 598 F. Supp. 2d at 350. In this case, the resources available to the State include funds that OMH, DOH, the Governor, or the

---

[894] To the extent Defendants assert that their actions constitute a "reasonable accommodation" for Adult Home residents seeking to receive services in the most integrated setting, <u>see</u> <u>supra</u> note 890, their limited efforts are insufficient, whether viewed as a "reasonable accommodation" or as part of a plan to comply with the integration mandate of the ADA and the Rehabilitation Act.

Legislature spend on persons with mental illness. The analysis includes not only current spending on mental health services and programs, but also savings that will result if the requested relief is implemented. Id. (noting that "Olmstead instructed the trial court on remand to conduct an assessment of the state's actual savings from implementing the relief plaintiffs sought, rather than simply comparing the cost of community placement with the cost of institutional care").

Defendants have failed to meet their burden to show that the requested relief would increase costs or limit the State's ability to provide services to other individuals with mental illness. As OMH's Chief Fiscal Officer Martha Schaefer-Hayes testified, OMH has not done any analysis to determine the financial impact of creating supported housing beds specifically for Adult Home residents. Defendants' cost expert, Mr. Kipper, failed to consider a number of relevant costs associated with providing services to people with mental illness in Adult Homes, including Medicaid costs. By contrast, DAI presented ample and persuasive evidence demonstrating why Medicaid costs are significantly higher in Adult Homes than in supported housing, and that the increased cost of Medicaid in Adult Homes is attributable to the nature of the Adult Home system of care rather than the characteristics of the Adult Home residents. As Mr. Jones's analysis showed, when the cost of Medicaid services for individuals in Adult Homes and supported housing is properly considered, the annual cost to the State of serving an Adult Home resident in supported housing is on average $146 cheaper than the cost of serving that resident in an Adult Home.

In addition to the savings in Medicaid costs that would result if Adult Home residents moved to supported housing, the State spends millions of dollars on programs and services for

Adult Homes. For example, the State has spent more than $28 million on the QuIP program, which is used to subsidize capital improvements in adult homes statewide, including a number of the Adult Homes at issue in this litigation. QuIP funds are allocated to those adult homes that apply for and are awarded grants based on the number of SSI-eligible residents living in the home. In addition, the State has spent millions of dollars on the Infrastructure Capital Program, on the EnAbLE program, on air conditioning for homes, and on the Case Management Initiative. Mr. Kipper's analysis ignores all of these costs. Although these costs are not as easily analyzed on a per-person basis, any savings that could be realized in these programs as a result of the movement of Adult Home residents to supported housing would also lead to substantial savings to the State.

Defendants assert that the court should not consider what the State spends on Adult Home programs such as QuIP, EnAbLE, and the Case Management Initiatives, because even if the residents at issue move to supported housing, Adult Homes are likely to remain full due to backfill.[895] The court rejects this contention. First, Mr. Kipper did no analysis as to whether backfill would occur and what the resulting costs would be. Defendants' witnesses suggested that the individuals most likely to backfill Adult Home beds are those coming from homeless shelters and psychiatric hospitals. Plaintiff has shown that if Adult Home beds were backfilled with such individuals, who are "high users" of the mental health system, it would likely cost the State less to serve them in the Adult Homes than in their current settings. The State spends an average of $40,000 per year in Medicaid expenses alone to provide services to homeless persons

---

[895] Defs. PFF ¶ 227.

with mental illness, and it is undisputed that psychiatric inpatient facilities are the most expensive treatment setting.

Second, the State has no obligation to insure that vacated Adult Home beds are backfilled. To the contrary, State law permits the State to regulate admissions to Adult Homes, and also permits the State to downsize or close Adult Homes for which there is no public need. See N.Y. Soc. Servs. Law § 461-b; N.Y. Comp. Codes R. & Regs. tit. 18 § 485.5(m)(1)(i). Olmstead recognized that states may not be "able to take advantage of the savings associated with the closure of institutions" because the need for institutions may remain. Olmstead, 527 U.S. at 604, 605 (explaining that "some individuals . . . 'may need institutional care from time to time to stabilize acute psychiatric symptoms'") (citations omitted); accord Williams v. Wasserman, 164 F. Supp. 2d 591, 636 (D. Md. 2001). As DAI points out, the evidence demonstrates that Adult Homes do not serve the purpose of providing the care and treatment of acute psychiatric symptoms. Indeed, the State prohibits Adult Homes from admitting or retaining anyone who suffers from a mental disability warranting placement in a psychiatric hospital or other inpatient psychiatric setting. See N.Y. Comp. Codes R. & Regs. tit. 18 § 487.4(b)(2). In any event, Adult Homes were not designed to be treatment settings for people with serious mental illness; instead, they filled a void caused by the unavailability of community-based housing.

