UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DISABILITY ADVOCATES, INC.,

**MEMORANDUM & ORDER**

**03-CV-3209 (NGG)**

Plaintiff,

-against-

DAVID A. PATERSON, in his official
capacity as Governor of the State of New
York, RICHARD F. DAINES, in his official
capacity as Commissioner of the New York
State Department of Health, MICHAEL F.
HOGAN, in his official capacity as
Commissioner of the New York State Office
of Mental Health, THE NEW YORK STATE
DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

Defendants.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

In 2003, Plaintiff Disability Advocates, Inc. ("DAI") brought this action on behalf of individuals with mental illness residing in, or at risk of entry into, "impacted adult homes" in New York City.[1] (See Compl. (Docket Entry #1).) Adult homes are for-profit residential adult care facilities licensed by the State of New York (the "State"). Following six years of litigation and a five-week bench trial, the court found that Defendants "denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs," and that these actions constitute discrimination in violation of Title II

---
[1] In this litigation, impacted adult homes refers to those adult homes with more than 120 beds and in which twenty-five residents or 25% of the resident population (whichever is fewer) have a mental illness.

1

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 791 et seq. (Mem. and Order dated Sept. 8, 2009 (Docket Entry #341) ("Sept. 8 Order"), at 3.) The court assumes familiarity with that Order. Although the court found that Plaintiff is entitled to some form of declaratory and injunctive relief, it directed briefing from the parties regarding the particular injunctive remedy to be imposed. (Id. at 208.)

Following the court's liability finding, three non-parties moved to intervene in the action: the United States, the Empire State Association of Assisted Living ("ESAAL"), and the New York Coalition for Quality Assisted Living ("NYCQAL").[2] In an Order dated November 23, 2009 ("U.S. Order"), the court granted permissive intervention to the United States. (See Docket Entry #384.) While the other motions to intervene were still pending, the court permitted ESAAL and NYCQAL to submit amicus curiae briefs regarding their views as to the appropriate remedy. (See Order (Docket Entry #389).) For the reasons that follow, the court now denies the ESAAL Motion (Docket Entry #361) and the NYCQAL Motion (Docket Entry #362).

I.  BACKGROUND

ESAAL and NYCQAL are non-profit trade associations that represent the interests of assisted living residences and adult homes throughout New York State. (See Affidavit of Lisa Newcomb (Docket Entry #361) ("Newcomb Aff.") ¶ 2; Affidavit of Francesca Sommer (Docket Entry #362) ("Sommer Aff.") ¶ 2.) Of the twenty-eight adult homes at issue in this litigation, eight are members of ESAAL and fourteen are members of NYCQAL. (Newcomb Aff. ¶ 5; Sommer Aff. ¶ 4.)

---

[2] Somewhat later, the City of New York submitted a letter to this court requesting leave to participate in the remedial phase of this litigation as a "litigating amicus." (Docket Entry #375.) In an Order dated November 24, 2009, the court granted the request in part, allowing the City to submit an amicus brief concerning the remedy. (Docket Entry #388.)

2

Although they are not parties, ESAAL and NYCQAL are no strangers to this litigation. During the several years of discovery in this case, the litigants were in frequent contact with the attorneys for the adult homes. The adult homes "actually facilitated the parties' discovery proceedings" and their attorneys negotiated stipulations with Plaintiff's counsel.[3] When the parties and their expert witnesses sought to visit the adult homes, ESAAL and NYCQAL's attorneys arranged the scheduling and terms of the visits,[4] and even accompanied the parties on their tours of the homes.[5] These attorneys attended depositions of adult home staff,[6] responded to subpoenas for documents in their possession,[7] and sat in on portions of the five-week bench trial in this case. In short, they have been active participants in this case for years.

Suddenly discontent with participating from the sidelines, ESAAL and NYCQAL have now decided that the time is right to enter the fray. In support of their motions to intervene, they assert several interests relating to the action. Chief among these is a concern over the economic ramifications for the adult homes of any remedy that might be imposed. In particular, the adult homes point to the possibility that, in implementing the remedy, the State might eliminate adult home grant programs, reduce or reallocate public funding for adult homes, revoke operating certificates for certain adult homes, or interfere with the homes' private contracts with their residents. (See ESAAL Motion 11; NYCQAL Motion 14-15.) They also contend that Plaintiff's requested relief – moving qualified adult home residents into supported housing – threatens the

---

[3] (Sommer Aff. ¶ 11; see also Declaration of Anne S. Raish (Docket Entry #372) ("Raish Decl.") Ex. B, Letter dated Jan. 24, 2005 (referencing stipulation negotiated between Plaintiff's counsel and Hinman Straub, counsel for ESAAL).)

