UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

DISABILITY ADVOCATES, INC.,

                        Plaintiff,

    and

THE UNITED STATES OF AMERICA,

                        Plaintiff-Intervenor

    -against-

DAVID A. PATERSON, in his official
capacity as Governor of the State of New
York, RICHARD F. DAINES, in his official
capacity as Commissioner of the New York
State Department of Health, MICHAEL F.
HOGAN, in his official capacity as
Commissioner of the New York State Office
of Mental Health, THE NEW YORK STATE
DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

                        Defendants.
----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

03-CV-3209

NICHOLAS G. GARAUFIS, United States District Judge.

      In 2003, Plaintiff Disability Advocates, Inc. ("DAI") brought this action on behalf of individuals with mental illness residing in, or at risk of entry into, "impacted adult homes" in New York City.[1] (See Compl. (Docket Entry #1).) Adult homes are for-profit residential adult care facilities licensed by the State of New York (the "State"). Following six years of litigation and an

---

[1] In this litigation, "impacted adult homes" refers to those adult homes with more than 120 beds and in which twenty-five residents or 25% of the resident population (whichever is fewer) have a mental illness.

1

eighteen-day bench trial, this court found that Defendants "denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs," and that these actions constitute discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 791 et seq. (Mem. and Order dated Sept. 8, 2009 (Docket Entry #341) ("Sept. Order") at 3.) The court assumes familiarity with that order. Although the court found that Plaintiff is entitled to injunctive relief, it directed briefing from the parties regarding the particular remedy to be imposed. (Id. at 208.)

Once a district court has found a violation of federal law, the scope of its "equitable power to remedy past wrongs is broad." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971). At the same time, principles of federalism compel a "proper respect for the integrity and function of local government institutions" in imposing a remedy. Missouri v. Jenkins, 495 U.S. 33, 51 (1990); see also Schwartz v. Dolan, 86 F.3d 315, 319 (2d Cir. 1996). Such respect does not, however, "require a court to adopt wholesale the local government's choice of remedies." United States v. Yonkers Bd. of Educ., 29 F.3d 40, 43.

Cognizant of these federalism concerns and seeking to avoid unnecessary intrusion upon the State's governance of its mental health system, the court provided Defendants an opportunity to come forward with their own proposal for remedying the civil rights violations found by the court. The court explained that Defendants' remedial proposal should be consistent with the findings of fact and conclusions of law set forth in the September Order. (Sept. Order 207.) In spite of that directive, Defendants' proposal neither affords an adequate remedy to Plaintiff's constituents, nor is it consistent with the court's findings. For the reasons that follow, the court

rejects Defendants' lackluster proposal, adopting instead Plantiff's proposal, with minor modifications.

I.  **PROBLEMS WITH DEFENDANTS' REMEDIAL PROPOSAL**

Rather than complying with the court's instructions, Defendants have submitted a proposal that scarcely begins to address the violations identified by the court. Worse still, many aspects of their proposal directly contradict the court's explicit findings of fact made after trial. The court is disappointed and, frankly, incredulous that Defendants sincerely believed this proposal would suffice: their proposed remedy is so egregiously deficient as to arouse suspicion that Defendants submitted the proposal knowing full well that the court would have to reject it, thereby raising a question as to their good faith. Some of the most glaring deficiencies are discussed below.

A.  **Number of Supported Housing Units**

This court found that "virtually all" of Plaintiff's 4,300 constituents are not in the most integrated setting appropriate to their needs and are qualified for supported housing. (Sept. Order 3, 12, 67, 109.) Yet Defendants propose to create only 200 supported housing units per year over five years, for a total of 1,000 new units.[2] (Def. Proposal (Docket Entry #365) 7.) To justify their meager 200-units-per-year proposal, Defendants resurrect a number of arguments that were already rejected by the court in its September Order. They argue that the possibility of a more aggressive rate of development is foreclosed by the "current fiscal crisis," the needs of other populations, and the time required to develop new supported housing units. Even if more

---

[2] Defendants' proposal would provide additional supported housing should the State in its own discretion make all of the following determinations: (1) there is a "reasonable basis to believe" that the number of residents who are (a) "determined to be eligible and clinically appropriate" and (b) "determined to have completed any required training" will exceed the number of housing units available; (2) there is state funding available; (3) that state funding is not needed for other demands; and (4) there is no member of another "priority population" who is also seeking supported housing. (Def. Proposal ¶ 2(e).) Plaintiff's constituents should not hold their breath waiting for the stars to align in this unlikely manner, however.

