UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

DISABILITY ADVOCATES, INC.,

                        Plaintiff,

     and

THE UNITED STATES OF AMERICA,

                        Plaintiff-Intervenor

     -against-

DAVID A. PATERSON, in his official capacity as Governor of the State of New York, RICHARD F. DAINES, in his official capacity as Commissioner of the New York State Department of Health, MICHAEL F. HOGAN, in his official capacity as Commissioner of the New York State Office of Mental Health, THE NEW YORK STATE DEPARTMENT OF HEALTH, and THE NEW YORK STATE OFFICE OF MENTAL HEALTH,

                        Defendants.
----------------------------------------------------------------------X

**AMENDED MEMORANDUM & ORDER**

**03-CV-3209**

NICHOLAS G. GARAUFIS, United States District Judge.

      In 2003, Plaintiff Disability Advocates, Inc. ("DAI") brought this action on behalf of individuals with mental illness residing in, or at risk of entry into, "impacted adult homes" in New York City.[1] (See Compl. (Docket Entry #1).) Adult homes are for-profit residential adult care facilities licensed by the State of New York (the "State"). Following six years of litigation and an

---

[1] In this litigation, "impacted adult homes" refers to those adult homes with more than 120 beds and in which twenty-five residents or 25% of the resident population (whichever is fewer) have a mental illness.

eighteen-day bench trial, this court found that Defendants "denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs," and that these actions constitute discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 791 et seq. (Mem. and Order dated Sept. 8, 2009 (Docket Entry #341) ("Sept. Order") at 3.) The court assumes familiarity with that order.

Before imposing a remedy, the court provided Defendants an opportunity to come forward with their own proposal for remedying the civil rights violations found by the court. (Id. at 207.) Instead of making a good faith proposal, Defendants offered a plan that scarcely began to address these violations and which, in many respects, directly contradicted the court's explicit findings of fact made after trial. (See Mem. and Order dated Mar. 1, 2010 (Docket Entry #406) 3-11 (highlighting the proposal's most glaring deficiencies).) By contrast, Plaintiff proposed a plan that would provide a full remedy to all the victims of discrimination in this case, a plan to which Plaintiff-Intervenor United States lent its full support. (See id. at 12-13.) Consequently, the court rejected Defendants' proposal as "unreasonable and inadequate," and adopted Plaintiff's proposal with minor modifications, (id. at 13), as set forth in the court's Remedial Order and Judgment (Docket Entry #405).

Currently before the court is Defendants' motion for a stay pending appeal of the Remedial Order and Judgment. (Letter dated Mar. 4, 2010 (Docket Entry #408) ("Def. Motion").) Both Plaintiff and Plaintiff-Intervenor oppose this request. (See Letter dated Mar. 8, 2010 (Docket Entry #410) ("Pl. Opp."); Letter dated Mar. 8, 2010 (Docket Entry #411) ("U.S. Opp.").)

**I.     DISCUSSION**

A party seeking a stay pending appeal under Rule 62(c) of the Federal Rules of Civil Procedure bears a "difficult burden." United States v. Private Sanitation Indus. Ass'n, 44 F.3d 1082, 1084 (2d Cir. 1994). Four factors are relevant in determining whether to grant a stay pending appeal: substantial injury to the party opposing a stay if one is issued, irreparable injury to the movant if a stay is denied, the likelihood of success on the merits on appeal, and the public interest. See Hilton v. Braunskill, 481 U.S. 770, 776 (1987); see also In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 170 (2d Cir. 2007). The factors should be considered on a "sliding scale," such that a greater showing on one excuses a lesser showing on another. Thapa v. Gonzales, 460 F.3d 323, 334-35 (2d Cir. 2004). In this case, the factors weigh in favor of denying a stay.