Defendants also argue that funds spent on Adult Home programs should not be considered because they are "not entitlements like SSI, issued to each resident separately."[896] This argument is without merit. The evidence demonstrates that the State has expended tens of

---

[896] Defs. PFF ¶ 227.

millions of dollars on adult homes, a portion of which has gone to the Adult Homes at issue in this case.[897] It does not matter that these funds are not issued "separately" to each resident. The State spends these significant sums <u>solely</u> on adult homes, so they are relevant to a consideration of the costs here.

In addition, there is insufficient evidence regarding other potential costs that Defendants contend should be included in the analysis – namely, "additional services" that Adult Home residents might need in supported housing, assessments of Adult Home residents, and administrative costs. Defendants did not provide evidence that the State would incur such costs, or how much such costs would be.

Defendants cite <u>Frederick L. I</u>, 364 F.3d at 497, for the proposition that the State's budget process is "beyond judicial scrutiny." In <u>Frederick L. I</u>, however, the plaintiffs sought an injunction requiring a state agency to request money in its budget for "the full amount necessary to fund all of the community placements requested." <u>Id.</u> The state agency successfully proved, however, that it would not have been able to do so because of requirements in the budget process. <u>Id.</u> The Third Circuit reasonably found that it could not "require the agency to request[] additional funding beyond that which it was permitted under the Governor's guidelines." <u>Id.</u> Here, however, Defendants have not pointed to State laws, regulations, or guidelines that would limit the funding of the relief DAI requests. In addition, unlike in <u>Frederick L. I</u>, DAI does not request that Defendants expend new funds until all of DAI's constituents are served in supported housing. The relief DAI seeks is a restructuring of the way that Defendants currently administer and fund their programs – the relief requires shifting funds

---

[897] Tr. 3460 (D. Jones).

196

Defendants <u>already spend</u> serving DAI's constituents in Adult Homes to serve them in community settings.

The evidence demonstrates that the relief DAI seeks could be accomplished by redirecting funds currently being spent on Adult Home residents in Adult Homes to serve those same individuals in supported housing. While Defendants also contend that, according to <u>Frederick L. I</u>, a court may not order a state to "shift[] funds from other programs to fund additional community placements," 364 F.3d at 497, <u>Frederick L. I</u> only prohibits "fund-shifting that would disadvantage other segments of the mentally disabled population." 364 F.3d at 497. Because the relief requested here would actually save the State money, it will not interfere with Defendants' ability to serve other individuals with mental illness.

Finally, Defendants contend that the State is undergoing "a severe economic crisis this year, which has resulted in budget cuts and freezing the development of a number of units of mental health housing."[898] In <u>Frederick L. I</u>, the Third Circuit, vacating the district court's decision and remanding for further proceedings, agreed with the plaintiffs "that states cannot sustain a fundamental alteration defense based solely upon the conclusory invocation of vaguely defined fiscal constraints." 364 F.3d at 496. Similarly, the Tenth Circuit held in <u>Fisher v. Oklahoma Health Care Authority</u>, 335 F.3d at 1182-83, that "the fact that [a state] has a fiscal problem, by itself, does not lead to an automatic conclusion" that providing the community services that plaintiffs sought would be a fundamental alteration. <u>Id.</u> (citing <u>Townsend</u>, 328 F.3d at 520). As the Tenth Circuit observed, Congress was clearly aware when it passed the ADA that "[w]hile the integration of people with disabilities will sometimes involve substantial

---

[898] Defs. PFF ¶ 220.

short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole.'. . . If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed." <u>Fisher</u>, 335 F.3d at 1183. In any event, Defendants did not present any evidence showing a nexus between the current state of the economy and the specific relief DAI seeks. They have not shown that current economic circumstances have impacted the State's ability to develop supported housing, which requires no outlay of capital. On the contrary, during the trial in this case, Defendants issued an RFP to develop new units of supported housing.