[4] (Sommer Aff. ¶ 12; see also Raish Decl. Ex. B, Letters dated Mar. 18, 2005, Sept. 1, 2004, and Jan. 24, 2005 respectively.)

[5] (See Raish Decl. Ex. B, Letter dated Mar. 18, 2005 ("I look forward to meeting you and sharing the thrill of watching adult home residents for six hours."); Raish Decl. Ex. B, Letter dated Jan. 24, 2005 ("I intend to be present during the on-site visits to these two adult homes.").)

[6] (See Raish Decl. Ex. C, Excerpt from Deposition of Hinda Burstein, Aug. 16, 2005 (reflecting presence of attorney from O'Connell and Aronowitz, counsel for NYCQAL).)

[7] (See Sommer Aff. ¶ 13.)

3

business model and continued viability of the affected homes. (See ESAAL Motion 11; NYCQAL Motion 10.)

Beyond these economic interests, the adult homes assert two other interests in the action. The first concerns the welfare of Plaintiff's constituents: the adult homes claim an interest in ensuring that residents are "properly assessed for their mental and physical readiness" before being moved into supported housing. (ESAAL Motion 11.) Second, the adult homes claim an interest in fashioning a remedy because certain implementation measures could occur in adult homes or require coordination with adult home operators. On the strength of these purported interests in the litigation, both ESAAL and NYCQAL have moved to intervene as of right or, in the alternative, permissively.

## II. DISCUSSION

Intervention as of right under Federal Rule of Civil Procedure 24(a) requires that an applicant satisfy four criteria: the would-be intervenor must "(1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 176 (2d Cir. 2001). Failure to satisfy even one of the four requirements will defeat a claim to intervention as of right. Id. Therefore, an untimely motion to intervene must be denied.

The requirement of timeliness "defies precise definition, although it certainly is not confined strictly to chronology." United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994). Courts evaluating timeliness consider the totality of the circumstances, focusing on a variety of factors: "(1) the length of time the applicant knew or should have known of his interest

before making the motion; (2) prejudice to existing parties resulting from the applicant's delay; (3) prejudice to the applicant if the motion is denied; and (4) the presence of unusual circumstances militating for or against a finding of timeliness." Farmland Dairies v. Comm'r of N.Y. Dep't of Agric. & Mkts., 847 F.2d 1038, 1044 (2d Cir. 1988). As an additional consideration, intervention after the liability phase of litigation "resembles post-judgment intervention, which is generally disfavored." United States v. Yonkers Bd. of Educ., 801 F.2d 593, 596 (2d Cir. 1986).

**A.      Notice of Interest**

The first factor to consider is the length of time the adult homes knew or should have known of their interest in this action. As discussed previously, the present motions to intervene come at a very late stage in this litigation: six years after the filing of the Complaint, three years after the close of discovery, two years after the parties' motions for summary judgment, and four months after a five-week bench trial. Yet, according to ESAAL and NYCQAL, they did not know of their interest until approximately two months before they sought intervention. For the adult homes, the moment of clarity arrived only when the court issued its September 8, 2009 Memorandum and Order, which found for the Plaintiff and ordered briefing on the appropriate injunctive relief. (See ESAAL Motion 6-7; NYCQAL Motion 7-8.) That Order, they argue, was the first indication that a remedy in this case might impair their interests. And only then did the adult homes perceive that their interests might diverge from Defendants' interests. (Id.)