3

could be done, they argue, it would be unnecessary because, contrary to the court's finding, far less than "virtually all" of Plaintiff's constituents will actually be qualified and willing to move to supported housing.

According to Defendants, developing 1,500 units per year is simply "not feasible," given the "current fiscal crisis." (Def. Mem. (Docket Entry #368) 8.) But the court has already considered and rejected this argument, finding that "Defendants did not present any evidence showing a nexus between the current state of the economy and the specific relief DAI seeks" and that Defendants did not demonstrate that the "current economic circumstances have impacted the State's ability to develop supported housing, which requires no outlay of capital." (Sept. Order 198.) Moreover, the court concluded that the evidence at trial showed that "serving DAI's constituents in supported housing rather than Adult Homes would not increase costs to the State." (Id. at 152.) On the contrary, doing so would save money – on average $146 dollars per resident annually, (id. at 193), a finding which Defendants doggedly refuse to accept.[3] (See Def. Mem. 8 ("Defendants hereby preserve their position that moving individuals from adult homes to supported housing will not be cost neutral or result in savings, in Medicaid costs or otherwise."); see also Hayes Aff. (Docket Entry #367) ¶¶ 5-7, 9-10 (ignoring, in computing cost of remedy, cost savings found by the court).)

As a second justification for their proposal, Defendants argue that developing more than the 200 supported housing units per year they propose will impede the State's ability to meet the needs of other populations, thus constituting a "fundamental alteration." (Def. Mem. 7-9 (citing Olmstead v. L.C., 527 U.S. 581, 604 (1999)).) Again, however, the problem with this argument

---

[3] Although Defendants are free to contest these findings on appeal, doing so in this court under the guise of preserving arguments for appeal is disingenuous. Moreover, by submitting a plan premised on factual assumptions already explicitly rejected by this court, Defendants ignored the court's instructions that their proposal must accept the court's factual findings. (See Sept. Order 207.)

is that it proceeds from the false assumption, already rejected by the court, that moving adult home residents to supported housing will increase costs to the State. Furthermore, Defendants unsuccessfully presented this fundamental alteration argument at trial. (See Sept. Order 128-203.) As the court found, the evidence at trial did not show that Plaintiff's requested relief would force the State to "cut back on services to other needy populations" or "prejudice others who seek supported housing." (Id. at 181.) Defendants cannot now relitigate the matter in their remedial submission.

Defendants' argument that it is incapable of developing more than 200 units per year is similarly meritless. Although Defendants point to the "difficulty of finding that number of affordable housing units in that amount of time," (Def. Mem. 8), the court credited expert testimony from Dennis Jones establishing that the State is capable of developing supported housing units "at a rate of approximately 1,500 per year for several years" and that, even in the New York City real estate market, "a sufficient number of units of appropriate housing" could be identified to achieve that rate of development.[4] (Sept. Order 182-83.)

Thus, all the justifications Defendants now raise for offering such a meager proposal were previously considered and rejected by the court and are plainly inconsistent with the court's findings of fact. Stripped of these excuses, which were foreclosed by the court's prior decision, Defendants neither adequately address the violations found by the court nor provide any good reason for failing to do so. This court found that "virtually all" of Plaintiff's 4,300 constituents – including those "who might have relatively high needs" – are qualified for supported housing

---

[4] Defendants also argue that a faster rate of development is not feasible because of the "time needed to educate, assess and prepare the residents to move" to supported housing. (Def. Mem. 8.) Defendants offer no explanation, however, as to why development of supported housing must be put on hold until after assessments and education have been completed. Plaintiff suggests, with some force, that this "timetable makes no sense except as a delay tactic." (Pl. Mem. (Docket Entry #390) 5 n.3.)

5

and are not opposed to moving to a more integrated setting. (Id. at 3, 12, 67, 109.) By contrast, Defendants' proposal would only provide 1,000 units of supported housing, and only after five years.[5] A proposal that affords a remedy to only 23% of those individuals whose civil rights are currently being violated is grossly inadequate.[6] Although Defendants have made it abundantly clear that they disagree with the court's finding,[7] they are not free to ignore it in crafting a remedial proposal.