**A.     Substantial Injury to Plaintiff**

Virtually all of Plaintiff's 4,300 constituents are not in the most integrated setting appropriate to their needs, as the ADA requires. Rather, they are being warehoused in adult homes – an ongoing violation of their civil rights. These individuals – as well as any individuals who become Plaintiff's constituents in the near future – will suffer substantial harm every day that they remain unnecessarily institutionalized in the adult homes. Just since this lawsuit began, Plaintiff's constituents have already waited over six years for redress of these longstanding violations. Even under the court's remedial order, full relief will take at least four years more. A stay of the remedial order would only further prolong the harm to Plaintiff's constituents, who the court found are entitled to relief after a full trial on the merits.[2]

---

[2] Amicus New York Coalition for Quality Assisted Living ("NYCQAL"), a non-profit trade organization representing many of the adult homes at issue, argues that other harms will flow to Plaintiff's constituents if a stay is denied. (See Letter dated Mar. 5, 2010 (Docket Entry #409) 1-2.) According to NYCQAL, moving residents to supported housing as the court has ordered will result in some inappropriate placements, creating a risk for those

Defendants argue that this harm is mitigated by the fact that "even absent implementation of this Court's order, residents are free to apply for supported housing and to move out of adult homes." (Def. Motion 2.) According to Defendants, the "record evidence indisputably demonstrates" that some adult home residents have been able to move to supported housing in the past. (Id.) Perhaps Defendants are referring to the 60 supported housing beds that the New York State Legislature <u>forced</u> them to set aside for adult home residents.[3] Beyond this one-time legislative set-aside, "only about 30 adult home residents have moved to supported housing since January 2000." (Mem. and Order dated Sept. 8, 2009 (Docket Entry #341) 201.) This means that over the last ten years, three individuals per year, on average, have been able to leave adult homes for supported housing. This rate of supported housing placement hardly mitigates the substantial injury to Plaintiff's 4,300 constituents caused by their continued unnecessary institutionalization in adult homes.

**B.     Irreparable Harm to Defendants**

In stark contrast to the ongoing civil rights violations suffered by Plaintiff's constituents, the irreparable harm Defendants claim they face absent a stay is purely financial and administrative. (See Def. Motion 2.) Of course, any large-scale remedy will entail some such burdens – though the claimed financial harm is extremely dubious given the court's finding that

---

individuals and those around them, and will force some adult homes to close. Although the court only granted NYCQAL amicus curiae status for the limited purpose of submitting briefs regarding its views on the proposed remedial plans, (Mem. and Order dated Dec. 23, 2009 (Docket Entry #400) 2), the court nevertheless will briefly address NYCQAL's concerns. The court does not agree that placements will pose risks to Plaintiff's constituents or those around them, since individuals who are found to pose a danger to themselves or others will be disqualified from moving to supported housing under the court's remedial order. Furthermore, even if NYCQAL's dire predictions come to pass and some adult homes close, these changes will not occur overnight. Under the court's remedial order, the issuance of Requests for Proposals ("RFP's") to identify supported housing providers may take as long as 120 days, and perhaps longer if the court must resolve disputes. Until providers are awarded contracts, they will not be able to begin to assess which residents are qualified to move and desire to do so, a process which must be conducted one resident at a time.

[3] "This initiative was imposed on [the Office of Mental Health ("OMH")] by the Legislature; OMH did not request it." (Mem. and Order dated Sept. 8, 2009 (Docket Entry #341) 19 n.50.)

the remedy will save the State about $146 per resident per year – but these are relatively trivial harms compared to those facing Plaintiff's constituents. To elevate Defendants' interest in avoiding budget woes and administrative difficulties above the civil rights of persons with mental illness would require an extremely strong likelihood of success on the merits on appeal, see Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002), a situation not present in this case.

### C. Likelihood of Success on the Merits

Defendants have failed to show that they are likely to succeed on the merits. The outcome in the case was not a close call; the evidence was overwhelming. Nevertheless, Defendants argue that this case presents significant legal issues warranting a stay. (Def. Motion 2.) Setting aside their importance, which has no bearing on the likelihood of a successful appeal, none of the legal issues Defendants raise suggest a strong possibility of success on the merits.