In sum, the court finds that Defendants have not shown that the requested relief would increase the State's costs. Accordingly, the requested relief will not limit Defendants' ability to provide services to other individuals with mental illness.

### 3. The Requested Relief Would Not Alter the Nature of the Services That Defendants Currently Provide

On summary judgment, the court held that "where individuals with disabilities seek to receive services in a more integrated setting – and the state <u>already provides</u> services to others with disabilities in that setting – assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'" <u>DAI I</u>, 598 F. Supp. 2d at 335. Here, the evidence at trial established that Defendants' supported housing program successfully serves individuals with the same support needs as DAI's constituents.

Defendants assert that they cannot serve DAI's constituents in supported housing without "altering the nature" of their programs.[899] They contend that the requested relief would: (1) force Defendants to create "a new program" to "assess and place" Adult Home residents in supported housing; (2) alter the purported "minimal needs" requirement of supported housing; (3) provide an "entitlement to one particular type of State subsidized housing for all individuals with mental illness who desire it," and require the State to abandon its alleged "linear continuum" approach; (4) prevent the State from considering the needs of other populations needing mental health services and "violate Olmstead's admonishment" that a "a court would have no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions"; and (5) alter the nature of the ACT program.[900] The evidence does not support Defendants' assertions. To the contrary, the evidence shows that DAI's constituents could be appropriately served by the State's existing supported housing program and would require no more than meaningful access to the successful programs Defendants already have in place.

First, this court has already rejected the proposition that the requested relief would fundamentally alter the State's programs merely because it would require Defendants to "assess and place" Adult Home residents in a more integrated setting. DAI I, 598 F. Supp. 2d at 335 (holding that "assessing and moving" plaintiffs to integrated setting in which the state already provides services to others not a fundamental alteration). Indeed, Defendants' claim that assessments would fundamentally alter the State's current programs is essentially an admission that it has no functioning Olmstead plan for Adult Home residents. See Frederick L. v. Dep't of

---

[899] See Defs. PFF ¶¶ 230-34.

[900] Id.

Welfare, 157 F. Supp. 2d at 540 (noting that "Olmstead does not allow the state to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities").  In addition, the evidence at trial showed that supported housing providers routinely assess which supports individuals moving to their supported housing programs will need.

Second, DAI has conclusively shown – through OMH's own RFPs, among other evidence – that OMH does not recognize a "minimal needs" requirement for supported housing. To the contrary, OMH targets populations such as "long stay" residents of psychiatric hospitals, who are likely to have significant support needs.  The small number of DAI's constituents who have significant support needs could be served in supported housing without any change to OMH's current policies and practices.

Third, DAI does not seek an "entitlement" to a particular type of housing that would involve abandoning the "linear continuum" approach.  Regarding an "entitlement," DAI seeks an order requiring that its constituents, who already receive mental health services funded by the State, have an opportunity to receive those services in the most integrated setting appropriate to their needs.  This is what Olmstead requires.  DAI has shown that the State administers and funds its programs in a way that has systematically denied DAI's constituents the opportunity to receive services in the most integrated setting.  As for Defendants' contention that placing Adult Home residents in supported housing would require them to abandon the "linear continuum," the evidence demonstrates that OMH has already abandoned the continuum approach to serving individuals with serious mental illness.  As Defendant OMH Commissioner Michael Hogan testified before the Legislature, OMH has moved to a model of "long term" housing "linked to

flexible services that can be increased or decreased as needed."[901]  Placing residents of Adult Homes directly into supported housing – rather than forcing them to transition through a "continuum of care" – would not fundamentally alter current State policy and practice.

Fourth, Defendants' argument that granting relief in this case will prevent Defendants from "consider[ing] the needs of all State residents with mental illness" is premised on the false assumption that the relief would increase costs to the State.  Defendants failed to prove that serving Adult Home residents in supported housing would divert money from services to other individuals with mental illness.  Defendants' citation to the language in Olmstead that a court cannot order displacement of persons "at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions" defies reason.  Defendants have no wait list whatsoever for OMH community housing, and Adult Home residents have had little meaningful access to supported housing beds.  Aside from the 60-bed legislative set-aside, only about 30 Adult Home residents have moved to supported housing since January 2000.

To the extent that Defendants' invocation of Olmstead could be construed as an argument that a "set-aside" would be a fundamental alteration, Defendants regularly use set-asides to allocate supported housing beds to particular target populations, including homeless individuals with mental illness (for whom OMH has designated 9,000 beds of community housing), individuals with mental illness discharged from prisons or psychiatric facilities, and in the case of the 60-bed legislative set-aside, Adult Home residents.  As the court held on summary judgment, "[t]hat Defendants have already issued a set-aside of supported housing beds for adult home residents and other target populations is evidence that doing so is not a 'fundamental

---

[901] P-590 (Comm'r Hogan Testimony) 4.

alteration' of their programs and services." <u>DAI I</u>, 598 F. Supp. 2d at 355-56; <u>see also</u> <u>Messier</u>, 562 F. Supp. 2d at 344-45 (noting that the defendant agency's "public commitment to further enhancing a system of community placement" was "entirely inconsistent with its fundamental alteration claim").

Finally, Defendants assert that the relief sought by DAI would alter the "nature and eligibility requirements" of the ACT program. The evidence demonstrates that OMH's statewide ACT guidelines contain broad eligibility criteria that would plainly cover any Adult Home residents who have high needs. Although OMH uses the "more stringent" CUCS eligibility criteria in New York City, OMH would hardly be fundamentally altering its programs merely by applying its own statewide guidelines in New York City. In any event, the evidence demonstrates that not many Adult Home residents would require ACT services in order to be served in supported housing. In addition, as Mr. Jones testified, there may well be Adult Home residents who would be qualified for ACT under the New York City guidelines.

The evidence at trial demonstrates that New York's supported housing providers successfully serve individuals who are not materially different from DAI's constituents. The evidence does not prove that serving DAI's constituents in supported housing would require significant changes to any of the State's programs and services.

As set forth above, Defendants have failed to prove that the requested relief would constitute a fundamental alteration. They have not shown that the requested relief would increase costs, limit the State's ability to provide services to others with mental illness, or fundamentally alter the State's existing programs and services. Nor have Defendants

demonstrated a genuine commitment to compliance with the integration mandate of the ADA and Rehabilitation Act with respect to Adult Home residents. Accordingly, their defense fails.

In sum, the evidence at trial establishes that (1) DAI's constituents are not in the most integrated setting appropriate to their needs; (2) virtually all of DAI's constituents are qualified for supported housing and unopposed to receiving services in a more integrated setting; and (3) the relief sought by DAI will not work a fundamental alteration of the State's mental health service system. DAI is entitled to declaratory and injunctive relief. The court will issue an Order and Judgment once it determines the appropriate injunctive remedy.

## V.      DOH AND COMMISSIONER DAINES ARE PROPER DEFENDANTS

In their Proposed Findings of Fact and Conclusions of Law, Defendants contend that, because DAI withdrew its claims based on Defendants' failure to take adequate measures to redress poor conditions in impacted Adult Homes, DOH and Commissioner Daines should be dismissed from the action.[902] As the court noted during trial, this case is not about whether DOH is fulfilling its obligations to enforce the State regulations governing the conditions in Adult Homes.[903] DOH and Commissioner Daines remain proper defendants for purposes of DAI's Olmstead claims, however, because they are necessary to afford DAI full relief. DOH participates in the administration of the State's service system for individuals with mental illness and controls the number of Adult Home beds certified by the State.[904] The court thus declines to

---

[902] Defs. PFF ¶ 241.

[903] See Tr. 3050-51.

[904] As set forth above, DOH is responsible for promoting sufficient and appropriate residential care programs for dependant adults and can revoke operating certificates for particular Adult Homes if doing so would conserve resources. DOH can use this authority to restrict the number of Adult Home beds to those "actually needed, after taking into consideration the total number of beds necessary to meet the public need, and the availability of facilities or services . . . which may serve as alternatives or substitutes for the whole or any part of a facility . . . ." N.Y. Soc. Servs. Law § 461-b; see N.Y. Comp. Codes R. & Regs. tit. 18 § 485.5(m)(1)(i). To support the reallocation of

dismiss these defendants from this case. See Fed. R. Civ. P. 21 (providing that the court has discretion to drop a party from an action "on such terms as are just").

## VI.     REMEDY

DAI has proven that it is entitled to declaratory and injunctive relief. In determining the scope of injunctive relief, the court must give appropriate consideration to principles of federalism, as "remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided." Schwartz v. Dolan, 86 F.3d 315, 319 (2d Cir. 1996) (quoting Ass'n of Surrogates v. New York, 966 F.2d 75, 79 (2d Cir.), modified, 969 F.2d 1416 (2d Cir. 1992)). Unnecessarily detailed remedial orders may inject federal courts into the business of "regulating a state's administration of its own facilities," and courts are ill-equipped "for formulation and day-to-day administration of detailed plans" to assure compliance with the law. Dean v. Coughlin, 804 F.2d 207, 213-14 (2d Cir. 1986). Nevertheless, the Supreme Court has held that where discrimination has been shown, the court has a duty to act, and "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Milliken v. Bradley, 433 U.S. 267, 281 (1977) (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971)) (addressing race discrimination in violation of the U.S. Constitution); see Ass'n of Surrogates, 966 F.2d 75, at 79. The remedy "must be designed as nearly as possible to restore victims of discrimination to the position they would have occupied" absent the discrimination. Milliken, 433 U.S. at 280 (citing Swann, 402

_____

resources from Adult Homes to supported housing, DOH may need to certify fewer Adult Home beds. Additionally, a number of the actions that will likely be required to effect relief in this case will occur in or require coordination with the Adult Homes. Because DOH regulates the Adult Homes, its participation in the relief may be necessary to ensure these actions can be carried out. DOH's participation may also be necessary in order to reallocate certain funds, such as QuIP money, from the Adult Homes in order to finance the relief.

U.S. at 746); see also Todaro v. Ward, 565 F.2d 48, 54 n.7 (2d Cir. 1977) (stating that courts have broad discretion to fashion equitable relief that is commensurate with the scope of the violation).  A remedial order must therefore "strike a balance" between the court's obligation to identify and take steps toward the elimination of the legal violations and the state's right to administer its own facilities or systems.  Dean, 804 F.2d at 214.  "[T]he state should be given responsibility to devise and carry out a plan to come into compliance in the manner directed by the court."  Id.

Plaintiff seeks a permanent injunction against the Office of Mental Health, the Department of Health, and the individual Defendants in their official capacities, directing them to take such steps as are necessary to enable DAI's constituents – people with mental illness residing in, or at risk of entry into, all impacted Adult Homes in New York City with more than 120 beds – to receive services in the most integrated setting appropriate to their needs.[905] Plaintiff requests that these steps include the expansion of supported housing and the end of practices that steer individuals with mental illness into Adult Homes instead of supported housing.[906]  Plaintiff requests that the court order Defendants to develop a plan that will enable DAI's constituents to receive services in the State's supported housing program.[907]

Plaintiff's proposed relief would require Defendants to provide a plan conforming to ten guidelines.[908]  These proposed guidelines include a four-year transition period, by the end of which Defendants would achieve the following goals: (1) all current Adult Home residents who

---

[905] Pl. PFF ¶¶ 295-96.

[906] Id.

[907] Id. ¶ 297.

[908] Id. ¶ 298.

desire placement in supported housing have been afforded such a placement if qualified; (2) all future Adult Home residents – including individuals admitted to the Adult Homes both during and after the four-year transition period – who desire placement in supported housing are afforded such a placement if qualified; and (3) no individual who is qualified for supported housing will be offered placement in an Adult Home at public expense unless, after being fully informed, he or she declines the opportunity to receive services in supported housing.[909]

Plaintiff's guidelines would require the development of at least 1,500 supported housing beds per year until such time as there are sufficient supported housing beds for all DAI constituents who desire such housing, ensuring that no fewer than 4,500 supported housing beds are developed.[910]  Plaintiff's guidelines would also require Defendants to take steps with respect to selecting supported housing providers, treating DAI's constituents as eligible for supported housing unless they possess certain enumerated characteristics, educating DAI's constituents about supported housing, transitioning Adult Home residents to supported housing, and reviewing housing preferences on a regular basis.[911]  Plaintiff's proposed guidelines would require detailed descriptions of the responsibilities of the different State agencies and Defendants in carrying out the plan and a timeline for accomplishing all aspects of the plan.[912]  Finally, pursuant to Rule 53 of the Federal Rules of Civil Procedure, Plaintiff seeks appointment of an

---

[909] Id.

[910] Id.

[911] Id.

[912] Id.

impartial Special Master selected by agreement of the parties to monitor and facilitate compliance with the injunction.[913]

Defendants request that they be given an opportunity to propose a remedial plan.[914] They point out that a district court was previously found to have exceeded its authority in ordering detailed injunctive relief without first giving the state an opportunity to present its own remedial plan. Schwartz, 86 F.3d at 319; cf. Fisher v. Koehler, 902 F.3d 2, 3 (2d Cir. 1990) (per curiam) (affirming a district court's injunctive remedy where the court consulted with the parties, reviewed New York City's remedial plan, and accepted the plan with modifications to ensure constitutional compliance). Consistent with this authority, the court will not issue an injunction in this action without first providing Defendants an opportunity to propose a remedial plan.

Accordingly, Defendants shall propose a remedial plan consistent with these Findings of Fact and Conclusions of Law no later than October 23, 2009. In addition to proposing a remedial plan, to the extent that Defendants object to particular elements of Plaintiff's proposed relief, including the specific language used, Defendants shall submit written objections stating the basis for the objections. Plaintiff shall respond to Defendants' proposed remedial plan no later than November 8, 2009, and shall similarly indicate written objections to Defendants' proposed relief. The court will not award relief until it has had an opportunity to consider the submissions of both sides.

---

[913] See id. ¶¶ 299-302.

[914] Id. ¶¶ 242, 245.

## VII.    CONCLUSION

DAI has proven that Defendants have discriminated against DAI's constituents in violation of the integration mandate of the Americans with Disabilities Act and the Rehabilitation Act.  In carrying out their administration of New York's mental health service system, Defendants have denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs.  DAI has proven that the large, impacted Adult Homes at issue are not the most integrated setting appropriate to the needs of DAI's constituents, especially compared to supported housing, in which individuals with mental illness live in apartments and receive flexible support services as needed.  DAI has also proven that virtually all of DAI's constituents are qualified to receive services in supported housing and are unopposed to receiving services in a more integrated setting.  Defendants have failed to prove that the relief DAI seeks would constitute a "fundamental alteration" of the State's mental health service system.  Accordingly, DAI is entitled to declaratory and injunctive relief.  Following additional briefing from the parties, the court will issue a separate Order and Judgment once it determines the appropriate injunctive remedy.

SO ORDERED.

  /s/ Nicholas G. Garaufis  

NICHOLAS G. GARAUFIS

United States District Judge

Dated: Brooklyn, New York
      September  8 , 2009

## APPENDIX OF ACRONYMS

ACT             Assertive Community Treatment

AOT             Assisted Outpatient Treatment

CDT             Continuing Day Treatment

CQC             New York State Commission on the Quality of Care for and Advocacy for

                Persons with Disabilities

CUCS            Center for Urban Community Services

CR-SRO          Community Residence-Single Room Occupancy

DOH             Department of Health

EnAbLE          Enhancing Ability and Life Experience Program

FEGS            Federation of Employment and Guidance Services, Inc.

HAI             Hospital Audiences, Inc.

HRA             Human Resources Administration

IPRT            Intensive Psychiatric Rehabilitation Treatment

MISCC           Most Integrated Setting Coordinating Council

OMH             Office of Mental Health

PACT            Programs of Assertive Community Treatment

PNA             Personal Needs Allowance

PROS            Personalized Recovery-Oriented Services

QuIP            Quality Incentive Payment Program

RFP             Request for Proposals

SAMHSA          Substance Abuse and Mental Health Services Administration

| | |
|---|---|
| SPMI | Severe and Persistent Mental Illness |
| SPOA | Single Point of Access |
| SRO | Single Room Occupancy |
| SSI | Supplemental Security Income |
| SSDI | Social Security Disability Insurance |