Contrary to the adult homes' assertions, the possibility of a remedy that could adversely affect their interests arose not when the court issued the September Order, but when this action was filed. Plaintiff's requested relief is clearly set forth in the 2003 Complaint. The Complaint makes clear that Plaintiff has always sought to allow current and future residents of impacted

adult homes to move to more integrated settings.[8] It explicitly references "the need for alternative, more integrated settings for current and future residents of large adult homes," and states in no uncertain terms that the "relief here sought is directed exclusively at impacted adult homes with over 120 beds located in New York City and the New York State system that steers people with mental illness into such homes." (Compl. ¶¶ 32, 34.) Equally clear is that Plaintiff would achieve this result by "[s]hifting residents and funds from impacted adult homes to community-based residential programs." (Id. ¶ 118.)

The parties' 2007 motions for summary judgment reprised these same themes. As the court noted in resolving those motions, the parties' briefs "provided different calculations of the fiscal impact on the State of the relief Plaintiff seeks – assessing and moving qualified adult home residents to supported housing." (Memorandum & Order dated Feb. 19, 2009 (Docket Entry #232) ("Feb. 19 Order") 99; see also id. at 99-108 (discussing these issues at length).) In the summary judgment briefing, just as in the Complaint, Plaintiff requested "that Defendants use funds currently spent on adult home residents to serve adult home residents in supported housing." (Id. at 107.) Further, Plaintiff specifically enumerated ways the State might redirect spending to facilitate the relief they seek: "the State could limit admissions to adult homes . . . or terminate operating certificates from adult homes" to conserve financial resources. (Id. at 106.) Plaintiff also suggested that examination of the State's grant programs for adult homes might provide another means of cutting costs. (See id. at 105 (noting that Plaintiff had provided evidence that "from 2003 to 2007, the State spent approximately $10 million on a variety of adult home programs, including the Quality Incentive Payment Program, the ACF Infrastructure Initiative, the case management initiative, and EnAbLE.").) These filings provided additional

---

[8] (Compl. 34 (praying for, inter alia, declaratory and injunctive relief and an order enabling "Plaintiff's constituents to receive services in the most integrated setting appropriate to their needs").)

6

indication to the adult homes that their interests might be affected by an unfavorable ruling in this case.

In spite of all of this, the adult homes claim that the post-trial September Order provided the first indication that a remedy might affect their interests.[9] They express great surprise at the references in the September Order to "the possible elimination of grant programs, the reallocation of beneficial public funding, and injunctive relief which may threaten adult home operating certificates." (ESAAL Motion 6.) In light of the Complaint and the summary judgment filings, the adult homes' argument strikes the court as disingenuous, at best. The relief Plaintiff seeks – and the means by which it would achieve that relief – has been abundantly clear for six years. The possibility of "reallocation of beneficial public funding"[10] is explicitly discussed in the Complaint. The other potential cost-cutting measures referenced in the September Order, which the adult homes claim came as a complete surprise – "elimination of grant programs" and "injunctive relief which may threaten adult home operating certificates"[11] – were fully briefed by the parties and addressed by the court at summary judgment. Plaintiff has been pursuing the same relief for six years and the September Order changes nothing in this regard. The only uncertainty remaining before the court issued the September Order was whether Plaintiff would ultimately prevail respecting liability. Thus, the Order has no bearing upon the issue of the adult homes' awareness of the remedies under consideration.

---

[9] (See ESAAL Motion 6; NYCQAL Motion 7 ("The [September Order] is the first time that we had notice that the Court may consider ordering relief so extensive as to impair the adult homes' very operating certificates, and the funding sources that pay for their . . . services.").)

[10] (ESAAL Motion 6.)

[11] (Id.)

Under the circumstances, the court rejects the adult homes' absurd contention that the time they "knew or should have known of their interest" in this action is less than two months.[12] The court also rejects the adult homes' claim that they waited to intervene because they believed that the State Defendants adequately represented their interests up until this point. In service of this fallacy, the adult homes assert that their interests did not diverge from the State Defendants' interests until Defendants lost on the merits. In truth, their interests were never aligned with the State. Defendants, as the regulatory agencies, "have never taken the position that their interests are coextensive with those of adult homes." (See Letter dated Nov. 13, 2009 (Docket Entry #370) 1 n.2.) Addressing a similar argument for intervention, the Second Circuit has admonished that private parties "should certainly have been aware . . . that the interests represented by the Attorney General are not coterminous with their own." Farmland, 847 F.2d at 1044. The Attorney General has a statutory obligation to "[p]rosecute and defend all actions and proceedings in which the state is interested . . . in order to protect the interest of the state." N.Y. Exec. Law § 63(1) (emphasis added).

Even if the adult homes, despite their intimate involvement in the proceedings, somehow managed to remain blissfully ignorant of these matters until after the trial, there is ample evidence that they should have perceived their interests in this litigation much earlier: at least at the summary judgment stage, if not upon the filing of the Complaint. Although lapse of time is only one of several factors to consider, see Pitney Bowes, 25 F.3d at 71, the lengthy and intentional delay in this case weighs in favor of denying intervention.

---

[12] NYCQAL argues that its delay is excusable because the organization was not formed until late 2005. (See Sommer Aff. ¶¶ 6-9.) However, this does not change the fact that its member homes should have been aware of their interest when the action was filed in 2003. Even if the court credits the argument, NYCQAL is left with a four-year delay in moving to intervene and a hollow excuse for failing to do so in a timely manner.

8

**B.	Prejudice to Existing Parties**

Allowing ESAAL and NYCQAL to intervene at this late stage would prejudice the existing parties by unduly delaying the remedial proceedings. After years of discovery and a trial on the merits, ESAAL and NYCQAL would inject collateral issues regarding their economic entitlements into Plaintiff's civil rights action. Because the nature of the relief Plaintiff seeks has so long been clear, the considerations affecting the remedy – costs, logistics, supports available in supported housing, characteristics of adult home residents who could be served in supported housing, etc. – were extensively argued at trial. The remedy is now fully briefed and the court is poised to grant appropriate relief. Full consideration of the adult homes' newly presented claims might well require conducting evidentiary hearings or even reopening discovery.

Worse still, ESAAL and NYCQAL seem intent on "relitigating issues which have already been decided after lengthy proceedings." Yonkers, 801 F.2d at 596. Although they claim they will rely on the record developed at trial, their motion papers strongly suggest otherwise by explicitly disputing the court's findings. NYCQAL's submissions take issue with the court's findings regarding the costs of Plaintiff's proposed relief: "While the Court found that the overall cost to the State will be no greater for residents in supported housing beds as opposed to adult home beds . . ., a finding with which NYCQAL strongly disagrees, the fact is that payments to adult homes, as opposed to outside medical providers, are far less than those to supported housing providers." (Sommer Aff. ¶ 28.) ESAAL expresses the intention to dispute whether private-pay residents are part of Plaintiff's constituency and to challenge the court's determination as to which adult homes are impacted. (See Newcomb Aff. ¶¶ 8, 20-23.) These statements evidence a willingness to disregard the findings of the court in this action, which

9

would further delay the remedial proceedings. In light of these considerations, the court is convinced that delay that would be occasioned by the post-trial intervention of the adult homes would be highly prejudicial to the existing parties.

**C.      Prejudice to ESAAL and NYCQAL**

Although the adult homes may be prejudiced if intervention is denied, the court is not sympathetic to their self-created plight. Knowing full well what was at stake in this litigation, the adult homes sat on their rights for six years, hoping that Defendants would prevail and that the case would simply go away. They made the tactical decision to litigate "on the cheap" by sitting on the sidelines, apparently planning to parade into court at the eleventh hour should the proceedings conclude unfavorably. Thus, any prejudice to the adult homes "resulting from the denial of intervention may be attributed to their own failure to seek intervention when they first had reason to become aware" of their interests in the action. Yonkers, 801 F.2d at 595.

Moreover, the degree of prejudice is mitigated in this case. To the extent that the adult homes have legally protectable interests in their State funding, contracts, or operating certificates, nothing prevents them from vindicating these interests in another forum. For example, New York law provides hearing and appeal procedures and a state forum for challenging the revocation of an operating certificate. See N.Y. Soc. Serv. Law §§ 460-d, 461-b. Furthermore, the adult homes have not been denied the opportunity to be heard in this matter. The court has granted ESAAL and NYCQAL amicus curiae status so that they may provide input to the Court regarding an appropriate remedial plan. (See Order (Docket Entry #389).) Thus, the harms the adult homes face as a result of their untimely motion are significantly mitigated in this case.

### D. Unusual Circumstances

NYCQAL argues that the intervention of the United States is an unusual circumstance that weighs in favor of allowing the adult homes to intervene. (NYCQAL Motion 11-12.) They point out that the United States "has asserted a vested interest in ensuring that this Court fashions a remedy consistent with the United States' interpretation of the integration regulation," and "has expressed its view that this case may serve as a model for other courts in similar cases." (Id. at 11.) NYCQAL expresses concern that "this Court's relief may ultimately be used as a springboard to pursue similar relief in other homes, or for other residents of the same homes" and that this is exactly what the United States intends. (Id. at 12.)

The fact that the court's decision in a case may have precedential consequences, however, hardly constitutes an unusual circumstance. Perhaps the true concern animating this argument is the fear that the United States will seek to broaden the potential scope of the remedy in this case. Whether or not this might constitute an unusual circumstance in some other context, in this case the fear is unfounded. Rather than putting forth its own remedial plan, the United States has expressed its support for Plaintiff's plan – the same plan described in the court's September 8 Order. (See United States' Memorandum (Docket Entry #385) ("Thus, the United States supports the Plaintiff's proposed remedial plan and objects to Defendants' remedial plan.").) In this context, the intervention of the United States is not an unusual circumstance favoring intervention.

### E. Timeliness

Considering all the factors set forth above, the court concludes that ESAAL and NYCQAL's motions to intervene in this case are not timely and must be denied.[13] After six

---

[13] NYCQAL argues that it would be unfair for the court to allow the United States to intervene, but not allow intervention by the adult homes. The argument fails to apprehend salient differences between the adult homes'

11

years of litigation, the court determined that DAI's constituents are entitled to a remedy, and permitting intervention by the adult homes at this late juncture would unnecessarily delay a remedial plan that is long overdue. Absent intervention, the harm facing the adult homes is largely of their own making. They were fully aware of this litigation and the possible consequences to their interests should Plaintiff prevail, yet they made the conscious decision not to seek intervention until after the court found liability. Faced with "the choice between the possibility of harm to the late-arriving prospective intervenors as against the possible harm to parties who have participated diligently during the pertinent portions of this litigation, it does not strike [the court] as unjust that intervention on the part of the late-arrivers must yield" under the circumstances. Yonkers, 801 F.2d at 596. Therefore, the court finds the motions to be untimely and therefore denies intervention as of right under Rule 24(a).[14] For the same reasons, the court denies permissive intervention under Rule 24(b), which also requires a timely motion.[15] See Fed. R. Civ. P. 24(b)(1) (allowing the court to permit intervention under certain circumstances "[o]n timely motion").

---

motions and the United States' motion. As the court noted in granting that motion, "intervention by the United States will not prejudice the original parties or unduly delay the proceedings concerning the appropriate injunctive remedy to be imposed." (U.S. Order 4.) Tellingly, neither party objected to the intervention of the United States. Moreover, unlike the adult homes, who are seeking to relitigate already-decided issues at the remedial stage, the United States "explicitly adopts the court's prior factual findings and legal conclusions in this case." (Id.) Nor does the intervention of the United States inject collateral issues into the case; it has merely lent its support to the remedy proposed by Plaintiff. In short, the court's decisions regarding intervention are neither inconsistent nor unfair: the court granted intervention when it would not prejudice the rights of the existing parties to the action.

[14] Having denied intervention as of right on timeliness grounds, the court need not consider the other requirements under Rule 24(a). As noted at the outset, failure to satisfy even one requirement defeats a claim to intervention as of right. Butler, 250 F.3d at 176.

[15] Even leaving aside timeliness, permissive intervention would be denied. In deciding a motion for permissive intervention, the "principal consideration set forth in the Rule is whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." United States Postal Svc. v. Brennan, 579 F.2d 188, 191 (2d Cir. 1978) (internal quotation marks omitted). As set forth above, the court finds that allowing intervention would be highly prejudicial to the existing parties.

## III. CONCLUSION

For the reasons set forth above, ESAAL and NYCQAL's respective motions to intervene are DENIED.

SO ORDERED.

<table>
<tr><td>Dated: Brooklyn, New York<br>December 23, 2009</td><td>__/s/ Nicholas G. Garaufis__<br>NICHOLAS G. GARAUFIS<br>United States District Judge</td></tr>
</table>