### B. Education Regarding Supported Housing

Defendants' proposal is starkly inconsistent with the court's findings in its treatment of educating adult home residents about supported housing. As the court found, most adult home residents are unaware of housing alternatives to the adult homes and "the wide range of assistance that would be available to them in supported housing." (Id. at 117-18.) Comprehensive efforts to educate Plaintiff's constituents about supported housing, allowing them to make an informed choice, are crucial to a successful remedy. Defendants propose to provide a once-annual "educational opportunity" to each adult home resident in which some unidentified entity will discuss supported housing, supports and income available in supported housing, Defendants' process for determining eligibility, other housing alternatives, and resident

---

[5] Defendants point to the Adult Care Facilities Workgroup Report to argue that "only 800 persons across the State could live in independent settings," and to demonstrate that 1,000 units of supported housing is actually an extremely generous proposal. Even leaving aside the fact that the court already found that virtually all of Plaintiff's 4,300 constituents could move to independent settings, this is a bizarre line of argument. Apparently not content merely to disregard the court's factual findings, Defendants are now renouncing even their own prior factual assertions. Defendants already stipulated to a very different characterization of the Report in the Joint Pretrial Order submitted to the court: "A report issued by the Adult Care Facilities Workgroup in October 2002 proposed a timeline for moving at least 6,000 adult home residents with psychiatric disabilities from adult homes into supported housing by March 2009." (Joint Stipulations of Fact (Docket Entry #260) ¶ 13.)

[6] Even Defendants' own expert, Dr. Geller, "conceded that 29% of current Adult Home residents in his sample could go to supported housing without ancillary services." (Sept. Order 174.) Presumably, that percentage would be even higher if ancillary supports were provided.

[7] (Def. Mem. 8 ("Defendants also wish to preserve their argument that substantially fewer than "virtually all" residents are both qualified for and interested in supported housing."); see also id. at 6-7 (marshalling evidence presented at trial in an attempt to reargue this point).)

rights. (Def. Proposal 2-3.) The idea that this token effort would sufficiently educate adult home residents is unsupported by the evidence, not to mention common sense.

Spending long periods of time in an institutional setting like an adult home fosters "learned helplessness" and makes residents "highly reluctant to move on, even if they are capable of living independently." (Sept. Order 124.) As Plaintiff rightly points out, comprehensive education about supported housing must consist of more than merely providing factual information to adult home residents. Crucially, the process "must include efforts to build trust, to emphasize strengths, and to encourage the exercise of informed choices" in order to adequately address the court's findings "concerning the learned helplessness and fears instilled in many DAI constituents, the homes' discouragement of residents from leaving, and residents' lack of awareness of housing alternatives and the availability of services in supported housing." (Pl. Mem. (Docket Entry #390) 15.) Adult home residents will likely require multiple meetings or discussions, and perhaps even trips to see what supported housing apartments look like, in order to address their specific concerns and help them to overcome their fear of leaving the institution. (See Sept. Order 124-26.) Defendants' proposal for a once-a-year "educational opportunity" cannot hope to address the significant barriers to change found by the court.

C.     Criteria for Assessing Eligibility

Defendants' propose unduly restrictive criteria to determine who will be permitted to move to supported housing. Specifically, Defendants attempt to limit eligible residents to those who have minimal needs. (See Def. Proposal 7.) Defendants' envisioned evaluation process, and indeed their proposal's very definition of supported housing, relies on a notion squarely rejected by the court after the trial: that supported housing offers only "a minimum level of housing-related support services" and is intended only for those "who are able to maintain their

7

living environment, shop and prepare meals, and manage their medications without ongoing assistance." (Id.) In the September Order, the court found that the evidence contradicted Defendants' contentions that "supported housing is only for those with 'minimal' support needs," and that "to live in supported housing, individuals must be capable of seeking assistance and taking their medication independently, . . . must be able to 'meet their own daily needs' and must 'maintain their apartment' with 'minimal assistance.'" (Sept. Order 70-71.) Rather, as the court found, supported housing targets individuals with mental illness who have "significant needs." (Id. at 65.)

Even as Defendants improperly propose to provide supported housing only to those needing minimal support, they seek to exclude individuals whose mental illness is not sufficiently severe. (Def. Proposal 3-4.) Defendants' proposal would disqualify any resident they determine not to have a "serious mental illness," based on a number of criteria set forth in their proposal. (Id.) Consistent with the court's prior order, however, the remedy in this case must be directed at "individuals with mental illness residing in, or at risk of entry into, [impacted] adult homes in New York City." (Sept. Order 2.) The court did not limit the individuals who are entitled to relief to those with "serious mental illness," and certainly never ruled on any such criteria for making that determination.

Finally, Defendants' eligibility determination proposal contradicts the court's findings by requiring some residents to complete training before they can become eligible for supported housing. Defendants assert that many residents must undergo training in the use of public transportation, medication and money management, shopping, or cooking before they can be allowed to move to supported housing. (Def. Proposal 5-6; Def. Mem. 5.) The court is very familiar with this argument, having heard it at trial and rejected it as unsupported by the

8

evidence. (Sept. Order 100-101 (finding that the notion that residents must be "taught independent living skills in the Adult Home before moving to more independent settings is contradicted by the weight of the evidence").) At trial, witnesses for both sides "testified that independent living skills cannot effectively be taught in institutional or congregate settings, because the individuals are unable to practice the skills that are taught." (Id.) Indeed, individuals living in supported housing often receive assistance with the very daily living activities that Defendants insist must be mastered before moving to supported housing. (See id. at 54 (noting that the Pathways supported housing program "routinely and successfully helps people overcome difficulties with activities of daily living such as laundry, cooking, or using public transportation, and does not regard such challenges as 'difficult issues' to deal with".) Thus, there is no need to delay residents' eligibility for supported housing in order to provide training that the court has found to be unnecessary and ineffectual.

### D. Contingencies

Although Defendants' proposal provides little in the way of a remedy, what little it does promise to provide is entirely contingent upon numerous factors, most notably passage by the New York State Legislature of budget legislation. (Def. Proposal 6, 9; Def. Mem. 8 n.5.) This is simply unacceptable. Even assuming – contrary to the court's factual findings – that serving Plaintiff's constituents in supported housing rather than adult homes would ultimately increase costs to the State, that would not provide Defendants with a legal excuse for failing to comply. See Milliken v. Bradley, 433 U.S. 267, 290 (1977) (holding that federal courts may impose the costs of securing prospective compliance with a remedial order upon the States); Spallone v. United States, 493 U.S. 265, 276 (1990) (finding that court properly imposed contempt sanction against local government for failure to secure legislative approval of plan to remedy residential

housing discrimination); Helen L. v. DiDario, 46 F.3d 325, 338 (3d Cir. 1995) (The state may not rely on a funding mechanism of the legislature "to justify administering its attendant care program in a manner that discriminates" in violation of the ADA.). This court will not approve a remedial plan that gives the New York State Legislature permission to decide that the State need not comply with federal law.

E.     **Future Adult Home Residents**

In order to fully remedy the civil rights violations found by the court, the remedial plan must provide for future adult home residents. Measures must be put in place to ensure that "when current Adult Home residents move to supported housing, the institutions will not be 'backfilled' with similar individuals who, if fully informed, would choose instead to receive services in supported housing." (Pl. Mem. 24.) Of course, this requires that Defendants develop sufficient supported housing capacity to accommodate these individuals. Otherwise, the same violations of the ADA and RA found by this court – after six years of litigation – will inevitably recur.

Defendants' proposal would not create any supported housing for future adult home residents who desire such placement. Rather, Defendants propose merely to notify individuals with mental illness, prior to their admission to an adult home, that this court has ruled that impacted adult homes are not the most integrated setting available. (Def. Proposal 9-11.) Defendants would require that any such persons sign a waiver to the effect that they have knowingly chosen to live in an adult home rather than supported housing. (Id.) Since no additional supported housing would be developed for these individuals under Defendants' proposal, however, the true choice presented would not be between an adult home or supported housing, but rather between entering an adult home or ending up on the street.

It is unspeakable that Defendants would propose a remedy that legitimizes, rather than cures, ongoing civil rights violations. Their proposal would force mentally ill individuals to choose between preserving their rights under the ADA and having a place to live. For future adult home residents, this is no remedy at all. In order to rectify the violations found by the court, Defendants must change the way they manage their mental health services so that Plaintiff's constituents have the choice – a real and meaningful choice – to receive the services to which they are entitled in supported housing instead of an adult home.

## II. DISCUSSION

Having been given the opportunity to propose a suitable remedial plan, the State had an obligation to "come forward with a plan that promises realistically to work, and promises realistically to work now." Yonkers, 29 F.3d at 43. Where the State has missed the mark and "failed to come forward with a reasonable plan or remedy," a court-devised solution may be imposed instead. Dean v. Coughlin, 804 F.2d 207, 214 (2d Cir. 1986); see also Schwartz, 86 F.3d at 319 (holding that a court-devised solution should be imposed "only if the state plan proves to be unfeasible or inadequate").

In this case, the State has failed abjectly. Defendants' proposal is neither reasonable nor adequate. The proposal brazenly ignores the court's factual findings and overtly attempts to relitigate issues lost at trial, in defiance of the court's explicit instructions. What Defendants' proposal lacks in subtlety, it more than makes up for in its inadequacy. First and foremost, it simply fails to address the civil rights violations found by the court. Defendants propose to provide supported housing for only a small fraction of Plaintiff's constituents, make only token efforts to educate adult home residents about supported housing, and impose unduly restrictive criteria to determine which residents are eligible to move. As if failing to provide a meaningful

11

remedy for current adult home residents were not bad enough, Defendants also make absolutely no provision of supported housing for potential future adult home residents, ensuring that the violations found by the court will inevitably recur. Surely Defendants cannot seriously believe that this proposal is consistent with the findings of fact and conclusions of law set forth in the court's extensive September Order.

By contrast, Plaintiff has taken the court's Order seriously and proposed a remedy that fully addresses the civil rights violations proven at trial, a plan to which Plaintiff-Intervenor United States has lent its full support. Plaintiff proposes that Defendants be required to develop at least 1,500 supported housing units per year until there is sufficient capacity for all of Plaintiff's constituents who desire such housing, and no fewer than 4,500 units in total. (Pl. Proposal (Docket Entry #390) 3-4.) Plaintiff further proposes that supported housing providers be identified and awarded contracts to provide housing and supports. (Id. at 4-5.) These providers would then conduct "in-reach"[8] to residents of adult homes to comprehensively educate them about their choices and to explore the types of services and supports each resident would need to be successful in supported housing. (Id.) These providers would be best positioned to determine if any residents have characteristics that might prevent them from successfully living in a more independent setting. (See id. at 6; Pl. Mem. 19-20.) Plaintiff's proposal provides a full remedy for all the victims of discrimination in this case – both current and future adult home residents – and contains none of the contingencies proposed by Defendants. As set forth above and thoroughly described in the briefs of Plaintiff and Plaintiff-Intervenor, Plaintiff's plan is consistent with this court's findings regarding the scope of relief

---

[8] "In-reach" refers to the process of going into the adult homes and developing relationships with residents to build trust and actively support these individuals in moving to supported housing.

that is feasible, realistic, and necessary to correct the violations of the ADA and RA found by the court.

Accordingly, the court rejects Defendants' proposal as unreasonable and inadequate, and adopts Plantiff's proposal with minor modifications, as set forth in the court's separate Remedial Order and Judgment. At the suggestion of Plaintiff and Plaintiff-Intervenor, and over the objection of Defendants, the court will appoint a Monitor to oversee compliance with the Remedial Order. Appointment of a Monitor is appropriate given the complexity of the case and the vulnerable population at issue. See, e.g., Juan F. v. Weicker, 37 F.3d 874, 876 (2d Cir. 1994) (affirming the appointment of a monitor "because of the difficult issues involved, as well as the importance to the plaintiff class of enforcing the decree"). The factual record is extremely voluminous, (see Sept. Order 4-5), the remedy will affect thousands of mentally ill individuals, and implementing the remedial order will require coordination of efforts by the Office of Mental Health, the Department of Health, the Governor's Office, and the supported housing providers who are awarded contracts. Defendants' demonstrated resistance to the remedy, as evidenced by their refusal to abide by the court's findings in crafting their patently inadequate proposal, further highlights the need for a Monitor in this case. See Nat'l Org. for the Reform of Marijuana Laws v. Mullen, 828 F.2d 536, 542 (9th Cir. 1987) (holding that "the prospect of noncompliance is an 'exceptional condition' that justifies reference to a master"). In this instance, referral to a Magistrate Judge would not suffice. Rather, successful implementation of the remedy will require the attention of a dedicated expert who is experienced in the development, management, and oversight of community programs serving people with mental illness.

## III. CONCLUSION

As set forth above, Defendants' remedial proposal is rejected. The court instead adopts Plaintiff's proposal with minor modifications, as embodied in the court's separate Remedial Order and Judgment.

SO ORDERED.

Dated: Brooklyn, New York  
       March 1, 2010

                                                                    /s/ Nicholas G. Garaufis  
                                                                    NICHOLAS G. GARAUFIS  
                                                                    United States District Judge