Defendants argue that the applicability of the ADA's integration mandate to cases where a state's service system relies on privately operated facilities is an open question in this Circuit. (Def. Motion 2.) While it is true that the Second Circuit has not had the opportunity to address this question until now, numerous other courts have applied the ADA's integration mandate to situations where a state uses private entities in meeting its obligation to deliver services to people with disabilities. See, e.g., Radaszewski v. Maram, 383 F.3d 599, 614 (7th Cir. 2004); Townsend v. Quasim, 328 F.3d 511 (9th Cir. 2003); Fisher v. Okl. Health Care Auth., 335 F.3d 1175, 1179 (10th Cir. 2003); Helen L. v. DiDario, 46 F.3d 325, 328 (3d Cir. 1995); Martin v. Taft, 222 F. Supp. 2d 940, 981 (S.D. Ohio 2002); Roland v. Celluci, 52 F. Supp. 2d 231, 237 (D. Mass. 1999).[4] Tellingly, Defendants do not identify even one case that supports their reading of the ADA. Thus, even though

---

[4] The court provided a more detailed analysis of these cases in ruling on the parties' cross-motions for summary judgment. (See Mem. and Order dated Feb. 19, 2009 (Docket Entry #232) 43-44.)

the Second Circuit has yet to resolve the issue, the vast weight of authority supports the court's ruling.

Defendants also argue that whether adult homes constitute an integrated setting turns upon interpretation of the federal regulation's definition of integration. (Def. Motion 2.) They offer neither reason nor authority, however, to suggest that this court interpreted the regulation incorrectly. Furthermore, they completely ignore the fact that Plaintiff-Intervenor United States "fully supports this Court's conclusions." (U.S. Opp. 1.) Since the United States Department of Justice's interpretation of the ADA integration regulation is entitled to deference, Bragdon v. Abbott, 524 U.S. 624, 646 (1998), its support of the court's interpretation weighs heavily against Defendant's likelihood of success on appeal.

As discussed above, the factors must be considered on a "sliding scale." Thapa, 460 F.3d 334-35. If a stay is granted, Plaintiff's constituents face continuing unnecessary institutionalization, while, absent a stay, Defendants face merely administrative inconvenience and questionable financial harm. In such a case, the injury prongs of the test weigh heavily against Defendants and their burden on the "likelihood of success" prong is proportionally higher. Mohammed, 309 F.3d at 101. Defendants' two weak arguments as to why they are likely to succeed on appeal do not even come close to meeting that burden.

### D. Public Interest

Considering the public interest only further tips the scale against Defendants. As Plaintiff rightly argues, "the public has a strong interest in the prompt remediation of systemic discrimination against a vulnerable population." (Pl. Opp. 5 (citing Kathleen S. v. Dep't of Pub. Welfare, 10 F. Supp. 2d 476, 481 (E.D. Pa. 1998)).) That interest is even greater when the discrimination is longstanding. This case has already been pending for over six years, and implementing the remedy, even without a stay, will take at least four more. Moreover, the public

interest disfavors any delay in realizing the substantial cost savings that will flow from the remedial order at both the state and federal levels – $7,693 annually per resident. (Mem. and Order dated Sept. 8, 2009 at 168.)

Against these weighty interests, Defendants assert only "the public interest in not unduly interfering in the operations of State government." (Def. Motion 3.) The court has been sensitive to federalism concerns throughout the remedial process, which is why Defendants were given an opportunity to propose a remedy. Unfortunately, Defendants did not take that opportunity seriously and instead offered a proposal that was so "egregiously deficient" that the court was forced to question their good faith in making the submission. (Mem. and Order dated Mar. 1, 2010 at 3.) Having failed to come forward with a reasonable plan, Defendants cannot now assert the public interest, citing undue interference with State governance, where such interference directly results from their own failure to offer a good faith remedial proposal.

## II. CONCLUSION

As set forth above, if a stay is granted, Plaintiff's 4,300 constituents face continuing and unnecessary institutionalization in adult homes, while Defendants face only administrative and financial burdens absent a stay. Furthermore, Defendants have failed to raise even a small likelihood of success on appeal and the public interest clearly favors swift implementation of the remedial order. Accordingly, Defendants' motion for a stay pending appeal is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
       March 11, 2010

    /s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge